UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CASE NO. 22-CR-184 (DLF) |
| v. : | |
| : | |
| BARRY BENNET RAMEY, : | |
| : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO REVOKE DETENTION ORDER AND FOR PRETRIAL RELEASE**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this response in opposition to Defendant Barry Bennet Ramey's Motion to Revoke the Detention Order and for Pretrial Release.  (Def. Mtn., ECF No. 16.)  The defendant's pretrial detention is supported by clear and convincing evidence, no condition or combination of conditions would reasonably assure the safety of the community if the defendant were to be released, and his motion to revoke the detention order should be denied.

**FACTUAL BACKGROUND**

*January 6, 2021, Attack on the Capitol*

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the United States Capitol building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election.  With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol.  At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.  Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol;

1

however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows. Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

*Barry Ramey's Involvement in the Attack on the Capitol*

On January 6, 2021, Ramey met up with known members of the Proud Boys in Washington, D.C., near the Washington Monument.[1] Ramey was wearing knee pads and tactical body armor, including a vest, as shown in Exhibit 1.[2]

---

[1]   The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

According to information obtained by the FBI, Ramey was listed on a master list of Proud Boys members in Southern Florida. In Exhibit 1, Ramey is seen with known Proud Boy leader Joe Biggs.

[2]   For simplicity of the record, exhibits entered into evidence at the April 27, 2022, detention hearing in the Southern District of Florida will be identified herein by the same exhibit number used in that hearing.



*Screenshot from Exhibit 1, a video exhibit, showing Ramey wearing knee pads; his vest is visible beneath his black jacket*

Ramey and the Proud Boys whom he was with marched to the Capitol well ahead of the crowd that would later assemble on the grounds. They approached from the west and congregated at an area at the edge of Capitol grounds called Peace Circle, shown on the map below at the red circle marked "A":



*Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter*

At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with U.S. Capitol Police (USCP) officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the mob had breached a second manned police barrier and were flooding into the Lower West Plaza, (marked by the red oval labeled "B" on the above map), pushing against the barricade there. The Proud Boys were key instigators in this breach at Peace Circle.

Ramey and the Proud Boys whom he was with were among the first to reach the West Plaza, where they and a growing crowd of rioters surrounded Capitol Police and forced them to successively retreat. Exhibit 3, a video which appears to have been recorded around 1:30 p.m, shows Ramey at the front of the crowd, in close proximity to the Capitol building, near the base of the scaffolding covering the Northwest Stairs (area marked by the red oval labeled "C" on the above map). Exhibit 3 also shows Ramey attempting to don what appears to be a large, commercial-grade gas mask. Exhibit 4, an image, shows Ramey actually wearing the gas mask.



*Screenshot from Exhibit 3, showing Ramey attempting to don a gas mask*



*Screenshot from Exhibit 3, showing Ramey in the crowd near the base of the NW scaffolding and stairs*



*Exhibit 4 – an image showing Ramey wearing a large gas mask*

At the base of the Northwest Scaffolding and Stairs, a small contingent of Capitol Police was attempting to block rioters' access to the stairs, inhibiting their advance to the Upper West Terrace and the Capitol's access points.  As shown and explained Exhibit 5, which is a clip of a longer documentary video created by the New York Times,[3] the base of the Northwest Scaffolding and Stairs was a "crucial access point," thinly guarded because Capitol Police were so overwhelmed by the size of the mob on the West Front.  A group of rioters, including several known Proud Boys and Ramey, began to yell at these Capitol Police officers while they held the line at the base of the stairs, and then begin fighting the officers, as shown in Exhibit 5.

At approximately 1:48 p.m., Ramey attacked two of these Capitol Police officers.  Ramey first sprayed USCP Officer D.R. in the eyes with a chemical irritant that looks like pepper spray.  This assault is visible in Exhibit 5.

---

[3] *Available at* https://www.youtube.com/watch?v=jWJVMoe7OY0.



