1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

2

                CASE NO. 22-MJ-06200-JMS-1

3

UNITED STATES OF AMERICA,

4                             Fort Lauderdale, Florida
           Plaintiff(s),

5                             April 27, 2022
       vs.

6

BARRY BENNET RAMEY,

7

              Defendant(s).     Pages 1 - 72
8 ------------------------------------------------------------

9                    DETENTION HEARING
          TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10        BEFORE THE HONORABLE ALICIA O. VALLE
          UNITED STATES MAGISTRATE JUDGE

11

APPEARANCES:

12

FOR THE PLAINTIFF(S):  ROBERT JUMAN, ESQ.
13                     UNITED STATES ATTORNEY'S OFFICE
                     500 East Broward Blvd.
14                     Fort Lauderdale, FL 33394
                     (954) 660-5948
15                     robert.juman@usdoj.gov

16

17 FOR THE DEFENDANT(S):  NAYIB HASSAN, ESQ.
                     LAW OFFICE OF NAYIB HASSAN, P.A.
18                     6175 NW 153rd Street
                     Miami Lakes, FL 33014-2435
19                     305-403-7323
                     hassan@nhassanlaw.com
20

21

22 TRANSCRIBED BY:       Joanne Mancari, RPR, CRR, CSR
                     Court Reporter
23                     jemancari@gmail.com

24

25

```
 1                      INDEX OF EXAMINATION

 2   Government Exhibits                            Page

 3    1     . . . . . . . . . . . . . . . . . .11

 4    1A    . . . . . . . . . . . . . . . . . .13

 5    2     . . . . . . . . . . . . . . . . . .13

 6    3     . . . . . . . . . . . . . . . . . .14

 7    4     . . . . . . . . . . . . . . . . . .15

 8    6     . . . . . . . . . . . . . . . . . .16

 9   RYAN NOUGARET

10   Cross By Mr. Hassan  . . . . . . . . . . . .26

11   Redirect By Mr. Juman  . . . . . . . . . . .49

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Thereupon,

2    the following proceedings were held:

3              THE DEPUTY CLERK:  Calling the matter of Barry Ramey,

4    case No. 22 6200.

5              Counselors, please announce your appearances for the

6    record.

7              MR. JUMAN:  Good afternoon, your Honor.  Robert Juman

8    for the United States.

9              THE COURT:  Mr. Juman, good afternoon.

10             MR. HASSAN:  Good afternoon, your Honor.  Nayib Hassan

11   on behalf of Barry Ramey.  Along with me is cocounsel Bill

12   Barner, Judge.

13             Mr. Ramey is seated to my far right, Judge.

14             THE COURT:  Great.  Thank you very much.

15             Give me a minute, gentlemen, to find my paperwork

16   before we start.

17             (Pause)

18             THE COURT:  Thank you.

19             So, Mr. Hassan, I got your name, but -- I'm sorry -- I

20   didn't get cocounsel's name because I was already thinking

21   about what I lost.

22             MR. BARNER:  Judge, Richard Barner.  Bill Barner.

23             THE COURT:  I still -- I'm sorry -- I don't understand

24   you with the mask.

25             MR. BARNER:  Barner, B-A-R-N-E-R.

```
1              THE COURT:  Great.  Thank you.

2              And you're cocounsel?

3              MR. BARNER:  Yes, your Honor.

4              THE COURT:  Thank you very much, gentlemen, for being

5       here.

6              All right.  So we are here this morning for a possible

7       detention hearing and removal hearing.

8              Have the parties reached an understanding or are we

9       going forward, Mr. Juman?

10             MR. JUMAN:  Your Honor, we're going forward.

11             THE COURT:  And the removal is to the District of

12      Columbia?

13             MR. JUMAN:  Yes, your Honor.

14             THE COURT:  All right.  This is the actual removal

15      hearing or the initial on the removal, to be clear.

16             MR. JUMAN:  Your Honor, I believe they are stipulating

17      to removal.  This is just for detention.

18             THE COURT:  Terrific.  Thank you.

19             Is that correct, Mr. Hassan?

20             MR. HASSAN:  That is correct, your Honor.

21             THE COURT:  All right.  So you are waiving identity

22      and agreeing to return to the District of Columbia.

