**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| v. : | Case No. 22-CR-184 (DLF) |
| BARRY BENNET RAMEY, : | |
| *Defendant* : | |

## DEFENDANT'S MOTION TO TRANFER VENUE

COMES NOW the Defendant, Barry Ramey, by and through counsel, and respectfully moves this Court to Transfer Venue pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure and the Fifth and Sixth Amendment to the Constitution.

## BACKGROUND

The Washington, D.C., protests on January 6, 2021, were unprecedented—in the scope of the physical incursion into the transition of power that day, and as in the subsequent investigations, media coverage, and political discourse that continues unabated. Mr. Ramey was one of the thousands of individuals who attended the political rallies on January 6, 2021, in exercise of his First Amendment right and privilege to protest, to speak out about voting rights, and to otherwise draw attention to political issues of concern to him.

Based on his alleged actions that day, the Government arrested Mr. Ramey in April of 2021 at his residence in Florida on a criminal complaint alleging Inflicting Bodily Injury on Certain Officers (18 U.S.C. § 111(a)(1) and (b)); Civil Disorder (18 U.S.C. § 231(a)(3)); Entering and Remaining in a Restricted Building or Grounds, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, and Engaging in Physical Violence in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1) and (a)(2) and (a)(4), and (b) (1)

1

(A)); Disorderly Conduct on Capitol Grounds, Impeding Passage Through the Capitol Grounds or Buildings, and an Act of Physical Violence in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(F), (E), and (F)). (ECF No. 1.)

The Government alleges various offenses related to Mr. Ramey's action near the Capitol on January 6, 2021; the most serious claim is that he injured law enforcement by using pepper spray. While this claim is a matter of factual dispute, it is clearly the most serious allegation as Mr. Ramey did not otherwise enter the Capitol building, did not destroy property, and did not engage in any other alleged physical acts of violence.

Whether due to political disposition, the trauma and effect of being in the capital on January 6, or the relentless onslaught of media attention—which often paints January 6 protestors as radical terrorists—independent polling demonstrates that relevant jury pool is predisposed in its opinion regarding the events of January 6, and that Mr. Ramey will not be able to receive a fair and impartial trial in this District. Additionally, the recent airing of the January 6 Committee's political investigation on primetime national television, has further prejudiced Mr. Ramey's ability to receive a fair and impartial trial in the District, where political news and coverage of this sort is so often consumed.

## ARGUMENT

**A.    Transfer of Venue.**

Rule 21 of the Federal Rules of Criminal Procedure prescribes that transfer is required where the defendant cannot obtain a fair and impartial trial:

> Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Rule 21 supports the Fifth Amendment's and the Sixth Amendment's guarantee of fair trial by an impartial jury for criminal defendants. *Cf. United States v. Burr*, 25 F. Cas. 49, 51 (CC Va. 1807)("The great value of the trial by jury certainly consists in its fairness and impartiality.").

Extraordinary local prejudice and predisposition makes a fair and impartial trial impossible, which supports transfer under Rule 21. *Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896 (2010); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences."). While adverse pretrial publicity in itself does not necessitate transfer, a "huge . . . wave of public passion" and where the venire possessed "a belief in [defendant's] guilt" is grounds for transfer. *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) (vacating a conviction and death sentence for the trial court's failure to transfer venue for community publicity). In addition to pretrial publicity, the community prejudice of an event can be so pervasive that transfer is appropriate and required. *See, e.g., United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla. 1996); *see also United States v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006).

Following the Supreme Court's decision in *Skilling*, district courts evaluate four factors to determine whether transfer is required:

> (i) the size and characteristics of the community;
> (ii) the nature and extent of the pretrial publicity;
> (iii) the proximity between publicity and the trial; and
> (iv) evidence of juror partiality.

*Skilling*, 130 S.Ct. at 2915 - 17.

**B.     Applying the *Skilling* Factors Shows that Transfer is Appropriate and Required.**

**1.     The Size and Characteristics of the Community.**

The District of Columbia has an estimated population of approximately 670,000 people as of July 1, 2021, with a voting-age population of closer to 500,000. *See*

3

https://www.census.gov/quickfacts/DC (last visited August 30, 2022). Relevant to the political undercurrents in this case, it is a predominant democratic voting electorate: 93% of voters in 2020's election cast a ballot for Joe Biden for president, compared with 5.4% for Donald Trump. *See* https://www.politico.com/2020-election/results/washington-dc/ (last visited August 30, 2022).

