### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Case No.: 1:22-cr-184-DLF** |
|  | **:** |  |
| **v.** | **:** |  |
|  | **:** |  |
| **BARRY BENNET RAMEY,** | **:** |  |
|  | **:** |  |
| **Defendant.** | **:** |  |
|  | **:** |  |

### <u>UNITED STATES'S POST-TRIAL BRIEF</u>

The United States, by and through its attorneys, respectfully submits this brief summarizing the government's evidence at trial, addressing specific legal issues as directed by the Court, and analyzing the elements of the charged offenses. The government introduced evidence at trial that proves the elements of the charged offenses beyond a reasonable doubt, and requests the Court to return verdicts of guilty on each count.

### INTRODUCTION

This case is before the Court following a one-day bench trial on February 21, 2022. At trial, the government presented four witnesses—Captain Carneysha Mendoza, Special Agent Ryan Nougaret, Officer Bryant Williams, and Officer David Riggleman. The government's evidence largely consisted of video exhibits showing the defendant, Barry Ramey, in various locations on Capitol grounds and, central to the government's case, pepper spraying Officers Williams and Riggleman in the face while they attempted to hold a police line at the base of the Northwest or Senate Stairs. This became a key breach point which facilitated the first interior breach of the Capitol building on January 6, 2021.

Following the presentation of evidence, the parties' core factual disputes appeared to be (1) whether the pepper spray or substantially similar chemical irritant used by Ramey to spray the

officers was a "deadly or dangerous weapon" as used by Ramey, (2) whether Ramey's second spray, in fact, hit Officer Williams, and (3) whether Ramey knew that he was not authorized to be inside the restricted area on Capitol grounds on January 6, 2021.

The government has proved beyond a reasonable doubt that the pepper spray used by Ramey was a deadly or dangerous weapon as Ramey used it.  The testimony of four law enforcement witnesses trained in the use of pepper spray testified about the dangers of being sprayed, which include breathing issues, being unable to open one's eyes, possible allergic reaction or asthma attack, and possible permanent eye damage, not to mention the pain of feeling one's face "on fire."

The government also proved beyond a reasonable doubt that Ramey's second spray hit Officer Williams.  The government's video exhibits showed Officer Williams physically reacting to being sprayed one second after Ramey sprayed him.  Though other rioters sprayed near the base of the Northwest stairs, no spray but Ramey's went in Officer Williams's direction, and the two other visible sprays occurred either too early or too late to be the spray that caused Officer Williams's reaction.  That said, the government does not have to prove that Ramey's second spray hit Officer Williams to satisfy any element of any of the charged offenses.  Ramey's second spray constitutes an assault whether it hit Officer Williams or not.

Finally, no reasonable interpretation of the evidence leads to a finding that Ramey did not know that he was not authorized to be on Capitol grounds on January 6.  Ramey was fully able to view police lines, barricades, and crowd control ordinance deployed by police.  He brought gear demonstrating that he showed up for a fight, with the intent to disrupt government functions.

This brief begins with a summary of the evidence presented at trial (Part I), then proceeds to a discussion of issues raised by the Court following the conclusion of evidence (Part II).  Finally,

this brief analyzes the government's proof of the elements of the charged offenses, demonstrating that the government has proved every element of the offenses beyond a reasonable doubt (Part III). This brief concludes by asking this Court to return the only verdict consistent with the evidence, guilty on all counts.

## I.    SUMMARY OF TRIAL EVIDENCE

### *Restricted Grounds*

Officers David Riggleman and Bryant Williams arrived for work at the United States Capitol at 6:00 am on January 6, 2021.  At that time, there was a plan for the day at the Capitol—prepare for the certification of the Electoral College vote, a meeting of Congress in Joint Session, for which the Vice President of the United States would be visiting.  For this purpose, the grounds surrounding the Capitol were closed to the public.  The restricted perimeter around the grounds was visually marked by "bike rack" barricades reinforced with green plastic snow fencing, adorned with large signs reading, "AREA CLOSED."  Officer Williams patrolled the perimeter that morning, ensuring that every barricade was interlocked, that the perimeter was intact.

### *Civil Disorder*

Just before 1:00 pm, as the Joint Session was getting underway, a large crowd approached Capitol grounds from the west.  Many of them were wearing helmets, tactical vests, goggles, and other body armor.  A thin line of United States Capitol Police (USCP) stood on Pennsylvania Walkway between the crowd and the grounds, behind the barrier demarcating the restricted area. The crowd chanted and shouted at officers as they approached the barrier.  At approximately 12:53 p.m., members of the crowd picked up the barricades and snow fencing and used them like battering rams, shoving the police officers backwards, mowing one female officer to the ground. Having lost the fencing, USCP briefly engaged in hand-to-hand combat with the front line of the

rioters before falling back to the Lower West Terrace.  As the front line of rioters chased police

back, hundreds of rioters followed behind, stepping over the wreckage of the fencing in their path.

As the invading mob flooded into the restricted area, they ignored or destroyed

intermediate barriers and fencing inside the perimeter on their way to the Lower West Terrace.

USCP formed a secondary line at the top of a set of steps, themselves fenced off by black metal

gates bolted into the ground.  Rioters continued to chant and shout, some screaming directly into

officers' faces while the officers tried to verbally deescalate and use hand signals to hold the crowd

back.  The crowd did not heed.  After mere minutes of this secondary standoff, the crowd advanced

again, literally tearing the metal fencing out of the ground as they went.  USCP fell back again to

the foot of the Capitol building itself and the scaffolding and stage that were being constructed for

the upcoming inauguration of the president.

The defendant, Barry Ramey, was right there.[1]  He entered the restricted area near the site

of the 12:53 p.m. breach of the perimeter, minutes after the breach.  Wearing knee pads, armored

gloves, a neck gator, and a black baseball cap, he hustled down Pennsylvania Walkway to meet

the crowd amassing in the Lower West Terrace.  There, he joined the standoff against police,

chanting and cheering.  Intermittently, he donned and removed a large gas mask as police deployed

crowd control ordinance in an effort to disperse the rioters.

Officer Williams arrived to assist the vastly outnumbered USCP officers on the West Front.

He positioned himself in front of an opening in the scaffolding at the base of the Northwest Stairs,

alternatively called the Senate Stairs.  One rioter with a bullhorn began yelling, "Take the stairs!

---

[1]      SA Ryan Nougaret, who watched many hours of Ramey on and near Capitol grounds and who interacted with Ramey in person when he was arrested, identified Ramey in court. Additionally, the defense stipulated to Ramey's identity in several screenshots from the government's video exhibits.  (Ex. 504)

Take the stairs!" (Ex. 202 at apx. 06:58.) Around this time, Officer David Riggleman also responded to the Senate Stairs to assist officers who were "greatly outnumbered." (Trial Tr. 170.)

*Assaults*

At approximately 1:42 p.m., the crowd began to push forward. As this happened, Ramey lifted his right arm. In his hand, he held a cannister about the length of his palm with a black cap. Ramey briefly turned his hand towards his own face, apparently checking to make sure the cannister was ready to fire, then he extended his right arm and sprayed. This spray hit Officer Riggleman directly in the eyes. Officer Riggleman reacted immediately, turning away from the surging crowd as he protected his service weapon. Officer Riggleman experienced a sensation of sand in his eyes and was no longer able to keep his eyes open. Officer Riggleman used a railing on the stairs to guide him back to the building, where he sought assistance from another officer to get to a bathroom so that he could decontaminate.



*Close up of Gov't Ex. 200A – spray (circled in white) of Ofc. Riggleman by Ramey*

Seconds after Ramey sprayed Officer Riggleman, Ramey extended his arm and sprayed again.   The second spray hit Officer Williams.   Because Officer Williams was wearing his motorcycle helmet, he did not react until the spray had seeped through the foam pad sitting on forehead and began dripping into his eyes.   He realized he had been hit with OC spray because he felt like "fire on his face."   (Trial Tr. 131.)   Officer Williams did not have an opportunity to decontaminate until several hours later.   After being sprayed by Ramey, Officer Williams experienced blurred vision.   Officer Williams continues to experience vision problems to this day. He did not have vision issues before he was sprayed by Ramey on January 6.



