<pre>
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 22-cr-184
 4            Plaintiff,              .
                                      .
 5        vs.                         .
                                      .  Washington, D.C.
 6   BARRY BENNET RAMEY,              .  February 21, 2023
                                      .  9:49 a.m.
 7            Defendant.              .
     - - - - - - - - - - - - - - - - -

 8

 9              TRANSCRIPT OF BENCH TRIAL - MORNING SESSION
                BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                   UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:      BRIAN BRADY, ESQ.
                                 KATHRYN FIFIELD, ESQ.
14                               U.S. Department of Justice
                                 1301 New York Avenue Northwest
15                               Washington D.C. 20005

16   For the Defendant:          FARHEENA SIDDIQUI, ESQ.
                                 Law Office of Samuel C. Moore
17                               526 King Street
                                 Suite 506
18                               Alexandria, Virginia 22314

19

20

21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
</pre>

1

C O N T E N T S

2

3                              TESTIMONY

4    CARNEYSHA MENDOZA          Direct Examination..............  21
                                Cross-Examination...............  42
5                               Redirect Examination...........  52

6    RYAN NOUGARET              Direct Examination..............  55
                                Cross-Examination............... 105
7

8

9                           EXHIBITS RECEIVED

10   Government 100, 101, 102, 103, 104, 105, 106, 200,
     200A, 200B, 200C, 200D, 201, 201A, 202, 202A, 203,
11   203A, 204, 204A, 204B, 205, 205, 206, 206A, 207,
     207A, 208, 208A, 209, 209A, 210, 210A, 211, 211A,
12   212, 212A, 213, 213A, 214, 214A, 215, 215A, 216,
     301, 301A, 302, 302A, 303, 303A......................   8
13
     Government 501, 502, 503, and 505....................   9
14
     Government 300.......................................  37
15
     Government 401, 402, 403, and 404.................... 100
16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2          (Call to order of the court.)
 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal
 4     Action 22-184, the United States of America versus Barry Ramey.
 5          If I can have counsel approach the podium and state your
 6     name for the record, starting with the United States.
 7              MS. FIFIELD:  Good morning, Your Honor.  Kathryn
 8     Fifield on behalf of the United States.  With me at counsel
 9     table are Brian Brady, trial attorney for the United States,
10     Melissa Macechko, a trial paralegal from our office, and Special
11     Agent Ryan Nougaret with the Federal Bureau of Investigation.
12              THE COURT:  Good morning, all.
13              MS. SIDDIQUI:  Good morning, Your Honor.  Farheena
14     Siddiqui on behalf of Mr. Ramey.
15              THE COURT:  Good morning.
16          All right.  So first thing, let me review the Waiver of
17     Jury Trial with Mr. Ramey.
18          Mr. Ramey, if I could have you come up to the podium.  All
19     right.  So Mr. Ramey, I have a copy of the Waiver of Trial by
20     Jury that appears to be signed by you.
21          Can you see this?
22              THE DEFENDANT:  Yes, Your Honor.
23              THE COURT:  Is that your signature on it?
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  And you read this and discussed it fully
```

1    with your attorney before signing it?

2              THE DEFENDANT:  Yes, I did, Your Honor.

3              THE COURT:  Do you understand that if you went to

4    trial, the government would have to prove you guilty beyond a

5    reasonable doubt on all the counts?  In order to do so, it would

6    have to convince 12 jurors to convict you unanimously.

7         Do you understand that?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  And you are confident that you want to

10   proceed today with a trial before me where I will be the finder

11   of fact rather than a jury?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  Do you have any questions at all?

14             THE DEFENDANT:  No, Your Honor, not at this time.

15             THE COURT:  All right.  Anything else the government

16   would like on the record?

17             MS. FIFIELD:  Nothing.

18             THE COURT:  All right.  Thank you.

19        Mr. Hopkins, if you can let the jury office know that the

20   jurors don't need to come in.

21             COURTROOM DEPUTY:  Absolutely, Your Honor.

22             THE COURT:  All right.  I received the government's --

23   sorry I was late.  I was trying to review the government's trial

24   brief before coming out.

25        Is there anything else that I should have reviewed since we

1    last spoke?  Is there any -- any other filings that I could have

2    missed?

3                MS. SIDDIQUI:  Your Honor, I believe we filed

4    objections to some exhibits, but I believe we've resolved most

5    of them.  We just have one outstanding.  We're happy to take it

6    up now or if you want to take it up as it comes up.

7                THE COURT:  It's fine.  Remind me which one it is.  Is

8    it the voiceover on the --

9                MS. SIDDIQUI:  It's Exhibit 300, Your Honor.  I

10   believe the government has taken out the voiceover, but it's

11   still lengthy and still has things that are not relevant to my

12   client's case.  So we can certainly make that objection when it

13   comes up.

14               THE COURT:  For the sake of brevity, I'm all for

15   shortening to the relevant part, and I was not inclined to have

16   the overlay of noise on it as well.  So I'm glad you all

17   resolved that.

18        What about -- and we can address this later, Ms. Siddiqui,

19   in depth, if there's a need to.  But what about your concerns

20   about the jury instructions, what we had discussed?  Have you

21   focused on that anymore, the assault?

22               MS. SIDDIQUI:  Well, no, Your Honor, since we're not

23   doing jury --

24               THE COURT:  Right, I understand.  But the law that I

25   will need to follow, do you have concerns?