*Screenshot from Exhibit 5 showing Ramey pepper spraying USCP Officer D.R. as another rioter screams, "Take the Stairs!!" in the background*

Ramey's assault caused Officer D.R. to back up the stairs, losing ground against the advancing rioters. Seconds later, Ramey sprayed a second officer, USCP Officer B.W., who was also forced to fall back from the line as a result of Ramey's assault. This assault is also visible in Exhibit 5.[4]

Ramey's assaults on Officers D.R. and B.W. caused the officers to become disoriented and caused their vision to be impaired at a critical time and location in the riot. Moments after these assaults, rioters did indeed "take the stairs," breaching the thin line of police, then engaging police in a brutal battle for control of the Stairs. The rioters' victory on the Stairs ultimately led to the breach of the interior of the Capitol.

---

[4] A slowed down version of the end of Exhibit 5 was marked as Exhibit 6 and admitted at the April 27 detention hearing. Exhibit 6 has been provided to this Court as well.

*Intimidation Attempts*

On February 11, 2022, Special Agent Ryan Nougaret, the FBI case agent, left a business card with an associate of Ramey after attempting to speak with that person to obtain a third-party identification of Ramey. The next day, Agent Nougaret received a phone call from a Mr. Richard Barner, an attorney purporting to represent Ramey.

In early April of 2021, Agent Nougaret called Ramey's workplace to verify Ramey's employment. Agent Nougaret, without identifying himself, inquired of the person who answered the phone whether Ramey still worked there. That person put Agent Nougaret on hold and, after being on hold for a minute or two, Agent Nougaret hung up the phone. Agent Nougaret did not speak further with anyone at Ramey's place of employment.

A few days later, on April 8, 2022, Agent Nougaret received a phone call on his work cell phone from a "voice-over internet protocol" ("VOIP") phone number.[5] The caller asked, "Is this Ryan Nougaret?" mispronouncing Agent Nougaret's last name. The caller then recited Agent Nougaret's current home address. Agent Nougaret had recently reviewed a video in which Ramey speaks at length, and immediately recognized the caller's voice as that of Barry Ramey. Shortly after the call, Agent Nougaret received a text message on his work cell phone from the same VOIP number containing a string of digits. Agent Nougaret replied, "???" and the VOIP number texted back, "check that VIN." That VIN number was associated with a vehicle that Agent Nougaret used to own. When FBI agents executed the warrant for Ramey's arrest on April 20, 2022, Ramey said, "This is about the call, isn't it?" followed by, "Are you Ryan Nougaret?" using the same mispronunciation that the VOIP caller used.

---

[5]   A VOIP number can be used similar to a burner phone because it makes the caller more difficult to identify and/or trace.

As represented in police reports and TRO petitions filed against him, Ramey has similarly engaged in disturbing threatening conduct towards other individuals in the past. In March of 2014, a petition was filed by an individual complaining of repeated calls, texts, and verbal threats of violence directed towards the petitioner by Ramey. Another petition filed in November 2014 described an incident where Ramey came to the petitioner's apartment, took something from the petitioner, and asked the petitioner to fight him. The same petition described a second incident in which Ramey confronted the petitioner outside of his car, threatening to "teach [the petitioner] a lesson and break [his] face." A 2018 police report from Davie, Florida, describes Ramey's repeated attempts to contact the owner of a UPS store regarding his displeasure with the compensation received for a damaged package, including by repeatedly coming to the store, demanding to see the owner in person, and by contacting owner's adult son via Facebook, using an alias and posing as a friend trying to obtain the owner's personal phone number.

Finally, Ramey's employer was interviewed on the day of Ramey's arrest in connection with this investigation. The employer described Ramey as aggressive and argumentative, and that he (the employer) had contemplated firing Ramey. The employer reported that Ramey told him that he was at the Capitol on January 6. Ramey did not get into detail with his employer about his activities on January 6, but he did tell his employer that he previously attended a protest in Atlanta, Georgia, where he punched an "Antifa guy" in the face.