23             MR. HASSAN:  Correct, Judge.

24             THE COURT:  Has that order been entered previously?

25             MR. HASSAN:  No, Judge.  We had agreed on the
```

1    stipulation; however, the court did not issue the order until

2    we had a detention hearing.

3          THE COURT:  Thank you very much.  I will just note

4    that, and when my courtroom deputy comes, we will get that

5    paperwork signed, that you are waiving removal and are agreeing

6    to be removed to D.C. to answer the charges.

7          All right.  So we are here for the detention hearing.

8          Of course, you have the choice of having a detention

9    hearing either here or in the District of Columbia, and you

10   chose to have it here, is that correct?

11         MR. HASSAN:  That is correct, your Honor.

12         THE COURT:  Thank you.

13         Mr. Juman, what is the government's basis for

14   detention?

15         MR. JUMAN:  Your Honor, we're seeking detention on

16   three grounds.  One, under Section 3142(f)(1)(A) for a crime of

17   violence.  There is a charge under Section 111(b).

18         THE COURT:  Hold on.  3142(f)(1)(A).

19         MR. JUMAN:  Yes.

20         THE COURT:  Crime of violence.

21         MR. JUMAN:  Also 3142(f)(1)(E), which is a felony that

22   is not a crime of violence that involves any other dangerous

23   weapon, and 3142(f)(2)(B) for a case that involves a risk that

24   a person will attempt to threaten, injure, or intimidate a

25   prospective witness.

1          THE COURT:  In addition to the basis under which you

2     are applying, is there any kind of presumption that applies in

3     this case?

4          MR. JUMAN:  There is no presumption, your Honor.

5          THE COURT:  Thank you.

6          Are you proceeding by proffer?

7          MR. JUMAN:  Yes, we would proceed by proffer, and we

8     have an FBI special agent available for cross-examination.

9          THE COURT:  Who is the FBI special agent?

10          MR. JUMAN:  Special agent Ryan Nougaret,

11     N-O-U-G-A-R-E-T.

12          THE COURT:  And is agent Nougaret here?

13          MR. JUMAN:  He is.  He is in the back row, your Honor.

14          THE COURT:  All right.  Thank you very much.

15          Lastly, before I let you get started with your

16     proffer, I just want you to walk me through the charges, the

17     statutory maximums, and the guideline ranges that apply.

18          MR. JUMAN:  Sure.  Your Honor, let me pull that up.

19     OK.

20          So, your Honor, there is a count under Title 18,

21     Section 231, which is civil disorder.  That carries a maximum

22     of five years.  There is a charge under Section 111, with the

23     subsection (b) enhancement for assault on a federal officer,

24     that carries a maximum of 20 years.

25          THE COURT:  Yes.

1          MR. JUMAN:  There are three felony charges under Title

2     18, Section 1752, which relates to unlawful activity on Capitol

3     grounds.  Each of those carries a maximum of ten years.

4          There is a charge under Title 40, Section 5104, which

5     is a petty offense, which I believe carries a maximum of six

6     months.

7          THE COURT:  That's a petty offense?

8          MR. JUMAN:  I believe, yes, an act of physical

9     violence on Capitol grounds.

10         THE COURT:  Have you had an opportunity to calculate

11    the advisory sentencing guideline ranges?

12         MR. JUMAN:  Yes, we have, your Honor.  Based on our

13    calculation, because we have two separate law enforcement

14    victims, our calculation is 78 to 97 months after trial, and I

15    should note that is before any upward departure under Section

16    3A1.4.

17         THE COURT:  And what is that?

18         MR. JUMAN:  That is an enhancement for acts of

19    domestic terrorism, and there are certain statutes which

20    specifically apply there, but there is also a commentary which

21    says that it can apply to any offense in which there was an

22    effort to use violence to intimidate or influence government

23    action.

24         THE COURT:  Thank you.  All right.  Thank you.

25         I think I am ready to hear your proffer.  Because I

1    don't have a written copy of your proffer, please speak slowly

2    so that I can take notes.

3            MR. JUMAN:  I will, your Honor.

4            With the court's permission, may I use the lectern?  I

5    have some video to show the court as well.

6            THE COURT:  I actually prefer that everyone use the

7    lectern.  It is easier for me to hear you and see you.

8            MR. JUMAN:  OK.  Perfect.

9            Your Honor, to save a little bit of time, I am going

10   to ask that I can incorporate by reference the background facts

11   set forth in the complaint regarding January 6th.

12           I think for our purposes it is sufficient to note that

13   on January 6, 2021 there was a joint session of Congress that

14   had convened in order to certify the Electoral College vote.

15           THE COURT:  You can adopt those paragraphs in the

16   complaint as part of your proffer.  That is not a problem.

17           MR. JUMAN:  Thank you, your Honor.

18           As your Honor knows, many people traveled to

19   Washington that day to attend a rally led by the former

20   President, and many of the attendees in that rally would, after

21   the rally was over, make their way to the Capitol and

22   participate in the riot which was televised on national

23   television.

24           In this case that is not the path the defendant took.

25   The defendant did travel to Washington that day, but he didn't

1    attend the rally.

2          After meeting up with fellow Proud Boys at the

3    Washington Monument, his group left the area.  They didn't

4    attend the rest of the rally.  They didn't stay to defend the

5    rally-goers from any enemies, real or imagined.  They didn't

6    wait to be told what to do by the former President.  Instead,

7    they marched from the Washington Monument in masks to the

8    Capitol.

9          Many of them, like defendant, were armed with pepper

10   spray, or worse.  Many of them, like defendant, were wearing

11   tactical gear and looking for a fight.

12         At this point I'd like to show your Honor Exhibit 1,

13   which is a portion of a video recorded by one of the Proud Boys

14   as that group marched around the Capitol complex, as they were

15   chanting their slogans.

16         In this frame, your Honor, just so the court is aware,

17   the individual in the black-and-white flannel is Joe Biggs, the

18   head of the Proud Boys.  There is an individual on the right in

19   some tan tactical gear.  His name is Christopher Worrell.  You

20   will see more of him later when you play the video for a little

21   bit.

22         THE COURT:  I'm sorry.  Give me just a moment,

23   Mr. Juman.

24         MR. JUMAN:  Sure.

25         (Pause)

1            THE COURT:  I'm sorry.  You referenced a second
2     individual in Exhibit 1.
3            MR. JUMAN:  Sure.
4            THE COURT:  That is the individual without a mask in
5     the tan outfit to the right of the screen?
6            MR. JUMAN:  Yes.
7            THE COURT:  Thank you.
8            MR. JUMAN:  I'm circling him in red right now.
9            THE COURT:  Thank you.  I wasn't sure you meant him or
10    the individual in the blue jeans.
11           MR. JUMAN:  OK.  All right.  If I can get this to
12    play.  No, that's not it.
13           One second, your Honor.  I'm sorry.
14           THE COURT:  That's all right.  You can figure it out.
15    As long as we are out of here by 2, as Mr. Hassan promised.
16           MR. HASSAN:  Robert, you're taking all the time.
17           MR. JUMAN:  All right.  That is not playing.  I will
18    try it this way.
19           (Pause)
20           MR. JUMAN:  No, it is not playing.  Goodness gracious.
21           THE COURT:  Yolanda, do you have a second copy of the
22    PTS on this case?  I seem to be losing everything.
23           MR. JUMAN:  Your Honor, I am going to try something
24    else.  I am going to try playing the raw video.
25           THE COURT:  Just take your time and figure it out.

1    That's all right.  Thank you.

2              (Pause)

3              THE COURT:  I'm sorry, Mr. Juman.

4              MR. JUMAN:  Yes.

5              THE COURT:  Are you moving this into evidence?

6              MR. JUMAN:  I am going to be offering all of these

7    exhibits into evidence.  Let me first check and see if there

8    are any objections from defense.

9              MR. HASSAN:  No, Judge.

10             THE COURT:  All right.  Thank you, Mr. Hassan.

11             So we will admit -- what are the exhibits?

12             MR. JUMAN:  This is Exhibit 1.  This is a video clip.

13             THE COURT:  I thought Exhibit 1 was a picture.  Oh, it

14   is a video clip.

15             MR. JUMAN:  It is a video.  I'm having trouble getting

16   it to play, but now I have gotten it to play.  With the court's

17   permission, I'd like to play the video.

18             THE COURT:  No objection, Mr. Hassan?

19             MR. HASSAN:  No objection, Judge.

20             THE COURT:  All right.  Admitted.

21             (Government's Exhibit 1 received in evidence)

22             (Videotape played)

23             THE COURT:  Is the volume important?

24             MR. JUMAN:  I made it as loud as I can make it, your

25   Honor.  Let's see if this is any better.

1        (Videotape played)

2        MR. JUMAN:  Let me see if there is anything else I can

3   do here.  All right.  Let's try this.

4        THE COURT:  Not a good idea.

5        MR. JUMAN:  OK.

6        (Videotape played)

7        MR. JUMAN:  I'm stopping it there.

8        Your Honor, in red there is the defendant.  You can

9   see him wearing his black jacket, a black hat, blue and white

10  gear.  You can see he's got kneepads on and you can see that he

11  is wearing that -- well, jeans and dark glasses.

12        (Videotape played)

13        MR. JUMAN:  What may not be readily visible in that

14  video, your Honor, is the fact that the defendant is also

15  wearing body armor.  I would like to show you Exhibit 1A.

16  These are two screenshots from other videos taken on the day.

17  In it you can see the defendant and you can see at chest level

18  a flap, and that is indicative of wearing body armor.

19        Now, at about 12:50 p.m., this group, that the

20  defendant was a part of, arrived in the area of the Capitol

21  grounds.

22        THE COURT:  Are you moving that exhibit into evidence?

23        MR. JUMAN:  Yes, your Honor.  Exhibit 1A.

24        THE COURT:  Any objection, Mr. Hassan?

25        MR. HASSAN:  No objection, Judge.

1              THE COURT:  Admitted.

2              (Government's Exhibit 1A received in evidence).

3              MR. JUMAN:  At about 12:50 p.m., this group arrives at

4    an area of the Capitol called the Peace Circle.

5              I would like to now show Exhibit 2, which is a

6    map/diagram of the grounds, and I'd like to offer Exhibit 2

7    into evidence.

8              THE COURT:  Any objection?

9              MR. HASSAN:  No objection, Judge.

10             THE COURT:  Admitted.

11             (Government's Exhibit 2 received in evidence)

12             MR. JUMAN:  So the Peace Circle, your Honor, is this

13   location here.

14             THE COURT:  Is it P, as in Peter, or peace, as in --

15             MR. JUMAN:  Peace, as in peace, love and

16   understanding.

17             Just shortly after the defendant's group arrives there

18   is a breach at this location of the police line and the rioters

19   move forward to an area of the Capitol called the West Lawn,

20   which is here.  This entire area had been designated a

21   restricted area.  There were signs, fencing, barricades

22   designed to keep people out.  Everyone, including the

23   defendant, who crossed those lines was entering the Capitol

24   grounds illegally.

25             Now, your Honor, I'd like to show you a video, Exhibit

1  3.  Before I begin, let me ask if I can offer this into

2  evidence.

3          THE COURT:  Any objection?

4          MR. HASSAN:  No objection, Judge.

5          THE COURT:  Admitted.

6          (Government's Exhibit 3 received in evidence)

7          MR. JUMAN:  Your Honor, this is a video taken from the

8  West Lawn that I previously showed you in Exhibit 2.  This is

9  at about 1:30 p.m.

10         At this point in time the crowd has not yet made it

11  through the police line at this location.  But in Exhibit 3, in

12  the red rectangle, you can see the defendant, who is facing

13  towards the Capitol, and in this video he is going to practice

14  or try to put on a gas mask that he's brought with him to the

15  Capitol.  You will also get to see a very clear shot of his

16  face, which is how the identification, part of the reason the

17  identification was made in this case.

18         (Videotape played)

19         MR. JUMAN:  Your Honor, Exhibit 4, which I'd like to

20  show, is a photograph from the same area of the defendant

21  actually wearing the gas mask.

22         THE COURT:  On the West Lawn?

23         MR. JUMAN:  On the West Lawn, yes.

24         I'd like to offer that into evidence as well.

25         MR. HASSAN:  No objection, Judge.

1          THE COURT:  Admitted.

2          (Government's Exhibit 4 received in evidence)

3          MR. JUMAN:  You can see the defendant in the bottom

4    right corner with the gas mask on.

5          Now at the end of the video, Exhibit 3, you saw the

6    defendant move towards the left side of the screen.  Your

7    Honor, that location that he is walking towards, that is where

8    the police had been stationed under scaffolding that's been set

9    up for the Inauguration.  The police are protecting this area

10   because there are stairs underneath it and those stairs provide

11   ready access to the upper levels of the Capitol and to the

12   entrances to the building itself.

13         I'd like to show you what happened next in Exhibit 5,

14   which is an excerpt of a video from the New York Times.  The

15   only change that I made is I have put up a red rectangle again

16   around the defendant.  So let me bring that up, and I'd like to