In addition to being one of the most homogeneous voting blocks in the nation, it is often one of the most engaged and knowledgeable electorates since it is the seat of the federal government. The fact it is the capital is exactly why so many protestors descended on the District on January 6, 2021. This means that the jury pool in this matter is nearly uniform in its opposition to former President Trump—and thereby presumably its supporters—and, by interest and occupation, the intended target of the January 6 opposition.

### 2. **Pretrial publicity.**

The January 6 protests have been some of the most widely circulated, viewed, and publicized political events in history. This is owing both to the symbolic attack on the transfer of power, and to the practical reality that it is one of the most video-recorded events in history. Between government surveillance cameras, law enforcement body cameras, bystander videos, and participants' own videos and pictures, the footage and commentary and been publicized at an unprecedented level. The Government's repeated representations to the Court regarding the unprecedented discovery in these matters underscores this point.

In addition to publicity through traditional media and social media, government leaders, including the current presidential administration, have labeled participants in the January 6 protests "violent extremists," "extremists," "white supremacist," and "insurrectionists" among

other terms. The Department of Justice now refers to the events of January 6 as a "siege" on the Capitol. More offensive vitriol has been common from other commentators. Regardless of what views one personally holds, it is hard to imagine an event that has been covered more stridently.

### 3.     **Proximity between Publicity and the Trial.**

Adding fuel to the last nearly two years of publicity and coverage, the Congressional January 6 Committee has introduced coverage and publicity of the January 6 events through multiple prime time media events. This is relevant both to the level of publicity this has pushed into the jury pool—which by its community makeup is predisposed to politically oppose the January 6 protests—but also to proximity that this publicity has to the trial, which is quickly approaching.

The Committee held six hearings during June and July 2022, and one in October 2022. *See* https://january6th.house.gov/ (last visited December 19, 2022). The spotlight was again focused on January 6 and allegations related to that day when on December 19, 2022, the Committee publicly announced they had voted unanimously to refer former president Donald Trump to the Department of Justice for criminal prosecution on four counts. The publicity from the local media and as presented through this Committee has been predominantly negative, and often eager to portray protestors as bad actors who were set out in pursuit of a violent coup.

There are few allegations that could be more prejudicial to a criminal defendant than these claims through the media and seemingly reinforced by government institutions. Moreover, the connection between the hearings and the prosecution of Mr. Ramey is anything other than speculative and tenuous; on June 13, 2021, Attorney General Merrick Garland told NPR, "I can assure you that the January 6 prosecutors are watching all the hearings[.]" *See*

https://www.npr.org/2022/06/13/1104659339/the-attorney-general-and-federal-prosecutors-are-watchingall-of-the-jan-6-hearings.

### 4. **Evidence of Jury Partiality.**

The results of a Federal Public Defender survey demonstrate the deep-seated partiality held by potential jurors, and the inescapable mix of politics, media, and views of January 6 protesters. *See Federal Public Defender Survey*, *United States v. Schwartz*, 1-21-cr-178 (APM), EFC No. 118. The overwhelming political partiality of a jury pool in a criminal prosecution that involves intense overtones of political concerns is inherently a problem that cannot be rooted out by *voir dire. See, e.g.,* Kerr, N L, *et al*. "On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study." *American University Law Review*, vol. 40, no. 2, 1991, pp. 665–701.

The survey shows that this is not simply a national problem, felt in every jurisdiction in the same way. Rather, residents of the district have far greater entrenched negative views of January 6 protestors than potential jurors in other jurisdictions. This is not simply conjecture, this is the outcome of studied inquiry. *See also* Lux Research Survey, *United States v. Caldwell*, 1-21-cr-028 (APM), ECF No. 654-1.

When combined with the political predisposition of District jurors, the pervasive and overwhelmingly intense media attention, the on-going January 6 Committee hearings, and upcoming Midterms, Mr. Ramey simply cannot receive a fair and impartial jury in Washington, D.C.

**Conclusion**

Because the prejudice against the Defendant exists in the District that the Defendant cannot obtain a fair and impartial trial there, Defendant respectfully requests that the Court grant this Motion for a Transfer of Venue.

Respectfully submitted,

/s/ Farheena Siddiqui
Farheena Siddiqui
District of Columbia Bar No. 888325080
Law Office Samuel C. Moore, PLLC
526 King St., Suite 506
Alexandria, VA 22314
Email: fsiddiqui@scmoorelaw.com
Phone: 703-535-7809
*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of Defendant's Motion to Transfer Venue was served upon counsel of record through ECF on the date of filing.

s/ Farheena Siddiqui
Farheena Siddiqui