*Close up of Gov't Ex. 200C – spray (circled in blue) of Ofc. Williams by Ramey*

Both Officers Riggleman and Williams testified that they recognized the substance that they were sprayed with on January 6 as OC or pepper spray,[2] because they felt the same burning sensation that they felt when they were sprayed with OC as part of their law enforcement training.

*Pepper Spray as a Deadly or Dangerous Weapon*

All four government witnesses—Officers Riggleman and Williams, Captain Carneysha Mendoza and Special Agent Ryan Nougaret—testified about their law enforcement training experience with pepper or OC spray.  All four witnesses were sprayed with OC as part of their training.  All four witnesses described experiencing a "burning sensation" and being impaired after being sprayed.  Captain Mendoza testified that the burning sensation can last up to 24 hours, in some cases longer, even after a person is able to decontaminate by flushing their face with water.

Captain Mendoza, who is herself a training officer in the use of OC spray, also testified that, while OC spray is considered a less-than-lethal weapon as used by law enforcement, depending on the circumstances and the person being sprayed, it can be lethal.  The witnesses described how OC or pepper spray can have a range of effects depending on the person, including varying degrees of incapacitation, impairment, and injury.  Captain Mendoza stated that OC spray's effect on an individual can depend on a number of factors, including whether or not that person has asthma.  SA Nougaret and Officer Williams both testified that at least one member of their training cohort required emergency medical attention after being sprayed.  Officer Williams testified about the importance of training to use OC spray safely and that one of the risks of using

---

[2]     OC spray is the term used by USCP officers to refer to the chemical irritant that they carry, which is essentially the same as pepper spray; both pepper spray and OC spray are generic terms. (Trial Tr. 115.)  Pepper spray is "a temporarily disabling aerosol that is composed partly of capsicum oleoresin and causes irritation and blinding of the eyes and inflammation of the nose, throat, and skin."  *Pepper Spray,* Merriam-Webster.com, https://www.merriam-webster.com/dictionary/pepper%20spray (last visited February 25, 2023).

OC spray in an "unsafe" way includes an effect called "needling," which can result in permanent damage to the retinas.  (Trial Tr. 116-17.)

*Disruption of Government Functions*

Ramey's assaults on Officers Riggleman and Williams contributed to the collapse of the line at the base of the Northwest Stairs.  Rioters continued to fight with police as they continued pushing up the stairs, towards the Capitol building.  Ultimately, the rioters did indeed "take the stairs."  Shortly after the mob made its way to the top, to the Upper West Terrace, the rioters breached the interior of the Capitol building for the first time on January 6, at around 2:13 p.m. The Joint Session was suspended due to the breach of the Capitol building and was not able to resume again until after the rioters were cleared and multiple security sweeps of the building had been performed, after 8:00 p.m.

Ramey himself did not leave Capitol grounds after assaulting Officers Riggleman and Williams.  He lingered on the Lower West Terrace until about 3:00 p.m., when he began to ascend the Northwest stairs.  He reached the Upper West Terrace around 4:00 p.m., where he remained until he and other rioters on the Upper West Terrace were cleared by police around 4:30 p.m.  Even then, Ramey did not leave.  After ending up on the East Front of the Capitol following the police push, Ramey again returned to the Lower West Terrace, where he remained until at least until 5:20 p.m. as the sun went down and Capitol grounds grew dark.  In total, Ramey was on Capitol grounds for at least four and a half hours.

## II.   DISCUSSION OF ISSUES

At the conclusion of trial, the Court asked the parties to analyze several issues regarding the "deadly or dangerous weapon" used by Ramey to assault Officers Riggleman and Williams, relevant to Counts 2 and 3, which charge the defendant with violations of 18 U.S.C. § 111(b), and

Counts 4, 5, and 6, each of which charge the defendant with a felony offense under 18 U.S.C. § 1752(b)(1)(A).  The Court requested analysis of pepper spray specifically as a deadly or dangerous weapon, to include Capitol breach cases where such a finding had been made, and queried the variety of objects that may be used as a deadly or dangerous weapon within the meaning of Sections 111 and 1752.  The Court also questioned how broadly it may consider the surrounding circumstances—such as the presence of a mob or the fact that the victim is an armed police officer—when considering whether pepper spray was a deadly or dangerous weapon as used here. Finally, the Court asked whether the government is required to prove beyond a reasonable doubt that the substance involved in the assaults was, in fact, pepper spray, because that is the substance noticed in the Indictment.  These questions are addressed below.

### A.  The meaning of "deadly or dangerous weapon" under Sections 111 and 1752

This Court's jury instructions—to which the parties have agreed—define "dangerous weapon" for purposes of Sections 111 and 1752 as an object "capable of causing serious bodily injury or death to another person," where the defendant uses the object "in that manner."  *See also United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002).  Whether an object is a deadly or dangerous weapon is a question of fact.  *United States v. Phelps*, 168 F.3d 1048, 1055 (8th Cir. 1999) ("[W]hat constitutes a dangerous weapon in a particular case is a question of fact for the jury."); *United States v. Estrada-Fernandez*, 150 F.3d 491, 497 (5th Cir. 1998); *United States v. Sturgis*, 48 F.3d 784, 788 (4th Cir. 1995); *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994); *United States v. Schoenborn*, 4 F.3d 1424, 1433 (7th Cir. 1993).  This Court's determination post-trial as to whether pepper spray as used by the defendant is a deadly or dangerous weapon depends on the factual record before the Court, as it would for a jury.  That said, the legal analysis included in this section may aid the Court in contextualizing the government's evidence.  The cases

cited below clearly demonstrate that pepper spray is a deadly or dangerous weapon, consistent with the evidence in this trial.

    *i.   Pepper spray as a deadly or dangerous weapon*

        1.   Capitol Breach Cases

In every Capitol breach case where the issue has been decided, judges and juries at various stages of litigation have concluded that pepper spray is a deadly or dangerous weapon.  *See United States v. Worrell*, 1:21-cr-292 (BAH), Hrg. Tr. 3/19/2021 (detention decision/finding under the BRA); *United States v. Mault*, 1:21-cr-657 (BAH) (guilty plea); *United States v. Mattice*, 1:21-cr-00657 (BAH) (guilty plea); *United States v. Bilyard*, 1:22-cr-34 (RBW) (guilty plea) (guilty plea); *United States v. Caldwell*, 21-cr-181 (guilty plea); *United States v. Khater*, 21-cr-222 (1) (TFH) (guilty plea); *United States v. Stallings*, 21-cr-178 (APM) (guilty plea); *United States v. Gardner*, 21-cr-622 (APM) (guilty plea); *United States v. Schwartz*, 21-cr-178 (APM) (jury trial/Rule 29); *United States v. Brown*, 21-cr-178 (APM) (jury trial/Rule 29); *United States v. Maly*, 21-cr-178 (APM) (jury trial/Rule 29).

Judges in Capitol breach cases have analyzed pepper spray as a dangerous weapon under the Bail Reform Act (BRA) in the context of pretrial detention.  *See* 18 U.S.C. § 3142(f)(1)(E) (allowing the government to move for detention in cases "involve[ing] a … dangerous weapon"). For example, in evaluating the defendant's motion to revoke pretrial detention, Judge Sullivan concluded that chemical spray was a dangerous weapon in part because it "is generally understood to be capable of causing 'extreme physical pain' and 'protracted' impairment of a bodily organ, such as coughing, choking, burning sensations of the eyes and nose, and exacerbation of pre-existing conditions such as asthma." *United States v. Gieswein*, 2021 WL 3168148, at *14 (D.D.C. July 27, 2021), *aff'd*, 2021 WL 5263635 (D.C. Cir. Oct. 19, 2021) (citing *United States v. Neill*,

166 F.3d 943, 949-50 (9th Cir. 1999); *United States v. Bartolotta*, 153 F.3d 875, 879 (8th Cir. 1998)).  In rejecting the defendant's argument that the government was required to show actual injury, the Court said: "It is enough that [the defendant] forcefully used the chemical spray in a manner that was threatening to a federal officer." *Id.* (citing *United States v. Duran*, 96 F.3d 1495, 1509-11 (D.C. Cir. 1996) (in turn holding that "the act of using a deadly weapon with the purpose of causing Secret Service agents to fear imminent serious bodily injury" constituted a crime under Section 111(b))).