```
 1            MS. SIDDIQUI:  No, Your Honor.  We're fine the Court's
 2    finding on that.
 3            THE COURT:  All right.  Very well, then.
 4         So Mr. Hopkins, are you okay if we proceed?
 5            COURTROOM DEPUTY:  Absolutely, Your Honor.
 6            THE COURT:  So if the government could call its first
 7    witness.
 8         And is there a motion to exclude witnesses?
 9            MS. SIDDIQUI:  Yes, Your Honor.
10            THE COURT:  All right.  So all witnesses except the
11    case agent should be excluded from the courtroom.
12            MR. BRADY:  Judge, given that there's no objection to
13    our exhibits, other than Exhibit 300, which we will get to with
14    this first witness, the government would move in our evidence.
15    Let me grab the evidence list so I can read that into the
16    record.
17            THE COURT:  All right.
18            MS. SIDDIQUI:  Your Honor, just to be clear, we have
19    no objection to most of the exhibits.  The only ones that I
20    would -- reserved objections for is just the foundation and the
21    relevance, obviously, just to the Safeway ones.  But other than
22    that, we have no objection to the remainder of the exhibits.
23            THE COURT:  Are the Safeway ones the ones to establish
24    an effect on interstate commerce?
25            MS. SIDDIQUI:  Yes, but no objection to authenticity.
```

1    It's a business record.  Obviously, that gets past hearsay.  But

2    I do believe there's still a foundation that has to be laid, and

3    it has to be relevant to my client.

4        So other than that, we have no objection to the remainder

5    of the list.

6            MR. BRADY:  With Your Honor's permission, I will read

7    through our list.

8        Government Exhibit No. 1, we are not moving that into

9    evidence, Your Honor.  We are striking that.

10       In the 100 series, Government Exhibit 100, 101, 102, 103,

11   104, 105, and 106, there's no objection from defense, and we

12   would move those in.

13       In the 200 series, 200, 200A, 200B, 200C, 200D, 201, 201A,

14   202, 202A, 203, 203A, 204, 204A, 204B, 205, 205A, 206, 206A,

15   207, 207A, 208, 208A, 209, 209A, 210, 210A, 211, 211A, 212,

16   212A, 213, 213A, 214, 214A, 215, 215A, 216.

17       The defense does have an objection to Government

18   Exhibit 300, which we will address when we go to move that into

19   evidence, Your Honor.

20       301, 301A, 302, 302A, 303, 303A.  And I don't know if I

21   said 303 -- 301A on the record, Your Honor.  I want to make sure

22   that's clear.

23           THE COURT:  Any objection, Ms. Siddiqui?

24           MS. SIDDIQUI:  No, Your Honor, aside from the ones

25   that we --

1          THE COURT:  Which one is the Safeway?

2          MS. SIDDIQUI:  The Safeway ones, he hasn't gotten to

3     yet.

4          THE COURT:  Oh, Exhibit 300, you mean.

5          MS. SIDDIQUI:  Yes, Your Honor.

6          THE COURT:  With the exception of defense's right to

7     reserve objection on that, they are all admitted.

8        (Government Exhibits 100, 101, 102, 103, 104, 105, 106,

9     200, 200A, 200B, 200C, 200D, 201, 201A, 202, 202A, 203, 203A,

10    204, 204A, 204B, 205, 205A, 206, 206A, 207, 207A, 208, 208A,

11    209, 209A, 210, 210A, 211, 211A, 212, 212A, 213, 213A, 214,

12    214A, 215, 215A, 216, 301, 301A, 302, 302A, 303, and 303A

13    received into evidence.)

14         MR. BRADY:  Yes, Your Honor.  And ones that are

15    relevant to Safeway are Government Exhibits 401, 402, 403, and

16    404.  404 is a business record certification.  We provided that

17    to Ms. Siddiqui last week.  We'll talk about that during our

18    discussions with the case agent.  That's the second witness,

19    Your Honor.

20       Government Exhibit 405, I believe we've reached a

21    stipulation with Ms. Siddiqui about the D.C. mayor's curfew

22    order that was in effect from 6:00 p.m. on January 6 until

23    6:00 a.m. on January 7 that closed down D.C.

24         MS. SIDDIQUI:  That's correct, Your Honor.

25         MR. BRADY:  So I don't believe we will be moving in

1    Government Exhibit 405 based on that stipulation, or 406 or 407.

2              THE COURT:  You will not be moving those in?

3              MR. BRADY:  No, Your Honor.

4              THE COURT:  Okay.

5              MR. BRADY:  And then typically, my practice, Judge, is

6    the 500 series are stipulations that we did come to an agreement

7    to that wasn't just orally but in writing with the defense.

8    That's 501, 502, 503, 504, and 505.  We would also move those in

9    as government exhibits.

10             THE COURT:  Okay.  So without objection, of course,

11   the stipulations are agreed to, 501, 502, 503, and 505 are

12   admitted.

13     (Government Exhibits 501, 502, 503, and 505 received into

14   evidence.)

15             THE COURT:  We will hold off now on 401, 402, 403, and

16   404 just for the reasons Ms. Siddiqui raised, and we will

17   address those.

18     Do you all want to right now argue about this?

19             MR. BRADY:  We're happy to, Your Honor, if you would

20   like.

21             THE COURT:  All right.

22             MR. BRADY:  We've submitted them to Ms. Siddiqui.

23   They're business records that are obtained from Safeway, with

24   the business records certification that was attached.

25             THE COURT:  I get the relevance.  I understand why

1    they're relevant.  She's objecting to the foundation.

2         MR. BRADY:  They're self-authenticating, Judge, under

3    the Federal Rules of Evidence, because there is a business

4    records certification, and that certification was provided to

5    counsel in advance.  While she does have an objection, it isn't

6    to the authenticity necessarily.  They're relevant, and they're

7    self-authenticating.  So they would come into evidence.  I don't

8    see a rule of exclusion that would keep them out.

9         THE COURT:  Ms. Siddiqui, why isn't that correct?  Do

10   you need a foundation in terms of relevance?

11        MS. SIDDIQUI:  I do, Your Honor, I do in terms of

12   whoever is testifying to it who can connect that link of -- that

13   interstate commerce was impacted because of these records that

14   they're trying to introduce, meaning that these records will

15   show whatever it is.  So whoever is testifying to it, I think

16   that will either solve it or not solve that issue.

17        So to me, I don't think somebody can just come in and say,

18   Hey, these are business records and this is what they mean.  It

19   has to be someone that has personal knowledge of what that

20   business record means and why it impacts interstate commerce.

21        And that's our objection.  So if they can lay the

22   foundation for that, no problem.

23        THE COURT:  Let me take a look.  You're saying that

24   these records are not really obvious what they mean?

25        MS. SIDDIQUI:  Yes, Your Honor.

1          THE COURT:  And that any knowledge they have from what

2     these records mean comes from conversations they've had with

3     people?

4          MS. SIDDIQUI:  Yes, Your Honor.

5          THE COURT:  Mr. Brady, why -- I mean, these are not

6     like obviously understandable here, what all these numbers mean,

7     without someone from Safeway explaining it to your case agent;

8     right?

9          MR. BRADY:  Sure.  If we could pull them up for Your

10    Honor just so I can have them to see, but for the Safeway

11    shipments one, I can pull that for Your Honor.  That is

12    Government Exhibit 403.

13        That one has a lot of different numbers, but the most

14    relevant part is up at the upper left-hand corner.  It shows

15    that Safeway shipments are given from out of state, from

16    Pennsylvania, coming into the District of Columbia.

17        That, in combination with the e-mail -- on that Government

18    Exhibit 403, it's merely to show that Safeway ships items from

19    out of state into the District of Columbia.

20        The rest of them, while there might be significance about

21    the number of shipments and things like that, but the fact that

22    they could not make shipments and receive shipments in on

23    January 6, or the shipments were decreased in number based on

24    the curfew order, that would be our relevance of that.

25        That, in combination with the e-mail, Government Exhibit

1    401, this is an e-mail between Safeway employees discussing the

2    closure of the Safeway stores in the Washington, D.C., area.

3         Ms. Macechko, if we could pull up -- Mr. Hopkins, could you

4    publish the laptop for us, please.

5                   COURTROOM DEPUTY:  Sure.  Is it from the table?

6              MR. BRADY:  Yes, sir.  If you could pull up 401 for

7    me, please.

8         Judge, this is a business record from Safeway that came

9    with the packet for the self-authenticating business records.

10   It discusses that there's a curfew in place in D.C.

11        Ms. Siddiqui is stipulating that there was a curfew in

12   place and that all D.C. stores will close at 4:00 p.m., with

13   plans to reopen.

14        This, when read in concert with the sales numbers on

15   Government Exhibit 402, which is a sales report -- and if we

16   could scroll down, I believe the second page discusses sales

17   numbers.  I think it would be a fair characterization to say

18   it's common to show that projected sales based on the closure of

19   the stores, the numbers are down.  The stores were closed at

20   4:00 p.m.  They lost out on sales from the times they would

21   normally be open from 4:00 p.m. until the close of business.

22                   THE COURT:  So help me understand what these columns

23   mean.

24                   MR. BRADY:  It shows on the far left-hand side --

25   they've redacted out the actual total numbers spent, because I

believe that would be something they don't want to disclose to
the public.  But on that first column on the far-hand left side,
that's going to be the actual percent of sales decline.  And
when comparing the numbers from January 6 compared to January 5
where they were opened a full day, that would be an effect on
the commerce.

Certainly, there's a common sense argument from closing
stores based on a curfew order is going to affect the ability of
consumers to go in and purchase goods at any D.C. business, let
alone Safeway.

THE COURT:  But the negative versus positive, what are
these?  Changes to their average sales?  They're up or down?

MR. BRADY:  There's changes -- "ID" is the identical
same store sales for the same day 52 weeks apart.  So they're
comparing sales from January 6, 2020, compared with January 6,
2021.  And you can see on, like, January 5, for example, some
days -- if we could scroll up, Ms. Macechko, please.  For
January 5, some days, they're up 17 percent -- some of the
stores are up 17 percent, some of them are down 10 percent.
It's varied.  They're not all negative, and they're not all
substantially negative, in comparison to January 6 where all of
the stores are in the negative for the sales compared to the
following year, which would be a fair comparison between them.

THE COURT:  All right.  Anything else you want to add?

MR. BRADY:  Just for Government Exhibit 403, the

1    Pennsylvania shipment at the top, it's to show that because the

2    Safeway stores were closed, at the top left-hand corner, it

3    shows the shipments were arriving from out of state, and those

4    shipments were delayed based on the curfew order, which would

5    have an impact on commerce.

6           THE COURT:  All of this is relevant for the civil

7    disorder charge?

8           MR. BRADY:  Yes, Your Honor.  There are three

9    different ways, for that last prong, the government can prove

10   it.  One would be interfering with a federally protected

11   function, which would be interfering with the police's job to

12   protect the Capitol essentially.  But the other two prongs

13   involve commerce.  So we're showing that not only was commerce

14   disrupted within the District of Columbia by the closure of

15   these stores, but also interstate commerce was affected because

16   the shipment of goods from out of state into the District of

17   Columbia was interrupted because the stores themselves were

18   closed, so they could not receive the full day's shipment

19   throughout the course of the day on January 6.

20          THE COURT:  Okay.  You have to prove both interference

21   with --

22          MR. BRADY:  No, Your Honor, it's an "or."  It would be

23   one of those three ways.  The government could prove it through

24   interference with a federally protected function in and of

25   itself.  But we would have argued that these prove the

1    interference of commerce as well.  The government is trying to

2    prove all three prongs, although we only need one of the three,

3    for civil disorder.

4              THE COURT:  All right.  Okay.  Ms. Siddiqui?

5              MS. SIDDIQUI:  Briefly, Your Honor.

6              THE COURT:  I agree with you that it's hard to

7    understand what these mean without being walked through, and

8    that that's -- the government knows this because they've had

9    conversations with Safeway people.  But what about like the

10   initial e-mail, just the stores are closing at 4:00?  That alone

11   is evidence of an interference with commerce; right?

12             MS. SIDDIQUI:  With commerce, but it has to be

13   interstate commerce, and it has to be an impact on that.

14       I guess what they're trying to piece together is Government

15   Exhibit 403, which is up in front of Your Honor right now.  We

16   don't disagree that it says Lancaster to Washington, D.C., but

17   nothing else in this document tells me that, one, that didn't

18   occur and, two, that it didn't occur because of this, because of

19   the store closing, meaning that there's not someone that's there

20   to receive these just because the actual store itself is closed.

21       Second of all, everything that the Court just asked the

22   government and they walked the Court through that, all of that

23   is hearsay.  What those numbers mean, what those columns are,

24   and what -- whether that's because of this only or it's because

25   of hey, they had a bad day and that happens, maybe two weeks

1    before it had happened, all those things are what somebody with

2    personal knowledge would have to prove in order to lay the

3    foundation to connect the dots and say because of this riot,

4    because the stores were closed, we could not send shipments, the

5    shipments were not received, and thus, our stores did this much

6    worse.

7         None of that is present here, and they certainly can't

8    elicit that from the case agent or a Capitol Police officer.

9    We've stipulated, obviously, to the curfew.  That's fine.  But

10   there's still another link that has to be made to interstate

11   commerce.

12             THE COURT:  So your position is they need to bring in

13   the Safeway employee to explain all this to me?

14             MS. SIDDIQUI:  Somebody with personal knowledge,

15   correct, Your Honor, that would say yes, we're not able to make

16   that shipment, and thus --

17             THE COURT:  But you do agree that they are

18   self-authenticating business records and that they are relevant

19   if they show an impact on interstate commerce?

20             MS. SIDDIQUI:  Right.  We think they can't make that

21   link to interstate commerce because of who is testifying to it.

22             THE COURT:  And you think these arguments go to

23   admissibility rather than weight?

24             MS. SIDDIQUI:  Correct, Your Honor.

25             THE COURT:  Because there's not been enough of a

1    foundation?

2              MS. SIDDIQUI:  Correct.

3              THE COURT:  Okay.

4              MR. BRADY:  If I may, Your Honor, for one saved round.

5         Just pointing Your Honor to the jury instructions, which we

6    all agreed to for the civil disorder -- Your Honor, the ELMO, I

7    don't know if I need your -- thank you.

8              THE COURT:  So it can mean commerce within D.C.

9    because we're in D.C.; right?

10             MR. BRADY:  Yes, Your Honor.

11             THE COURT:  You don't need to show commerce from

12   another state into D.C.?

13             MR. BRADY:  We don't.

14             THE COURT:  So just shutting a Safeway at 4:00, it's

15   common sense that money will be lost in D.C.

16             MR. BRADY:  Your Honor, I'm showing you the second

17   page of the jury instructions, ECF 28, Your Honor.  The fourth

18   element is where we are.

19        The civil disorder in any way or degree obstructed,

20   delayed, or adversely affected commerce, that's number 1; or the

21   movement of any article or commodity in commerce; two; or third,

22   the performance of any federally protected function.

23        Setting aside federally protected function, the movement of

24   articles or commodities in commerce would relate to that

25   shipment from Pennsylvania.  But that first one, that it

1   affected commerce, I will point Your Honor, as Your Honor knows,

2   to page 3.  Page 3 defines "commerce" as "it also means commerce

3   wholly within the District of Columbia."  The fact that the

4   Safeway stores were closing early that day is business that is

5   affected that is wholly within the District of Columbia.

6       I do feel like I'm getting partially and stepping on

7   Ms. Fifield's toes for closing argument, Your Honor, but that

8   would be our arguments for these and the relevancy of these.

9       THE COURT:  I definitely get the relevance.  I just

10  know that you've had to rely on some information from a Safeway

11  employee to sort of explain these records to me.  And

12  presumably, your agent had to get that information as well,

13  which is hearsay, is it not?

14      MR. BRADY:  No, these are not hearsay, because he's

15  relying on these documents themselves.

16      THE COURT:  No, but I mean in terms of laying the

17  foundation to admit them, to explain to the Court what they mean

18  required him to talk to a Safeway employee.

19      MR. BRADY:  Not necessarily, Your Honor.  I think the

20  records speak for themselves.  I've never spoken to a Safeway

21  employee myself, and I think that just viewing the records

22  themselves --

23      THE COURT:  I'm going to take a closer look at them.

24      Ms. Siddiqui, I'm inclined to admit them.  I get your

25  point.  But I want to look at them more carefully.  I think the

1    initial e-mail, the 401, all Safeway D.C. stores will close at

2    4:00 p.m. and plans to reopen at 6:00 a.m., that one's pretty

3    self-explanatory.

4        Do you agree with that?

5            MS. SIDDIQUI:  We do, Your Honor.

6            THE COURT:  That one is definitely coming in.  The

7    question I have is whether all the rest come in, too, or

8    whether -- I think the Court can draw the link, but I want to

9    look at them more carefully.  I don't know that the Court would

10   necessarily understand all of the details on these forms by

11   studying them, but I think they probably do explain -- even if I

12   might not understand the details, I do understand the gist of

13   what they're saying, which is the 4:00 p.m. closing caused a

14   change in sales, and it's kind of common sense.

15           MS. SIDDIQUI:  And we can certainly take it up as the

16   testimony comes in as well, if that might be easier, to just

17   kind of parse out what does and what doesn't.

18           THE COURT:  You don't disagree with the jury

19   instruction that they don't need to prove -- part of your

20   argument was they prove for the interstate commerce that

21   shipments came in.  You agree that for D.C. you don't need to do

22   that?

23           MS. SIDDIQUI:  Yes, Your Honor, they can be within

24   D.C.  We still stick to our objection that, obviously, all the

25   things that Mr. Brady walked the Court through about this is

1    what this column means and this is what this means and these

2    dates, this is why it changed, all of that is entirely hearsay.

3            THE COURT:  And you also agree that they could prove

4    this element of the charge by proving interference with a

5    federal function, law enforcement function?

6            MS. SIDDIQUI:  Your Honor, I want to take a look at

7    that a little bit more, if that's okay, because I did not read

8    it that way, and I have not -- the case law that I've looked at

9    does not read it that way.  I might be mistaken, and I'm happy

10   to take a look at it and let the Court know.  Because I

11   thought -- I was not reading it that way.

12           THE COURT:  So just looking at the government's trial

13   brief, Mr. Brady, on page 10, in order to find the defendant

14   guilty of the civil disorder, there's four elements listed.

15   Element number 3 is law enforcement officers were engaged in the

16   lawful performance of their duties, and then four, the civil

17   disorder obstructed, delayed, or adversely affected -- no, it

18   says either commerce -- oh, or the movement of articles,

19   commodity in commerce, or the performance of any federally

20   protected function.

21       So that's clearly three -- he's right, three different ways

22   to prove element 4.

23           MS. SIDDIQUI:  So we're saying it's obstructed or

24   affected commerce.

25           THE COURT:  "Civil disorder in any way or degree

1    obstructed, delayed, or adversely affected any federally

2    protected function."  That's a way they can prove this, which in

3    this case is protecting the Capitol.

4              MS. SIDDIQUI:  Your Honor, if I could take a look at

5    it.

6              THE COURT:  All right.  Let's go ahead and proceed

7    with the first witness.  I'm just not sure about the three other

8    exhibits, but certainly, the e-mail comes in.

9              MR. BRADY:  Yes, Your Honor.

10        Your Honor, the government's first witness will be Captain

11   Carneysha Mendoza with the United States Capitol Police.  May it

12   please the Court.

13             THE COURT:  You may proceed.

14        CARNEYSHA MENDOZA, WITNESS FOR THE GOVERNMENT, SWORN

15                      DIRECT EXAMINATION

16             BY MR. BRADY:

17   Q.   Good morning.  Can you please introduce yourself to the

18   Court and spell your name for the record.

19   A.   Sure.  My name is Captain Carneysha Mendoza,

20   C-a-r-n-e-y-s-h-a, last name Mendoza, M-e-n-d-o-z-a.

21   Q.   Where do you work?

22   A.   The United States Capitol Police.

23   Q.   How long have you worked for the United States Capitol

24   Police?

25   A.   20 years.

1   Q.   What various jobs and capacities have you served as a

2   United States Capitol Police officer?

3   A.   I've served, well, several different varieties.  I was an

4   officer, first-line supervisor, sergeant, lieutenant, watch

5   commander, field commander, CDU commander.  Currently, I serve

6   as the commander with the Civil Disturbance Unit and assistant

7   commander for the Special Operations Division.

8   Q.   What's your current rank?

9   A.   Captain.

10  Q.   And where does the captain fall within the rank structure

11  at the Capitol Police?

12  A.   Senior management.

13  Q.   And you mentioned you were a CDU field commander.  Can you

14  explain for the Court what a field commander is and what CDU

15  stands for?

16  A.   Right.  That's two different things.  I'm commander of the

17  Civil Disturbance Unit.  I used to be a field commander.

18       A field commander oversees operations for the department.

19  So any critical incidents or anything that occur, a field

20  commander is responsible for overseeing that, as well as

21  department operations.

22       Currently, I'm the commander of the Civil Disturbance Unit.

23  So I oversee protest activity, any type of First Amendment

24  activity, civil disobedience or civil disorder.

25  Q.   As a part of your training to become a Capitol Police

1    officer and continuing training to remain a Capitol Police

2    officer, do you have to be exposed to the nonlethal components

3    that you might deploy as an officer?

4    A.    Yes.

5    Q.    Does that include pepper spray or OC spray?

6    A.    Yes.

7    Q.    Can you explain to the Court what that was like for you,

8    what your exposure was like and the details surrounding that?

9    A.    So prior to coming to Capitol Police, I was in the Army.

10   So I've been exposed to different types of chemicals.

11       So for me, it was basically when you go through the

12   academy, they spray you with pepper spray -- or OC spray is what

13   we use actually.  And you have to fight through it for 90

14   seconds.  So it's a test basically to see if you can -- and you

15   have to pass.

16   Q.    And what did it feel like when you were sprayed?

17   A.    Burning eyes, nasal issues, breathing issues.  Your skin

18   can burn.

19   Q.    Okay.  I want to move on to January 6, 2021.  Were you

20   working as a United States Capitol Police officer that day?

21   A.    Yes, I was.

22   Q.    Was anything going on at the Capitol on January 6 of 2021?

23   A.    We were preparing for certification of the electoral votes.

24   Q.    Can you explain to the judge what that entails at a high

25   level?

1  A.   So, basically -- I don't really get involved in the

2  politics of everything, but it's a Joint Session of Congress.

3  For us, it's just a Joint Session of Congress where the Vice

4  President will be in attendance, as well as the Speaker of the

5  House and various members of Congress from both sides, the House

6  and the Senate.

7  Q.   And was the Vice President scheduled and did he actually

8  visit the Capitol on January 6, 2021?

9  A.   Yes, sir, he did.

10 Q.   On January 6, 2021, was the Capitol open to the general

11 public?

12 A.   It was not, no.

13 Q.   Why was that?

14 A.   Well, we had security for the certification of the

15 electoral votes, but the building was also closed due to the

16 pandemic.  So the building was closed prior to the certification

17 of electoral votes.  So it was closed for both those reasons.

18 Q.   Now, on a prepandemic nonjoint session/noncertification of

19 the Electoral College day, if a member of the public wanted to

20 go to the Capitol to visit, how would that take place, or how

21 would they get into the Capitol to visit?

22 A.   So we have a visitors center, Capitol Visitor Center.  So

23 the public enters through the Capitol Visitor Center.  They go

24 through a -- they place their bags on an X-ray machine.  They go

25 through a magnetometer or a metal detector.  And then they're

married up with a tour guide who will give them tours to certain

parts of the building.  Certain parts of the building are open

for tours, and certain parts are not open for tours.

Q.   Is it important that everyone that's not a member of

Congress or a Capitol Police officer go through a metal

detector?

A.   Yes, sir, it is.

Q.   Why is that?

A.   To ensure individuals don't have any type of contraband or

weapons or anything.  Obviously, we protect some high-level

dignitaries.  So we want to make sure they're safe.

Q.   Now, on January 6, 2021, was just the Capitol building

itself restricted, or was a more expansive area protected for

the Capitol?

A.   It was a more expansive area.  Due to the certification of

the electoral votes, we actually had set up a restricted area

around the Capitol and also on some of the Capitol grounds.

            MR. BRADY:  Your Honor, may I publish Government

Exhibit 104?

            THE COURT:  You may.

            MR. BRADY:  Mr. Hopkins, I believe I switched it over

to the laptop.

            MS. SIDDIQUI:  Your Honor, may I move the monitor so

we can see?

            THE COURT:  Sure.