## PROCEDURAL BACKGROUND

Ramey was charged by complaint and arrested on April 20, 2022. A detention hearing was held in the Southern District of Florida, Hon. Alicia O. Valle, on April 27, 2022. The government moved for detention under 18 U.S.C. § 3142(f)(1)(A), (E) and 18 U.S.C. § 3142(f)(2)(B). The court ordered that Ramey be detained pretrial, finding by clear and convincing evidence that no

condition or combination of conditions would reasonably assure the safety of others and the community if Ramey were to be released.[6]

On May 25, 2022, a grand jury in the District of Columbia returned an indictment against Ramey on seven counts: 18 U.S.C. § 231(a)(3) (civil disorder); 18 U.S.C. § 111(a)(1) and (b) (assaulting, resisting, or impeding certain officers using a dangerous weapon); 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (entering and remaining in a restricted building or grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon); and 40 U.S.C. § 5104(e)(2)(F) (act of physical violence in the Capitol grounds or buildings).

## ARGUMENT

Pursuant to the Bail Reform Act (BRA), 18 U.S.C. § 3142 *et seq.*, the Court "shall order" that a defendant be detained pretrial if, after a hearing, the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention must be supported by clear and convincing evidence when the justification is the safety of the community, 18 U.S.C. § 3142(f), and preponderance of the evidence when the determination is based on risk of flight, *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).[7] Regardless of whether the defendant

---

[6] The magistrate judge's detention order and the April 27, 2022, transcript are attached to this filing.

[7] The BRA is "silent as to the level of proof required to establish a risk of flight," but the D.C. Circuit has held that a finding that a defendant is a risk of flight "need only be supported by

poses a flight risk, "danger to the community alone is sufficient reason to order pretrial detention." *United States v. Chrestman*, 525 F. Supp. 3d 14, 22 (D.D.C. 2021) (citing *United States v. Salerno*, 481 U.S. 739, 755 (1987)).

On a motion to revoke a detention order pursuant to 18 U.S.C. § 3145(b), this Court reviews the magistrate judge's detention order *de novo*. *See Chrestman*, 525 F. Supp. 3d at 23, 23 n.5 (noting that, while the BRA is silent on the standard of review of a magistrate judge's detention or release order and the D.C. Circuit has not addressed the question, the court would adopt the uniform conclusion of every circuit to have addressed the issue that the standard of review is *de novo*).

The government has moved for detention in this case on three grounds:

(1) Ramey is charged with a crime of violence (18 U.S.C. § 111(b)), 18 U.S.C. § 3142(f)(1)(A);

(2) Ramey is charged with a felony that is not a crime of violence that involves a dangerous weapon, 18 U.S.C. § 3142(f)(1)(E); and

(3) this case involves a serious risk that Ramey will obstruct or attempt to obstruct justice, or will threaten, injure, or intimidate (or attempt to do any of these) a prospective witness, 18 U.S.C. § 3142(f)(2)(B).

In considering whether Ramey should be detained pretrial, this Court must consider four factors: (1) the nature and circumstances of the offenses, (2) the weight of the evidence against the defendant, (3) the defendant's history and characteristics, and (4) the danger to the community if

---

a preponderance of the evidence." *Simpkins*, 826 F.2d at 96 (internal quotation marks omitted) (citing *United States v. Vortis*, 785 F.2d 327, 329 (D.C. Cir. 1986)).

the defendant were to be released. 18 U.S.C. § 3142(g). All four factors weigh in favor of pretrial detention. Each are addressed in turn.

### A. Nature and Circumstances of the Charged Offenses

The nature and circumstances of Ramey's January 6 conduct, supporting the charged offenses, weigh heavily in favor of detention. Like all rioters on January 6, Ramey was a member of a thousand-strong mob that attacked the Capitol and succeeded in halting the operation of the United States Congress. But Ramey literally stood out from the crowd. On January 6, 2021, Ramey donned knee pads, a tactical vest, and a gas mask. Ramey attacked two uniformed Capitol Police officers in broad daylight as part of an angry mob. These assaults rendered these officers vulnerable as rioters' attention had begun to focus on the officers' location—the base of the Northwest Stairs—as a potential path the Upper West Terrace. Ramey's attack on these officers not only physically injured them, it directly and negatively impacted the officers' ability to guard the Capitol—specifically, the very access point that rioters would shortly breach, providing the mob access to the interior of the Capitol building. Ramey's role in this critical breach was not small. It is not enough to say that the crowd broke the line and Ramey was a member of that crowd. His assaults on Officers D.R. and B.W. caused those officers' incapacitation, which led directly to the collapse of that police line.