17   offer Exhibit 5.

18         THE COURT:  Objection?

19         MR. HASSAN:  No objection, Judge.

20         (videotape played)

21         MR. JUMAN:  I am going to pause here, your Honor.  The

22   red rectangle is going to be the defendant viewed from the

23   back.

24         (Videotape played)

25         MR. JUMAN:  Your Honor, the breach that we just saw

1  was caused in no small part by the defendant's use of pepper

2  spray.

3        I'd like to now show Exhibit 6, which is the same

4  image, but I've slowed it down a little so it is easier to see

5  exactly what the defendant did.

6        THE COURT:  Any objection to Exhibit 6, Mr. Hassan?

7        MR. HASSAN:  Give me a minute, Judge.

8        THE COURT:  I'm sorry?

9        MR. HASSAN:  Give me a minute, Judge.

10        (Pause)

11        MR. HASSAN:  No objection, Judge.

12        THE COURT:  Thank you.  Admitted.

13        (Government's Exhibit 6 received in evidence)

14        MR. JUMAN:  All right.

15        THE COURT:  And this is a video?

16        MR. JUMAN:  This is a video, Exhibit 6.  It is the end

17  of the last video, but in this case I have slowed down the

18  video to about 50 percent.

19        THE COURT:  All right.  Give me a second before you

20  start playing.  OK.

21        MR. JUMAN:  What you will see here, your Honor, is the

22  assault that is described in the complaint.  The defendant is

23  going to spray two officers with pepper spray.  In the middle

24  of it you are going to see someone throws a bottle of what

25  looks like Gatorade.  It hits his arm, and again you will see

1   the defendant indicated by the red rectangle.

2             (Videotape played)

3             MR. JUMAN:  OK.  Now, as your Honor saw, that breach

4   allows a rioter to make it up through those initial, that

5   initial police line, up the steps.  The defendant did not join

6   those rioters at that time.  Instead, he stayed in the base of

7   the scaffolding and he celebrated with the other Proud Boys he

8   had joined that morning.

9             I would like to show Exhibit 7, which is a video of

10  the defendant, some other members of the Proud Boys, right

11  outside that same location shortly after the breach.

12            THE COURT:  Any objection?

13            MR. HASSAN:  No objection, Judge.

14            THE COURT:  Thank you.

15            (Videotape played)

16            MR. JUMAN:  Let me go back.  I should indicate,

17  instead of a red rectangle, your Honor, the defendant is

18  indicated with a yellow highlighting in this video.

19            (Videotape played)

20            THE COURT:  Is he wearing a gas mask?

21            MR. JUMAN:  Your Honor, in that footage -- I will go

22  back and see if we can see that with clarity -- I believe he

23  is.

24            Yes.  I am stopping at about one second into it, and

25  you can see the back of the defendant's head and you can see he

1    is wearing a gas mask at this time.

2         What we saw in this video, your Honor, as I noted

3    before, you saw Christopher Worrell, who was the individual I

4    pointed out in the tan gear from Exhibit 1.  He is the one who

5    shouted at the end "taking the Capitol," and you see the

6    defendant and the other Proud Boys shouting on the slogans,

7    "proud of your fucking boy" and making hand gestures.  It is

8    not a coincidence, of course, that the defendant was with these

9    people at this time.  He had been with them the whole day.  He

10   arrived at the Capitol with them.

11        Let me be clear, the defendant is entitled to join

12   whatever associations he wants.  He's entitled to his political

13   beliefs.  We are not concerned with that.  We are concerned

14   with his actions that day, and the relevance of him being among

15   this group on January 6th is that the defendant didn't go alone

16   to the Capitol.  He traveled in a group, he coordinated with a

17   group, and that group didn't go to Washington to attend a

18   peaceful rally; that group went to Washington that day to

19   attack the Capitol.  The relevance is, for our purposes, the

20   danger posed by the defendant is magnified because he engaged

21   in the preplanning and acted in coordination with others who

22   were also willing to engage in political violence.

23        Now, that really concludes the conduct which led to

24   the charges in the complaint, your Honor, but I have more that

25   I need to get into because there is some disturbing conduct

1   involving an attempt to intimidate the case agent.

2               THE COURT:  I'm sorry.  To intimidate who?

3               MR. JUMAN:  The case agent.

4               THE COURT:  OK.

5               MR. JUMAN:  So my proffer, and agent Nougaret can

6   testify to this, on February 11th of 2022, as part of his

7   investigation into this case, agent Nougaret left his business

8   card with Ramey's fiance in an effort to inquire, see if

9   anybody was willing to talk to him.  We know that the defendant

10  received that card because the very next day the agent received

11  a call from Mr. Barner who was calling on the defendant's

12  behalf.  That was in early February.

13              In early April, agent Nougaret called the defendant's

14  workplace solely to determine whether he still worked there as

15  part of his background investigation.  The person who answered

16  the phone put him on hold and, after a minute or two of being

17  on hold with no response, agent Nougaret hung up.  To be clear,

18  agent Nougaret's purpose that day was not to speak with the

19  defendant.  He knew that the defendant had an attorney.  His

20  call was just to confirm employment, and agent Nougaret did not

21  leave a name.

22              That is significant because it means the only way the

23  defendant knew agent Nougaret's name was from the business card

24  left at his fiance's residence, which clearly identified him as

25  an FBI agent.

1          Now a few days after this call, on April 8, 2022,

2     agent Nougaret received a phone call from a voice over internet

3     protocol number.  That is VOIP or VOIP.  That is essentially a

4     burner number that cannot be traced.  Agent Nougaret recognized

5     the voice of the caller as the defendant because agent Nougaret

6     had recently listened to the defendant's video on YouTube.

7          The caller asked:  Is this Ryan Nougaret?  He

8     pronounced it somewhat unusually, with the emphasis on the

9     middle syllable, who lives at, and then he proceeded to state

10    agent Nougaret's home address.  The message being conveyed was

11    clear; I know where you live.

12         Shortly thereafter the agent receives a text from the

13    same burner phone number with a VIN number.

14         THE COURT:  Same date?

15         MR. JUMAN:  Same date, April 8th.

16         It is a string of digits, which turns out to be later

17    the VIN number of a car that agent Nougaret once owned.  Again,

18    the message is clear; I know all about you; I can find out your

19    personal information.

20         We know this was the defendant.  The agent recognized

21    his voice from the YouTube video.

22         I also will note that the first thing that the

23    defendant said when the agents came to arrest him were words to

24    the effect of:  This is about the call, isn't it?  And:  Are

25    you Ryan Nougaret?  Again, pronouncing it the same way that the

1   caller had.

2           So there is no question that not only was the

3   defendant harassing someone, he was harassing someone who he

4   knew was a case agent, an FBI agent investigating him, and that

5   he reasonably inferred that they were investigating him for his

6   crimes on January 6th.

7           That not only speaks to the defendant's consciousness

8   of guilt in this case, it goes to the danger posed by the

9   defendant and, unfortunately, it is of a piece with the

10  defendant's past behavior.  We will concede the defendant has

11  no prior convictions, but his conduct towards agent Nougaret is

12  disturbingly similar to conduct that is described in a series

13  of police reports and TRO petitions that have been filed

14  against the defendant.  I have provided these materials to the

15  defense, and I can proffer from those materials that in March

16  of 2014 a petition was filed against the defendant for making

17  verbal threats.

18          MR. HASSAN:  Judge, I am going to object because those

19  are facts that we don't have the declarant here in court to

20  testify as to what those documents are.  The government did

21  provide the reports; however, we don't have the declarant from

22  those reports in the courtroom, and, additionally, they cannot

23  be questioned on that.  Those reports were thereafter dismissed

24  by the court and the proffers that the government wishes to

25  proceed on, Judge.

1          THE COURT:  Thank you, Mr. Hassan.  Your objection is

2     noted.  It is on the record.  However, it is overruled.  This

3     is a detention hearing in which hearsay evidence is admissible.

4     It is a different issue at trial, but for purposes of a

5     detention hearing we get hearsay all the time.  It is

6     admissible under the Rules of Evidence.

7          MR. HASSAN:  Understood, Judge.

8          MR. JUMAN:  Your Honor, continuing --

9          THE COURT:  So this was March 2014?

10         MR. JUMAN:  March 2014.  So the petition claims

11    that --

12         THE COURT:  I'm sorry.  This was a TRO petition?

13         MR. JUMAN:  This is a TRO petition, yes, your Honor.

14         THE COURT:  By whom?

15         MR. JUMAN:  Hold on, your Honor.  Let's see.  I have

16    two for 2014, so let me just make sure I have the right one

17    here.

18         This is the March 2014.  So the petitioner's name was

19    Anthony Robinson.

20         THE COURT:  Was he a law enforcement officer?

21         MR. JUMAN:  No.  No, these are from individuals.  I

22    have a case number if the court likes, or I can probably hand

23    up the petition if the court would prefer.

24         THE COURT:  I don't know where you're going with it

25    yet, so I'll wait.

1    MR. JUMAN:  I really just want to -- my point is not

2    to suggest the defendant is guilty of anything.  He was not

3    charged.  These cases, as many domestic violence cases are, was

4    dismissed.  My point is simply to show a pattern of conduct,

5    your Honor, that focuses on or at least explains what the

6    defendant intended when he tried to intimidate agent Nougaret.

7        The substance of the petition in March 2014 is that he

8    was making verbal threats and that he continued to call and

9    text the petitioner with threats of violence.

10       Another petition was filed in November of 2014 by an

11   individual named Patrick Solarino, S-O-L-A-R-I-N-O.  The

12   substance of that petition was that the defendant allegedly

13   came to the petitioner's apartment, took something from the

14   petitioner and asked the petitioner to fight him, and the

15   petitioner describes another incident where the defendant

16   confronted the petitioner outside of his car, threatening to,

17   quote, teach the petitioner a lesson and break his face.

18       Now, I'd like to also note in November of 2016 the

19   defendant filed a TRO application.  So this is again not about

20   establishing that he is guilty of anything, it is establishing

21   what is in his mind when he contacts agent Nougaret.

22       In 2016 the defendant claimed to being harassed and

23   cyberstalked by an individual who was threatening him via phone

24   calls and text messages.  According to the court records, the

25   defendant voluntarily dismissed this claim.  So again, this is

not conduct by the defendant, but it shows that the defendant appreciates how serious threatening phone calls and text messages can be.

Finally, in January of 2018, the Davie, Florida, police took a report from an owner of a UPS store who reported that the defendant was unhappy with how a package of his had been treated by the store.  He wasn't happy with the compensation he'd been provided for the damage to the package, and as part of his dealing with the situation, he contacted the owner's adult son via Facebook in an attempt to get the owner's personal phone number.

So again, these are actions which suggest that the defendant thinks it is acceptable to behave that way towards someone he doesn't like.

One more fact to proffer to the court.  On the day of the defendant's arrest, two agents went to speak to the defendant's employer.  The employer indicated that the defendant has worked there for about six months, not a full year, which I think is what the Pretrial report says.  The employer described the defendant as argumentative, said he'd come very close to firing the defendant, but only held off doing so because of sympathy for the defendant's family situation, and he said that the defendant admitted to him that he was on the Capitol on January 6th and was aware that the FBI might come to talk to him or show up there.

1        So again, that goes to the defendant's state of mind

2   when he sees the card left by agent Nougaret.

3        According to the owner, while the defendant did not

4   say much about his activities at the Capitol, he did admit to

5   his employer that he had attended a protest in Atlanta and had

6   punched a, quote, Antifa guy in the face.  So that is another

7   act of violence that the defendant was relaying to his

8   employer.

9        That concludes the government's factual proffer, your

10  Honor.  Agent Nougaret is available for cross-examination.

11       THE COURT:  All right.  Thank you very much.

12       Mr. Hassan, are you going to use those exhibits in any

13  way?

14       MR. HASSAN:  Judge, if I may --

15       MR. JUMAN:  No, no, it is fine.  Do you want me to

16  keep it on?

17       MR. HASSAN:  Yes.

18       THE COURT:  You don't have to just because I asked the

19  question.

20       MR. HASSAN:  No, Judge.  I was going to inquire.

21       Judge, if I can question the agent?

22       THE COURT:  Yes.  The agent needs to take the stand.

23       Good afternoon, agent.  Thank you for being here.  How

24  do you say your name again?

25       THE WITNESS:  Nougaret.

Nougaret - Cross