Similarly, on a detention motion, Chief Judge Howell concluded that pepper spray is a "dangerous weapon" for purposes of the Bail Reform Act.  *Worrell*, 1:21-cr-292 (BAH), Hrg. Tr. 3/19/2021 at 62-63.[3]  The Court concluded that "pepper spray gel" is capable of causing bodily injury "not only to people who suffer from preexisting conditions, like asthma to make it difficult for them to breathe, but it can cause people who get it in their mouth, their nose, and their eyes to feel very serious stinging and be very uncomfortable unless they can promptly wash it out."[4]  *Id.*

In another Capitol breach case, also on a detention motion, Chief Judge Howell commented that evidence of "a defendant's intentionality for engaging in assaultive behavior, as evidenced by planning for *carrying and using a conventional dangerous weapon, like a taser or chemical spray,*

---

[3]     Chief Judge Howell's ruling also was affirmed by the D.C. Circuit, though the holding that pepper spray gel constituted a dangerous weapon was reviewed only for plain error because the defendant failed to preserve the issue for appeal.  *United States v. Worrell*, 848 F. App'x 5, , 5-6 (D.C. Cir. 2021) (per curiam).

[4]     Looking at precedent outside of the Circuit, Judge Bates held last year that a "deadly or dangerous weapon" under Section 111(b) of Title 18 means "any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person."  *United States v. Klein*, No. CR 21-236 (JDB), 533 F. Supp. 3d 1, 10 (D.D.C. 2021) (quoting *United States v. Bullock*, 970 F.3d 210, 215 (3d Cir. 2020) (citing *United States v. Sanchez*, 914 F.2d 1355, 1358-59 (9th Cir. 1990) (collecting cases))).  The government views that definition as essentially identical to that used in *Arrington* and the Sentencing Guidelines.

raises a much greater risk of dangerousness than bringing a skateboard." *United States v. Owens*, 541 F. Supp. 3d 102, 118 (D.D.C. 2021) (emphasis added).

Indeed, in this case, the government moved for Ramey's pretrial detention in part based on his use of a dangerous weapon, that being pepper spray. (*See* ECF. No 17, Gov't Response to Defendant's Motion to Revoke Detention Order, at 11.) Because the government moved for Ramey's detention on multiple grounds, the Ramey's eligibility for detention was not contested, and the BRA does not require findings on the government's grounds for a detention motion, this Court did not analyze at that time whether pepper spray is a dangerous weapon under 18 U.S.C. § 3142(f)(1)(E).[5]

## 2. Other Cases

Numerous courts have concluded that pepper spray (or "mace") is a dangerous weapon under the U.S. Sentencing Guidelines, which define the term in part as "an instrument capable of inflicting death or serious bodily injury," U.S.S.G. § 1B1.1 comment. n.1(E); "serious bodily injury," in turn, is defined in the Sentencing Guidelines to mean "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." *Id.* § 1B1.1 comment. n.1(M).

In *Neill*, 166 F.3d at 949, the victim "suffered from exercise-induced asthma controllable with a inhaler after exercising," and a pepper-spray attack caused "severe asthma attacks for a week after the incident" and thereafter. *Id.* The Ninth Circuit concluded that pepper spray was a

---

[5] This summary is based on counsel's notes as the government was not able to obtain the hearing transcript as of the date of this filing.

"dangerous weapon" under the Guidelines because, as those facts showed, it was capable of causing "serious bodily injury":

> Initially, evidence at trial proved that pepper spray is capable of causing "extreme pain." [The victim] testified that after being sprayed she felt "like somebody took a match and stuck it up both sides of [her] nostrils ... it was like I was on fire." Additionally, [the victim's] testimony proves that pepper spray is capable of causing "protracted impairment of a function of a bodily organ." [The victim] testified that "I was not able to breath, you know, no air in. A lot of coughing mucus in—in my lungs. Its like your lungs are just being filled up slowly with liquid and you're not able to breathe in because there's no way for the air to come in." According to [the victim], this condition lasted for days and did not completely abate for two weeks. [The victim] testified that she is currently required to take five asthma relief pills a day for the rest of her life. Such lifelong severe asthma is surely a protracted impairment of a bodily organ, the lungs.

*Id.* at 949-50.

Similarly, in *Bartolotta*, 153 F.3d at 879, the Eighth Circuit concluded that "mace" is a dangerous weapon under the Sentencing Guidelines.[6] The victim in that case "testified that she developed chemical pneumonia as a result of the [mace attack], and that she missed almost two weeks of work. [The victim] had to take daily steroid shots for over four months and steroid pills for one year to cleanse the mace from her system." *Id.* In *United States v. Melton*, 233 F. App'x 545 (6th Cir. 2007), the court affirmed the district court's classification of pepper spray as a "dangerous weapon" based on the following effects:

> The spray burns the face, nostrils, restricts breathing passages, and causes blindness. Most persons recover from its effects within 20 to 30 minutes, sooner with aid. However, persons with medical problems such as asthma have experienced damage to lungs when exposed to pepper spray.

*Id.* at 547; *see also United States v. Douglas*, 957 F.3d 602, 607 (5th Cir. 2020) (holding that the lower court did not clearly err in finding that pepper spray is a "dangerous weapon" and noting

---

[6]     Mace is another term for pepper spray or OC spray. *See, e.g., United States v. Dautovic*, 763 F.3d 927, 930 (8th Cir. 2014).

that "[t]wo victims were treated in a hospital after initial treatment in the prison infirmary, and one victim suffered protracted impairment in his right eye"); *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1199-1200 (9th Cir. 2000) ("pepper spray is *designed* to cause intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx" (emphasis in original)), *cert. granted, judgment vacated*, 534 U.S. 801 (2001); *cf. United States v. Dukovich*, 11 F.3d 140, 142 (11th Cir. 1994) (tear gas was "dangerous weapon" under Sentencing Guidelines because it can cause "eye pain and a severe headache," and can cause vomiting, a rash, the loss of breath, or temporary damage to the eyes).

District courts have come to the same conclusion. *See United States v. Krueger*, No. 13-20242, 2013 WL 8584873, at *2 (E.D. Mich. July 10, 2013) (concluding that pepper spray was dangerous weapon under Sentencing Guidelines); *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1261 (E.D. Wash. 2005). Others have similarly concluded that pepper spray is a "dangerous weapon" under similarly worded state statutes. For example, in *Norris v. Lafler*, No. 04-CV-72176, 2008 WL 786661 (E.D. Mich. Mar. 20, 2008), the district court found reasonable a state court's conclusion that a combination of tear gas and pepper spray was a "dangerous weapon" under a state statute requiring a "serious injury," because that combination had caused victims' "extreme eye pain and burning sensations that required two of them to seek medical treatment," one victim "need[ed] glasses to read and ha[d] blurred vision in his left eye" and cornea defects as a "result of being sprayed," and another could not wear contact lenses for a month. *Id.* at *8-9.

The cases cited herein make clear that pepper spray is widely understood to be capable of causing serious bodily injury, and so is a dangerous weapon, for three reasons. First, it is capable of causing an "injury involving extreme physical pain"—typically extreme burning pain in the

eyes, nose, throat, or lungs—as the Ninth Circuit held in *Neill*.  166 F.3d at 949 ("pepper spray is capable of causing 'extreme pain'").  Second, pepper spray can cause "protracted impairment of a function of a bodily member [or] organ," as evidenced by the "lifelong severe asthma" suffered by the victim in *Neill*, 166 F.3d at 949-50 (finding that to be "surely a protracted impairment of a bodily organ, the lungs"), the "chemical pneumonia" that forced the victim in *Bartolotta* to miss two weeks of work and receive treatment for a year, 153 F.3d at 879, the "blurred vision" and cornea defects suffered by the victim in *Norris*, 2008 WL 786661 at *8, or the sustained vision impairment in *Douglas*, 957 F.3d at 604.  Finally, pepper spray can require "medical intervention," such as the doctor's visit and prescriptions in *Neill*, the steroid shots and pills in *Bartolotta*, or the medical treatment in *Norris* and *Douglas*.