```
 1            MR. BRADY:  Your Honor, while we're waiting for that
 2    to pull up, we actually made an enlarged Government Exhibit 104.
 3         May I approach the witness to --
 4            THE COURT:  Of course.
 5            MR. BRADY:  Well, I will stay here, Your Honor.  But
 6    may the witness stand up to point at Government Exhibit 104?
 7            THE COURT:  Sure.
 8            BY MR. BRADY:
 9    Q.   Now, Captain Mendoza, if you could speak very loudly so the
10    court reporter can hear you, I don't want your voice to fade
11    away, what are we looking at in Government Exhibit 104 at this
12    poster board?
13    A.   The red line around the -- basically, the red line
14    designates our perimeter for January 6, and it designates the
15    restricted area.  The red line -- also where the red line is
16    were bike rack and snow fencing.  So this area specifically was
17    restricted to the public, and there were "area closed" signs on
18    the bike rack as well.  So this is the entire -- this is what we
19    call the east front of the Capitol.
20         So the perimeter, you know, goes around the east front,
21    down Constitution Avenue, and then this is First Street.  So it
22    goes down First Street, and it encompasses also the north side
23    of Independence Avenue.
24    Q.   And you mentioned bike racks.  Can you explain for the
25    Court what a bike rack is?
```

1    A.    Sure.  So a bike rack is basically -- it's a bike rack.

2    It's used to secure bikes.  Bike --

3              THE COURT:  It's all right.  I know.  It's fine.

4              MR. BRADY:  Yes, Your Honor.

5              BY MR. BRADY:

6    Q.    And you mentioned snow fencing.  Could you briefly describe

7    what snow fencing is?

8    A.    Yes.  I was going to say, typically for security purposes,

9    law enforcement and security use bike rack to designate areas to

10   be secure.  The snow fencing is basically placed behind the bike

11   rack to reinforce it.

12             MR. BRADY:  Your Honor, may I have a moment?

13             THE COURT:  Sure.

14             MR. BRADY:  Your Honor, may I publish on the ELMO?  My

15   co-counsel was smart enough to print out hard copies old school.

16             THE COURT:  Sure.

17             BY MR. BRADY:

18   Q.    Captain Mendoza, if you could retake the stand for me,

19   please.

20         Captain Mendoza, I'm showing you what's previously been

21   entered into evidence as Government Exhibit 105.  What do we see

22   here?

23   A.    My screen's not on, I don't think.

24             MR. BRADY:  Your Honor, may I approach the witness?

25             THE COURT:  Sure.

1           THE WITNESS:  I'm good.

2           BY MR. BRADY:

3     Q.    Captain Mendoza, what do we see in Government Exhibit 105?

4     A.    That is a picture of the west front of the Capitol.  At the

5     bottom of the screen, there's some snow fencing, and at the top

6     of the screen, there is some fencing with the "area closed"

7     signs.

8     Q.    I'm circling some green fencing at the very bottom.  Is

9     this what you're referring to when you say snow fencing?

10    A.    Yes, sir.

11    Q.    On the direct center of the screen, you mentioned

12    some "area closed" signs.  Are these the "area closed" signs

13    that were placed by U.S. Capitol Police on January 6?

14    A.    Yes, sir.

15    Q.    Just so we are all orienting ourselves, when you say the

16    west side of the Capitol, is this the side of the Capitol that

17    faces out toward the National Mall?

18    A.    It is, yes.

19    Q.    Showing you Government Exhibit 106, you mentioned bike

20    racks earlier.  Is this a depiction of those bike racks that we

21    were referring to?

22    A.    Yes, sir.

23    Q.    And the "area closed" sign on the left-hand side of the

24    screen, is this one of the same "area closed" signs that we saw

25    in the previous government exhibit?

1    A.    Yes, sir.

2    Q.    Were there just a few of those "area closed" signs around

3    the Capitol that day?

4    A.    No, sir.  There were hundreds of signs out there.

5    Q.    Showing Government Exhibit 102, what do we see here?

6    A.    That is a 3D photo of the Capitol building and part of the

7    Capitol grounds.

8    Q.    And Government Exhibit 103?

9    A.    That's also a 3D photo of the Capitol building, with the

10   inaugural stage.

11   Q.    You mentioned inaugural stage.  What's the inaugural stage?

12   A.    It's set up for the inauguration the President.

13   Q.    Does the inauguration happen in January after an election

14   year?

15   A.    Yes, sir.

16   Q.    And was this how the Capitol looked on January 6, 2021?

17   A.    Yes, sir.

18   Q.    What side of the building are we looking at in this image?

19   A.    This is also the west side of the building.

20   Q.    I'm circling on the left-hand side a staircase with an

21   opening at the bottom.  Can you tell me what this is?

22   A.    The -- that's a part of the inaugural stage as well, and to

23   the left is a northwest stairwell that leads up to the Lower

24   West Terrace area.

25   Q.    Okay.  When you said Lower West Terrace, I'm circling this

1    area at the very bottom.  Is this the Lower West Terrace that we

2    commonly refer to?

3    A.   Yes, that's a part of the Lower West Terrace.

4    Q.   And the Upper West Terrace, can you circle on your screen

5    where the Upper West Terrace would be?

6    A.   Yes.  It's up here.

7    Q.   So you drew on the upper portion of the landing that are

8    just up the stairs.  Those stairs on the northwest side of the

9    building, the one that I briefly circled in red on the screen,

10   is that a direct pathway up from the Lower West Terrace to the

11   Upper West Terrace?

12   A.   Yes, sir, it is.

13   Q.   Does that lead to any entryways into the United States

14   Capitol?

15   A.   Yes.  We have the Senate Wing Doors.  If you go up those

16   stairs, there's Senate Wing Doors, and the Lower West Terrace

17   doors are near there as well.

18   Q.   Are those doors secured?

19   A.   Yes, they are.

20   Q.   Is the Capitol typically secured on a normal day?

21   A.   Yes.

22   Q.   Is it secured every day?

23   A.   Yes.

24   Q.   24 hours a day?

25   A.   Yes, sir.

1    Q.    365 days a year?

2    A.    Yes, sir.

3    Q.    That Senate Wing Door, do you see the approximate location

4    of where it would be on Government Exhibit 103?

5    A.    I don't specifically see it on this picture, but if you go

6    up the stairs and make a left, it's somewhere in this area over

7    here.

8    Q.    So on the left-hand side, upper left-hand side of the

9    screen?

10   A.    Yes.

11   Q.    And what does that door lead into inside the Capitol?  We

12   don't need to get into great detail, but does the Senate Wing

13   Door lead towards the Senate?

14   A.    Senate side of the Capitol, yes.

15   Q.    For your testimony here today, did you review closed

16   circuit television or CCTV cameras from the United States

17   Capitol, both inside and outside?

18   A.    Yes, sir, I did.

19   Q.    For -- that CCTV cameras that you reviewed, were these from

20   January 6, 2021?

21   A.    Yes, sir.

22   Q.    Based on your rank and senior management in the United

23   States Capitol Police, are you aware of the various breaches and

24   the various times when the exterior and interior of the Capitol

25   were breached on January 6, 2021?

1   A.   Yes, sir.

2   Q.   I want to talk to you about the first breach of the outer

3   perimeter of the Capitol.  When did that take place?

4   A.   At 12:53 p.m.

5   Q.   And where did that take place?

6   A.   On the west side of the Capitol, the west front.

7   Q.   I'm showing you Government Exhibit 104.  Do you see where

8   the first breach of the United States Capitol happened on this

9   exhibit?

10   A.   Of the Capitol grounds?

11   Q.   Capitol grounds, yes, ma'am.

12   A.   Yes.  It happened somewhere down here on First Street.

13   This bike rack here was breached first.

14          THE COURT:  Mr. Brady, sorry to interrupt.

15      Ms. Siddiqui, I'm just wondering, are you disputing all of

16   these facts?

17          MS. SIDDIQUI:  From what I've heard so far, no.  I

18   don't know what else they plan on eliciting.

19          THE COURT:  It seems like a lot of this is not key to

20   the case, but I'm guessing that they did try to get as many

21   stipulations as possible.  It seems to me that the case boils

22   down to two issues:  The number of assaults and whether pepper

23   spray, a dangerous weapon/deadly weapon, was used.

24          MS. SIDDIQUI:  It is part of our stipulation that --

25   the 1253 breach is actually in one of our stipulations we

1   reached.

2          THE COURT:  Mr. Brady, I've seen so much of this from

3   so many cases, that you're asking some questions that a jury

4   would definitely need to understand that I fully understand

5   based on the exhibits.  And so I don't want to interfere with

6   you trying your case, but a lot of this is not necessary, I

7   don't think.

8          MR. BRADY:  Okay.

9          MS. SIDDIQUI:  Just on the stipulations piece, we have

10  not signed the stipulations.  So if you want to enter it as an

11  exhibit, we're happy to sign it now.  There's no changes to it.

12  I'm just stating for the record, we haven't signed it yet.

13         THE COURT:  I don't want to interfere.  I know you

14  prepared as if this was going to be tried to a jury, but a lot

15  of this stuff, I know.  I know the Capitol.  I know the doors.

16  I know the bike racks.  I know the time of breach.  If it's

17  all -- you've got to get in the evidence that you need, but if

18  we can do it in a way that will take us to the critical issues

19  in the case more quickly, that would be helpful.

20         MR. BRADY:  Yes, Your Honor.  I only have a few more

21  questions, and I was going to get into Government Exhibit 300.

22  I wanted to orient the Court on the various times, which I'm

23  sure Your Honor already knows, but I don't want to make

24  assumptions.

25         THE COURT:  And the same when you get to the case

1    agent.  I had a trial involving the stairway on the west side.

2    All right?  So I'm intimately familiar with all of this.

3         But go ahead.

4         BY MR. BRADY:  Your Honor, at this point, I would want

5    to go over Government Exhibit 300, which I believe Ms. Siddiqui

6    is objecting to.  I would happily go over and make my arguments

7    against it, or she can raise her objection now.

8         THE COURT:  Let me hear your objection now,

9    Ms. Siddiqui.  Are you saying it's not all relevant?

10        Certainly, they need to be able to play enough to show

11   there's a civil disorder going on.  You agree with that?

12        MS. SIDDIQUI:  I do, Your Honor.  And Judge Mehta had

13   the same issue -- I'm having to pull up the case cites; it

14   certainly wasn't our case -- *U.S. v. Brown*, where he did not

15   allow the government to play all 13 minutes because it was

16   showing places and events that my client would not have ever

17   seen, was not a part of.

18        That's our same objection here.  They can certainly talk

19   about civil disorder in the context of where he was or what he

20   would have seen and he should have known to not have been there.

21        THE COURT:  Right.  I imagine some of that video might

22   be -- I don't know, but from what I recall from the trial I had,

23   some of the video would be things that he would have been able

24   to see from his perspective, but certainly not all of it; right?

25        MS. SIDDIQUI:  That's right, Your Honor.  That's our

1    objection.

2         THE COURT:  Mr. Brady, I do -- this is not going to be

3    an issue whether civil disorder was going on and whether he knew

4    that there was fighting.  In fact, he was involved in a brawl

5    himself.  So let's -- can you play the most critical part?

6         MR. BRADY:  Yes, Your Honor.  We did narrow down that

7    30-minute video to five minutes, and it only encompasses the

8    area where this defendant was or the areas that logically follow

9    from his pepper spray of the officers at the northwest stairs

10   which led up to the Upper West Terrace and the Senate Wing Door

11   and the breach there.

12        THE COURT:  You mean that he could see?

13        MR. BRADY:  He does end up going up to the Upper West

14   Terrace on the United States Capitol later in the day.  He

15   wanders over towards the Senate Wing Door.  He doesn't go into

16   the Capitol that day.  But certainly, his spray led to that

17   breach, and the mob ascended the stairs.

18        THE COURT:  Why is this critical for the government to

19   prove that the spray led to the breach?  For the obstruction?

20        MR. BRADY:  Civil disorder, that his actions in

21   obstructing those officers led to a breach, which interfered

22   with the certification of the Electoral College vote, which

23   would be the protection of the Vice President --

24        THE COURT:  Understood.  But that's all his pepper

25   spray; right?  I guess I'm -- what is it that you want to show

1    me on the Upper West Terrace that you need to prove your case?

2        MR. BRADY:  I'm showing that's a natural consequence

3    of him pepper spraying those officers, that that breach led up

4    the stairs -- that the mob continued up the stairs and then

5    breached ultimately at 2:13 that day.

6        THE COURT:  Again, is there any question that the

7    Capitol was breached on the west side at 2:13 p.m. that day?  I

8    don't think there is.

9        MR. BRADY:  I don't think there is for those of us who

10   are very deep in the case, Your Honor.  I understand you are.  I

11   want to lay out the facts on the record, Your Honor, so you can

12   make those factual findings if in the event that we have proven

13   our case beyond a reasonable doubt.

14       THE COURT:  Ms. Siddiqui, his points about the Capitol

15   being breached at 2:13 on the upper west side right behind where

16   Mr. Ramey was is certainly relevant.

17     Do you stipulate to all of that?

18       MS. SIDDIQUI:  I think we can push back on the

19   insinuations that they're making, that it is because of my

20   client's pepper spray --

21       THE COURT:  Well, it's because of the mob as a whole.

22       MS. SIDDIQUI:  Yes, Your Honor, that's fine.

23       THE COURT:  Which he's a part of, an active part of,

24   they're going to prove.

25       MS. SIDDIQUI:  That part that goes up to the Senate

 1    doors is not necessarily just the mob or just the rioters that

 2    were at the staircase, and that, I think, is a missing inference

 3    that they're trying to make here.  If they want to say yes, the

 4    Senate Door was breached at a certain point, yes, that's a fact,

 5    but to create that that is a natural cause of my client doing

 6    whatever he did and it's the same people that are going up, that

 7    cannot be proven by --

 8            THE COURT:  I overrule that objection.  There are a

 9    lot of different places from which the crowd could get up.  His

10    was one.  So he might not be the sole cause, his group, but it

11    was certainly a cause of what happened up there.

12            MS. SIDDIQUI:  And just the fact that everything

13    inside the Senate Door, or once that Senate Door was breached,

14    my client has never -- there's no allegations that he has ever

15    been there.  That was a part of that.  And that piece of the

16    video we do think is prejudicial and not relevant to my client's

17    case.

18        But I understand Your Honor's ruling.

19            THE COURT:  I'm going to overrule it, but again, let's

20    just try to focus on the issues that are most at issue in this

21    case.

22            MR. BRADY:  Yes, Your Honor.  Given your ruling on

23    that objection, we would move in Government Exhibit 300.

24            THE COURT:  All right.

25        (Government Exhibit 300 received into evidence.)

1          MR. BRADY:  Your Honor, I will streamline playing the

2     video based on Your Honor's comments.

3          If we could bring up Government's Exhibit 300, please.

4          (Video playing.)

5          BY MR. BRADY:

6     Q.   Captain Mendoza, we are seeing at 12:51 p.m.  The video

7     denoted Peace Circle.  Is this the area you circled for the

8     Court, the first breach area of the United States Capitol

9     perimeter?

10    A.   Yes, it is.

11    Q.   The video says 12:54 p.m.  The fencing that's at the very

12    bottom, is that the bike racks that we were talking about

13    earlier?

14    A.   Yes.

15    Q.   Great.

16         Captain, we're at 12:57 on the video time stamp.  What's

17    the area here?

18    A.   The breach of the grounds, so individuals in restricted

19    areas of the west front.

20    Q.   This is showing at 12:58.  Is this the Lower West Terrace

21    that we were talking about earlier?

22    A.   Yes, sir.

23    Q.   If we could pause, Ms. Macechko, please.

24         This black fencing at the very bottom, what is that

25    exactly?

1   A.   That fencing was put there to secure the area of the

2   inaugural stage.

3   Q.   Okay.  And circling at the very top at 12:58 p.m., what are

4   we seeing there at the top left-hand corner?

5   A.   That is fencing that was -- and "area closed" signs that

6   was placed there as a part of the restricted grounds.

7   Q.   If we could hit play, Ms. Macechko.

8        (Video playing.)

9            BY MR. BRADY:

10  Q.   If you can pause for me, please.

11       Captain Mendoza, it's at 2:09 p.m. on the northwest stairs.

12  Can you orient the Court as to where we are exactly?

13  A.   That's the northwest stairs that I showed you earlier.

14  It's directly to the north of the inaugural stage.

15  Q.   If we could hit play.

16       (Video playing.)

17           BY MR. BRADY:

18  Q.   Which area of the Capitol are we seeing here?

19  A.   The Senate Wing Doors are directly in front.

20  Q.   Is this area the Upper West Terrace that we were talking

21  about earlier?

22  A.   Yes, sir.

23  Q.   If you could hit play for me, please.

24       (Video playing.)

25           BY MR. BRADY:

1    Q.   Now we're showing you 2:12 to 2:13 p.m. on the video.

2    Which area of the Capitol are we looking at?

3    A.   The Senate Wing Doors.

4    Q.   Is this from the interior or the exterior of the building?

5    A.   We're looking at the interior of the building right now.

6    Q.   Where was the first breach of the United States Capitol on

7    January 6, 2021?

8    A.   The Senate Wing Doors.

9    Q.   Is that the area we see depicted here?

10   A.   Yes.

11   Q.   Is this the first breach that we're seeing here on the

12   video?

13   A.   The first breach of the building, yes.

14   Q.   I forgot to ask you about a breach between that 12:53 p.m.

15   time period and the breach of the Senate Wing Door.  Are you

16   aware of the breach at the northwest stairs, those stairs we've

17   been talking about a couple times today?

18   A.   Yes.

19   Q.   Were those stairs breached by the mob that day?

20   A.   Yes.

21   Q.   Do you know what time those stairs were breached

22   approximately?

23   A.   Between 13:48 and 13:52, so 1:48 p.m. to 1:52 p.m.,

24   somewhere around there.

25   Q.   And once the Capitol is breached, what happens to the Joint

1    Session of Congress that's taking place inside the Capitol that

2    day?

3    A.   Well, the Joint Session of Congress was interrupted due to

4    the breach of the Capitol.

5    Q.   Once it's interrupted, is it just as simple as kick them

6    out and start back up again?

7    A.   No.  We have to secure the entire building.  So there's

8    systematic checks that have to take place, and officers have to,

9    you know, check each room, clear the building.  K9s have to come

10   in and sweep; the bomb squad has to come in and sweep.  So

11   there's a process.

12   Q.   Are you able to continue, or allow Congress to continue

13   their session if, let's say, one or two rioters are in the

14   building?

15   A.   No.

16   Q.   Was the certification of the Electoral College vote that

17   day delayed based on the breaches at the Capitol?

18   A.   Yes, it was.

19   Q.   Did the certification resume later on that evening?

20   A.   Yes, sir, it did.

21         MR. BRADY:  Judge, may I have a moment?

22         THE COURT:  Sure.

23         MR. BRADY:  I have nothing further, Your Honor.

24         THE COURT:  All right.  Thank you.

25      Ms. Siddiqui?