The D.C. Circuit has categorically distinguished those rioters who engaged in violence and destruction on January 6, placing a thumb on the scale of detention for those rioters. *See United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Further, Chief Judge Howell has outlined a number of factors that the Court may consider in assessing the comparative culpability of each January 6 defendant in relation to other rioters. *See Chrestman*, 525 F. Supp. 3d at 26. Those factors include whether the defendant engaged in prior planning, such as by "obtaining

weapons or tactical gear," suggesting that a defendant "came to Washington, D.C. with the intention of causing mayhem." *Id.*  This defendant engaged in such prior planning.  He carried with him on January 6 body armor, knee pads, pepper spray, and a gas mask.  There is no legitimate purpose for assembling, carrying, and deploying this collection of items; they unequivocally signal Ramey's intent to engage in violence, which he did.  "Likewise, a defendant's carrying or use during the riot of a dangerous weapon," is a factor that distinguishes more culpable defendants.  *Id.*  Ramey carried pepper spray and used it to attack police.  Another *Chrestman* factor is whether the defendant assumed either a formal or de facto leadership role.  Ramey was at the forefront of the attack on the Capitol for multiple hours.  He was with the Proud Boys when they marched to the Capitol ahead of the crowd, before the end of President Trump's speech.  Ramey not just participated but was a key actor in a critical breach of police lines on the West Front of the Capitol.  Even without the other Section 3142(g) factors, the nature and circumstances of Ramey's offenses are extreme and weigh heavily in favor of detention.

### B. Weight of the Evidence Against the Defendant

The weight of the evidence against Ramey is overwhelming.  Ramey's assaults are captured on video from multiple angles.  In these videos, and in images capturing him on January 6, Ramey's face is fully visible, except when he is wearing his gas mask, which is distinctive.  Further, Ramey is prolifically captured in photo and video footage of January 6.  The government continues to identify additional photos and videos showing Ramey with the Proud Boys, at the front of the line on the West Front, and wearing his gas mask.  Ramey's cellphone was identified as being one of those present on Capitol grounds on the afternoon of January 6.  Hotel records show that Ramey was in Washington on January 6.  He admitted to his boss that he traveled to Washington on January 6.

### C. Defendant's History and Characteristics

Ramey's history and characteristics are deeply concerning and support pretrial detention. Ramey's history shows a disturbing pattern of aggressive behavior towards others, threats and harassment. Even if he has never been convicted of a criminal offense in connection with this behavior, it seems fairly clear from his history that Ramey views aggression, harassment, threats of violence, and intimidation as appropriate methods for handling his grievances.

Earlier this year, Ramey's pattern of harassment and intimidation extended to include a federal law enforcement officer in connection with this case. The evidence amply supports a conclusion that Ramey (a) purposefully contacted the case agent, Ryan Nougaret, via phone and text, (b) knew that Agent Nougaret was an FBI agent, and (c) recited Agent Nougaret's sensitive personal information in an attempt to intimidate him, if not obstruct a federal investigation.

The VOIP caller, who called Agent Nougaret on his work cell phone, identified Agent Nougaret by name, and distinctively mispronounced his name. Agent Nougaret recognized the caller's voice as Ramey's voice because he had recently listened to a video in which Ramey speaks at length. The only way that Ramey could have obtained Agent Nougaret's name *and* work cell number is from the business card that Agent Nougaret left at the home of Ramey's associate, which also identified him as an FBI agent. Ramey could not have learned Agent Nougaret's name and phone number from his employer, because Agent Nougaret did not provide that information to Ramey's employer. That an attorney claiming to represent Ramey called Agent Nougaret the day after Agent Nougaret left his business card also supports inferences that Ramey obtained Agent Nougaret's name and contact information from the FBI business card, and that he knew he was being investigated. When Ramey was arrested, he said to the arresting agents, "This is about the

14

call isn't it?" and asked, "Are you Ryan Nougaret?" using the same distinctive mispronunciation that he used when he called.