```
 1              THE COURT:  Nougaret.  Gotcha.

 2              THE DEPUTY CLERK:  Do you solemnly swear the testimony

 3    you are about to give will be the truth, the whole truth, and

 4    nothing but the truth so help you God?

 5              THE WITNESS:  I do.

 6              THE DEPUTY CLERK:  State your full name for the

 7    record, please.

 8              THE WITNESS:  Ryan Nougaret.

 9              THE COURT:  Is it Brian or Ryan?

10              THE WITNESS:  It is Ryan, with an R.

11              THE COURT:  Thank you.

12              THE WITNESS:  Sure.

13     RYAN NOUGARET,

14         called as a witness,

15         having been duly sworn, testified as follows:

16              THE COURT:  You may proceed, Mr. Hassan.

17              MR. HASSAN:  Thank you, Judge.

18    CROSS-EXAMINATION

19    BY MR. HASSAN:

20    Q   Agent Nougaret, you have had the opportunity to listen to

21    the government's proffer, correct?

22    A   I have.

23    Q   And would you adopt those to be the same as yours?

24    A   Yes.

25    Q   You've had the opportunity to read the complaint as well,
```

Nougaret - Cross

1   correct, that was drafted in this case?

2   A    Yes.

3   Q    You drafted the complaint?

4   A    Yes.

5   Q    And you would also adopt those as your findings, correct?

6   A    Yes.

7   Q    OK.  When the government made, elicited proffers regarding

8   January 6th, they elicited regarding my client Mr. Ramey's

9   knowledge of the Proud Boys.  Is there anything -- how long

10  have you been working this case?

11  A    Since September, October 2021.

12  Q    OK.

13  A    Roughly.

14  Q    So you must be familiar with the text messages with the

15  differing apps, Parler and Telegram, those apps, correct?

16  A    I'm familiar with them, yes.

17  Q    And, to your knowledge, between --

18          THE COURT:  I'm sorry, Mr. Hassan.

19          Tamesha, I just have a text that someone is in the

20  waiting room to get into the call.  I'm sorry.

21          MR. HASSAN:  It is OK.

22          THE COURT:  Technical stuff.

23          THE DEPUTY CLERK:  That's just the television.

24          THE COURT:  That's the name.  It might be the

25  meeting -- never mind -- that I'm missing.

1          Thank you.  I'm sorry about that.

2          MR. HASSAN:  No.  That's fine, Judge.

3          May I proceed, Judge?

4          THE COURT:  Yes.  I'm so sorry for the interruption.

5          MR. HASSAN:  That is OK, Judge.

6          THE COURT:  I thought someone was trying to get into

7   our waiting room.  It is a waiting room to a meeting.

8          MR. HASSAN:  OK.

9   BY MR. HASSAN:

10  Q   So where we were at, agent, you've had the opportunity to

11  review Parler and Telegram apps, is that correct?

12  A   I have not reviewed the apps per se, no.  You asked me if I

13  was familiar with them.  Yes, I have heard of them.

14  Q   I would imagine that you work not only this case but you

15  have worked with multiple other agents regarding the January

16  6th cases, correct?

17  A   Yes.

18  Q   And in your workings, did you ever have the opportunity to

19  cross any Parler and Telegram apps regarding --

20         THE COURT:  I'm sorry.  To cross any what?

21  BY MR. HASSAN:

22  Q   Look into the Parler and look into Telegram apps?

23  A   I am familiar with the apps.

24  Q   But you never looked at them?

25  A   I have looked at them, yes.

Nougaret - Cross

1   Q    And is there any notation by my client, Mr. Ramey, in any

2   of those Proud Boy chats in Parler and/or Telegram prior to

3   January 6, 2021?

4   A    You asked me if there was any what?  I'm sorry.

5   Q    Any indications that my client was aware or was on any of

6   the Telegram or Parler apps.

7   A    Well, he was on the Parler app, if I recall.

8   Q    And anything regarding the Proud Boys, was he commenting,

9   was he making any statements, anything whatsoever prior to

10  January 6, 2021?

11  A    I recall -- specifically relating to the Proud Boys, I

12  don't recall seeing or viewing anything that he said

13  specifically using the word Proud Boys.  I do remember reading

14  some comments by him regarding the Capitol, pre-January 6, come

15  to the Capitol, fight for Trump.  I'm not sure if that is

16  exactly what he said, but I do remember some Capitol

17  references.

18  Q    And you had the opportunity to present those today.  You

19  don't have those here today?

20  A    No, I don't have those here with me today, no.

21  Q    And is it on any Proud Boy chat or anything like that that

22  he makes those references, that you believe?

23  A    A Proud Boy chat?

24  Q    Yes.  Is there like a specific chat?

25  A    Not that I'm aware of.

Nougaret – Cross

1    Q   The government testified earlier or the government

2    proffered earlier that Mr. Ramey went specifically to join up

3    with the Proud Boys that day, correct?  And how do you have

4    knowledge that Mr. Ramey went up there specifically to join

5    with the Proud Boys other than what you see on the video there?

6    A   I mean, the video is what we're referencing in regards to

7    that conclusion.

8    Q   You're making a hypothetical based upon what you are seeing

9    on video, correct?

10   A   I don't know if I'd call it a hypothetical, but based on

11   what I am seeing on video, the fact that he is with Proud Boy

12   members from the start to the finish, yes.

13   Q   Are there many other individuals that are present which are

14   not with the Proud Boys?

15   A   There were thousands of people at the Capitol, yes.

16   Q   And thousands of people marched up the same Capitol,

17   correct?

18   A   Correct.

19   Q   OK.  And are all the thousands of individuals Proud Boy

20   members?

21   A   I honestly don't know.  I would assume not, but I was

22   focused on the subject.

23   Q   OK.  And they marched as one, correct?  We had the

24   opportunity to look at the video there.  There are thousands of

25   individuals on the White House Capitol lawn, correct?

Nougaret - Cross

1   A    Correct.

2   Q    And where you see Mr. Ramey, you also see thousands of

3   other individuals.

4          Do you want to see the video again?

5   A    No.  I've watched it enough, but thanks.  I agree, there's

6   plenty of people there.  He's not the only one there.

7   Q    When the government proffers that this is Mr. Biggs and

8   this is this other individual, is there any knowledge that

9   Mr. Ramey knows Biggs or knows any of the other individuals

10  that are present?

11  A    There is -- I don't have it directly in front of me, but I

12  know there was some telephonic communication between Mr. Ramey,

13  and I know he went by Milk Shake.  I don't remember his real

14  name.  He is a Proud Boy member.  In other words, there is

15  evidence of telephonic communication between Mr. Ramey and

16  other known Proud Boy members.

17  Q    And where were those telephone communications made?

18  A    If I recall, there were some communications made right

19  before January 6 and directly after and then into months after

20  January 6, all the way up until, I think, around mid-May,

21  mid-May-ish 2021.

22  Q    I am going to jump a little bit right now, but subsequent

23  to January 6, 2021 Mr. Ramey does not attend any rallies, does

24  not attend anything else subsequent to January 6, is that

25  correct?

Nougaret - Cross

1   A   Not that I'm aware of.

2   Q   OK.  And prior to January 6, 2021, other than the statement

3   that he made to his employers, there is no history about him

4   attending any other rallies, correct?

5   A   Other than the statement that he made to his employer, not

6   that I'm aware of.

7   Q   So if he is sloughing up to his own self regarding his

8   position, that's Mr. Ramey, you have no independent knowledge

9   whether he attended, whether he did not attend another rally,

10  correct?

11  A   I do not, no.

12          THE COURT:  Just to be clear, Mr. Hassan, no other

13  rallies are at issue here, right?

14          MR. HASSAN:  No, I understood.

15          THE COURT:  I want to be clear.

16          MR. HASSAN:  No, Judge.  The government highlighted

17  Atlanta, so I just want to make sure that there is nothing

18  there that my client is not simply sloughing after his own

19  self, but the government doesn't have any identification there.

20          THE COURT:  Got it.

21          MR. HASSAN:  Or knowledge of that, for that matter.

22  BY MR. HASSAN:

23  Q   Regarding the vest that he has on, that he wears at some

24  point in time, and the government proffered that it is a

25  bulletproof vest, do you have any knowledge that it is a

Nougaret – Cross

1    bulletproof vest?

2    A    I can't say with certainty that it is a bulletproof vest.

3    All I can tell you is that it looks to be a vest that is

4    consistent with other tactical vests that I have seen in my

5    line of work.

6    Q    Tactical vests such as things that you can -- there are

7    tactical vests that individuals use to work out, correct, like

8    weights, that they literally put on their body and use for

9    Cross-Fit?

10   A    I'm not an expert -- I'm not sure.  I guess it's possible,

11   depending on your workout routine.

12   Q    But there are vests which are not bulletproof that could be

13   stab proof, correct?

14   A    Yes.

15              THE COURT:  Can be what proof?

16              MR. HASSAN:  Stab proof.

17              THE COURT:  Got it.

18   BY MR. HASSAN:

19   Q    So you don't know in fact what vest he is wearing that day,

20   if he actually is wearing a bulletproof or whatever vest he's

21   wearing, correct?

22   A    I don't know what kind of vest he's wearing that day.

23   Q    Regarding the gas mask that Mr. Ramey at some point tries

24   to put on, you don't know where he brings that, correct?  You

25   don't know where he came from, correct?

Nougaret - Cross

1   A   I do not know where it came from, no.

2   Q   You don't know if somebody provided it to him that day,

3   correct?

4   A   I do not.

5   Q   You don't know if during the commotion at some point in

6   time when they are walking up somebody hands him a gas mask,

7   correct?

8   A   That's correct.

9   Q   You've had an opportunity to see the video where there are

10  thousands of individuals, and we just spoke about that right

11  now.

12          There appears to be smoke in the background, is that

13  fair to say?

14  A   That's fair to say.

15  Q   Do you know if Mr. Ramey has any allergies, any issue with

16  his eyes that would have had him put on the mask at that point

17  in time?

18  A   I do not know.

19  Q   So you don't know in fact why he had the gas mask other

20  than the fact that at some point in time he tries to put on a

21  gas mask, correct?

22  A   That's correct.

23  Q   Now, let's proceed in the later-on presentation where the

24  government makes the allegation that my client apparently

25  squirts two officers with pepper spray.

Nougaret - Cross

1          Is that your statement?

2    A    Yes.

3    Q    When those words were made, the first one, were the

4    eyewitnesses able to identify Mr. Ramey at that point in time

5    as the individual that made the squirt?

6    A    So I did interview the two Capitol police officers that

7    were at that location, that stairwell in the lower west

8    terrace.

9    Q    OK.

10   A    They both told me that they remember being sprayed in the

11   face, but they did not see who sprayed them due to the large

12   crowds, etc.

13   Q    So they would not be -- other than the video that you have

14   here present, you don't have any way to confirm that Mr. Ramey

15   is actually the one that squirted those individuals in the

16   face, correct?

17   A    Other than the video, no.

18   Q    Other than the video, we don't know if there is a different

19   squirt coming from a different direction hitting one of the

20   officers, is that fair to say?

21   A    I can only go off of what I see with my own eyes on the

22   video.

23   Q    There's two officers.  One squirt is made, I believe, at

24   the 24-second mark, correct?  Is that fair to say?

25   A    I'm not sure of the exact second mark, but there were

Nougaret - Cross

1    multiple sprays.

2    Q    When you say "multiple," two, correct?

3    A    More than one.  Yes, two.

4    Q    Are there three, four?  I mean, how many times is there --

5    A    There were multiple sprays.

6    Q    What does "multiple" mean?

7    A    More than one.