Several of these cases, in concluding that pepper spray is a dangerous weapon, noted that pepper spray had in fact caused serious bodily injury to the victims in those cases.  While actual injuries are plainly *sufficient* to show that pepper spray is a dangerous weapon, such injuries are not *necessary*.  As the Sentencing Guidelines, D.C. Circuit case law, and text of Sections 1752(b)(1)(A) and 111(b) make clear, the government need not show serious bodily injury—or even that the victim was touched by the dangerous weapon—in a particular case.  The Guidelines and this Circuit's *Arrington* case make this point obvious by stating that a weapon is dangerous if it is merely "*capable*" of inflicting "serious bodily injury" in the way it was used, even if it did not in fact do so.  U.S.S.G. § 1B1.1 n.1(E) (emphasis added); *Arrington*, 309 F.3d at 45.  Section 1752(b), meanwhile, applies an enhancement to anyone who "uses *or carries* a . . . dangerous weapon" during and in relation to the offense.  18 U.S.C. § 1752(b)(1)(A) (emphasis added).  By separately criminalizing the mere carrying of a "dangerous weapon," the statute makes abundantly clear that a weapon can be dangerous under Section 1752 without ever having been used at all in

the charged offense, much less without having hit a victim or caused serious bodily injury.[7]

Finally, Section 111(b) states that a defendant will receive that subsection's enhanced penalty if

he "uses a . . . dangerous weapon . . . *or* inflicts bodily injury," which presupposes that a defendant

can use a dangerous weapon without causing bodily injury.  18 U.S.C. § 111(b) (emphasis added).[8]

Thus, as long as the type of pepper spray used or carried by the defendant *can* cause serious bodily

injury, it is a dangerous weapon.  *See also United States v. Brown*, No. 21-MJ-565 (ZMF), 2021

WL 4033079, at *6 (D.D.C. Sept. 3, 2021), *aff'd*, No. 21-3063, 2021 WL 5537705 (D.C. Cir. Nov.

17, 2021) ("Brown's mere wielding of pepper spray toward officers satisfies the elements of the

charged offenses for which the use of a dangerous weapon is relevant.") (Capitol breach case).

### ii.  *Other objects as dangerous weapons*

Because the question of whether an object is a deadly or dangerous weapon is a fact-

specific one, a wide variety of objects have been found by courts to be deadly or dangerous

weapons based on the manner in which those objects were used.  *United States v. Gholston*, 932

F.2d 904, 905 (11th Cir. 1991) (desk); *United States v. Sanchez*, 914 F.2d 1355, 1359 (9th Cir.

1990) (citing cases involving "mop handle" and "mouth and teeth"); *United States v. Loman*, 551

F.2d 164, 169 (7th Cir. 1977) (citing cases involving "a wine bottle," "shoes," "a rake," and "a

chair leg" and finding that a "walking stick" was a deadly or dangerous weapon); *Galvan v. United*

---

[7]     Unlike Section 1752(b)(1)(A), Section 111(b) only applies if the defendant "uses" the dangerous weapon.  18 U.S.C. § 111(b).  Thus, while a canister of pepper spray (like a firearm) may be a "dangerous weapon" under Section 1752(b)(1)(A) and Section 111(b) even if never used, the defendant could only be convicted of the latter Section 111(b) charge if he used the pepper spray in a way that is dangerous (e.g., by discharging it).

[8]     The enhanced penalty provision in Section 1752(b) operates similarly: it applies to the defendant's use or carrying of a dangerous weapon *or* where the "the offense results in significant bodily injury."  18 U.S.C. § 1752(b)(1)(B).  That further makes clear that significant bodily injury is not required to show that the defendant used or carried a dangerous weapon, because otherwise the significant bodily injury provision would be superfluous.

*States*, 318 F.2d 711 (9th Cir. 1963) (automobile); *United States v. Johnson*, 324 F.2d 264, 266

(4th Cir. 1963) (chair); *Thornton v. United States*, 268 F.2d 583 (D.C. Cir. 1959) (wine bottle),

*Medlin v. United States*, 207 F.2d 33 (D.C. Cir. 1953) (shoe);

Human body parts have been found to be deadly or dangerous weapons in circumstances

where they are "employed to inflict death or serious physical injury." *Sturgis*, 48 F.3d at 788.  To

conclude otherwise, the Fourth Circuit stated, would reflect "empty formalism," as statutes

criminalizing conduct involving dangerous weapons "draw no such artificial line." *Id.*; *see also*

*United States v. Moore*, 846 F.2d 1163, 1167-68 (8th Cir. 1988) (concluding that the mouth and

teeth of an HIV positive inmate were dangerous weapons when used to bite two federal

correctional officers due to the potential for serious infection resulting from a human bite, which

is a form of "serious bodily harm"); *State v. Born*, 159 N.W.2d 283, 284-85 (Minn. 1968)

(concluding under state law that fists and feet may be dangerous weapons when used to strike and

stomp); *compare United States v. Rocha*, 598 F.3d 1144, 1157 (9th Cir. 2010) (holding that a

federal prisoner, by pulling a fellow inmate's ankles and forcing him to the floor, did not commit

an assault with a "dangerous weapon" under the federal assault statute, 18 U.S.C. § 113).

In Capitol breach cases, other than those involving OC spray, objects determined to be

deadly or dangerous weapons have included:[9]

- Police baton.  *United States v. Devlyn Thompson*, 21-cr-461 (RCL); *United States v. Mason Courson*, 21-cr-35 (RC); *United States v. Mark Mazza*, 21-cr-736 (JEB)
- Extended police baton.  *United States v. Geoffrey Sills*, 21-cr-40 (6) (TNM)
- Orange traffic barrier and two stick-like objects.  *United States v. Nicholas Languerand*, 21-cr-353 (JDB)
- Metal flagpole.  *United States v. Howard Richardson*, 21-cr-721 (CKK); Thomas Webster, 21-cr-208 (APM)
- Wooden flag pole.  Mark Ponder, 21-cr-259 (TSC); *United States v. James Elliott*, 21-cr-735 (RCL)

---

[9]      As with the cases listed *supra* on pages 8 and 9, these determinations have been made at various stages of litigation following varying degrees of analysis.

- Large metal billboard frame on casters. *United States v. Charles Bradford Smith*, 21-cr-567 (2) (RCL)
- Mace Brand Compact Stun Gun (taser). *United States v. Alan Byerly*, 21-cr-527 (RDM)
- Crutch. *United States v. Jack Whitton*, 21-cr-35 (5) (EGS)
- Table leg. *United States v. Josiah Kenyon*, 21-cr-726 (CJN)
- OC MK-46 incapacitation device. *United States v. Mitchell Todd Gardner II*, 21-cr-622 (APM)
- Wooden plank/fire extinguisher. *United States v. Palmer*, 21-cr-328 (TSC)
- Contents of a fire extinguisher. *United States v. Nicholas Brockhoff*, 21-cr-524 (CKK)
- Fire extinguisher (as thrown as a blunt object). *United States v. Robert Sanford Jr.*, 21-cr-86 (PLF)
- Large metal billboard frame on casters. *United States v. Marshall Neefe*, 21-cr-567 (1) (RCL)
- Long gray pole (PVC pipe). *United States v. Lucas Denney*, 22-cr-70 (RDM)
- Wooden handrail. *United States v. James McGrew*, 21-cr-398 (BAH)
- Skateboard. *United States v. Grady Owens*, 21-cr-286 (BAH)
- Bike rack barricade (thrown). *United States v. Landon Copeland*, 21-cr-570 (APM)
- Firecracker. *United States v. David Judd*, 21-cr-40 (TNM)
- Riot Shield. *United States v. Patrick McCaughey*, 21-cr-40 (TNM)

   iii. *Impact of surrounding circumstances on whether an object is capable of causing serious bodily injury in the manner in which it is used.*