```
 1                          CROSS-EXAMINATION
 2             BY MS. SIDDIQUI:
 3     Q.   Good morning, ma'am.
 4     A.   Good morning.  How are you?
 5     Q.   Good.  We talked a lot about snow fencing and the bike
 6     racks and all that.  At some point, all of those things came
 7     down; correct?
 8     A.   I can make an assumption, but I'm not 100 percent sure.  I
 9     think it was still standing in some places, but yeah, I couldn't
10     answer that honestly for you.
11     Q.   And when you got to the Capitol, you came a little bit
12     later, is that right, in the afternoon?
13     A.   I arrived around 1400 hours.
14     Q.   Okay.  And when you arrived, did you see all of them in the
15     same place as they would have been?
16     A.   The snow fencing?
17     Q.   Correct.
18     A.   And bike rack?
19     Q.   Yes.
20     A.   I didn't -- I didn't drive the perimeter.  I came in
21     through the south barricades.  So I wouldn't have seen the
22     fencing at all.
23     Q.   And the snow fencing that's put up, you mentioned, on the
24     outside perimeter, is that always there, regardless of --
25     throughout the year, 365 days?
```

```
1    A.    Around the outer perimeter?

2    Q.    Yes.

3    A.    No, ma'am.

4    Q.    Okay.  And the Capitol grounds, so not the building itself

5    but the Capitol grounds, the snow fencing doesn't remain there

6    throughout the year; correct?

7    A.    No, ma'am.

8    Q.    So there are times when the public can access just that

9    ground, because there's no fencing or bike racks preventing them

10   from it?

11   A.    Certain parts of the grounds, yes, ma'am.  Certain parts of

12   the grounds are off limits 24/7.

13   Q.    Makes sense.  And you mentioned that you have training and

14   experience -- I think you said you're commander of the CDU unit;

15   is that right?

16   A.    Yes, ma'am, I am.

17   Q.    And because of that, you have training and experience in OC

18   spray?

19   A.    Yes, ma'am, I do.

20   Q.    Okay.  So let's talk about that.  You lead the less lethal

21   team; is that right?  You oversee them?

22   A.    I'm in charge of the less lethal team, yes.

23   Q.    And they actually responded on January 6; correct?

24   A.    Yes, ma'am, they did.

25   Q.    And the less lethal team, they are trained -- I think
```

1    they're called grenadiers?

2    A.   Yes.  I am also a grenadier.

3    Q.   And you and your team, you're trained to deploy chemicals

4    or impact rounds with the chemicals; correct?

5    A.   Yes, chemical impact.

6    Q.   And these include like flash bangs and PepperBall guns and

7    things like that?

8    A.   Yes.

9    Q.   And were those deployed that day?

10   A.   I'm sorry?

11   Q.   Were those deployed that day?  They were used?

12   A.   Yes, ma'am, they were.

13   Q.   Okay.  And the team is called less lethal because it's not

14   firearms, it's a step below that; correct?

15   A.   Yes.

16   Q.   Okay.  And the PepperBall system that we just talked about,

17   did officers use it that day against rioters?

18   A.   Yes, ma'am, they did.

19   Q.   And the PepperBall system, it launches caliber rounds;

20   right?  It launches a bullet that has chemical spray in it?

21   A.   It's -- we don't really call it a bullet, but it's like

22   thin stabilized-type round.  It's like a little ball.

23   Q.   And it's a 0.68-caliber round?

24   A.   0.68 calibers, yes.

25   Q.   Once you hit someone with it, it actually releases the

1   chemical on impact; is that right?

2   A.   Yes, ma'am, it does.

3   Q.   And there's different levels of OC spray that Capitol

4   Police has; is that right?

5   A.   Yes, ma'am.

6   Q.   Okay.  And so there's smaller ones; there are larger ones?

7   A.   Yes, ma'am, that's correct.

8   Q.   And the larger ones are the ones that are more impactful?

9   A.   Yes, ma'am.

10  Q.   Okay.  So the small handheld ones, not as much; correct?

11  A.   When you're dealing with one subject, typically the small

12  ones are effective.

13  Q.   And you mentioned that there was training that you received

14  as a part of that, and you had to be sprayed, and then you did

15  90 seconds of -- you had to fight through it for 90 seconds; is

16  that right?

17  A.   Yes.

18  Q.   In the 90 seconds, are you performing tasks?  You're told

19  to perform certain tasks for training?

20  A.   In the training situation?

21  Q.   Yes, ma'am.

22  A.   You're fighting -- you fight a role player for 90 seconds.

23  Q.   Okay.

24  A.   They say the typical fight lasts 90 seconds.  So that's the

25  reason behind that.

1    Q.   And I'm going to show you what's been marked as Government

2    Exhibit 210.  I believe it's already been admitted into

3    evidence, if we can pull that up.  Thank you.  And approximately

4    at 12 seconds.

5        I'm going to ask you to focus on this part of the screen.

6    Are those officers?

7    A.   I see one officer up there.  I'm not sure about the other

8    one.  My eyesight's not that great.  I see one for sure.

9    Q.   If we could play it for a couple of seconds.

10       (Video playing.)

11           BY MS. SIDDIQUI:

12   Q.   What they're holding, that's the PepperBall system?

13   A.   Can you pause that for a second?

14   Q.   Sure.

15   A.   It's hard to see, but that may be a 40-millimeter impact

16   weapon.

17   Q.   And is that also chemical spray?

18   A.   So what the 40 millimeter can be, you can load it with

19   chemicals or impact alone or aerial flash bangs.

20   Q.   This is to control the crowd; correct?

21   A.   Yes.

22   Q.   We can take the exhibit off.

23       And I want to talk to you a little bit about, just based on

24   your training and experience, use of force in general.

25   A.   Sure.

```
1    Q.   There is a continuum, is that right, for Capitol Police, a
2    use of force continuum?
3    A.   Yes.
4    Q.   And there's five steps to it; is that right?
5    A.   Correct.
6    Q.   Okay.  And it's five levels, essentially, of how you
7    escalate; correct?
8    A.   Yes, ma'am.
9    Q.   Okay.  And the lowest level, first level, that's the
10   cooperation or cooperative tactics; is that right?
11   A.   Yes.
12   Q.   Okay.  And these are verbal commands that you're giving?
13   A.   At the lowest level?  Verbal commands, police presence.
14   Q.   Okay.  So just by the presence of an officer might calm
15   things down?
16   A.   Sure.
17   Q.   And one step above that is contact; is that right?
18   A.   Yes.
19   Q.   Okay.  And that's like hand gestures or telling someone to
20   go to the side or whatever it might be; correct?
21   A.   Yes, ma'am.
22   Q.   Okay.  And then one step above that, compliance; is that
23   right?
24   A.   You said compliance?
25   Q.   Compliance.
```

1   A.   Defensive movements, you know, defensive tactics, also

2   hands on, correct.

3   Q.   And these would be like holds or chemical sprays and things

4   like that at this point; correct?

5   A.   Can be, yes.  It could be open-hand techniques, chemical

6   sprays.  It could be a host of things.

7   Q.   And one above that is the hand baton strikes and things

8   like that; correct?

9   A.   Yeah, so baton strikes and chemical sprays can be on the

10  same level.  It just depends on how you use it.

11  Q.   And the last one above all of that is lethal, which is

12  discharging a firearm; is that right?

13  A.   It can be discharging a firearm, yes.

14  Q.   And this is when there's an imminent injury or death to an

15  officer; is that right?  That's -- that you're worried about?

16  A.   So, before you use lethal force?  It could be to an officer

17  or any individual, public individual, visitor --

18  Q.   And the lethal -- I didn't mean to cut you off.

19  A.   Any citizen.

20  Q.   And a lethal force, that's in cases of imminent danger to

21  an officer or some sort of grave bodily injury; is that right?

22  A.   To an officer or the public, yes.

23  Q.   And you mentioned the OC spray, or dangers of it, I guess,

24  depending on how it's used.  Can you talk me through that?  What

25  does that mean?

A.    Sure.  So OC spray is typically meant to be less lethal.
We train -- I'm also a less lethal instructor.  When we train
our officers in the use of less lethal, we train them to use it
a certain way.

     So for OC spray, for example, you're trained to use short
bursts of OC spray in order to have it maintain that level of
less lethal, and also depending upon where you use it.  For
example, if you spray someone directly in the eye at close
range, then that obviously ups the level of force.

     Also, you could -- depending upon how you incapacitate the
person.  So if I spray someone and I don't maintain or gain
immediate control of that individual and they fall and bump
their head, well, it's no longer less lethal; right?

Q.    Makes sense.

A.    So -- but whenever officers use less lethal, we are exposed
often.  I'm exposed a lot because I'm an instructor.  But when
officers utilize less lethal, one of the things we discuss is
like weapon retention and those type of things.  So any time OC
spray is used against an officer, it's a little bit higher level
of force, just because the officer's weapon is then compromised
and whatever other equipment that they have on their person.

Q.    And OC spray, the different sizes, they can also create
additional dangers; is that right?  Like, the bigger sprays can
be more dangerous than the smaller ones; is that right?

A.    They can be more effective, I would say, just because --

1  because it's the same chemical; right?  It's just the amount of

2  chemical being utilized or -- so for example, I would use a

3  bigger canister if I'm trying to affect more people.  So --

4  versus affecting one person with a small canister.

5  Q.   And the bigger canisters also have a higher velocity,

6  right, in which it's coming out?  It's coming out with more

7  force?

8  A.   Yes, ma'am, it does.

9        MS. SIDDIQUI:  No further questions, Your Honor.

10       THE COURT:  All right.  I have one question, Captain

11  Mendoza.

12       THE WITNESS:  Yes, ma'am.

13       THE COURT:  In the training exercise you described

14  where you had to receive pepper spray for, what, 90 seconds, you

15  said, during the training exercise, or 60?

16       THE WITNESS:  You're quickly sprayed, and then you

17  fight for the 90 seconds.

18       THE COURT:  Fight for 90 seconds, okay.

19       THE WITNESS:  Yes, ma'am.

20       THE COURT:  And after that exercise, do you do

21  anything to clear your eyes?

22       THE WITNESS:  Yes, ma'am.  So you basically just

23  decontaminate with water.  So you splash your face with water,

24  don't wipe or scrub the face, and then you stand in front of a

25  fan.

1          Other than that, you just wait it out.  You will have some

2     burning sensation that can occur up to probably 24 more hours.

3          THE COURT:  If you don't use water?  Does the water

4     take -- are you saying the up to 24 hours happens if you don't

5     have access to water?

6          THE WITNESS:  Either way.  So whenever you're -- when

7     the chemical hits your skin or your face, you know, it creates

8     the nasal situation.  Your eyes are watery and stringing.  The

9     water basically washes that away.  You can use like a mild soap,

10    but we don't use anything really to -- anything you use could

11    make it burn more.  So -- so basically just the water.

12         After you've been exposed to the OC, you can still have a

13    burning sensation later, regardless of whether you

14    decontaminated or not.

15         THE COURT:  For how long?

16         THE WITNESS:  It depends on the person really.  It can

17    be up to 24 hours.  Usually it's a couple hours, one or two

18    hours.

19         THE COURT:  In your experience, no long-term impact?

20         THE WITNESS:  I personally had a long-term impact

21    recently, on January 6, but I'm not sure exactly what I was

22    sprayed with.

23         My experience with OC spray, I haven't seen a longer-term

24    impact, besides maybe like if someone is not used to it and they

25    get PTSD or something like that.

1          THE COURT:  Okay.  Thank you.

2          MR. BRADY:  Briefly, Your Honor.

3          THE COURT:  Sure.

4                    REDIRECT EXAMINATION

5          BY MR. BRADY:

6     Q.   Talking about the capabilities, or what it could do to

7     someone on OC spray, it's a less-than-lethal force, but is it

8     capable of being lethal, given the right reaction by a person?

9     A.   Any weapon is capable of being, you know, lethal.  A pen is

10    capable of being lethal; right?  So again, it depends on how the

11    weapon is utilized, what other factors are there.  Does the

12    person have asthma, does the person have other, you know, things

13    on them, weapons, those types of things.  It's not typically

14    lethal, but can it be?  Of course.

15    Q.   Does the context surrounding where an officer might be

16    sprayed, is that going to increase the danger to the officer?

17    A.   Where the officer is sprayed?  Like if they're sprayed in

18    the eye directly?

19    Q.   I'm more thinking if someone is sprayed in a controlled

20    training environment versus surrounded by a mob of people.

21          MS. SIDDIQUI:  Objection, Your Honor; speculation.

22          THE COURT:  Overruled, but this is kind of obvious.

23          THE WITNESS:  Do you want me to answer that?

24          THE COURT:  You can answer it.

25          THE WITNESS:  There's a difference.  Obviously, if

1   it's a training environment, a training environment is

2   controlled.  When you're out in the public, an officer sprayed,

3   my concern would be someone getting access to their weapons or

4   their equipment.

5        So I hope that answers the question.

6            BY MR. BRADY:

7   Q.   And what equipment is typically carried by U.S. Capitol

8   Police?

9   A.   You said what weapon?

10  Q.   What weapon or equipment are carried by U.S. Capitol

11  Police?

12  A.   Depending on where the officer is assigned, all officers

13  have a pistol, Glock, and then, you know, various officers

14  assigned to various divisions having different types of weapons.

15  I'm assigned to Special Operations Division.  So my officers

16  typically have more weapons than the typical officer in the

17  field.

18  Q.   You said during training, you're exposed for 90 seconds

19  because that's the typical fight.  On January 6, were the

20  officers in the fight that day for only 90 seconds?

21  A.   Just to clarify, you're not exposed for the 90 seconds.  So

22  whenever we are in training, you are sprayed, you're quickly

23  sprayed, and then you have to fight for 90 seconds.  It's just

24  to show that the officers -- they have to show that they can

25  fight through an exposure, and so when they do get exposed out

1    in the real world, it's not a surprise to them.

2    Q.   Okay.  You mentioned on cross-examination about barriers

3    being moved.  Is it -- would you be surprised if someone coming

4    from the Peace Circle area, if they didn't encounter any

5    barriers on January 6, based on your view of the security?

6              MS. SIDDIQUI:  Objection.

7              THE COURT:  Sustained.

8              BY MR. BRADY:

9    Q.   Based on the number of security -- can you describe the

10   security that someone would have to go through on January 6

11   coming from the Peace Circle area to the Lower West Terrace,

12   what they might have encountered?

13   A.   Sure.  There were multiple levels of restricted space, and

14   there were multiple layers of bike rack set up and snow fencing

15   on January 6.  So you had the bike rack down at Peace Circle,

16   which was on First Street, along the entire First Street.  And

17   then as you -- if you crossed over that, there was an additional

18   bike rack like in the middle of the west lawn.  And then there

19   was additional fencing prior to getting to the Lower West

20   Terrace.  And then there was a bike rack behind that as you

21   approached the Lower West Terrace.  Additionally, there were

22   officers out and about on the fence lines.

23   Q.   And did the officers deploy riot control measures against

24   the crowd that were out there to disperse them?

25   A.   Yes.