Ramey called and texted Agent Nougaret, knowing that he was a federal law enforcement agent, and having reached the reasonable conclusion that Agent Nougaret was investigating him. He recited some of Agent Nougaret's sensitive personal information—his current home address and the VIN number of a car he used to own. The message was clear: I know all about you; I know where you live; I can find you. This was, as Judge Valle put it, "a very direct, if subtle, attempt to intimidate a law enforcement agent." (Det. Tr. at 69.)

Ramey's attempts to explain his harassing conduct towards Agent Nougaret have been both inconsistent and nonsensical. In his memorandum supporting the instant motion, Ramey unconvincingly attempts to cast doubt on his identity as the person who called and texted Agent Nougaret. (*See* ECF No. 16 at 8.) Ramey has alternatively suggested that he did call and text Agent Nougaret, but that he did not know that Agent Nougaret was a law enforcement officer. As posited at the detention hearing, Ramey purportedly thought "another individual [could be] trying to harass him" by calling his employer; "[Ramey] doesn't know if he's in fear for his own safety, if his family is in fear for their own safety." (Det. Tr. at 62.) Even accepting that scenario as true, even assuming that Ramey was not aware that he was calling and texting a federal law enforcement officer, he was still clearly trying to harass and intimidate *someone*.

Nevertheless, the weight of the evidence suggests that Ramey knew exactly who Agent Nougaret was and that he deliberately tried to intimidate an FBI agent who was investigating him. This attempt was part of a pattern of harassing and threatening behavior intended to intimidate perceived enemies.

Finally, as to Ramey's history and characteristics, Ramey asks to be placed on house arrest and put on GPS monitoring, in lieu of pretrial detention, it is not clear that he has stable housing. Shortly before his arrest, Ramey was forced to move out of his apartment.[8] He was arrested at the home of his fiancée, where the government understands he was temporarily living.  This is just one factor among many indicating that there is no condition or combination of conditions that would reasonably assure the safety of the community and assure Ramey's presence in court if he were to be released.  Ramey's history and characteristics weigh in favor of detention.

### D. Danger to the Community Posed by the Defendant's Release

Ramey's actions at the Capitol alone make him a serious risk of danger to the community. As the D.C. Circuit determined in *Munchel*, violent participants in the Capitol riot are in a "different category of dangerousness." *Munchel*, 991 F.3d at 1284.  Specifically, *Munchel* distinguished rioters who assaulted police officers as falling into an elevated category of dangerousness. *Id.*  Other courts in this district have made the same observation:  "Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does," *United States v. Fairlamb*, No. 1:21-CR-120-RCL, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021).  Violence against police in the context of a riot that succeeding in halting the functioning of the United States government is a measure of a defendant's disregard for the rule of law, a quality that bears on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.

---

[8] It is the government's understanding that Ramey was asked to vacate because the owner of the property wanted the space back for his own use, not because of a housing infraction on Ramey's part.

16

But the government does not ask this Court to rely on Ramey's January 6 conduct alone to find that he is a danger to the community. Ramey's history shows a consistent pattern of threats, harassment, and a willingness to engage in violence. This is a defendant who clearly believes in his power to subdue those who have crossed him through intimidation. Given Ramey's violent conduct on January 6 and his history of harassing, threatening behavior, including his attempt to intimidate a federal law enforcement officer, the risk of danger to the community should Ramey be released is high. This factor weighs in favor of detention.

## CONCLUSION

The defendant's detention is supported by clear and convincing evidence under the factors laid out in 18 U.S.C. § 3142(g), and no condition or combination of conditions can reasonably assure the safety of the community if he is released. Accordingly, the government respectfully requests that the defendant's motion to revoke the detention order and for pretrial release be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Kathryn E. Fifield*
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 320-0048
Kathryn.fifield@usdoj.gov