8    Q    Can we narrow it down to the number two, three, four?  Do

9    you know?

10   A    I don't know exactly how many times he sprayed it.

11   Q    OK.

12   A    There were more than one.  There were multiple sprays.

13   Q    In regards to contact with the second officer, there are

14   multiple sprays coming from different directions at that point

15   in time, correct?

16   A    I think that's fair, yes.

17   Q    So in fact, when there is contact made with a second

18   officer, we don't know if it is Mr. Ramey that makes contact

19   with the second officer or if it is somebody else that makes

20   contact with that second officer, is that correct?

21   A    Based on the video that I have viewed, as I track Mr. Ramey

22   extending his arm and the spray that appears to be coming from

23   his hand, holding what appears to be a pepper spray bottle or

24   some sort of spray bottle, I mean, it appears, based on what I

25   viewed, to be coming from Mr. Ramey.

Nougaret - Cross

1    Q    Has there been any forensic experts regarding any

2    trajectory or anything like that from where he was positioned

3    to where the officer was positioned to ensure that was the

4    spray that was contacting that officer?

5    A    No, sir.

6    Q    So in fact, we don't know if it is Mr. Ramey's squirt that

7    hits the officer, is that fair to say, other than the evidence

8    itself?

9    A    That's fair to say.

10   Q    Subsequent to January 6, 2021, there are no incidents of

11   violence regarding Mr. Ramey, correct?

12   A    Not that I'm aware of, no.

13   Q    We fast forward now coming into February 11, 2022.  You try

14   to make contact with Mr. Ramey, is that fair to say?

15   A    No.

16   Q    When do you try to make contact?

17   A    So on February 11th --

18   Q    The date that you first tried to make contact with

19   Mr. Ramey and/or his girlfriend.

20   A    So I wasn't trying to make contact with Mr. Ramey on the

21   11th.

22   Q    OK.

23   A    As part of the prosecution package that I had to submit,

24   not to get into the weeds, but I was required to obtain

25   multiple third-party identifications.

Nougaret - Cross

1   Q   OK.

2   A   So that particular individual, Ms. Desiree Roland, I was

3   aware, based on some background work that we had done, that she

4   was an associate of some sort of Mr. Ramey or could possibly

5   know him.  So I was simply knocking on her door in order to

6   obtain what we call a third-party identification.

7   Q   So you tried to make -- you did the third-party

8   identification with Ms. Roland, correct?

9   A   No, I wasn't able to do it.  No.

10  Q   So you never spoke to her?

11  A   I did speak with her.  I spoke with her -- she did not open

12  the door for me.  It was kind of quite the ordeal, but

13  basically we knocked at the door.  I tried to -- we did speak.

14  She was uncomfortable opening the door.

15  Q   But you spoke with her?

16  A   Yes.

17  Q   So go on.  You tried to speak with her.

18  A   So spoke with her.

19           THE COURT:  I'm sorry.  You spoke with her through the

20  door?

21           THE WITNESS:  Spoke with her through the door, and

22  then at one point she asked us to come around to the kitchen

23  window, because I was trying to show her a driver's license

24  photo of Mr. Ramey as part of that third-party identification

25  process.  She was at the window, a clear glass window.  I

Nougaret - Cross

1    showed her the photo, and she was noncommittal on the photo, at

2    which time I told her that -- and she also indicated that she

3    didn't necessarily believe that we were law enforcement.

4    Q   OK.

5    A   So I left her my card.

6        Shortly after that she ended up calling the Plantation

7    police on us, on me. We waited and they showed up.

8    Q   When you say "they" showed up, who --

9    A   The Plantation police, sorry, showed up. We spoke with

10    them briefly. They further indicated -- at that point

11    Ms. Roland had departed, had exited her apartment. I never

12    spoke with her at that point, but the Plantation police officer

13    did speak with her and verified that we were who we said we

14    were, but she did not want to speak and so we left.

15        THE COURT: I am going to interrupt you for just a

16    second. Judge Hunt needs this courtroom at 2:00 for another

17    live hearing.

18        MR. HASSAN: We are at 1:15, correct?

19        THE COURT: I'm sorry. It is 1:15. I don't know how

20    much longer you have. I am obviously not rushing you. I am

21    just making everybody aware.

22        MR. HASSAN: Understood, Judge.

23        THE COURT: Tamesha, if necessary, maybe you can see

24    if we can find another courtroom.

25        MR. HASSAN: My apologies, Judge.

Nougaret - Cross

1             THE COURT:  No.  I mean, you have to do what you have

2    to do.

3             MR. HASSAN:  So --

4             THE COURT:  That is just in case, Tamesha.  Hopefully

5    we will be done.

6             MR. HASSAN:  I hope to be done, Judge.

7             THE COURT:  You weren't kidding when you said 2:00.

8    BY MR. HASSAN:

9    Q   So in fact, you leave your card there, is that fair to say?

10   A   I do.

11   Q   And you don't know what she does with the card at that

12   point in time, correct?

13   A   I do not.

14   Q   You don't know if she relays that information to Mr. Ramey,

15   correct?

16   A   I do not.

17   Q   You don't know if she relays that information to

18   Mr. Barner, correct?

19   A   Well, I have to assume someone relayed my information to

20   Mr. Barner because I received a call from him the next day.

21   Q   But you don't know who is the one that relays that

22   information, correct?

23   A   That is correct.

24   Q   Subsequent thereafter you receive a phone call from

25   Mr. Barner, correct?

Nougaret - Cross

1    A    Yes, on the 12th of February 2022.

2    Q    And during your course of communication with Mr. Barner, I

3    would imagine that he instructed you that he was Mr. Ramey's

4    attorney, correct?

5    A    He did.

6    Q    And I would imagine that any communication that you would

7    have, you would have it through counsel with Mr. Ramey,

8    correct?

9    A    Correct.

10   Q    So the next following, a month later or two months later,

11   you reach out to his employer, correct?

12   A    I do.

13   Q    And when you reach out to his employer, you don't reference

14   yourself as an agent, correct?

15   A    No.

16   Q    You reference yourself out as a family friend?

17   A    No.

18   Q    How do you reference yourself out?

19   A    Actually, and I have talked about this with Mr. Juman, I

20   don't remember exactly what I said in the course of that quick

21   call with whoever it was I spoke with, but I did indicate that

22   I was trying to -- I don't remember exactly how I put it, but

23   that I was trying for track down or verify if a Barry Ramey was

24   employed there.

25   Q    But you don't remember the exact wording, correct?

Nougaret - Cross

1   A   I don't.

2   Q   Why do you believe that you didn't say that you are a

3   family friend?

4   A   Because I don't remember saying that.

5   Q   But you don't remember what you said either?

6   A   I don't 100 percent remember what I said because, I mean,

7   this isn't the only case I'm working on.  I'm making a lot of

8   calls.  I don't remember exactly what I said.

9   Q   Did you make notations immediately thereafter on what you

10  said on the phone call?

11  A   I did not.

12  Q   Was the phone call recorded?

13  A   I didn't record it.

14  Q   OK.  Was it recorded -- if you didn't record it, law

15  enforcement didn't record it, correct?

16  A   No, sir.

17  Q   You never spoke with Mr. Ramey again, correct?

18  A   No, sir.  Other than on the 21st when we arrested him, yes.

19  Yes.

20  Q   The followup phone calls and messages, the messages that

21  the government elicited regarding your VIN number --

22  A   Yes.

23  Q   -- and the phone call.

24  A   Yes.

25  Q   Mr. Ramey, for all you know Mr. Ramey does not know that

Nougaret - Cross

1   you're the case agent working on this case, correct?  For all

2   you know?

3   A   That's fair.

4   Q   You don't know if Mr. Barner told Mr. Ramey that you're the

5   case agent or not by name, correct?

6   A   That's correct.

7   Q   All Mr. Ramey may know is that the FBI is investigating him

8   for January 6th, correct?

9   A   Yes.  That's fair.

10          I will say what I -- on February 11th, when I tried to

11  do the third-party identification with Ms. Roland, I did not

12  give her any indication as to why I was there.  So in other

13  words, I didn't reference January 6th or anything, for what's

14  that's worth.

15  Q   Your conversation with Mr. Barner didn't reference that?

16  A   I believe I did reference it with Mr. Barner.  I believe I

17  did.

18  Q   You didn't make any corresponding messages immediately

19  thereafter after your phone call with Mr. Barner?

20  A   Corresponding messages --

21  Q   You didn't note it down, you didn't make any notations

22  about your phone call with Mr. Barner?

23  A   I did notate, I did document the call that I received from

24  Mr. Barner on the 12th.  Yes, I did document that.

25  Q   A lot of times, and I may go off script here, is your

Nougaret - Cross

1    information blocked on, let's say, on different -- is it

2    Chapter 119 protected?  Is there a public records pretty much

3    deletion from your information, your VIN number, your house?

4    A   You're asking me if I -- I'm sorry.  What are you asking

5    me?

6    Q   If your information is pretty much removed from the system,

7    like let's say your residential address and stuff like that.  I

8    would imagine you have gone that recourse and pretty much

9    sealed --

10   A   Well, it's obviously not.  It hasn't been.

11   Q   Officers have the ability to basically seal their

12   information, correct?  That's a yes or no.  I mean, come on.

13   Agents have the ability to --

14   A   I mean, not completely seal it, but, yes, there are avenues

15   you can take to make it, yeah, to seal it to some degree,

16   right, depending on the state.

17   Q   You live in South Florida?

18   A   Correct.

19   Q   So it's basically Chapter 119 protected, correct?

20   A   Correct.

21   Q   And typically when information is Chapter 119 protected,

22   basically you know it's an officer that you're communicating

23   with, correct?

24   A   I'm sorry.  Say that again.

25   Q   You would know it is a law enforcement officer or somebody

Nougaret – Cross

1    in law enforcement capacity when their information is protected

2    under Chapter 119, correct?

3    A    I mean, that's a fair assumption.  Yes.

4    Q    But there is no indications that your information was

5    protected when Mr. Ramey was able to obtain it.  You don't know

6    how he obtained your information, correct?

7    A    Correct.

8    Q    You don't know if he obtained it through a Google search?

9    A    Correct.

10   Q    So being that he may have obtained it through a Google

11   search, he may have not known that you were a law enforcement

12   officer, correct?  Is that correct?

13   A    That's fair to say.

14   Q    When you took Mr. Ramey into custody, did he run?

15   A    No.

16   Q    Let me reference the report.  The report says he was

17   cooperative, correct?

18   A    Very cooperative, yes.

19   Q    He immediately agreed and he understood and put his hands

20   behind his back and did whatever you asked him to, correct?

21   A    Yes.

22   Q    You even engaged in an actual conversation with him,

23   correct?

24   A    I will say, though, I will make clear, I wasn't part of the

25   initial arrest.  It was a SWAT hit.  I was not a part of that

Nougaret - Cross

1    initial arrest, but I was there right after.  So but, yes, I

2    was told by everyone involved with the initial hands-on that he

3    was very cooperative.

4    Q    Nobody instructed you anything otherwise, that he ran --

5    A    No.

6    Q    -- or that he hid or anything of that sort, correct?

7    A    No.  Correct.

8    Q    What time was he arrested at?

9    A    It was the 21st of April, roughly around 7 a.m., a little

10   before 7 a.m.

11   Q    OK.  And he didn't make any aggressive actions towards law

12   enforcement officers, correct?

13   A    No.  Correct.

14   Q    The government also elicited, also discussed during their

15   proffer his prior history regarding contacts with the system.