When considering whether an object is a deadly or dangerous weapon, courts generally have not considered the nature of the environment or surrounding circumstances to determine whether the object is capable of causing serious bodily injury in the manner that it is used. The analysis may be different, however, under circumstances where the weapon is designed to incapacitate a person and the defendant intentionally uses the weapon in a dangerous situation. *See, e.g.*, *United States v. Wallace*, 800 F.2d 1509 (9th Cir. 1986). In *Wallace*, the defendant was convicted under 49 U.S.C. § 1472(l) for boarding a plane with a concealed dangerous weapon. On appeal, the defendant argued the trial court erred in finding that a "stun gun" was a dangerous weapon because a stun gun "incapacitates its victims temporarily and does not inflict serious permanent harm." *Id.* at 1513. In dismissing the defendant's argument, the Ninth Circuit first noted that "evidence was introduced at trial indicating that stun guns may cause permanent injury

to eyes and that a single stun gun may incapacitate twenty to forty people at a time." *Id.* (internal citations omitted).  "Moreover," the court stated:

> [T]he potential for devastating injury that is present during even a temporary incapacitation of key personnel aboard an aircraft in flight requires courts applying the statutory prohibition against a deadly or dangerous weapon to consider both the transitory and permanent nature of the weapon's effect.  Finally, a stun gun may be found to be a dangerous weapon because display of the gun is likely to provoke fear in the surrounding passengers creating "an immediate danger that a violent response will ensue.

*Id.* (internal citations omitted).  *See also United States v. Robertson*, No. 21-CR-34 (CRC), 2022 WL 2438546, at *8 (D.D.C. July 5, 2022) ("[T]he Court concludes that the evidence, including the surrounding circumstances of what was happening at the Capitol, is sufficient to support the jury verdict on counts three and four with respect to the defendant carrying a deadly or dangerous weapon.").

### B. The government is not required to prove beyond a reasonable doubt that the weapon used here was pepper spray despite pepper spray being the dangerous weapon identified in the Indictment.

At the close of evidence, the Court *sua sponte* asked whether the government was required to prove that the substance used by Ramey to assault the officers was "pepper spray, not bear spray or anything else." (Trial Tr. 195.)[10]  As an initial matter, the evidence proves beyond a reasonable doubt that that the weapon used by Ramey to assault Officers Riggleman and Williams was pepper spray.  The officers testified that they both recognized the substance that they were sprayed with as pepper spray or OC spray based on their experience being sprayed during training.  (Trial Tr. 132, 176.)  As shown by the trial evidence, the term "pepper spray" is generic.  (Trial Tr. 115.)

---

[10]     In his post-trial brief, Ramey incorrectly states that "[t]he Government first raised this issue at the close of evidence …"  (ECF No. 43 at 6.)  Ramey's claim that the government "made it known that it did not intend to prove that the spray was 'pepper spray,'" (*id.*) is likewise false. (*See* Trial Tr. 195-96.)

Pepper spray may alternatively be called "OC spray," which is also a generic term. (*Id.*) The terms "pepper spray" and "OC spray" refer to a chemical irritant substance that is marketed under different brands and comes in different sizes and concentrations. (*Id.*)[11] Thus, the term "pepper spray" as used in the Indictment is already a general term and does not command the factfinder to determine the exact nature of the chemical irritant used by Ramey to spray the officers. Nevertheless, the Court is not required to find that the substance was "pepper spray," per se, despite that term being used in the Indictment.

At trial, the government is required to prove the elements of the charged offenses, not specific facts alleged in the Indictment. *See United States v. Lemire*, 720 F.2d 1327, 1344 (D.C. Cir. 1993) ("[P]roof at trial need not, indeed cannot, be a precise replica of the charges contained in the indictment." (quoting *United States v. Heimann*, 705 F.2d 662 (2d Cir. 1983)). Allegations in an indictment serve to "apprise the accused of the charges against him so that he may adequately prepare his defense." *See United States v. Haldeman*, 559 F.2d 31, 123 (D.C. Cir. 1976). Deviations between proof offered at trial and facts alleged in an indictment may result in an impermissible variance, but only if the proof at trial and the allegations are "materially different" *and* the variance results in "substantial prejudice" such that the defendant is deprived "of notice of the details of the charge against him." *United States v. Emor*, 573 F.3d 778, 786 (D.C. Cir. 2009).[12]

---

[11]     Such as "bear spray," which is also a type of pepper spray. *See* John Briley, *Bear spray is showing up at protests and riots. Here's why, and how it affects humans*, WASHINGTON POST (March 19, 2021), *available at https://www.washingtonpost.com/lifestyle/wellness/bear-spray-pepper-riot-dangerous/2021/03/19/053c3870-87fb-11eb-bfdf-4d36dab83a6d_story.html* (last visited February 27, 2023)

[12]     Ramey suggests that the government's proof at trial resulted in a "constructive amendment" to the Indictment. A constructive amendment occurs when the evidence presented at trial and the jury instructions so modify the elements of the charged offense that the defendant may have been convicted on a ground not alleged by the grand jury's indictment. *United States v. Mangieri*, 694 F.2d 1270, 1277 (D.C. Cir. 1982). The Indictment was not constructively amended

If the Court finds that the government proved beyond a reasonable doubt that Ramey sprayed Officers Riggleman and Williams with a chemical irritant similar in nature to pepper spray, if not pepper spray itself, that would not result an impermissible variance. There is no material difference between "a chemical irritant spray similar in nature to pepper spray," a "substance consistent with pepper spray," or "a chemical irritant substantially similar to pepper spray," and pepper spray itself, especially given that "pepper spray" is already a generic term.

The government put Ramey on notice that it intended to offer evidence that Ramey assaulted the officers with pepper spray, and the government offered such proof at trial. If the Court finds that the substance was not "pepper spray," but "substantially similar" or a "substance consistent with pepper spray," Ramey will not have been prejudiced, let alone substantially prejudiced. Moreover, to require the government to prove a fact noticed by the Indictment but not included in the elements of the offense would hold the government to a higher burden of proof than is required by the statute. Had this case been submitted to a jury, the jury would not have been asked to find that the substance was "pepper spray" in order to find that the defendant used or carried a deadly or dangerous weapon. The government's burden does not increase because the finder of fact is the Court.

## III.    ANALYSIS OF THE ELEMENTS

Given that the main factual issues in this case involve whether Ramey assaulted officers using a deadly or dangerous weapon, this discussion begins with analysis of the elements of Counts 2 and 3. Analysis of Count 1 follows, then analysis of Counts 4, 5, 6, and 7 collectively, as those counts share many common elements.

---

for the simple reason that the Indictment alleged that the substance was pepper spray and the government pursued a theory at trial that the substance was pepper spray.

**Counts 2 and 3 (Assaults, 18 U.S.C. § 111(a)(1) and (b))**

Counts 2 and 3 of the Indictment charge the defendant with assault[13] with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(b), which is a 20-year felony.  In the alternative, Counts 2 and 3 charge the defendant with felony assault, 18 U.S.C. § 111(a)(1).  Simple assault, which is a violation of 18 U.S.C. § 111(a)(1), is a lesser included offense of both felony offenses, but neither felony offense under Section 111 is a lesser included offense of the other.   In considering whether the government has proven Counts 2 and 3, the Court must consider the greater felony offense (assault with a deadly or dangerous weapon, 18 U.S.C. § 111(b)) first, and the Court cannot convict the defendant of both assaults under 111(a)(1) and 111(b).  This statutory framework is correctly reflected in the Court's jury instructions.

This analysis begins with the elements of Simple Assault, which are the first four elements of either felony assault, then addresses the respective fifth elements of the felony offenses in turn.