```
 1                MR. BRADY:  Your Honor, may I have a moment?
 2                THE COURT:  Sure.
 3                MR. BRADY:  Nothing further for this witness, Your
 4      Honor.
 5                THE COURT:  All right.  Thank you.  You may be
 6      excused.
 7                THE WITNESS:  Thank you.
 8                THE COURT:  Next witness?
 9                MS. FIFIELD:  Your Honor, the government calls Special
10      Agent Ryan Nougaret.
11           RYAN NOUGARET, WITNESS FOR THE GOVERNMENT, SWORN
12                          DIRECT EXAMINATION
13                BY MS. FIFIELD:
14      Q.   Good morning, Agent Nougaret.
15      A.   Good morning.
16      Q.   Could you please spell your full name for the record,
17      please.
18      A.   First name Ryan, R-y-a-n, last name Nougaret,
19      N-o-u-g-a-r-e-t.
20      Q.   Where do you work?
21      A.   For the FBI, Federal Bureau of Investigation.
22      Q.   And what is your job title?
23      A.   Special agent.
24      Q.   How long have you worked for the FBI?
25      A.   About seven and a half years.
```

1    Q.    What did you do before that?

2    A.    I taught special education at an elementary school, and

3    then I also after that worked for -- at a defense contracting

4    firm in their procurement department, contracts department.

5    Q.    Okay.  And to become a special agent with the Federal

6    Bureau of Investigation, you had to undergo some training?

7    A.    I did.

8    Q.    As a part of your training, did you become familiar with OC

9    spray or pepper spray?

10   A.    I did.

11   Q.    And can you describe how that was introduced to you as a

12   part of your training?

13   A.    Very similar to what Captain Mendoza described.  We were

14   put in a situation where we were sprayed across the face, and we

15   then had to essentially, after being sprayed, verbalize commands

16   to a role player, essentially conducting an arrest basically.

17   Had to tell them to put their hands up and drop to their knees,

18   and basically, they wanted to see how we were going to react in

19   a contrived situation after being sprayed.

20   Q.    And what was the physical experience of being sprayed like

21   for you?

22   A.    So for me personally, burning sensation, eyes watering,

23   your skin kind of felt like it was on fire, you know.  Depending

24   on the person, I personally didn't -- it didn't incapacitate me,

25   but it definitely had an effect.

1   Q.   Is it fair to say that it -- you were talking about being

2   tested, giving verbal commands, conducting an arrest, basic

3   aspects of your job.  Fair to say that being sprayed made those

4   basic aspects of your job more difficult?

5   A.   Yes.

6   Q.   When you and your cohort were sprayed, when you did that

7   part of your training, were EMS personnel standing by?

8   A.   Yes.

9   Q.   Why was that?

10          MS. SIDDIQUI:  Objection; speculation.

11          THE COURT:  Overruled.

12          BY MS. FIFIELD:

13   Q.   If you know.

14   A.   I'm assuming there was --

15          MS. SIDDIQUI:  Objection, Your Honor; speculation.

16   It's an assumption.

17          THE COURT:  Sir, if you don't know, don't answer the

18   question.

19          THE WITNESS:  Like I said earlier, my reaction was

20   what it was.  I did witness there were other agents --

21          MS. SIDDIQUI:  Objection, Your Honor.

22          THE COURT:  No, overruled.

23          THE WITNESS:  There were other agents in my class who

24   were sprayed at the same time I was who had a different

25   reaction, and that was a little more severe than mine.

1    THE COURT:  And did they need emergency care?

2    THE WITNESS:  Yes, a couple of them did.

3    BY MS. FIFIELD:

4    Q.   Can you describe any one of those reactions in particular?

5    A.   One agent that was in my class had a more severe reaction

6    to it.  It kind of -- frankly, it kind of knocked him down, like

7    kind of brought him to his knees.  He became kind of

8    discombobulated and required assistance from medical personnel

9    that they had standing by.

10   Q.   Have you been conducting investigations into crimes that

11   were committed at the United States Capitol on January 6, 2021?

12   A.   Yes.

13   Q.   Have you investigated multiple cases involving the breach

14   of the Capitol on January 6?

15   A.   I have.

16   Q.   Did there come a time when you began an investigation into

17   an individual named Barry Ramey?

18   A.   Yes.

19   Q.   How did that investigation start?

20   A.   It started -- I received essentially a lead, if you will,

21   from our headquarter office, specifically regarding a BOLO

22   number 329, I believe, along with some confidential human source

23   reporting as well.

24   Q.   What was the substance of the BOLO?

25   A.   It essentially was a identification or a possible at the

1    time identification of Mr. Ramey and his conduct on January 6.

2    Q.    In the course of your investigation, did you watch video

3    showing the person you believed to be Barry Ramey on or near

4    Capitol grounds on January 6?

5    A.    I did.

6    Q.    How much video?

7    A.    Hours and hours of video footage.

8    Q.    And could you see the person you believed to be Mr. Ramey's

9    face in those videos?

10   A.    Yes.

11   Q.    Could you see his full body?

12   A.    Yes.

13   Q.    Based on your review of the video capturing that person on

14   January 6, 2021, what was that person wearing on that day?

15   A.    Mr. Ramey was wearing a black baseball cap with the

16   American flag on the front of the cap, a black in color jacket.

17   At one point he had gloves, it looked like armored gloves.  I

18   believe they were black in color as well.  Denim jeans,

19   kneepads, tan-colored, they looked like Army boots type of boot,

20   a black backpack with like a paracord on the back of it.  At

21   certain times of the footage, a fairly large gas mask was on his

22   face.

23        I think that's, in terms of articles of clothing, what he

24   was wearing.

25   Q.    What about around his neck?

1    A.   Yes, I'm sorry.  He had a gaiter.  It kinds of looks like a

2    scarf if you have it below your chin.  He had a gaiter around

3    his neck, blue, black, and white American flag gaiter that he at

4    times had up over his nose.

5    Q.   For the record, the witness is making a motion like he is

6    covering his face with the gaiter that we've been talking about.

7         Was Barry Ramey ultimately charged in connection with your

8    investigation?

9    A.   Yes.

10   Q.   Was he arrested?

11   A.   Yes.

12   Q.   Did you personally participate in the arrest of Barry

13   Ramey?

14   A.   Yes.

15   Q.   Did you interact with him face to face?

16   A.   Briefly, yes.

17   Q.   And was his appearance consistent with the videos you had

18   watched?

19   A.   Yes, his overall appearance.  At the time of the arrest, he

20   had grown a pretty thick beard.

21   Q.   But based on this interaction and the videos that you had

22   seen, were you confident that the person you were looking at on

23   the day of the arrest was the same person that you had seen in

24   all these videos?

25   A.   Yes.

1    Q.   How did you make that determination?

2    A.   Well, obviously, like I said earlier, I watched hours and

3    hours of video footage.  So I was able to see him in that

4    footage with his gaiter mask pulled down.  So just his overall

5    facial complexion, his overall physique, like height, build,

6    just various nuances with his facial complexion, I was confident

7    it was the same person.

8    Q.   Do you see Barry Ramey in the courtroom today?

9    A.   I do.

10   Q.   Could you identify him by describing where he's sitting and

11   article of clothing he's wearing?

12   A.   He's sitting next to his defense counsel wearing a grayish

13   light blue button-down dress shirt with a grayish blue tie and

14   wearing a white mask.

15          MS. FIFIELD:  May the record reflect an in-court

16   identification of the defendant.

17          THE COURT:  It so reflects.

18          BY MS. FIFIELD:

19   Q.   Let's talk about some of these videos that you reviewed as

20   a part of your investigation.  Now, the Court has all these

21   videos.  We're not going to go through all of them.  I just want

22   to go over some of the high points.

23      Have you reviewed the exhibits in the Government's 200

24   series?

25   A.   I have.

1    Q.   Are those videos that you reviewed in the course of your

2    investigation?

3    A.   Yes.

4    Q.   How are those videos obtained generally?

5    A.   Open source material, coupled with CCTV footage, various --

6    posted videos on various platforms.

7    Q.   Some of the videos were surrendered to the government by

8    other Capitol breach subjects and defendants?

9    A.   Yes.

10   Q.   And open source, that's just like I found it on the

11   Internet, correct --

12   A.   Right.

13   Q.   -- in layman's terms?

14        So because many of these videos are open source, were you

15   able to obtain metadata for all of them?

16   A.   Yeah, a lot of the -- well, no.  I mean, a lot of the

17   videos that were posted, you know, contained -- some of them

18   contained metadata that as a result I wasn't able to necessarily

19   say that that time stamp was accurate, because depending on who

20   posted the video, you know, the person who posted it is going to

21   have metadata associated with that post.

22   Q.   So it's not possible to determine exactly when and where

23   each video was recorded?

24   A.   No, not all of them, no.

25   Q.   Okay.  In preparation for your testimony today, did you

1    tour Capitol grounds?

2    A.    I did.

3    Q.    Did you compare the videos that you reviewed as a part of

4    your investigation to actual locations on Capitol grounds?

5    A.    Yes.

6    Q.    And you've reviewed maps and images of the Capitol grounds?

7    A.    Yes.

8    Q.    And those are the exhibits in the Government's 100 series?

9    A.    That's correct.

10   Q.    And you're familiar with the boundaries of the restricted

11   area as depicted in Government's 104?

12   A.    I am.

13   Q.    So based on your review -- your in-person review of Capitol

14   grounds, all the video that you've watched, the maps, the

15   images, are you able to estimate approximately where on Capitol

16   grounds each of the videos in the Government's 200 series were

17   recorded?

18   A.    Yes.

19   Q.    And based on your review of the video and other evidence in

20   this case and your investigation into the riot generally, are

21   you aware of kind of the timeline of how the riot unfolded?

22   A.    Yes.

23   Q.    And you're aware, for example, of where and when the first

24   breach of the outer perimeter of the Capitol grounds took place?

25   A.    Yes.

1    Q.   What about the breach at the base of the northwest stairs

2    or the Senate stairs?

3    A.   Yes.

4    Q.   And based on that knowledge, when you review the videos in

5    the Government's 200 series, are you able to place them

6    approximately in time as well as space?

7    A.   Yes.

8    Q.   All right.  Let's take a look at some of those videos.  I'd

9    like to pull up Government's 203.  I want to start at about 18

10   seconds and just play for a couple of seconds.

11        (Video played.)

12             BY MS. FIFIELD:

13   Q.   All right.  What are we looking at here?

14   A.   A number of individuals, Capitol Police officers, behind a

15   fence trying to hold back a crowd of people.

16   Q.   What location is this on Capitol grounds?

17   A.   This appears to be on the westward-facing side of the

18   Capitol, kind of the walkway from -- Pennsylvania walkway from

19   Peace Circle, coming from that direction, if that makes sense.

20   Q.   And that time stamp in the lower left -- actually, let me

21   ask you this first:  Is this, to your knowledge, the first

22   breach of the outer perimeter of the grounds at Peace Circle?

23   A.   Yes.

24   Q.   The time stamp at the bottom left, is that accurate?

25   A.   No.

1    Q.   How do you know that?

2    A.   That initial breach, exterior breach of the Capitol

3    occurred at approximately 12:53 p.m.

4    Q.   And you're aware that the government and defense have

5    stipulated to that fact?

6    A.   Yes.

7    Q.   Is this one of those open source videos that you were

8    talking about?

9    A.   It is.

10   Q.   All right.  If we could play, please.  Actually, let's move

11   to one minute into the video.

12        (Video played.)

13            BY MS. FIFIELD:

14   Q.   Okay.  What do we see happening to the -- you heard Captain

15   Mendoza.  This is bike racks, snow fencing.  What's happening to

16   that stuff?

17   A.   It's been overrun, or it's in the process of being toppled

18   over, barreled through by crowds of people.  It's evident that

19   crowds of people have already made their way through that

20   fencing.

21   Q.   You're referring to these folks up here in the left?

22   A.   Yes, I am, yes.

23   Q.   And in addition to the bike racks and snow fencing, are

24   there Capitol Police in this frame?

25   A.   Yes.

1   Q.   Nine Capitol Police?

2   A.   Yeah.  I actually count ten, yep.

3   Q.   Can we move to 1:38 in 203, please.

4   (Video played.)

5       BY MS. FIFIELD:

6   Q.   Pause, please.

7   What do we have here?

8   A.   Fencing that has been pulled out of the ground and

9   thrown -- thrown to the side.

10   Q.   Can we play for a couple of seconds.

11   (Video played.)

12       BY MS. FIFIELD:

13   Q.   Okay.  So the bike racks that we just saw on the ground, do

14   you know approximately where on Capitol grounds those were?

15   A.   They were -- well, that line of bike racks that we've

16   previously looked at were kind of along that walkway from Peace

17   Circle that leads up to the west side of the Capitol.  I mean,

18   there's a number of steps, like elevated little platforms that

19   you walk up, but those appear to be from that first line of bike

20   racks that have been kind of tossed to the wayside.

21   Q.   So somewhere between Peace Circle and the Lower West

22   Terrace on the Pennsylvania walkway?

23   A.   Yes.

24   Q.   Okay.  We can pull up Government's 201, please, and play

25   the first ten seconds.

1      (Video played.)

2           BY MS. FIFIELD:

3    Q.   Okay.  What are we looking at here?

4    A.   We are looking at again the west side of the Capitol, I

5    guess from an angle, and you can see, obviously, the Capitol,

6    but you can specifically see a little bit of the scaffolding

7    there, Lower West Terrace area where the scaffolding is and

8    where that -- you can't see the door to the Senate steps, but

9    that's what I'm seeing.

10   Q.   Okay.  Based on your knowledge of the restricted area and

11   the location of Peace Circle, are some of these folks outside

12   the restricted area?

13   A.   Yes.

14   Q.   If you want to refer to Government's 104 as well, you can.

15   A.   Some of these individuals appear to be outside of the

16   restricted area, but this picture is showing a greater number of

17   individuals that have -- that are within the restricted area,

18   having toppled over that fencing that we looked at earlier.

19           THE COURT:  Ms. Fifield, sorry to interrupt.

20      Ms. Siddiqui, is the defense's position that he didn't know

21   he was in restricted grounds?  Is this at issue?

22           MS. SIDDIQUI:  Yes, I guess in some way.

23           THE COURT:  All right.  Go ahead.

24           MS. FIFIELD:  Thank you, Your Honor.

25           BY MS. FIFIELD:

1    Q.   So it looks like this is after the breach of Peace Circle

2    took place?

3    A.   Yeah, a large amount of people have already breached that

4    fencing.

5    Q.   Can we skip to 1:16 into the video.

6         (Video played.)

7              BY MS. FIFIELD:

8    Q.   And can we pause, please.  Actually, can we go back one

9    second.

10              THE COURT:  Ms. Fifield, if you're going to go through

11    every instance in which a video shows the barriers, I can watch

12    this later.  Is that what you're doing now, or are you moving on

13    to the actual engagement?

14              MS. FIFIELD:  Part of the purpose, Your Honor, is

15    to -- I apologize for cutting you off.  But part of the purpose

16    is to establish that there's no reasonable way the defendant

17    didn't know that he was on restricted grounds.

18         The other part of the purpose is to -- because we don't

19    have metadata for these videos, to approximately place them in

20    space and time.  So the presence of these bike racks downed

21    shows it was relatively close in time after the actual breach at

22    Peace Circle itself.

23              THE COURT:  Okay.  Go ahead.

24              BY MS. FIFIELD:

25    Q.   Bike racks, snow fencing?

1    A.    Yes.  Both have been knocked down, and the crowds are

2    larger as people are filing through.

3    Q.    This looks like approximately the same area that we saw the

4    bike racks knocked down in the other video?

5    A.    Yes, approximately, coming off that Peace Circle walkway.

6    Q.    Okay.  Play for a couple seconds.

7          (Video played.)

8              BY MS. FIFIELD:

9    Q.    You can skip forward to 2:25 -- actually, 2:20.

10         You see Barry Ramey in this frame?

11   A.    I do.

12   Q.    Can you circle him?  And can you point out some of the

13   articles of clothing that you see him wearing that you discussed

14   previously?

15   A.    Black baseball cap, blue and white gaiter that appears to

16   be slightly over his chin, black backpack, black jacket, black

17   gloves, denim jeans, kneepads, brown-colored boots.

18              MS. FIFIELD:  Your Honor, may I approach the witness?

19              THE COURT:  Sure.

20              BY MS. FIFIELD:

21   Q.    So I've just handed you still frames of these video

22   exhibits.  Have you reviewed these stills before?

23   A.    I have.

24   Q.    And in each still, in this case 201A, is there a time stamp

25   in the lower left corner?

1    A.    There is.

2    Q.    And based on your review of the video just now and

3    previously, is that time stamp accurate on the video player?

4    A.    No.

5    Q.    On the exhibit, 201A?

6    A.    Yes.

7    Q.    What does that time stamp say down on the lower left

8    corner?

9    A.    2:25.

10    Q.    Okay.  So then in that case, that one is not accurate.

11         So can you cross that out and write 2:25?

12              THE COURT:  Wait.  Where is that coming from?

13              MS. FIFIELD:  This is two minutes and 25 seconds into

14    the video.  So each still is marked with the time stamp that the

15    frame is taken from.

16              THE COURT:  So he previously testified about the

17    correct time when the video started?

18              MS. FIFIELD:  When we're talking about time, Your

19    Honor, it's kind of confusing, because we're talking about

20    realtime, like 12:53 p.m.  We're also talking about the time of

21    the video.  And on government's 201A, there's a time stamp in

22    the lower left corner that says the time marker on the video.

23              THE COURT:  Realtime?

24              MS. FIFIELD:  Not realtime.  Time marker on the video.

25              THE COURT:  And you want to correct that?

1            MS. FIFIELD:  Nope.  That's why I was getting mixed

2    up, because it's getting confusing with video time and realtime.

3            BY MS. FIFIELD:

4    Q.   Agent Nougaret, can you read the time stamp on 201A?

5    A.   The video time stamp is 02:25.

6    Q.   So that would be two minutes and 25 seconds?

7    A.   Yes.

8    Q.   And we just saw that time on the video play?

9    A.   Correct.

10            THE COURT:  Are you tying this to realtime, so it has

11    some significance?  No?  You're just trying to show that this is

12    immediately after the barriers are down?

13            MS. FIFIELD:  The time stamp provided on the still

14    exhibits is to assist the Court in locating the still frame

15    within the video.

16            THE COURT:  I see.  Okay.

17            MS. FIFIELD:  So that you can find it later.

18            THE COURT:  I see.

19            BY MS. FIFIELD:

20    Q.   So you've circled Barry Ramey in Government's 201.  You

21    also have a still frame from two minutes and 25 seconds.

22         Do you see Barry Ramey on 201A?

23    A.   I do.

24    Q.   Can you circle him in that exhibit and initial, please.

25    A.   I have done that.

1    Q.   Okay.  Can we play, please, 201.

2         (Video played.)

3              BY MS. FIFIELD:

4    Q.   Okay.  Pause.  Okay.

5         What does it look like Mr. Ramey is doing in 201?

6    A.   Mr. Ramey is walking with purpose to the --

7              MS. SIDDIQUI:  Objection, Your Honor; speculation and

8    characterization of something that's not in his personal

9    knowledge.

10             THE COURT:  Didn't he testify he reviewed the video?

11             MS. SIDDIQUI:  It's not to the ID, Your Honor.

12   It's "walking with a purpose."  I don't know what that means.

13             THE COURT:  Describe what you saw in the video.

14             THE WITNESS:  Mr. Ramey is walking toward the -- Lower

15   West Terrace toward the scaffolding there at the base of the

16   Senate steps.

17             BY MS. FIFIELD:

18   Q.   Does it look to you based on your review of the video that

19   he's moving at a leisurely pace?

20   A.   No.

21   Q.   And again, this is -- this video, based on what we can see

22   in the video, was recorded just after the breach of Peace

23   Circle?

24   A.   That's correct.

25   Q.   Can we pull up 202, please, and can we go to 1:25.