16   You had the opportunity to look into those cases?

17   A    I have read a couple of the police reports.  I haven't -- I

18   remember reading the Davie police report regarding the UPS

19   owner incident, but I haven't delved into those cases in

20   particular, no.

21   Q    The Davie police report, Davie police case dismissed?

22   A    Yes.

23   Q    To your knowledge, there is no history of Mr. Ramey being

24   violent against anyone other than this alleged incident on

25   January 6th, is that fair to say?

Nougaret - Cross

1    A    That's fair to say.

2    Q    The restraining orders.  You make no reference in regards

3    to Mr. Ramey making any contact with anybody, correct, physical

4    contact?

5    A    Correct.

6             MR. HASSAN:  Give me just one second, Judge.

7             THE COURT:  Sure.

8             (Pause)

9    BY MR. HASSAN:

10   Q    Agent, I just want to clear this up.  When you called

11   Mr. Barner, you specifically told him that you had not made

12   contact with Mr. Ramey other than through counsel, is that

13   fair?  Is that accurate?

14   A    I'm sorry.  You said when I called --

15   Q    When you spoke with Mr. Barner --

16   A    OK.

17   Q    -- the day after you made contact with Ms. Roland or you

18   spoke with Ms. Roland --

19   A    Yes.  Mr. Barner called me the day after, yes.

20   Q    Correct.  And when you discussed with Mr. Barner, you also

21   discussed that you would not make contact with Mr. Ramey other

22   than through Mr. Barner, right?

23   A    That's correct.

24   Q    When you called the employer and you stayed on hold, why

25   did you stay on hold -- was there a period that you stayed on

Nougaret - Cross

1   hold for, an extended period of time?

2   A   I don't know exactly how long it was, but I wasn't going to

3   wait.  I just ended up hanging up.  At that point we were in

4   the process of trying to figure out where he worked and where

5   he lived.

6   Q   OK.

7   A   So I just didn't remain on hold.

8   Q   I mean, did you stay on hold for a minute, did you stay on

9   hold for any extended period of time that you could tell the

10  court?

11  A   No.  I mean, long enough to where I was tired of staying on

12  hold.

13  Q   And that was to reference employer?

14  A   Yes.

15  Q   And who did you speak with initially on the phone?  Do you

16  recall the name of the individual you spoke with?

17  A   I have no idea.  I don't think they gave a name.

18  Q   Did you make any attempts thereafter to try to make contact

19  with that company?

20  A   No, no.

21  Q   You didn't try to make an immediate phone call thereafter

22  to try to make contact and try to reengage the individuals on

23  the phone call?

24  A   With the business?

25  Q   Correct.

Nougaret - Redirect

1  A    No.

2            MR. HASSAN:  I have nothing further, Judge.

3            THE COURT:  Thank you very much.

4            Any redirect, Mr. Juman?

5            MR. JUMAN:  Your Honor, very briefly.

6            THE COURT:  That is a good idea.

7            MR. JUMAN:  Just to clarify.

8  REDIRECT EXAMINATION

9  BY MR. JUMAN:

10  Q    Agent, you talked about thousands of people.  I just want

11  to make clear to the court, the group that we saw Mr. Ramey

12  with marching and we saw in the first video --

13            THE COURT:  Can I ask you a question?  Can I ask the

14  agent a question?

15            MR. JUMAN:  Oh, please.

16            THE COURT:  Does it matter whether or not he was there

17  with the Proud Boys or not?  Isn't this about his conduct?

18            THE WITNESS:  I would agree with that statement.  Yes,

19  I would agree with that.

20            MR. JUMAN:  Absolutely, your Honor.  I just want to be

21  clear.

22  BY MR. JUMAN:

23  Q    So the group you saw him with, that wasn't the thousands of

24  people attending the rally, was it?

25  A    No.

1      MR. HASSAN:  Well, objection, your Honor.  Asked and

2   answered.  I mean, we have gone over this already.

3      THE COURT:  Overruled.

4      MR. JUMAN:  I just want to get your answer.

5   A   Well, I thought I made it clear that I was tracking him and

6   he was with -- obviously, there were other people at the

7   Capitol, but the, quote-unquote, group that he was with

8   throughout the time that I see him on video are Proud Boy, are

9   known Proud Boy members.

10  Q   And they were not attending the rally?

11  A   That's correct.  During the time that I see him with them,

12  correct.

13      MR. JUMAN:  No further questions, your Honor.

14      THE COURT:  All right.  Thank you, agent.  You may

15  step down.

16      THE WITNESS:  Thank you.

17      (Witness excused)

18      THE COURT:  Anything else in terms of evidence from

19  the government?

20      MR. JUMAN:  No further evidence, your Honor.

21      THE COURT:  Mr. Hassan, any evidence from your side?

22      MR. HASSAN:  No, Judge.  Essentially what I am going

23  to be doing is proffering what the family would do, but it is

24  just simply by proffer, Judge.

25      THE COURT:  If it is argument, I will hear it after

1    the government.  If it is a proffer related to factual matters,

2    then I will take it as evidence.

3         MR. HASSAN:  Not as factual, Judge.  Just simply for

4    bond purposes.

5         THE COURT:  All right.  So then I am going to hear

6    from the government in terms of your argument, Mr. Juman.

7         MR. JUMAN:  Thank you, your Honor.  Your Honor,

8    obviously the government seeks detention based on a risk of

9    flight, danger to the community, and risk of obstruction.

10   Let's put aside for the moment the reasons the defendant

11   attacked the police that day and what he and his fellow rioters

12   were hoping to achieve.  Just looking at his conduct alone, he

13   assaulted uniformed police officers in broad daylight as part

14   of a mob.  That demonstrates dangerousness, a lack of

15   self-control, a lack of respect for law enforcement.

16        When you add in the reasons for his violence, the

17   danger is magnified.  This wasn't a spur-of-the-moment attack.

18   He came to Washington in body armor.  I didn't say bulletproof,

19   I just said body armor.  Kneepads carrying pepper spray and a

20   gas mask.  He didn't go there to engage in Cross-Fit.  He went

21   there planning for violence, prepared for violence, and

22   ultimately engaging in violence.  He didn't like how a

23   democratic election had turned out and he was willing to use

24   violence to change that outcome.

25        I have no doubt the court appreciates the nature and

1    circumstances of this offense, but I do want to note how the DC
2    courts, where this case is pending, have addressed this factor.
3         In a case the D.C. circuit decided called United
4    States v. Munchel, 991 F.3d --
5         MR. HASSAN:  Judge, I am going to object as to what
6    another court did in regards to what this court has to do and
7    the facts of this case, Judge.  There is no bearing.
8         THE COURT:  We cite cases all the time.  I am going to
9    make a decision as to what I am going to do based on what I am
10   going to do, but certainly case law is relevant.
11        What is the case, Munchel?
12        MR. JUMAN:  Munchel -- M-U-N-C-H-E-L -- 991 F.3d 1273.
13        The point of Munchel is it drew a categorical
14   distinction between the rioters who simply cheered on the
15   violence and those who engaged in violence, and that the ones
16   who engaged in violence, like the defendant, are categorically
17   more dangerous.
18        In United States v. Crestman, C-R-E-S-T-M-A-N --
19   that's 2001 WL 765662 -- the chief judge of D.C. set forth a
20   number of considerations, and I just want to highlight those as
21   they pertain to this defendant.  For example, whether the
22   defendant engaged in prior planning.
23        Here, the defendant did engage in preplanning.
24   Putting aside, again, who he had chose to attend the rally
25   with, the fact is that he didn't stay at the rally.  He went

right to the Capitol.  He traveled to D.C. with body armor and
kneepads and pepper spray and a gas mask.  There is no
legitimate need for this material.  It wasn't to protect the
rally-goers because he didn't stay at the rally.  It wasn't for
self-defense at the Capitol because that is one of the most
heavily policed areas in Washington, D.C.  The only thing that
paramilitary gear is good for is a confrontation with law
enforcement.

It is very common to blame Antifa or some other group,
these boogie men as the reason for all this gear, but the fact
remains that by the time he attacks those police, at the time
he is at the Capitol, he knows there is no Antifa there.  He
knows the only confrontation is between the rioters and the
police, and that's when he puts on his gas mask and that's when
he uses his pepper spray.

Another factor that Crestman points to is whether the
defendant assumed either a formal or de facto leadership role.
Well, we would say that the video shows him at the front line.
There are thousands of people there by that time.  Most of them
are well behind the defendant.  Most of them are not attacking
the police.  The defendant is at the front of those lines, and
so he is leading by example, attacking the officers, and paving
the way for the others to make it through the police line.

The defendant participated in one of the key breaches
in the police lines, and though he didn't enter the Capitol, at

1    least as far as we know at this point, his actions at the

2    Capitol opened that floodgate.  And afterwards, after this

3    violent attack succeeded in breaking the police lines, he

4    celebrated.  That is the video we showed with the defendant

5    waving his hands and showing his signs.

6         So under Crestman and Munchel, under this court's

7    precedent, the defendant is among the most serious category of

8    offenders, and the nature and circumstances of the charged

9    offense weigh in favor of detention.

10        The weight of the evidence clearly favors detention.

11   The evidence is overwhelming.  The defendant is caught on

12   videotape from multiple angles.  His face is visible.  We have,

13   as the complaint notes, his cell phone was present at the

14   Capitol.  Hotel records show he was in Washington on the 6th.

15   He admitted to his boss that he was at the Capitol.  So the

16   weight of the evidence and the very high sentence the defendant

17   faces also make him a flight risk.

18        The defendant's history and characteristics weigh in

19   favor of detention.  Again, acknowledging that he has never

20   been convicted, there is a disturbing pattern shown in the

21   public record regarding his willingness to engage in threats,

22   and most recently the defendant demonstrated his willingness to

23   obstruct law enforcement.  He attempted to intimidate an FBI

24   agent.  It doesn't matter whether he knew he was the case agent

25   on the case, and it is, frankly, absurd to suggest that he

1    didn't know who he was calling.

2          The agent left a card with his fiance and the very

3    next day he got a call from Mr. Ramey's attorney.  The premise

4    that all of this was done without his knowledge is absurd.

5          With that information he then obtained the personal

6    information of the agent.  Our issue here is not that he

7    obtained it.  He is not being charged with hacking.  The issue

8    is that he chose to use that information by sending it to the

9    agent in a not-so-veiled threat.  I know where you live.  I can

10   find this information about you.  That's not normal behavior

11   directed at anyone, even if you think it is some random person

12   who has called your office for an appointment check.  But

13   directed at someone he knows to be an FBI agent, investigating

14   him for crimes he knows he committed on January 6th, that's an

15   effort to obstruct, and it shows that the defendant doesn't

16   think that the rules apply to him.  It creates a significant

17   risk that the defendant will not comply with any conditions of

18   release this court might otherwise set.

19         I will also note that the defendant has no ties

20   whatsoever to Washington, D.C., the district where this case is

21   pending.

22         The final factor, your Honor, is the nature and

23   seriousness of the danger.  Your Honor, it shouldn't need to be

24   said in this 21st century, but in this country voters decide

25   elections, not violent mobs.  Even if you indulge in some

1    fantasy that there were problems with the election, you resolve