A.  Elements 1-4 (Simple Assault, 18 U.S.C. § 111(a)(1))

The first four elements of Counts 2 and 3 require the government to prove beyond a reasonable doubt that the defendant (1) assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer of the United States, that he did so (2) forcibly, (3) voluntarily and intentionally, and that (4) the officers were engaged in the lawful performance of their official duties.

---

[13]     When referring to conduct which constitutes a violation of 18 U.S.C. § 111, the government has used the word "assault" as shorthand as the evidence shows that Ramey's acts constitute "assault."  However, 18 U.S.C. § 111 does not merely proscribe assault.  The defendant may also violate Section 111 by resisting, opposing, impeding, intimidating, or interfering with an officer of the United States.  The defendant is only required to have "committed one of the acts described in § 111(a), i.e., 'forcibly assault[ed], resisted[ed], oppose[d], impede[d], intimidate[d], or interefere[d] with' a [federal officer] in specified circumstances;' " *United States v. Sabol*, 534 F. Supp. 3d 58, 68 (D.D.C. 2021) (internal citation omitted).

The government proved these elements beyond a reasonable doubt with respect to Ramey's assaults on Officers Riggleman and Williams. Ramey is plainly visible in Government's Exhibits 200 and 216, with his right arm outstretched, holding a cannister in his hand, and aiming, first, for Officer Riggleman and then for Officer Williams. Exhibits 200 and 216 show the spray emitting directly from the cannister in Ramey's hand, and Exhibits 200A, 200B, and 200C capture that in screenshots. Exhibit 200D, a screenshot of Exhibit 200 at 45 seconds, is a close-up of Ramey's hand with the cannister in it, seconds after he sprays the officers. Both officers testified about the moment that they became aware that the spray had hit them, and Exhibits 200 and 216 show their immediate reactions, with a slight delay for Officer Williams because the spray hit him in the helmet first and he became aware of having been hit once the spray began to seep down through the foam in his helmet, into his eyes.

Ramey's use of pepper spray was forceful. Captain Mendoza and Officer Williams testified that the use of pepper spray is literally a "use of force" in law enforcement terms. (Trial Tr. 48, 119.) Ramey used the force in his body and the force exerted by the pressure of the spray cannister to propel the spray the officers' direction. Ramey's body language—sizing up, tensing, jumping, his firmly extended arm, one spray for each reach—demonstrates that Ramey's acts were intentional and voluntary. Ramey's body language and the cannister in his hand shows that he had the intent to inflict injury on Officers Riggleman and Williams, and that he had the apparent present ability to do so. In fact, he did injure and incapacitate both officers when he hit them with the substance in the cannister.[14] Unchallenged evidence demonstrates that the substance in the

---

[14]     Though the government is not required to prove that either officer was injured or even hit by Ramey's spray. *See supra* at 15-16; *see also Gieswein*, 2021 WL 3168148, at *14 ("It is enough that [the defendant] forcefully used the chemical spray in a manner that was threatening to a federal officer."); *Brown*, 2021 WL 4033079, at *6. As discussed below, however, Ramey's spray did hit both officers.

cannister was pepper spray, OC spray, or a substantially similar substance, which has the capability to inflict serious bodily injury, as discussed further below.

Ramey committed two assaults—two extensions of his arm, two sprays—one for each officer, at both of whom Ramey was clearly aiming. Importantly, "assault" does *not* require physical conduct or touching. An "assault" is "any intentional *attempt or threat to inflict injury* upon someone else coupled with the apparent present ability to do so." (Emphasis added). Within the statutory framework of Section 111, physical contact (or, alternatively, the intent to commit another felony) elevates "simple assault" from a misdemeanor to a felony.[15]

Ramey intentionally attempted to and threatened to inflict injury upon Officers Riggleman and Williams. The extension of his arm and the release of spray, as seen in Exhibit 200, was clearly intentional. Ramey did these acts in the midst of a surging crowd that was attempting to forcefully break the police line. There is no reasonable interpretation of Ramey's sprays as seen in Exhibit 200 that leads to a finding that he did not intend to inflict injury on the officers at whom he was aiming, and by his sprays he undoubtedly attempted and threatened to inflict injury upon those officers. Armed with pepper spray, Ramey had the apparent present ability to injure both officers. The evidence proves beyond a reasonable doubt that Ramey's acts constituted assaults,

---

[15]     Physical contact distinguishes a common-law battery from a common-law assault. *See* 1 W. Blake Odgers, et al., The Common Law of England 317 (2d ed. 1920) ("[E]very battery includes an assault" because "it is in short an assault which has succeeded."); *California v. Hodari D.*, 499 U.S. 621, 631 (1991) (Stevens, J., dissenting) (noting "the distinction between the common-law torts of assault and battery—a touching converts the former into the latter"); *United States v. Taylor*, 848 F.3d 476, 493 (1st Cir. 2017) ("At common law, assault meant an attempt to commit a battery or an act putting another in reasonable apprehension of bodily harm. . . . A battery is the slightest willful offensive touching.") (cleaned up); *United States v. Delis*, 558 F.3d 177, 180 (2d Cir. 2009) ("common-law assault consisted of either attempted battery or the deliberate infliction upon another of a reasonable fear of physical injury").

but in the alternative, Ramey's acts certainly constitute at least resisting, opposing, impeding, intimidating, or interfering with officers attempting to maintain a police line.

Both officers were engaged in the lawful performance of their official duties at the time, as they testified at trial.  (Trial Tr. 134, 176.)

### B.   Element 5 (18 U.S.C. § 111(b)) – Deadly or Dangerous Weapon

The fifth element of the felony assault charged in Counts 2 and 3 under 18 U.S.C. § 111(b) requires the government to prove that, in doing the acts described above, the defendant used a deadly or dangerous weapon.  An object is a "deadly or dangerous weapon" if it is capable of causing serious bodily injury or death to another person and the defendant used it in that manner. In determining whether the object is a "deadly or dangerous weapon," the Court may consider both physical capabilities of the object used and the manner in which the object is used.

The evidence proves beyond a reasonable doubt that (1) the cannister that Ramey used to spray both officers was pepper spray or a substantially similar chemical irritant, and (2) pepper spray is a deadly or dangerous weapon because it is capable of causing serious bodily injury or death in the manner that the defendant used it.

The evidence at trial showed that the substance sprayed by Ramey was pepper spray, OC spray, or a substantially similar chemical irritant.  All four of the government's witnesses, all of whom are law enforcement officers trained in the use of pepper or OC spray, testified about their own experiences being sprayed as a part of their training.   All four described the physical experience of being sprayed as "burning" sensation on the skin and in the eyes.  (Trial Tr. 23, 56, 117, 132, 164, 172.)  SA Nougaret and Officer Williams described a feeling like their faces were "on fire."  (Trial Tr. 56, 117.) Officer Riggleman described experiencing a "gritty" feeling, like sand in his eyes.  Officers Williams and Riggleman both testified that the sensation that they

experienced when they were sprayed at the base of the Northwest Stairs on January 6 was the same as the sensation when they were sprayed as part of their training.  (Trial Tr. 132, 176.)  They both recognized the substance that they were sprayed with as OC or pepper spray.

OC or pepper spray is a deadly or dangerous weapon in the manner that the defendant used it.  All four law enforcement witnesses testified about the dangers of OC or pepper spray.  Captain Mendoza, a less-lethal weapons training officer, testified that, while OC spray is considered a less-than-lethal weapon as used by law enforcement, depending on the circumstances and the person being sprayed, it can be lethal.  (Trial Tr. 52.)  The witnesses described how OC or pepper spray can have a range of effects depending on the person, including varying degrees of incapacitation, impairment, and injury.  (Trial Tr. 52, 118.)  SA Nougaret and Officer Williams both testified that at least one member of their training cohort required emergency medical attention after being sprayed.  Captain Mendoza stated that OC spray's effect on an individual can depend on a number of factors, including whether or not that person has asthma, (Trial Tr. 52), the inference being that the breathing problems caused by OC spray (Trial Tr. 23) could be dangerously aggravated for a person with asthma.  The subject of spray could also suffer an allergic reaction which, at least in the case of Officer Williams's fellow trainee, can cause a person to not be able to breathe.  (Trial Tr. 118.)  Officer Williams testified about the importance of training to use OC spray safely and that one of the risks of using OC spray in an "unsafe" way includes an effect called "needling," which can result in permanent damage to the retinas.  (Trial Tr. 116-17.)