```
 1        (Video played.)
 2            BY MS. FIFIELD:
 3   Q.    Pause briefly.
 4         Do you see these folks here?
 5   A.    Yes.
 6   Q.    Who are they?
 7   A.    Capitol Police officers that are standing on the Lower West
 8   Terrace at the base of the northwest or Senate steps.
 9   Q.    Fair to call that a police line?
10   A.    Yes.
11   Q.    Okay.  And behind this flag now, but I won't make us go
12   back, what's back there?
13   A.    The base steps that lead up to the Upper West Terrace.
14   Q.    And there's an opening there?
15   A.    There is.
16   Q.    Okay.  We can play.
17        (Video played.)
18            BY MS. FIFIELD:
19   Q.    Okay.  What did we just see happen there?
20   A.    The crowd is moving, I guess, more centered to the west
21   side of the Capitol.  There appear to be -- they appear to be
22   moving away from that Senate step scaffolding entrance opening.
23   Q.    They're advancing into the Lower West Terrace?
24   A.    Yes.
25   Q.    Past that fencing?
```

1   A.   Yes.

2   Q.   And we saw that -- did we see that on CCTV as well?

3   A.   Yes.

4   Q.   Captain Mendoza?

5        Okay.  What do we have here?

6   A.   It looks like more bike rack apparatus set up there.

7   Q.   They're in close proximity to this opening here?

8   A.   Yes.

9   Q.   Can we skip to 6:55, please.

10       (Video played.)

11            BY MS. FIFIELD:

12  Q.   Pause.

13       Keep your eye on this fellow here.

14       Okay.  Play.

15       (Video played.)

16            BY MS. FIFIELD:

17  Q.   Pause.

18       What do we hear that guy saying?

19  A.   "Take the steps; we can take the steps."

20  Q.   Can we move to -- actually, continue playing.

21       (Video played.)

22            BY MS. FIFIELD:

23  Q.   Go back to 7:06, please.

24       (Video played.)

25            BY MS. FIFIELD:

1    Q.   Do you see Barry Ramey in this frame?

2    A.   I do.

3    Q.   Can you circle him?  Can you describe what we can see how

4    you know that's Barry Ramey?

5    A.   Black hat with American flag and black on the front of the

6    hat or cap, gaiter pulled up over his nose, blue, white gaiter

7    previously referred to, black jacket.  He also appears to have

8    some sort of, I don't know, goggle-looking item up on his

9    forehead below his hat brim.

10   Q.   Can you please make the same mark with your initials on

11   202A in front of you, and look up when you're done.

12        What do we have here that I've just circled?

13   A.   Bike racks at the base of the Senate steps on the Lower

14   West Terrace.

15   Q.   Just at a very general level, can you estimate based on

16   this video how far Mr. Ramey is away from those bike rack

17   barricades?

18   A.   Maybe 5 to 10 feet.

19   Q.   Pull up 203G, please.  Go to 5:55.

20        (Video played.)

21          BY MS. FIFIELD:

22   Q.   Pause.

23        Again, what do you see?

24   A.   Bike racks, layered bike racks, yeah.

25   Q.   And these folks?

```
 1    A.   Capitol Police officers that appear to be forming -- a line
 2    of Capitol Police officers.  I see four in this picture.
 3    Q.   But they're looking in this direction; right?
 4    A.   Yes.
 5    Q.   Play.
 6         (Video played.)
 7              BY MS. FIFIELD:
 8    Q.   Pause quick.
 9         At this point, is the crowd's attention focused on that
10    opening where the officers are standing?
11    A.   No.
12    Q.   Play.
13         (Video played.)
14              BY MS. FIFIELD:
15    Q.   Pause.
16         Do you see Barry Ramey in this frame?
17    A.   I do.
18    Q.   Could you circle him, please.
19         Any notable changes in his appearance?
20    A.   Other than he's wearing sunglasses now.
21    Q.   You're confident that that's him?
22    A.   I am.
23    Q.   Okay.  Please make the same mark on 203A in front of you,
24    and look up when you're done.
25         204, please, and let's play the first 13 seconds.
```

1        (Video played.)

2             BY MS. FIFIELD:

3    Q.   Okay.  Did you see Barry Ramey in those first 13 seconds

4    there?

5    A.   Yes.

6    Q.   Could you circle him, please.  And what did you see him

7    doing in those first 13 seconds?

8    A.   Putting a gas mask over his head.

9    Q.   Trying to, at least?

10   A.   Attempting to, yeah, at that moment.

11   Q.   Can you make that same mark on 204A, please, and look up

12   when you're done.

13        Let's go to 45 seconds.

14        (Video played.)

15             BY MS. FIFIELD:

16   Q.   Pause.

17        Okay.  Did you see Mr. Ramey in those ten seconds there?

18   A.   Yes.

19   Q.   What did he appear to be doing?

20   A.   He's moving -- he's angled his body to where he's moving

21   toward that -- still on the Lower West Terrace, moving toward

22   that scaffolding with the opening at the base of the Senate

23   steps.

24   Q.   Okay.  Could you circle him in this frame, please.  And go

25   ahead and make the same mark on 204B.

1    205, please, and we will play the first seven seconds.

2    (Video played.)

3        BY MS. FIFIELD:

4    Q.   Okay.  What did we see happening in that frame -- or in the

5    clip as it opened?

6    A.   We see the crowds, large crowd of people, Lower West

7    Terrace.  That is -- U.S. Capitol Police are on an elevated --

8    from an elevated position appear to be trying to control the

9    crowd, shooting various devices into the crowd to try to control

10   the crowd.

11   Q.   Okay.  And you see Barry Ramey in this frame?

12   A.   I do, yes.

13   Q.   He's hard to see in this one?

14   A.   Off to the left there, but yes, I see him.

15   Q.   Can you circle him, please.

16       And how can you tell that's him?

17   A.   I see the gas mask apparatus around his head, and just with

18   the haircut that he has, it -- it's the same person, familiar

19   haircut.

20   Q.   Could you make the same mark on 205A, and look up when

21   you're done.

22       Okay.  Can we play to 30 seconds, please.

23       (Video played.)

24           BY MS. FIFIELD:

25   Q.   We see additional crowd control ordnance being deployed

```
1    there?

2    A.   Yes.

3    Q.   Okay.  206, please, and we will start at 1:20.

4         (Video played.)

5              BY MS. FIFIELD:

6    Q.   Pause.

7         You see Barry Ramey in this frame?

8    A.   I do.

9    Q.   Can you circle him.

10        Anything notable about his appearance here?

11   A.   His gas mask is on -- a rather large gas mask, but

12   everything else I previously described, he's wearing.  I don't

13   see anything additional.

14   Q.   Do you see those gloves?

15   A.   Yes.

16   Q.   And the boots?

17   A.   Yes.

18   Q.   Can we play 1:25 to 1:42.

19        (Video played.)

20              BY MS. FIFIELD:

21   Q.   Okay.  Before we move on, in terms of the identification

22   and marking you made on this video exhibit, would you make the

23   same identification mark on 206A?

24   A.   Yes.

25   Q.   We saw additional crowd control ordnance being deployed
```

1    there?

2    A.   Yes.

3    Q.   Would a person standing where Ramey is reasonably be able

4    to perceive that crowd control ordnance?

5    A.   Yes.

6    Q.   See it?

7    A.   Yes.

8    Q.   Hear it?

9    A.   Yes.

10   Q.   Okay.  We're going to play about -- a few more seconds of

11   this exhibit.  I want you to keep your eye on Mr. Ramey, please,

12   and watch the people closely around him.

13        (Video played.)

14            BY MS. FIFIELD:

15   Q.   Pause.

16        Okay.  What did we see happen just there?

17   A.   I saw an individual get Ramey's attention by putting his

18   hand on his shoulder, and there was some sort of conversing back

19   and forth.  And after doing that, Mr. Ramey appeared to change

20   his attention and follow that individual over toward that Senate

21   step scaffolding area, opening.

22   Q.   Okay.  Can we move the video ticker back like two seconds?

23   We don't need to play.

24        Okay.  And back here, what do we see?

25   A.   Bike rack -- bike racks.

```
1    Q.   And officers behind them?

2    A.   Yes.

3    Q.   Okay.  Can we pull up 207, please.

4         Okay.  Before we play this, about -- based on what you see

5    in this video, can you see Mr. Ramey and tell us approximately

6    where he is relative to the stairs and to the police?

7    A.   Yes.  I see Mr. Ramey, and he is much closer now.  He's

8    right almost -- if not front row, you know, right at the front

9    row to the police line at the base of the Senate steps there.

10   Q.   So a person standing where Mr. Ramey is can see these

11   officers here; right?

12   A.   Yes.

13   Q.   Okay.  Can we play until 11 seconds.

14        (Video played.)

15             BY MS. FIFIELD:

16   Q.   Okay.  Can you circle Barry Ramey in this frame?

17   A.   Yes.

18   Q.   And do the same on 207A, with your initials.

19        As we just saw in that clip there, where does the crowd's

20   attention appear to be focused?

21   A.   The crowd is located on the Lower West Terrace at the base

22   of the northwest or Senate steps where the -- the opening there

23   in the scaffolding.  The crowd appears to be focused on that

24   location.