2    those problems in court.  You don't resort to violence.

3           The events of January 6th showed us that we may take

4    that for granted, and the defendant's conduct on January 6th

5    shows that he either doesn't understand that principle or

6    doesn't agree with it.  The same people, the same lies that led

7    to January 6th are still being told, and so long as the

8    defendant is willing to use violence to pursue political goals,

9    the danger is serious and ongoing.  Indeed, if any crime

10   establishes danger to the community and a disregard for the

11   rule of law, assaulting riot-clad police officers does.

12          So for all of these reasons we think that the 3142(g)

13   factors weigh in favor of detention.  When you add on top of

14   that his most recent conduct in attempting to intimidate an FBI

15   agent, we think that the weight of the evidence -- all of the

16   factors lean largely in favor of detention and we ask the court

17   to issue an order accordingly.

18          THE COURT:  Thank you very much.

19          Mr. Hassan, I will hear from you.

20          MR. HASSAN:  I will try to be as brief as possible,

21   Judge.

22          Judge, I want to note the Pretrial Services report in

23   this case, the indications from Pretrial Services pretty much

24   on its own face show the following.  They are making a

25   recommendation to a personal surety bond cosigned by the fiance

1    Desiree Roland.  Judge, what we are proffering to the court is

2    a three-step bond in this situation, Judge.  I will lay it out

3    and then I will go through all the factors.

4          We are asking for a $25,000 10 percent bond to be

5    posted by Desiree Roland.  Then a $100,000 signature bond, to

6    be cosigned by his mother, Ms. Roland, and himself.  Then,

7    Judge, we would agree with the GPS, as recommended through

8    Probation, with home confinement, with permissions to leave his

9    residence for medical, court appearances, attorney visits and,

10   of course, to travel to the District of Columbia for his case

11   at hand.

12         Judge, the government proffers under 3142 to detain

13   Mr. Ramey, and it is two factors.

14         Number one is flight risk.  There is no history here

15   whatsoever that Mr. Ramey, number one, traveled outside of the

16   country.  There is none.  He has never traveled once outside of

17   the country.  He is a 38-year-old man, has never traveled once

18   outside of the country.

19         His whole family for the most part is present in the

20   courtroom, Judge.  He has approximately seven to -- I would say

21   seven to eight individuals in the courtroom right now, which

22   are all family and friends of his which are here for his

23   support.  So the family here present is mom, his sister, his

24   significant other.  That is just to name a few, Judge.

25         He's always responded to court hearings.  Although

1   never has there been a criminal case, he's always responded to

2   court hearings.  Every single issue that the government

3   highlighted as far as the two, he's always responded, and those

4   two temporary restraining orders have always been dismissed.

5        He's been always gainfully employed.  He's never had a

6   lack of employment.  Even throughout the period of COVID, he

7   tried to have a startup company, which is highlighted in the

8   Pretrial Services report, and thereafter was gainfully employed

9   with Noble Jet.

10        So this coming from an individual for the last ten

11   years, based upon what we have in the Pretrial Services report,

12   he's always been gainfully employed.

13        His mom is also receiving cancer treatment, and he is

14   the caretaker for his mom.  So he is literally going to his mom

15   and making sure that mom is receiving the appropriate treatment

16   for her cancer.

17        So, Judge, I would say that flight risk, there is none

18   there.  This is not an individual that is going to flee from

19   the jurisdiction because he has nowhere to go.  He doesn't have

20   Colombia, he doesn't have Cuba, he doesn't have Mexico.  It is

21   the United States for him, Judge.

22        THE COURT:  Yes, but a flight risk doesn't mean that

23   he has to flee for a foreign jurisdiction; it means he could

24   hide in plain view by absconding himself from D.C. and Florida

25   and going to live in Wisconsin.

1           MR. HASSAN:  I agree, Judge, but all his family and

2     everybody is here in South Florida.

3           THE COURT:  I get you.  I just wanted to correct that,

4     that it doesn't have to be a flight to Tahiti.  It could be

5     hiding in Opa-locka.

6           MR. HASSAN:  I get that, Judge.  We are in the

7     Southern District of Florida where individuals typically flee

8     to other nations, other countries, but this is not that

9     individual, Judge.  I just wanted to make sure to highlight

10    that to the court.

11          THE COURT:  I get it.

12          MR. HASSAN:  When you talk about the factors for

13    danger, there's multiple factors, and the nature and

14    circumstances of the evidence and the case at hand.

15          Judge, although I would tend to agree somewhat that

16    the evidence is significant in this case because we do have

17    video in this situation, you heard from the agent that there

18    was no expert or any forensic expert that testified that this

19    spray, that this pepper spray that hit this individual, came

20    from my client, Mr. Ramey, Judge.  All you have is based upon

21    video and their hypothesis based upon the video, based upon the

22    video surveillance that was conducted.

23          The weight of the evidence is simply based upon the

24    video.  You heard from the agent himself that there was no

25    eyewitness statements and there is no cooperating statements

that Mr. Ramey's pepper spray contact was the contact that made

contact with the agent, agent 1 and/or agent 2.

You also heard from the agent that you don't know

where Mr. Ramey picked up the gas mask that the government so

highlights in this case.  It could have been provided to him by

one of the other protestors that were there that day or one of

the individuals that were amongst the thousands of individuals

that were present.  So we don't know where the vest came from,

we don't know where the gas mask came from, we don't know where

the pepper spray comes from; we just know at some point in time

he has those items on him.

Now we go to the third prong, which is history and

characteristics of Mr. Ramey.

Judge, again I highlight the fact that there is no

criminal history with Mr. Ramey.  There are no actions of him

being aggressive or violent towards anybody.  There are

restraining requests or temporary restraining orders that are

imposed by the county courts in maybe Broward and Palm Beach

counties, however, they did not equate to a permanent

restraining order or extended restraining order.  They were

simply TROs that were initially put in place.

Additionally, Judge, the seriousness of any danger or

to persons in the community, you heard from the agent himself,

Judge.  Between the period January 6, 2021 to the current time

period, Mr. Ramey has not been in contact with anybody, has not

1  been in any rallies, he has not attended any protests, he has

2  not made, for any intents and purposes, any contact with

3  anybody else regarding any demonstrations regarding what

4  transpired during the elections.

5      Judge, I would highlight to the court that when the

6  court asks yourself are there any conditions or combination of

7  conditions that will reasonably assure Mr. Ramey, his presence

8  in court and/or the safety of the community, I would proffer to

9  the court that the conditions that were imposed, that we're

10  requesting, Judge, are significant and will reasonably assure

11  the community and this court that Mr. Ramey will reside in his

12  residence.  He will not come into contact with any other

13  individuals.

14      The court heard that when Mr. Ramey was taken into

15  custody he was cooperative with law enforcement.  He didn't

16  run.  He didn't do any actions.  It is quite the contrary.  He

17  was cooperative.  He surrendered to law enforcement.

18      This situation where Mr. Ramey tried to effectuate, in

19  essence, the initial surrender, he contacted Mr. Barner.  The

20  purpose of contacting Mr. Barner was to make sure that any

21  contact with law enforcement be made with an attorney present.

22  So he basically was telling the government, hey, if you're

23  going to come and arrest me, just call my attorney and I'll

24  surrender.  But yet the government, the agent testified that he

25  doesn't leave a name, doesn't leave any number when he calls

1   his office, calls his place of business, and for all Mr. Ramey

2   knows this could be just another individual trying to harass

3   him regarding what transpired since information got leaked

4   somewhere.  This could be an individual that was harassing him.

5          That individual, that information by law enforcement

6   is normally privileged, as what the agent testified.  That is

7   normally Chapter 119 privilege.  But yet the information was

8   readily available.  That creates an issue for Mr. Ramey because

9   he doesn't know who is reaching out to him.  He doesn't know if

10  he is in fear for his own safety, if his family is in fear for

11  their own safety.  He just wants to make sure that, hey, you

12  know what, if I've got to surrender, I want to surrender to my

13  attorney, and that's basically it.

14         Judge, the government highlights, the government

15  initially highlighted a case and the standards which the D.C.

16  courts have stood by, and I'm going to highlight a case myself.

17  21 Cr. 129.  It is United States v. Gabriel Augustine Garcia,

18  Judge.

19         In that case, the facts of that case are very similar

20  to what we have here.  Mr. Garcia is currently out of custody

21  and he is facing a case very similar to Mr. Ramey's in the

22  District of Columbia.  That individual is also here in the

23  Southern District of Florida.  So when the government

24  highlights what the courts did in D.C., I want to highlight

25  also what the courts have done here in the Southern District in

1    response to other cases in the District of Columbia.

2          Gabriel Garcia is a case that originated out of the

3    Southern District of Florida.  Judge, for those reasons we are

4    asking the bond conditions to be set as we have been

5    requesting, Judge.

6          Judge, if I may just have one minute, Judge.

7          THE COURT:  Sure.  Confer with cocounsel?

8          MR. HASSAN:  Yes, Judge.

9          (Pause)

10         THE COURT:  Mr. Hassan.

11         MR. HASSAN:  Judge, just two things to highlight to

12   the court, Judge.  Number one, that Mr. Ramey had no knowledge

13   or, as the agent conceded, that there was no evidence that

14   Mr. Ramey knew he was a law enforcement officer when that phone

15   call was made to the business, Judge.

16         Additionally, the February restraining orders, the

17   three accusations, those did not involve law enforcement

18   officers.  In fact, those are three individuals that he had

19   known in the past.  I don't have the names in front of me, but

20   those are individuals that he had known in the past and that's

21   why there are temporary restraining orders.  Those are, in

22   essence, friends, Judge.

23         THE COURT:  All right.  Thank you.

24         MR. HASSAN:  That's it.  Thank you so much.

25         THE COURT:  You're welcome.

1          Ms. Rawls, can I see you at side bar.

2          PROBATION OFFICER:  Yes, Judge.

3          (Side bar discussion held off the record)

4          THE COURT:  I will review the Pretrial Services report

5     because I got it right before I got to court and didn't have a

6     chance to read it thoroughly.  Just for his background.

7          (Pause)

8          THE COURT:  All right.  So this matter comes before

9     the court on the request of the government that the defendant

10    Barry Ramey be detained pending trial and unto conclusion

11    thereof.

12         In considering the government's request, I am guided

13    by several principles.  First, at all times the defendant is

14    entitled to the presumption of innocence.  Nothing that takes

15    place in this hearing or that I set forth in my findings is

16    intended or should be construed to in any way affect that