The record before the Court proves beyond a reasonable doubt that pepper spray can be a lethal weapon depending on how it is used.  "Less than lethal" does not mean "safe."  As Officer Williams testified, police carry multiple "less than lethal" weapons that are capable of producing

serious bodily injury.  (Trial Tr. 116.)  Every one of the government witnesses testified about the dangers of pepper spray when it is used in an unsafe way.

    C.  <u>Element 5 (felony 18 U.S.C. § 111(a)(1)) – Physical Contact or Intent to Commit Another Felony</u>

The fifth element of felony assault under 18 U.S.C. § 111(a)(1) requires the government to prove that the defendant made physical contact with an officer of the United States who was then engaged in the performance of official duties, *or* acted with the intent to commit another felony. The Indictment charges Ramey under both theories.  Though the government offered proof of both theories at trial, the government was not required to pursue both and the Court may convict under one or both theories.  *See United States v. Brown*, 504 F.3d 99, 104 (D.C. Cir. 2007) ("[I]t is well established that if a criminal statute disjunctively lists multiple acts which constitute violations, the prosecution may in a single count of an indictment or information charge several or all of such acts in the conjunctive and under such charge make proof of any one or more of the acts, proof of one alone, however, being sufficient to support a conviction." (internal quotation marks omitted)).

    i.  *Physical Contact*

By hitting them with spray, Ramey made physical contact with both officers.  Assault with "physical contact" (a battery) does not require body-to-body touching; it includes "any offensive touching," which may be accomplished with an object or other kind of projectile released by the defendant as part of the assault.  *See, e.g.*, *United States v. Stoddard*, 407 F. App'x 231, 233 (9th Cir. 2011) (spitting was "offensive touching" and therefore physical contact with victim officer under 18 U.S.C. § 111); *United States v. Lehi*, 446 F. App'x 96, 100 (10th Cir. 2011) (same); *United States v. Taliaferro*, 211 F.3d 412, 415 (7th Cir. 2000) (throwing urine on prison guard was offensive touching).

The evidence at trial showed that Ramey hit both Officers Riggleman and Williams with spray.  Exhibits 200 and 216 show the spray emitting from Ramey's hand and heading in the officers' direction.  Exhibits 200A, 200B, and 200C show this in still shots.  Both officers testified that they perceived being hit by Ramey's spray, and the video exhibits showing the assault shows both officers' reactions showing that they were hit by the spray.  In Officer Riggleman's case, the reaction was obvious and immediate.  In Officer Williams's case, there was a slight delay (about a second) before the videos show Officer Williams's body tensing, his head turning away from what was in front of him on the stairs, and then falling over as if he'd been hit by something.  Officer Williams testified that his reaction was delayed because the spray hit his helmet first and he did not perceive that he had been hit with spray until the liquid began to seep through his helmet.

At trial, the government used VLC Media Player's "frame-by-frame" feature to show this sequence of events.[16]  The same is shown below in screenshots from Exhibit 200.  In Exhibit 200, at 30 seconds, Ramey releases the second spray from the cannister in his hand, aiming for Officer Williams:



_____

[16]    Two other sprays close in time to Ramey's sprays, in the area at the base of the Northwest Stairs, are visible in Exhibits 200, 216, and 211.  For ease of reference, the government refers to these sprays as "OR1" ("other rioter spray number 1" – visible starting at 28 seconds into Exhibit 200) and "OR2" ("other rioter spray number 2" – visible starting at 32 seconds into Exhibit 200).

At 31 seconds, Officer Williams is visible with his head turned toward rioters on the stairs while Ramey's arm is still outstretched:



At 32 seconds, Officer Williams's body recoils as if he has been hit with something.  This is subtle, but clearly visible in Exhibit 200 when using the frame-by-frame feature.  Still at 32 seconds, Officer Williams's body continues to recoil backwards into the scaffolding as another rioter releases a different spray (OR2) into the air:



OR2, as is visible in Exhibits 200, 216, and 211, is not heading in Officer Williams's direction. (*See also* Ex. 211 at 00:06, shown in screenshots below.)  As OR2 begins to dissipate in the air,

still at 32 seconds, Officer Williams's body has begun to rotate away from the rioters and away from the stairs:



In Exhibit 200, it looks like Officer Williams is falling over at this point.  Notably, the other Capitol Police officer whose hand appeared to be tugging on Officer Williams's jacket two seconds earlier (see the first screenshot from Exhibit 200 on the previous page) is not touching Officer Williams as his body begins to fall.  Officer Williams continues to fall:





These screenshots and the frame-by-frame play of Exhibit 200 show (a) Officer Williams reacting to getting hit with Ramey's spray and (b) that Officer Williams reacted to Ramey's spray *before* another rioter released a different spray heading in a different direction.  The evidence proves beyond a reasonable doubt that Ramey made physical contact with both officers.

The evidence shows that neither of the two other sprays in the area (OR1, OR2) hit either officer.   Officer Williams identified OR1 as "bear spray" due to apparent tightness and concentration of the stream.  (Trial Tr. 155.)  OR1 is visible starting at 28 seconds into Exhibit 200.  As is visible in Exhibits 200 and 211, that stream was not heading in Officer Williams's direction, nor did it travel over his head.  Exhibits 200 and 211 show OR1 hitting the scaffolding above the opening, leaving a mark.  Exhibit 211 also shows the path of OR1 and OR2:



*Screenshots from Ex. 211 at 00:03 showing OR1 (circled in green) traveling away from Officer Williams*



*Screenshot from Ex. 211 at 00:04 showing OR1 (circled in green) traveling away from Officer Williams*



*Screenshot from Ex. 211 at 00:006 showing OR2 (circled in green) traveling away from Officer Williams.*

Neither spray (OR1 nor OR2) travels anywhere near Officer Williams's head.

ii.  *Intent to Commit Another Felony*

Ramey assaulted Officers Riggleman and Williams while in the course of committing and intending to commit other multiple felonies with which he is charged in the indictment—that is, Count 1 (18 U.S.C. § 231(a)(3)) and Counts 4, 5, and 6 (Entering and Remaining, Disruptive and Disorderly Conduct, and Physical Violence in Restricted Building or Grounds, While Using or Carrying a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1), (2), (4) and (b)(1)(A)).  As discussed elsewhere, Ramey committed the acts constituting these felonies intentionally, knowingly, and voluntarily.

**Count 1 (Impeding Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3))**

Count 1 of the Indictment requires the government to prove four elements:  (1) that the defendant knowingly committed an act or attempted to commit and an act, (2) by that act, the defendant intended to obstruct, impede, or interfere with one or more law enforcement officers, (3) the officers were engaged in their official duties incident to and during a civil disorder, and (4) the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

A.  Knowing Act by Which Ramey Intended to Obstruct, Impede, or Interfere with One or More Law Enforcement Officers

At the base of the Northwest Stairs, Ramey knowingly committed and attempted to commit multiple acts by which he intended to obstruct, impede, or interfere with Capitol Police officers, most notably his assaults of Officers Riggleman and Williams, but the Court could also interpret as "knowing acts" Ramey's pushing against the police line with other members of the crowd.  For the reasons discussed under Counts 2 and 3, the government has proved beyond a reasonable doubt

that Ramey committed such acts knowingly and intentionally.  His intent to obstruct, impede, or interfere with law enforcement officers may be inferred from his conduct, which involved attacking officers attempting to hold a police line and pushing against those officers as part of a mob.

### B.   Officers Engaged in Official Duties Incident to and During a Civil Disorder

As Officers Williams and Riggleman testified, they were engaged in the lawful performance of their official duties as Capitol Police officers at all times on January 6, 2021, including at the time when Ramey impeded, obstructed, and interfered with their performance of those duties.