25   Q.   Okay.  And what -- how would you characterize their
```

1    behavior towards this police line that's standing there?

2    A.    Rambunctious, active.

3    Q.    Even in that video clip, did we hear their volume increase?

4    A.    Yes.  I hear shouting, shouting at the officers.

5    Q.    Okay.  200, please.

6          Do you know who these two folks are?

7    A.    I do.

8    Q.    Can you -- who is the guy with the baseball cap?

9    A.    U.S. Capitol Police Officer Riggleman.

10   Q.    And who is the guy with the blue helmet?

11   A.    U.S. Capitol Police Officer Williams.

12   Q.    Okay.  Can we play until 25 seconds, please.

13         (Video played.)

14             BY MS. FIFIELD:

15   Q.    Okay.  Do you see Barry Ramey in this frame?

16   A.    I do.

17   Q.    Can you circle him.

18         Okay.  We're going to watch from 25 seconds to 35 seconds,

19   and we're going to do it a couple of times, and I'm going to ask

20   you to focus on different things each time.

21         This time, I'm going to ask you to focus on Mr. Ramey.

22   Okay?

23   A.    Okay.

24         (Video played.)

25             BY MS. FIFIELD:

1   Q.   What did we just see Mr. Ramey do?

2   A.   I saw Mr. Ramey extend his right arm, hand, and spray some

3   sort of liquid in the direction of Capitol Police officers.

4   Q.   Did he do that once?

5   A.   No.

6   Q.   How many times did he do it?

7   A.   I saw him do it twice.

8   Q.   Could you see the spray emitting from his hand?

9   A.   Yes.

10  Q.   We're going to go back to that in a second.  We're going to

11  watch the same second again, and I would ask you to watch

12  Officer Riggleman in the white mask.

13       (Video played.)

14            BY MS. FIFIELD:

15  Q.   What do we see Officer Riggleman do in those seven seconds?

16  A.   I see him get sprayed.  I see Mr. Ramey extend his right

17  hand, spray a substance at Officer Riggleman, who then

18  immediately reacts, kind of puts his hands over his face and

19  proceeds to retreat the opposite direction up those northwest

20  Senate steps.

21  Q.   Is he using anything to help him get up the stairs?

22  A.   He is -- he at times is holding onto the railing to make

23  his way up the steps.

24  Q.   Let's do that one more time, 25 seconds, and this time, I'd

25  like you to watch Officer Williams in the blue helmet.

1          (Video played.)

2               BY MS. FIFIELD:

3     Q.   Okay.  What did we see happen to Officer Williams in those

4     seven seconds?

5     A.   I see a second spray coming from Mr. Ramey, right arm

6     extended, that is aimed at United States Capitol Police Officer

7     Williams, who also immediately reacts and kind of lowers his

8     head and proceeds to move away from that opening in the

9     scaffolding out of the line of the crowd.  He just kind of moves

10    out of the way.

11    Q.   You were able to see the spray in that seven seconds again?

12    A.   That second spray, yes.

13    Q.   Can we pull up Government's 200A.  Can we zoom in on

14    Mr. Ramey and Officer Riggleman.

15         Can you see the spray emitting from Mr. Ramey's hand?

16    A.   I do.

17    Q.   Can you circle that spray, please.  Okay.  Can you make the

18    same mark on 200A in front of you as well, and let me know when

19    you're done by looking up.

20         All right.  200B, please.  Again, can we zoom in on this

21    area here.

22         Okay.  Can you see the spray emitting from Mr. Ramey's hand

23    in 200B?

24    A.   Yes.

25    Q.   Can you circle the spray, please.  Okay.  Can you make the

1   same mark on 200B in front of you.

2       Okay.  200C, can we zoom in again.

3       Same thing, if you see the spray, circle it on the screen

4   and on 200C in front of you.

5       Okay.  Can we go back to 200 and play from 25 seconds to 45

6   seconds.

7       (Video played.)

8           BY MS. FIFIELD:

9   Q.   Okay.  You see Mr. Ramey's hand in this frame?

10  A.   I do.

11  Q.   Can you circle it.

12       He's got those armored motorcycle gloves on?

13  A.   Yes.

14  Q.   Does it look like he's holding anything?

15  A.   Yes.

16  Q.   I want to hold on that just for a second, and I want to go

17  back to 25 seconds one more time, and again, I want you to watch

18  Mr. Ramey's hand specifically.

19       (Video played.)

20          BY MS. FIFIELD:

21  Q.   Hit pause.

22       Before he sprayed, did you see him do something with his

23  hand?

24  A.   I mean, it appeared his hand was holding a device with his

25  thumb on the top of that device.

1    Q.   Let's watch those couple seconds just one more time.

2              MS. SIDDIQUI:  Your Honor, just as a preemptive

3    objection, I understand if they're trying to ID him within this

4    video, within the context.  That makes sense as an agent for him

5    to do that.

6         At this point, it's becoming a narrative of what we're

7    seeing.  The best evidence is what's presented.  He was not

8    there that day.  He's done quite a bit of testifying about what

9    he is thinking and what the officers are thinking.

10             THE COURT:  I tend to agree, Ms. Fifield.

11             MS. FIFIELD:  We can move on.

12             BY MS. FIFIELD:

13   Q.   Let's pull up 200D briefly.

14        Is this the same screenshot of what we just saw at 45

15   seconds?

16   A.   Yes.

17   Q.   Can you circle Mr. Ramey's hand, please, on the screen and

18   on the paper copy in front of you.

19        Just for the Court, we have a slowed-down version of 200

20   that's 216.  I don't think we need the witness to describe that

21   video to you.

22        So let's move on to 211.  We're going to play from the

23   beginning the first 15 seconds.

24        (Video played.)

25             BY MS. FIFIELD:

```
1    Q.    Okay.  What was 211?

2    A.    The breach of that -- or the continuance of the breach of

3    that -- the Senate steps there, the police line at the base of

4    the Senate steps on the Lower West Terrace.  And you see the

5    crowd making their way up the steps.

6    Q.    Did we also see the assaults on Officers Riggleman and

7    Williams in that brief clip?

8    A.    Yes.

9    Q.    Was there other spray in the area that -- sorry.

10   A.    There was.

11   Q.    Can we watch that again.

12         (Video played.)

13              BY MS. FIFIELD:

14   Q.    All the way back.  Sorry.

15         (Video played.)

16              BY MS. FIFIELD:

17   Q.    Okay.  Pause.

18         Do we see other spray in that brief clip?

19   A.    Yes.

20   Q.    Can you on your screen show approximately where that spray

21   traveled to and from or from and to?

22   A.    So it appears to travel across from this side --

23              MS. SIDDIQUI:  Your Honor, I raise the same objection.

24   Again, the video is admitted.  I don't see the relevance of it.

25   I think at this point he's just narrating what he's seeing in
```

```
1    the video.
2              THE COURT:  Ms. Fifield, I'm inclined to agree.
3              MS. FIFIELD:  If Ms. Siddiqui has no intention to
4    cross on other sprays in the area, I can move on.
5              THE COURT:  You can certainly redirect if she does.
6              MS. FIFIELD:  Okay.
7              BY MS. FIFIELD:
8    Q.   208, please.
9         (Video played.)
10             BY MS. FIFIELD:
11   Q.   Assault again, different angle?
12   A.   Yes.
13   Q.   Okay.  I'm going to do one more video exhibit, and then we
14   can finish with just the stills.
15        All right.  209, please.
16        (Video played.)
17             BY MS. FIFIELD:
18   Q.   Pause.
19        Do you see Barry Ramey in this frame?
20   A.   I do.
21   Q.   Will you circle him.
22        Okay.  Go ahead and play.
23        (Video played.)
24             BY MS. FIFIELD:
25   Q.   Pause.
```

1          First of all, is this video before or after the spray?

2    A.    After.

3    Q.    How can you tell?

4    A.    The Senate step -- the police line at the base of the

5    Senate steps has been breached.  The crowd is making its way up

6    the steps.

7    Q.    In your review of exhibits, tour of Capitol grounds, where

8    do these folks appear to be heading?

9    A.    Up to the Upper West Terrace.

10   Q.    Okay.  And what was Mr. Ramey doing with his hands in that

11   clip that we just saw?

12   A.    He was holding up --

13               MS. SIDDIQUI:  Your Honor, same objection.

14               THE COURT:  I'll allow this one question.

15               THE WITNESS:  He was holding up the number 3 with both

16   hands up in the air and then appeared to clap.

17               BY MS. FIFIELD:

18   Q.    It seemed like he was celebrating?

19               MS. SIDDIQUI:  Objection, Your Honor.

20               THE COURT:  Sustained.

21               BY MS. FIFIELD:

22   Q.    What's your interpretation of Mr. Ramey's hand gestures in

23   that clip?

24               MS. SIDDIQUI:  Objection, Your Honor.

25               THE COURT:  Sustained.

1          MS. FIFIELD:  Your Honor, I think it's -- all right.

2    Moving on.

3          BY MS. FIFIELD:

4    Q.   All right.  So in Exhibits 208A, 209A, if you could briefly

5    circle Mr. Ramey in those shots, 210A as well.

6    A.   Yes.  Hold on.

7          MS. SIDDIQUI:  Your Honor, is the witness circling on

8    a physical copy?

9          THE COURT:  Yes.

10         MS. SIDDIQUI:  I just want to make sure.

11         THE WITNESS:  You said 210A as well?

12         BY MS. FIFIELD:

13   Q.   Yes, please.

14        Could we pull up 212A while we're waiting.

15   A.   I'm having trouble -- I'm looking at 208A.  Hang on.  Bear

16   with me.  So I just did 208A, 209A, and 210A, circled and

17   initialed.

18   Q.   Okay.  We're looking at 212A on the screen and in front of

19   you as well.  If you could circle Mr. Ramey in 212A and then

20   tell us, based on your review of Capitol grounds, where

21   approximately is Mr. Ramey standing now?

22   A.   He appears to be on the Upper West Terrace.

23   Q.   Sorry.  Could we pull up 212, the video.

24   A.   Oh, no, I'm sorry.  He's not up there yet.  He's on the

25   Lower West Terrace.  He's kind of stepped back from that -- the

```
 1    base of the Senate steps and appears to be taking a video of the
 2    Upper West Terrace area.
 3    Q.   Okay.  Can we pull up Government's 103, please.  If we
 4    could pause the video.  All right.  103.  Okay.
 5         Could you indicate for the Court, just roughly where is
 6    Mr. Ramey standing at this point?
 7    A.   Kind of in this -- still Lower West Terrace area.
 8    Q.   So he's no longer by this opening?
 9    A.   No, yeah, he's off to the left there.
10    Q.   All right.  213A, please.
11         You see Mr. Ramey in this frame?
12    A.   I do.
13    Q.   Can you circle him, please, and do the same on your hard
14    copy.
15    A.   212A as well, should I have circled and initialed?
16    Q.   Yes.  I apologize if I didn't say that.
17    A.   Okay.
18    Q.   Based upon your review of Exhibit 213, where approximately
19    is Mr. Ramey standing now?
20    A.   He is off to the left of that -- up on the Upper West
21    Terrace, having made his way -- or making his way to the left of
22    that scaffolding.
23    Q.   The scaffolding is over the stairs?
24    A.   Correct.
25    Q.   So it looks like he's on the stairs?
```

1  A.   Right, but he's not with -- yeah, to the side, not within

2  that opening.

3  Q.   Okay.  And this time stamp up here, 15:07, which would be

4  3:00 p.m. in nonmilitary time -- or 3:07 p.m., based on your

5  investigation, is it your opinion that that time stamp is

6  approximately accurate?

7  A.   Approximately.

8  Q.   This is one of those open source videos?

9  A.   Yes.

10  Q.   That had the time stamp just in it?

11  A.   It did.

12  Q.   Okay.  301A, please.

13       Do you see Barry Ramey in this frame?

14  A.   I do.

15  Q.   Can you circle him, and do the same on your hard copy.

16  A.   I don't know if I have the --

17  Q.   Sorry.  We don't have the 300 stills in front of you, but

18  he's pretty easy to -- well, I will leave it at that.

19       Where is he standing at this point, or where is he located?

20  A.   Upper West Terrace.

21  Q.   And if we were to watch the video, what would he be in the

22  process of doing?

23  A.   He makes his way around the corner and continues there on

24  the Upper West Terrace.

25  Q.   And the time stamp up here, what does it say?

```
 1   A.    3:59:16 p.m.

 2   Q.    302A, please.

 3         Again, you're familiar with the government's exhibits.  The

 4   300 series is what?

 5   A.    CCTV footage.

 6   Q.    Okay.  So these are all still shots of Capitol Police

 7   surveillance footage?

 8   A.    They're the still shots, yeah.

 9   Q.    Do you see Barry Ramey in this frame?

10   A.    I do.

11   Q.    Could you circle him, please, and do the same on your hard

12   copy.  Oh, sorry.  Not doing the 300s.  All right.

13         And time stamp up here?

14   A.    4:14:58 p.m.

15   Q.    Okay.  And if we were to watch the video, does Mr. Ramey

16   leave this area shortly afterwards?

17   A.    Yes.

18   Q.    Does it look like he -- can we see him walking off on his

19   own accord?

20             MS. SIDDIQUI:  Objection, Your Honor.

21             THE WITNESS:  Yes.

22             MS. SIDDIQUI:  Same objection.

23             THE COURT:  Sustained.

24             BY MS. FIFIELD:

25   Q.    Let's go to 214A.
```

```
 1        Do you see Barry Ramey in this frame?

 2             MS. SIDDIQUI:  Your Honor, may I approach counsel for

 3   a second?

 4             THE COURT:  Sorry?

 5             MS. SIDDIQUI:  May I approach counsel for a second?

 6             THE COURT:  Sure.

 7        (Counsel conferred.)

 8             MS. FIFIELD:  Your Honor, just to let the Court know,

 9   we had agreed to redact the caption here.  We did so in the

10   video but did not do that in the still shot.

11             THE COURT:  Okay.

12             BY MS. FIFIELD:

13   Q.   Do you see Barry Ramey in this frame?

14   A.   I do.

15   Q.   Can you circle him, and do the same on your hard copy.

16             THE COURT:  You'll replace this exhibit with one

17   redacted?

18             MS. FIFIELD:  Yes, Your Honor.

19             BY MS. FIFIELD:

20   Q.   Based on your review of Capitol grounds and the video

21   itself, approximately where on Capitol grounds is Mr. Ramey at

22   this point?