17    presumption of innocence.  Rather, the purpose of the hearing

18    is simply to determine whether or notwithstanding the

19    presumption of innocence the defendant should be detained

20    pending trial.

21         Second, under the Bail Reform Act pretrial detention

22    is considered an exceptional step.  Under the Act, a defendant

23    must be released prior to trial unless I find that no condition

24    or combination of conditions exists which will reasonably

25    assure the appearance of the defendant if the government seeks

1   detention based on risk of flight or reasonably assure the

2   safety of any other person in the community if the government

3   seeks detention based on the defendant being a danger to the

4   community.

5        The Act requires that the least restrictive conditions

6   be imposed that are necessary to provide those reasonable

7   assurances.  If, however, I cannot find any such assurances,

8   then I am required by the Act to order the defendant be held in

9   custody.

10       Here, the government seeks detention on the basis of

11  risk of flight and danger to the community as well as the

12  danger of obstruction going forward.

13       In terms of risk of flight, the government must show

14  by a preponderance of the evidence that no condition or

15  combination of conditions will reasonably assure the

16  defendant's presence as required.  In terms of danger to

17  another or the community, the government must show by clear and

18  convincing evidence a higher burden, that no condition or

19  combination of conditions will reasonably assure the safety of

20  the community.

21       There are no presumptions that apply to the instant

22  offense.

23       I now turn to the four specific factors that the Bail

24  Reform Act requires me to consider in making my determination.

25       The four factors include the nature and circumstances

of the alleged offense; the weight and evidence against the

defendant; the history and characteristics of the defendant,

which includes the defendant's physical and mental condition,

family ties, employment, length of residence in the community,

community ties, past conduct, criminal record, history of drug

or alcohol abuse, record of appearance at prior court

proceedings, and whether the defendant was on conditional

release of some sort at the time of the new alleged offense.

Lastly, I consider the nature and seriousness of the danger to

others or the community.

        I have considered all of the evidence on these

factors, including the government's proffer, the testimony on

direct and cross-examination of the agent who testified, and as

well as the proffer of the defense.  I have given consideration

to the recommendation contained in the Pretrial Services

report.

        Of note, prior to making my decision, I conferred in

private with the Pretrial Services officer.  The Pretrial

Services report was written by a different officer and she

recommended that there were some conditions that would assure

the defendant's appearance in court and safety to the

community.

        I disagree with those and I wanted to see what this

Pretrial Services officer recommended.  She believed that

danger had not been addressed and that the government had met

1    its burden regarding danger.  I agree with that assessment.

2            Based on the evidence as I'm about to disclose or

3    discuss, I find that the government has met its burden of

4    showing that detention is required based on danger to the

5    community and others in the community.

6            Even if defendant is not a risk of flight, I find that

7    the danger prong has been established so that I am not even

8    going to address the risk factor, and I am going to give the

9    reasons for my conclusions, for my findings.

10           First of all, turning to the nature and circumstances

11   of the alleged offense, obviously the first part of this case

12   is the January 6, 2021 riot at the Capitol.  The government's

13   evidence in that regard of the defendant's participation is

14   very strong.  It is on video.  So you can't really argue with

15   what is on the video.  I really don't care whether the

16   defendant went there on his own or met up with the Proud Boys

17   or whatever.  That is not what this case is about.  It is about

18   the violent conduct that occurred at the Capitol.  I want to

19   make that clear.

20           The defendant can associate with whomever he wants,

21   but not everyone on that video took the aggressive and violent

22   steps that appeared to be taken by the defendant, and I think

23   Mr. Hassan raises a good point regarding was this the pepper

24   spray that hit the officers, and that is going to be a question

25   for you, Mr. Hassan, to bring up to a jury and it is going to

1    be a question of weight of the government's evidence.  But for

2    purposes of today's hearing I think that the video is very

3    compelling in terms of showing the violent participation of

4    this defendant during the riot on January 6.

5           In that regard I do accept and appreciate the

6    reference to the D.C. case that enumerated those factors, and

7    although it is a different district or in a different circuit,

8    I think that those factors provide good guidance for me to

9    follow, including the fact that there was prior planning.

10          This wasn't just an incident where somebody gets

11   caught up in the heat of the moment.  Not that that would

12   excuse violence in any event, but it would be a mitigating

13   factor.  What we have here instead is evidence of prior

14   planning.  The defendant wore body armor, had kneepads, carried

15   pepper spray, carried a gas mask.  All of those things show

16   some degree of preparation not to attend a gym or to go to

17   Cross-Fit training but to engage in potential violence, and

18   that is what troubles me and that is why I find that the

19   defendant is a danger.

20          If there is a distinction, again, and this one came

21   from the Munchel case, and I think it is an excellent guide for

22   my decision, the language to draw a distinction between

23   exercising one's First Amendment right to gather and speak and

24   cheer on the rioters, another one is to engage in actual

25   physical violence.  In this case the use of pepper spray.

1    Leaving to another day and to a jury whether or not in fact the

2    government can prove beyond a reasonable doubt that the pepper

3    spray was the one that the officers were hit with is another

4    matter.  That goes to, again, the weight.

5          In addition to the preparation, in advance of the

6    attendance, referring to the gas mask and the body armor, etc.,

7    the defendant here -- I'm sorry -- then took the danger to

8    another level when after the fact he called the agent -- well,

9    it is alleged that he called the agent at a phone number that

10   he had gotten potentially from a business card that the agent

11   had left behind with the defendant's girlfriend and asked the

12   agent, mispronouncing his name, does so-and-so, does agent

13   Nougaret live at this home address.  On the same date the agent

14   received a text from the same voice over internet protocol

15   number, which cannot be traced, with the VIN number for the FBI

16   agent's car or a car that he owned previously.

17         I agree with the government that this is a very

18   direct, if subtle, attempt to intimidate a law enforcement

19   agent.  The agent recognized the defendant's voice, even though

20   he could not get a readout of the phone number because of the

21   voice over internet protocol that was being used, that the

22   agent nonetheless recognized the voice because he had listened

23   to various YouTube recordings that the defendant had made.

24         Also notably, at the time of the arrest on April 21,

25   when the defendant was being arrested, the defendant said this

1   is about the call, are you Brian Nougaret.  Again, knowing

2   about the call that was made, the threatening call, and again

3   mispronouncing the name in the same way that the anonymous

4   caller had mispronounced the agent's name.

5          That call, above anything else, is what makes me find

6   that the government has met its dangerousness level.  I think

7   that call shows that the defendant sought to intimidate the law

8   enforcement agent and showed very little respect for law

9   enforcement in general.

10         As to whether the vest, whether the bulletproof vest,

11  whether or not he took the mask with him or somebody else gave

12  it to him or whether the squirt came from this particular

13  pepper spray or another, those are issues that go to the weight

14  of the evidence and that a jury will have to determine at the

15  end.  For my purposes, the vest, the gas mask and the pepper

16  spray all show preplanning in terms of the events that took

17  place on January 6th.

18         I do want to say that it is not common for an

19  individual to wear a gas mask to control his allergies.  That

20  is not just something that I have ever heard of before and do

21  not believe is a credible argument.

22         So, again, just to summarize, the government has met

23  its burden as to danger in that the defendant's own conduct by

24  assaulting two uniformed police officers shows his violent

25  tendencies and lack of respect for law enforcement and his

1   willingness to intimidate and obstruct law enforcement by

2   attempting to intimidate the case agent with a subtly-veiled

3   threat regarding, I know where you live.  On that basis I find

4   that the defendant is a risk of flight and I will detain him

5   pending trial.

6           Obviously, he is going to be removed to D.C.

7           If you object to my ruling, you are free to appeal and

8   somebody else might have a different opinion.  Everyone's got

9   one.

10          MR. HASSAN:  Judge, I just want to be clear, the court

11  stated last as to risk of flight.  Is it risk of flight or

12  danger to the community?

13          THE COURT:  Danger.

14          MR. HASSAN:  OK.

15          THE COURT:  I'm so sorry.  I misspoke.

16          MR. HASSAN:  No, Judge.  I just want to be clear.

17          THE COURT:  I actually said that I am not deciding on

18  risk of flight.  I didn't even do the analysis because I find

19  that he is a danger based on the violence, the pepper spray on

20  the two law enforcement, two police officers, and then, of

21  course, the threatening phone call to the agent.

22          MR. HASSAN:  Judge, just for my notation, will the

23  court be corresponding with an order reflecting the same or is

24  the oral pronunciation --

25          THE COURT:  That is a good question.  What I do

1   normally, my practice is I ask the government to submit to me a

2   draft order by email.  It is just a draft that comes to me

3   within 24 hours of my ruling, and then I will turn it around as

4   soon as I can and file a formal written order.

5          MR. HASSAN:  OK.

6          MR. JUMAN:  Your Honor, along those lines, if I could

7   inquire, there was a third argument about risk of obstruction.

8   Is the court simply treating that like risk of flight, not

9   addressing it?

10          THE COURT:  No.  No.  I thought I did in terms of --

11   that is really -- yes.  I find that the risk of obstruction is

12   great based on, again, the intimidation, the attempted

13   intimidation of a law enforcement agent, which also goes to

14   danger, and I addressed that within the danger prong.  But

15   certainly I do find that the willingness to obstruct is also

16   there and, again, shows little respect for law enforcement.

17          MR. JUMAN:  Thank you, Judge.

18          THE COURT:  And at the beginning we noted that you

19   were waiving, you were agreeing to removal and have signed the

20   removal order, which reflects that the government has a

21   detention hearing here but otherwise waived removal, correct?

22          MR. HASSAN:  Yes, your Honor.

23          THE COURT:  Thank you.  Good luck to you, Mr. Cadre.

24          (Adjourned)

25

C E R T I F I C A T E


I hereby certify that the foregoing is an accurate
transcription to the best of my ability of the digital audio
recording in the above-entitled matter.


May 12, 2022                s/ Joanne Mancari
                            Joanne Mancari, RPR, CRR, CSR
                            Court Reporter
                            jemancari@gmail.com