A "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property.  The riot at the Capitol on January 6, 2021, was undoubtedly a civil disorder.  It was a massive public disturbance that involved thousands of unauthorized rioters screaming at police and throwing projectiles.  The mob as a collective caused injury to officers (such as Officers Williams and Riggleman) and damage to property (such as the windows near the Senate Wing Door, as seen in Exhibit 300, or the Inaugural scaffolding, as seen in multiple of the government's video exhibits) as well as causing significant and immediate danger of injury and property damage.

### C.   Obstructed, Delayed, or Adversely Affected Interstate Commerce or Federally Protected Function

The civil disorder obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any

federally protected function.  To find this element satisfied, the Court may find either an adverse effect on commerce or a on a federally protected function *in any way or degree*.

i.   *Commerce*

The government introduced records from a grocery store chain, Safeway, which was forced to close due to a curfew imposed by the District of Columbia mayor in response to the riot.  (*See* Ex. 401).  The closure of Safeway's D.C. stores had a meaningful and adverse impact on its sales (*see* Ex. 402, showing an obvious decrease in sales on January 6, 2021, relative to the same day the previous year and compared with January 5 and January 7, 2021).

ii.   *Federally Protected Function*

On January 6, 2021, Capitol Police Officers were engaged in the performance of a federally protected function, which is "any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof," that is securing the Capitol building and grounds and protecting members of Congress.  The civil disorder meaningfully and adversely affected those officers' ability to perform those functions.  Several of the government's video exhibits show the mob breaking and advancing past police lines.  After the breach at Peace Circle, USCP was forced to retreat multiple times and cede ground within the restricted area to the mob.  Eventually, USCP's ability to protect the Capitol was so impaired that rioters were able to destroy windows and break into the building.

**Counts 4, 5, 6, and 7 (Entering and Remaining, Disruptive and Disorderly Conduct, and Physical Violence in Restricted Building or Grounds, While Using or Carrying a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1), (2), (4) and (b)(1)(A); Act of Physical Violence on Capitol Grounds, 40 U.S.C. § 5104(e)(2)(F))**

Because Counts 4, 5, 6, and 7 share multiple common elements, the following discussion addresses those elements collectively.  The discussion demonstrates that the government has proved every element of Counts 4, 5, 6, and 7 beyond a reasonable doubt.

A.  Restricted Building or Grounds (element of Counts 4, 5, and 6)

On January 6, 2021, Capitol grounds was restricted to the public in part due to the presence of the Vice President who was visiting Capitol grounds for the purpose of participating in the Joint Session to Certify the electoral college vote.  The perimeter of the restricted area was visually marked with multiple types of fencing—bike racks, snow fencing—and hundreds of large signs stating that the area was closed.  Within Capitol grounds, intermediate barriers were also erected using bike racks, snow fencing, and signs.

B.  Defendant's knowledge of Restricted Grounds (element of Count 4 and 6)

There is no reasonable interpretation of the evidence that could lead the Court to conclude that Ramey did not know that he was in a restricted area, or that he did not know that he was not authorized to be there.  Ramey and others near him in the mob passed through multiple layers of bike rack and snow fencing on their way from Peace Circle to the Lower West Terrace and the base of the Northwest Stairs.  Some of those barriers were intact when Ramey saw them, such as the barriers blocking the opening in the scaffolding (*see, e.g.*, Ex. 202 at apx. 06:58 (intact bike rack fencing in front of stairs), Ex. 203 at apx. 05:57 (Officer Williams standing in front of bike rack fencing blocking access to the stairs), Ex. 206 at apx. 03:39 (Ramey standing right in front of the police line at the stairs and bike rack fencing)).  Other barriers were broken, but they were clearly destroyed, not invisible (*see* Ex. 201 at apx. 01:20, rioters picking up knocked over bike rack and snow fencing near Peace Circle), Ex. 202 at 00:00 (rioters walking over downed fencing), Ex. 203 at apx. 05:00 rioters tearing black metal fencing in Lower West Terrace out of the ground and walking over the pieces).  Ramey and the mob were subjected to crowd control ordinance in the Lower West Terrace (Exs. 205, 206).  Most significantly, Ramey encountered and *personally*

*broke* a police line trying to prevent rioters' passage up the Northwest Stairs toward the Capitol building's interior entrances.

C.  Disruptive and Disorderly Conduct (element of Count 5)

"Disorderly conduct" occurs when a person acts in such a manner as to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken, uses words likely to produce violence on the part of others, is unreasonably loud and disruptive under the circumstances, or interferes with another person by jostling against or unnecessarily crowding that person.  "Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.  For reasons discussed in greater depth elsewhere, Ramey's conduct inside the restricted area was obviously disruptive and disorderly.  Ramey disrupted and interfered with the police's official duty to secure and protect the Capitol.  Ramey caused Officers Riggleman and Williams to be in reasonable fear, which they testified about at trial, and Ramey certainly jostled and unnecessarily crowded others as part of a tightly packed mob trying to "take" the Northwest Stairs.

D.  Intent to Impede or Disrupt the Orderly Conduct of Government Business or Official Functions (element of Count 5)

For reasons discussed in reference to Counts 1, 2, and 3, Ramey impeded and disrupted the orderly conduct of government business and official functions, most notably, Capitol Police's duty to protect and secure the Capitol.  Ramey's intent to impede and disrupt these functions may be inferred from his conduct, which was actively obstructive and assaultive.  Ramey arrived on Capitol grounds on the exact day and hour of the Certification of the Electoral College vote.  His attire is also indicative of his intent.  Ramey arrived on Capitol grounds dressed for war in a gas mask, knee pads, and armored gloves.  Further, Ramey and the mob succeeding in disrupting Congress and preventing Congress from resuming the Joint Session until after 8:00 p.m., after all

rioters were cleared and the building was determined secure.  Ramey's intent to disrupt government may be inferred from his continued presence within the restricted area, which was adjacent to a clearly secured government building, for over four and a half hours.

### E.   Disruption of Government Business or Official Functions (element of Count 5)

As discussed, *supra*, in reference to the "federally protected function" element of Count 1, Ramey succeeded in disrupting and impeding officers' performance of their duties, of government functions.  As discussed in the previous subsection, Ramey and the mob also succeeding in disrupting the electoral college certification and preventing it from resuming until after the building and grounds were cleared.

### F.   Physical Violence/Act of Violence (element of Counts 6 and 7)

As discussed in reference to Counts 2 and 3, Ramey engaged in physical violence and committed acts of violence while in a restricted area and on Capitol grounds.

### G.   Using or Carrying Deadly or Dangerous Weapon (element of Counts 4, 5, and 6)

As discussed in reference to Counts 2 and 3, Ramey knowingly used and carried a deadly or dangerous weapon while inside the restricted area.

If the Court does not find beyond a reasonable doubt that Ramey knowingly used or carried a deadly or dangerous weapon in relation to the offenses charged in Counts 4, 5, and 6, the Court may convict Ramey of the lesser included offense of each charge.

## CONCLUSION

The government has proved every element of every charge against the defendant, Barry Ramey, beyond a reasonable doubt.  Ramey joined the mob of rioters that attacked the U.S. Capitol building and grounds on January 6, 2021.  Ramey's assaults, with a weapon, on Officers Riggleman and Williams risked serious bodily injury to those officers and, in no small part,

facilitated the first interior breach of the Capitol building.  Beyond his assaults, Ramey's extended presence on Capitol grounds during this civil disorder, as part of the mob, interfered with law enforcement's ability to do their job and secure the Capitol building.  Ramey had knowledge that the Capitol grounds were restricted, and that he was not supposed to be there.  He saw and heard crowd control ordinance.  He encountered police and physical barriers at multiple points.  At many of those points, he witnessed police attempting to hold rioters back or dissuade them from advancing.  He himself resisted these efforts when he pushed with a crowd at the base of the Northwest Stairs and sprayed officers.  Ramey is guilty beyond a reasonable doubt of all counts in the Indictment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:      /s/
Kathryn E. Fifield
Brian D. Brady
Trial Attorneys
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
601 D St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048