23   A.   He is no longer -- he's no longer on the Upper West

24   Terrace.  He appears to be leaving, or in the process of leaving

25   the restricted area.
```

1    Q.    Okay.  Is he --

2    A.    I don't know if he's leaving the restricted area, but he's

3    no longer on the Upper West Terrace.

4    Q.    Is he on the east side?  We can review the video, if that

5    would help.

6    A.    Yeah, let me look at the video just one more time.

7    Q.    Can we pull up 214, please.

8          What part of the Capitol building can we see here?

9    A.    He appears to be on the east side of the Capitol.

10   Q.    Okay.  Pause, please.  This time stamp up here, based on

11   your investigation, your review of the video, is that time stamp

12   approximately accurate?

13   A.    No.

14   Q.    What's the difference?

15   A.    Approximately an hour.  It's an hour behind.

16   Q.    And is this -- okay.  So based on your investigation, your

17   estimate is that this video is showing footage from

18   approximately 4:35 p.m. on January 6?

19   A.    Approximately.

20   Q.    Okay.  Could we have 215A, please.

21         Do you see Barry Ramey in this frame?

22   A.    I do.

23   Q.    Can you circle him, please, and do the same on your hard

24   copy.

25         Okay.  What's notable about the sky in this shot?

1    A.    The sun appears to be going down.

2    Q.    Okay.  Do you see these flags?

3    A.    I do.

4    Q.    Okay.  And you reviewed the actual video 215, not just this

5    still exhibit?

6    A.    Yes.

7    Q.    You saw those three flags?

8    A.    Yes.

9    Q.    Could we have 303A, please.

10        Do those look like the same three flags?

11    A.    They do.

12    Q.    Okay.  And this time stamp up here?

13    A.    5:19:00 p.m.

14    Q.    So is it fair to infer that Mr. Ramey is approximately

15    somewhere in this area at about 5:20 p.m.?

16    A.    Yes.

17    Q.    Okay.  And we're about to get into -- well, let me ask this

18    last question.

19        For approximately how long was Mr. Ramey on Capitol grounds

20    inside the restricted area?

21    A.    Approximately four and a half hours, roughly.

22    Q.    1:00 p.m. to 5:20?

23    A.    Four and a half hours.

24        MS. FIFIELD:  We're about to get into the interstate

25    commerce exhibits.

1      THE COURT:  Okay.  Can I ask you a question, ask you

2  to clarify what Mr. Brady said?  I think, unlike government

3  records, business records aren't self-authenticating.

4      MS. FIFIELD:  Your Honor, the government's position is

5  that they are self-authenticating.  These records have been

6  introduced through case agents in other trials.

7      THE COURT:  All right.  But the rule -- I mean, tell

8  me why I'm wrong here.  So Rule 803.6(d) says that a custodian

9  or other qualified witness would introduce business records to

10 get around the hearsay bar.  The agent's certainly not a

11 custodian, and I don't think he's an other qualified witness who

12 is familiar with how business records are maintained.

13     MS. FIFIELD:  Court's indulgence.

14     Your Honor, if we could refer you to Federal Rule of

15 Evidence 902, evidence that is self-authenticating, sub 11,

16 certified domestic records of a regularly conducted activity.

17 The certificate of authenticity or authentication, which is 404,

18 I believe, certifies that these are the business records

19 products of a regularly conducted activity.

20     THE COURT:  All right.  I'm sorry.  I didn't see that.

21     Do you agree, Ms. Siddiqui?

22     MS. SIDDIQUI:  I do.  And our objection is not

23 authenticity.

24     THE COURT:  So I missed 404.  Here's what I'm inclined

25 to do.  I'm inclined to admit all of the government's exhibits

1    but not permit the agent to testify about what he was told about

2    these records.  I will have them, and based on the captions that

3    are on them, I will draw whatever inferences I can.  But I don't

4    think it's appropriate to let him testify about his knowledge of

5    the records based on something he may have learned from a

6    Safeway employee.

7         MS. SIDDIQUI:  Your Honor, just for the record's sake,

8    if he is not testifying to it and no one else is testifying to

9    it to say this is how it links to this case, we would,

10   obviously, object --

11        THE COURT:  They can argue that in their closing.

12        MS. SIDDIQUI:  But what they would be arguing is

13   essentially hearsay.  They would be arguing, We know that this

14   is what it is.

15        THE COURT:  No, they will be arguing that this record

16   means this, look at the title, use your common sense.

17        MS. SIDDIQUI:  I think it would inevitably have to be

18   hearsay that they're arguing.  What they're essentially saying

19   is --

20        THE COURT:  They're asking me to draw an inference

21   based on what's on the paper.

22        MS. SIDDIQUI:  Understood, Judge, and I can understand

23   the Court's ruling.  I just want to make sure for the record

24   that if somebody is not testifying to it and saying this is what

25   it is, we would object, obviously, to characterization of it

1    that's not in evidence.

2             THE COURT:  But you have -- these are authentic

3    documents.  You're saying they're not -- so your other objection

4    is they're not relevant?

5             MS. SIDDIQUI:  Only in the sense that, just like the

6    Court had to ask Mr. Brady to walk the Court through what does

7    this column mean, why is this relevant to this case and what it

8    proves, all of that is coming from hearsay.

9             THE COURT:  Well, no, because he did walk through, but

10   what I hadn't seen earlier is the ID at the bottom.  It says

11   "identical same store sales same day 52 weeks apart."  That's on

12   the document itself.

13            MS. SIDDIQUI:  And we can certainly -- that's fine,

14   Your Honor.

15            THE COURT:  And likewise, on the warehouse shipments

16   from Lancaster, Pennsylvania, to Washington, D.C., stores, I

17   think they're of marginal weight.  They're certainly not the

18   best evidence.  In the Reffitt trial, they had a stipulation

19   saying this is how much sales went down, and that would be

20   better evidence here, but I still think it meets the relevance

21   bar based upon what's reflected on these documents.

22            MS. SIDDIQUI:  Understood, Judge.  Thank you.

23            THE COURT:  So I don't -- maybe you just want to admit

24   them, Ms. Fifield, through this witness?

25            MS. FIFIELD:  Yes, Your Honor.  At this point, the

1    government would move to admit --

2              THE COURT:  You did move to admit them, and I held on

3    them.

4        Ms. Siddiqui, you still object for the reasons already

5    stated.  And I will overrule the objection and allow them to be

6    entered into evidence.

7        (Government Exhibits 401, 402, 403, and 404 received into

8    evidence.)

9              MS. SIDDIQUI:  This is 405 to 407?

10             MS. FIFIELD:  401, 402, 403, and 404.  401 is the

11   email.  402 is the sales report.  403 is the records of the

12   shipments from Pennsylvania.  And 404 is the certificate of

13   authentication.

14       Just for the record, Your Honor, the government's position

15   would have been that the agent is perfectly capable of

16   testifying about records obtained in the course of an

17   investigation, as case agents often do.  Same situation with the

18   videos.  He obtained them in the course of an investigation.

19   He's qualified to --

20             THE COURT:  I think he could testify about them, but

21   I'm just concerned that he talked to Safeway employees and that

22   some of his testimony will include that information.

23             MS. FIFIELD:  The agent would be testifying about the

24   records, from the records themselves, not from conversations

25   with Safeway witnesses -- Safeway agents.

1       That aside --

2           THE COURT:  Did you have conversations with Safeway

3   employees about what these records mean, or did they just hand

4   them to you?

5           THE WITNESS:  No, these records were -- I've never

6   spoken with a Safeway employee.

7           THE COURT:  I see.  Okay.  All right.  I will allow

8   him to explain your reading of it.

9           MS. FIFIELD:  And we will make this very brief, Your

10  Honor, because as the Court has suggested, in addition to being

11  self-authenticating, you know, the records sort of speak for

12  themselves.

13          THE COURT:  Just to be clear, don't speculate on what

14  things mean.  Just by reading these records, what they say.

15          THE WITNESS:  Understood.

16          MS. SIDDIQUI:  Your Honor, same objection as to the

17  narration of earlier, if he doesn't have personal knowledge of

18  the business and what happened there or what didn't happen.

19      These pieces of evidence have been admitted.  So they can

20  make the argument --

21          THE COURT:  I don't think there's a problem with him

22  pointing out something on this record that I might not have

23  seen.  There's a lot of stuff on here.

24          MS. SIDDIQUI:  But he would not have known that, other

25  than his conversations -- if he hasn't spoken to Safeway and

 1   this is entirely coming from -- he's just looking at a piece of

 2   paper saying this column is titled this.  If that's what it is,

 3   fine.

 4            THE COURT:  That's what I expect it will be.

 5            MS. SIDDIQUI:  Even then, if there's meaning ascribed

 6   to those columns, I would object to that, because he wouldn't

 7   have any personal knowledge.

 8            THE COURT:  I've asked him to describe what he sees on

 9   the documents, and because there's so much on these documents,

10   it would be helpful to the Court to be directed to the most

11   salient features of these documents that you find relevant here

12   for the purpose that they're being admitted.

13            BY MS. FIFIELD:

14   Q.   Okay.  Very briefly, Agent Nougaret, were you or are you

15   aware that a curfew was imposed in the District of Columbia on

16   January 6, 2021?

17   A.   Yes.

18   Q.   And as a result of that curfew, did businesses have to

19   close down?

20   A.   Yes.

21   Q.   Are you familiar with Safeway?

22   A.   Yes.

23   Q.   Generally?

24   A.   Yes.

25   Q.   What is it?

1    A.    It's a grocery store.

2    Q.    And to your knowledge, are there Safeway stores in the

3    District of Columbia?

4    A.    Yes.

5    Q.    Okay.  If we could pull up 401, please.  These documents

6    that we've been referring to, Government's Exhibits 401, 402,

7    403, 404, you've reviewed these documents?

8    A.    Yes.

9    Q.    Are these records that were obtained from Safeway in the

10   course of the government's investigation into the Capitol

11   breach?

12   A.    Yes.

13   Q.    Agent Nougaret, if you could read starting on --

14          THE COURT:  I don't need him to read the e-mail.

15          BY MS. FIFIELD:

16   Q.    All right.  If we could pull up 402.

17          Down here, I don't need you to read it, but we're going to

18   refer to it in terms of the meanings of the columns.

19          Up here, this column says what?

20   A.    "Actual ID percentage."

21   Q.    And based on this down here, what does that mean?

22   A.    ID stands for identical same store sales, so same day 52

23   weeks apart.

24   Q.    So this column has positives and negatives.

25          What do those indicate?

1          MS. SIDDIQUI:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          THE WITNESS:  So the numbers that are --

4          THE COURT:  No, I sustained the objection.

5          THE WITNESS:  I'm sorry.

6          THE COURT:  Let's move on to Exhibit 403.

7     Agent, aside from the title at the top, "warehouse

8  shipments, Lancaster, Pennsylvania, to Washington, D.C.,

9  stores," and the dates that are reflected in the third column,

10  is there anything else significant on this document that the

11  Court, in your view, should focus on?

12          THE WITNESS:  No, I mean other than, obviously, the

13  date range at the top, January 3rd through the 9th, 2021.  No,

14  there's nothing additional I would necessarily point out.

15          THE COURT:  Okay.  Anything you would like to add,

16  Ms. Fifield?

17          BY MS. FIFIELD:

18  Q.   In your review of Government Exhibits 401, 402, and 403,

19  what did you learn about the impact on Safeway's base as a

20  result of the riot at the Capitol on January 6?

21          MS. SIDDIQUI:  Objection, Your Honor; foundation,

22  speculation, lack of personal knowledge.

23          THE COURT:  Yeah, I think I can draw the necessary

24  inferences, Ms. Fifield.

25          MS. FIFIELD:  One moment, please.

1          Nothing further for this witness, Your Honor.

2               THE COURT:  All right.

3          Ms. Siddiqui?

4                       CROSS-EXAMINATION

5          BY MS. SIDDIQUI:

6     Q.   Good afternoon.  We started out talking about OC spray and

7     your experience with it.  You mentioned something about your

8     training, but it was similar to Captain Mendoza; is that right?

9     A.   Yes.

10    Q.   Okay.  And you mentioned the same thing, that you're

11    sprayed across your face; is that right?

12    A.   Yes.

13    Q.   Is that in an X formation?

14    A.   No.  If I recall, it's just spray across.

15    Q.   Across your eyes?

16    A.   Yes.

17    Q.   And how close are they when they're spraying you?

18    A.   I don't know.  Maybe five feet.  I'm guessing.  I'm not --

19    I don't know for sure.

20    Q.   Okay.  And they spray you just straight across, is that

21    right, across your entire face, the eyes?

22    A.   Yeah, that's the general motion.

23    Q.   In your time as an officer, if you recall and if you

24    remember, does every officer carry OC spray?

25    A.   Carry it?  Are you talking about specifically an agent with

106

body1    the FBI?

2    Q.    Were you just a normal officer before you became an agent?

3    A.    No, ma'am.

4    Q.    I will withdraw the question.

5          If we could pull up Government Exhibit 202, please, at

6    6:55.

7          (Video played.)

8              BY MS. SIDDIQUI:

9    Q.    If you could pause it, please.

10         You testified earlier that you heard that man say "take the

11   stairs"; is that right?

12   A.    Yes.

13   Q.    Do you know what stairs he's talking about, these ones in

14   front or anything else, to your personal knowledge?

15   A.    Well, based on what I see and the way the individual who is

16   saying that is facing, based on what I see and hear, he's

17   referring to the stairs in the direction that he's facing and

18   shouting, which would be the Senate stairs there at the Lower

19   West Terrace.

20   Q.    And if we could go to Government Exhibit 204, if we could

21   play the first 13 seconds.

22         (Video played.)

23             BY MS. SIDDIQUI:

24   Q.    If you could pause it for a second for me.

25         This is who you testified is Mr. Ramey; is that right?

1    A.    That's correct.

2    Q.    If we could continue playing that, and if you could pause

3    it for a second.

4          (Video played.)

5              BY MS. SIDDIQUI:

6    Q.    Do you see this smoke?

7    A.    I do.

8    Q.    And that's in the crowd of rioters; correct?

9    A.    It appears to be, yes.

10   Q.    And I think you testified earlier that you saw crowd

11   control devices being deployed; is that right?

12   A.    Yes.

13   Q.    And as a part of your training and experience, were those

14   crowd control devices pepper spray or cannonballs or things like

15   that that were being thrown into the crowd?

16   A.    I'm not sure exactly what was thrown into the crowd, but

17   those would -- those are crowd control devices.

18   Q.    Okay.  If we could pull up Exhibit 215A, please.

19         You testified that this was around nighttime, is that

20   right, when the sun was going down?

21   A.    Based on the still shot.

22   Q.    When you watched the video, you saw a time stamp on that

23   video, which was 215, Exhibit 215?

24   A.    Yes, I see a time stamp on this video.

25   Q.    Actually, if we could pull up 215, sorry, the actual video.

```
 1              (Video played.)
 2                   BY MS. SIDDIQUI:
 3      Q.   If you could pause for a second.
 4           215A, that still that we showed you, do you know if that
 5      was before or after the curfew?
 6      A.   I believe it was before the curfew.
 7      Q.   And I believe you testified that you were there when
 8      Mr. Ramey was arrested; is that right?
 9      A.   Yes, I was.
10      Q.   And that arrest went without incident?
11      A.   Yes, it did.
12                   MS. SIDDIQUI:  No further questions, Your Honor.
13                   THE COURT:  Any redirect?
14                   MS. FIFIELD:  No, Your Honor.
15                   THE COURT:  Okay.  Great.  Thank you, sir.
16           All right.  So I think it makes sense to take a break for
17      lunch now.  You all have two more witnesses, the two victim
18      officers?
19                   MS. FIFIELD:  That's correct.
20                   THE COURT:  Okay.  All right.  So how about if we come
21      back at -- does 1:45 give you all enough time to eat lunch?
22                   MS. SIDDIQUI:  Yes, Your Honor.
23                   MS. FIFIELD:  Yes, Your Honor.
24                   THE COURT:  We will resume at 1:45.  Thank you, all.
25              (Recess taken at 12:28 p.m.)
```

1      (Afternoon session reported by Sherri Grubbs and bound

2  under separate cover.)

3

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5

6               CERTIFICATE OF OFFICIAL COURT REPORTER

7

8      I, Sara A. Wick, certify that the foregoing is a

9  correct transcript from the record of proceedings in the

10  above-entitled matter.

11

12

13  /s/ Sara A. Wick            February 24, 2023

14  SIGNATURE OF COURT REPORTER      DATE

15

16

17

18

19

20

21

22

23

24

25