United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          BEFORE THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4    UNITED STATES OF AMERICA,   .
                                 .
5              Plaintiff         .          Case Number 22-cr-184
                                 .
6    vs.                         .
                                 .          Washington, D.C.
7    BARRY BENNET RAMEY,         .          February 21, 2023
                                 .          1:45 p.m.
8              Defendant.        .
9    - - - - - - - - - - - - - -

10                   BENCH TRIAL

11                **AFTERNOON SESSION**

12      BEFORE THE HONORABLE DABNEY L. FRIEDRICH

13          UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15   For the United States:        BRIAN BRADY, ESQ.
                                    KATHRYN FIFIELD, ESQ.
16                                  U.S. Department of Justice
                                    1301 New York Avenue Northwest
17                                  Washington D.C. 20005

18   For the Defendant:            FARHEENA SIDDIQUI, ESQ.
                                    Law Office of Samuel C. Moore
19                                  526 King Street
                                    Suite 506
20                                  Alexandria, Virginia 22314

21   Official Court Reporter:      Sherri Grubbs,
                                    RPR, RMR, CRR, RDR
22                                  333 Constitution Ave.
                                    Room 4704-B
23                                  Washington, D.C. 20001
                                    202-354-3284
24
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1        (Proceedings had on February 21, 2023, 1:45 p.m.)

2            THE CLERK:  Your Honor, we're in the matter of the

3   United States v. Barry Bennet Ramey, Criminal Action 22-184.

4        All of the parties who were previously before the Court

5   are currently before the Court.

6            THE COURT:  All right.

7        So, Ms. Fifield, you want to call your next witness?

8            MS. FIFIELD:  Yes, Your Honor.  The United States

9   calls United States Capitol Police Officer Bryant Williams.

10  Mr. Brady is just going to go grab him.

11           THE COURT:  Okay.

12       (Witness duly sworn.)

13           THE COURT:  Good afternoon, sir.

14           THE WITNESS:  Good afternoon, ma'am.

15           THE COURT:  Watch out for that mic there.

16       And, please, when you speak, speak into the microphone so

17  that the court reporter can hear you.

18                      **BRYANT WILLIAMS,**

19  after having been first duly sworn, testifies in reply to the

20  questions propounded as follows:

21                      **DIRECT EXAMINATION**

22  BY MS. FIFIELD:

23  Q.   Good afternoon, Officer Williams.

24  A.   Good afternoon.

25  Q.   Could you state and spell your full name for the record,

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1  please.

2  A.   Bryant Williams.  B-R-Y-A-N-T.  W-I-L-L-I-A-M-S.

3  Q.   Could you tell us briefly about your educational

4  background?

5  A.   Yes.  I attended the University of Embry-Riddle

6  Aeronautical University where I got my bachelor's degree in

7  professional aeronautics.

8  Q.   And what did you do after you got your bachelor's degree?

9  A.   I received my bachelor's degree while I was in the Navy.

10 I joined the Navy in 1996 to 2005.

11 Q.   And where did you go after 2005, or in 2005?

12 A.   2005, I joined the United States Capitol Police in

13 September of 2005.

14 Q.   Is that where you currently work?

15 A.   Yes, it is.

16 Q.   And what is your title with Capitol Police?

17 A.   Police officer.

18 Q.   Okay.  And between 2005 and now, you've worked for

19 Capitol Police for 17 years?

20 A.   That is correct.

21 Q.   And in those 17 years, can you tell us a little bit about

22 some of the different assignments that you've had?

23 A.   Yes, I can.

24      In 2005, I went down to Glynco, Georgia, had training at

25 the Federal Law Enforcement Training Center, which is also

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1  called FLETC, then went to Cheltenham, went to our academy for

2  three months.

3  Q.   And what are some of the other things -- after you

4  finished your training as a Capitol police officer, what are

5  some of the assignments that you've had in your capacity as an

6  officer over the last 17 years?

7  A.   Once I completed our academy, I was assigned to the

8  United States Capitol, third shift, which is from 3:00 p.m. to

9  11:00 p.m.  I stayed there for a year.

10       Then I switched to the first responder's unit, third

11  shift, same time, 3:00 to 11:00.

12       Then I went to our patrol division.  I was there for a

13  year.  That was from -- the time was 07 to three o'clock p.m.

14       I left patrol division, went back to first responder's

15  unit, third shift.  Then I transferred back to -- or to first

16  responder's second shift, which is from 07 to 3:00 p.m.

17  Q.   And in most of those capacities, have you mostly worked

18  outside on Capitol grounds?

19  A.   That is correct.

20  Q.   Are you familiar with Capitol grounds?

21  A.   Yes, I am.

22  Q.   Okay.  So you mentioned FLETC.

23       Can you tell us a little bit about the kind of training

24  that U.S. Capitol police officers undergo before they are

25  sworn in as officers?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.   The training that we received down at FLETC, we received

2   training for firearms, use of force, handcuffing, verbal judo,

3   report writing, and legal; Fourth Amendment rights, First

4   Amendment rights.

5   Q.   You mentioned verbal judo, what is that?

6   A.   Verbal judo is when we talk to the individual to try to

7   deescalate any kind of situation that we come to.  So we can

8   understand what they're trying to say, so we won't have to

9   escalate anything.

10  Q.   So, in that sense, is verbal judo somewhere on the

11  spectrum of use of force?

12  A.   It can be, but we try not to use any kind of force.  We'd

13  rather talk to the individual to deescalate any kind of

14  situation that we come across.

15  Q.   So if that's on the use of force spectrum, it's towards

16  the bottom?

17  A.   Yes, ma'am.

18  Q.   Okay.  And in your training, did you become familiar with

19  pepper spray, or OC spray?

20  A.   Yes, I have.

21  Q.   Are pepper spray and OC spray essentially the same thing?

22  A.   Yes, it is.  "OC spray" is the police term for pepper

23  spray.

24  Q.   And are there different brands of OC spray?

25  A.   Yes, there is.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    Q.   And when we're talking about pepper spray, or OC spray,

2    we're not talking about a specific brand, we're talking about

3    generic terms for the same substance?

4    A.   Yes.

5    Q.   So as part of your training, were you taught how to use

6    or deploy pepper spray as a law enforcement officer?

7    A.   Yes, I was.

8    Q.   Can you describe that?

9    A.   Yes.  When we were taught to use OC spray, we are taught

10   to use a Z pattern, which is above the forehead, across the

11   face, and down towards the bottom of their face.  We are not

12   allowed to deploy OC spray closer than 3 feet to the

13   individual.

14   Q.   And would you ever deploy -- in addition to being more

15   than 3 feet away, would you ever deploy OC spray straight on

16   into someone's face?

17   A.   No, I would not.

18   Q.   What about shaking the can of OC spray?  Is there

19   something you were trained to do with respect to that?

20   A.   Yes.  By us shaking the can, which will -- most of the

21   irritant is at the bottom of the can.  By us shaking it, it

22   will be disbursed throughout the whole entire can, so it won't

23   get a whole entire -- at the very end, like a lethal dose.

24   Q.   What is OC spray supposed to be used for in the law

25   enforcement context?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    A.   OC is used to incapacitate the individual.

2    Q.   And -- in the law enforcement context, what is the

3    purpose of that, incapacitating someone?

4    A.   To make them stop, ma'am, to comply.

5    Q.   Do Capitol Police consider OC spray a less-than-lethal

6    weapon?

7    A.   Yes, it is.

8    Q.   And do you carry OC spray on you?

9    A.   Yes, I do.

10   Q.   Do you carry other less-than-lethal weapons?

11   A.   Yes, I do.

12   Q.   Could you give us an example?

13   A.   I carry my ASP baton with me on a day-to-day basis.

14   Q.   Is it possible to use your baton to seriously hurt

15   somebody?

16   A.   Yes.

17   Q.   And is there a safe and an unsafe way to use OC spray?

18   A.   Yes, there is.

19   Q.   And if you use OC spray in an unsafe way or a way that's

20   not consistent with your training, what are some of the risks

21   of using OC spray in that manner?

22   A.   Using OC spray in an illegal way, you can damage their

23   retinas in their eyes.

24   Q.   How?

25   A.   It's a term that we call "needling."  Once the OC is

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1  deployed right into their eyes, it can damage their retinas.

2  Q.   As part of your training, were you sprayed?

3  A.   Yes, I was.

4  Q.   Why is that part of your training?

5  A.   The reason we are sprayed is so we know what the -- how

6  it feels and how to fight through it.

7  Q.   And when you were sprayed as part of your training, what

8  was that experience like just from a physical perspective?

9  A.   It was very irritating.  It felt like my face was

10 burning, it was on fire.

11 Q.   Okay.  Is there an impact on your eyes?

12 A.   If the irritant -- I'm sorry?

13 Q.   When you were sprayed as part of your training, was there

14 an impact on your eyes?

15 A.   Yes.  If the OC got into my eyes, it would make my eyes

16 shut.  And we are trained to fight through that, try to open

17 our eyes, try to still continue with the fight, whatever we

18 need to do to stop the individual.

19 Q.   Okay.  Consistent with your training, what did you do

20 after you were sprayed?

21 A.   After I was sprayed, I immediately went to decon.

22 Q.   What is decon?

23 A.   Decon is to -- to flush out my eyes, to get the OC out of

24 my eyes so I can actually start seeing.

25 Q.   And when you're doing decon, what are you actually doing

118

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1  to yourself?

2  A.   We're flushing water –– so we are –– tilt our head to the

3  side, water, so it goes straight through our eyeballs and out.

4  Q.   To your knowledge, is everyone's experience being sprayed

5  unique to that person?

6  A.   Yes, it is.

7  Q.   There are different degrees of pain?

8  A.   Yes, there is.

9  Q.   And do folks have a different ability to fight through

10  it, as you were saying?

11  A.   Yes.

12  Q.   When you were sprayed as part of your training, you did

13  this with your –– like a training cohort; is that right?

14  A.   Yes.

15  Q.   Did anyone in your cohort after being sprayed require

16  medical attention?

17  A.   Yes.

18  Q.   Can you tell us about that?

19  A.   After my fellow classmate got sprayed, she stated that

20  she could not breathe.  We flushed her eyes out, but she still

21  stated that she could not breathe.

22       Apparently, she was having an allergic reaction.  We

23  called for our instructor.  They called EMS to render aid.

24  Q.   Now, prior to January 6, 2021, after your training at

25  FLETC, had you ever deployed OC spray?

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1    A.    No.

2    Q.    Why not?

3    A.    I'd rather use verbal judo to talk them down and try to

4    have a decent conversation so I won't have to deploy OC spray.

5    Q.    So is it fair to say that you consider deploying OC spray

6    to be a use of force that you'd rather avoid unless it's

7    necessary?

8    A.    That is correct.

9    Q.    Okay.  I'd like to turn your attention to January 6,

10   2021.

11         Were you at work as a Capitol police officer on January

12   6, 2021?

13   A.    Yes, I was.

14   Q.    What time did you get to work that day?

15   A.    I arrived at work at six o'clock in the morning.

16   Q.    Okay.  What was your assignment on that day?

17   A.    My assignment was to patrol the Capitol grounds.

18   Q.    Were you on foot?

19   A.    No.  I am motor trained, so I took my motorcycle out and

20   rode around the perimeter.

21   Q.    Okay.  When you were on patrol in the morning, what were

22   you patrolling?

23   A.    I was patrolling the restricted area.  We deployed bike

24   racks out, and my officials informed us we needed to make sure

25   that all of the bike racks were locked and secured.

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1   Q.   Okay.  If you could turn your attention to the blowup of

2   Government's Exhibit 104.

3       Is that -- are you familiar with Government's Exhibit

4   104?

5   A.   Yes, I am.

6   Q.   Do you see that red line?

7   A.   Yes, I do.

8   Q.   Is that red line approximately the perimeter of the

9   restricted area on January 6th?

10   A.   Yes, it is.

11   Q.   So could you indicate for the Court kind of the route of

12   your patrol.

13        MS. FIFIELD:  Is it all right if the witness stands

14   up?

15        THE COURT:  Sure.

16        THE WITNESS:  Yes, ma'am.

17       As soon as we completed our roll call, I then was

18   instructed to check the fence line.

19       At that time, I came down Jersey Avenue, north on Jersey

20   Avenue, went east on Constitution Avenue, came inside the

21   north barricade, and then I started proceeding down our

22   northeast drive -- I'm sorry, northwest drive, checking all

23   the fence line, making sure everything was locked and secured.

24       Then I went towards the west front, made sure that around

25   the exit barriers that that was all closed off.

121

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          Then I proceeded to the lower west terrace, cut across,

2   went down towards the southwest barrier, made sure that was

3   closed, went up the southwest drive, made sure that the access

4   point there was clear.

5          Then I proceeded down on the east side of the Capitol to

6   make sure there were no holes in the fence line.

7   Q.   (BY MS. FIFIELD)   Thank you.   You can take your seat.

8          So by way of your patrol, did you personally ensure that

9   the perimeter was physically constructed and intact?

10  A.   Yes.

11  Q.   Were there other barriers and barricades set up within

12  the restricted area?

13  A.   Yes, there was.

14  Q.   When did it start to seem like the day on January 6 was

15  not going as planned?

16  A.   When we got a call on the radio saying that there was a

17  breach on the west front.

18  Q.   Okay.   Where were you when you got that call?

19  A.   I was on the east side of the Capitol.   Then once I heard

20  the radio call, I proceeded to the west front, lower west

21  terrace.

22  Q.   When you got to the lower west terrace, what did you see?

23  What did you hear?

24  A.   I saw a group of individuals that were in the restricted

25  area coming towards the lower west terrace.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    Q.   What about hear?

2    A.   Hearing?  They were saying "Stop the vote" or "Stop the

3    steal," something to that nature.

4    Q.   Okay.  What was the volume like?

5    A.   It was really loud and chaotic.

6    Q.   And did you see other Capitol police officers down there

7    when you arrived?

8    A.   Yes, I did.

9    Q.   What were they doing?

10   A.   All the Capitol police officers were lined up on the

11   lower west terrace trying to stop the individuals from coming

12   up towards the inaugural stage.

13           MS. FIFIELD:  Could we pull up 103, please?

14   Government Exhibit 103.

15   Q.   (BY MS. FIFIELD)  Officer Williams, can you see that image

16   on your screen?

17   A.   Yes, I do.

18   Q.   Can you indicate the area that you're talking about where

19   you saw U.S. Capitol Police when you arrived down at the lower

20   west terrace?

21   A.   Yes.  This is where --

22   Q.   And you can mark on your screen using your finger.

23   A.   It's not working, ma'am.

24   Q.   Is this where you saw Capitol Police?

25   A.   Yes, that's where -- they were also down at the -- some

United States v. Barry Bennet Ramey
Bench Trial — Afternoon Session — February 21, 2023

1  of them were at the base where the wall was, which is,

2  correct, right down there.

3  Q.   Okay.

4         MS. FIFIELD:  And, for the record, I've drawn two

5  lines on 103; one down by a retaining wall that's in the lower

6  part of the frame, and one alongside some steps leading up to

7  the inaugural stage.

8  Q.   (BY MS. FIFIELD)  And where did you go once you arrived

9  down in the lower west terrace?

10 A.   I positioned myself at the base of the Senate steps where

11 the opening is, going -- yes, right there.

12        MS. FIFIELD:  Okay.  I've circled the opening at the

13 base of the Senate steps or the northwest steps underneath the

14 scaffolding.

15    Okay.  Could we pull up Government's Exhibit 202, please,

16 starting at 2 minutes and 15 seconds.

17    (Government Exhibit 202 played in open court.)

18        MS. FIFIELD:  Pause, please.

19 Q.   (BY MS. FIFIELD)  Do you see any U.S. Capitol police

20 officers in this frame?

21 A.   Yes, I do.

22 Q.   Okay.  I'm going to circle that.

23    Are those U.S. Capitol police officers?

24 A.   Yes, they are.

25 Q.   And are they standing approximately in the area where you

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    just talked about using Government's Exhibit 103?

2    A.    Yes.

3    Q.    Watch this officer right here.

4            MS. FIFIELD:  Okay, play.

5          (Government Exhibit 202 played in open court.)

6    Q.  (BY MS. FIFIELD)  What do we see that officer doing?

7    A.    That officer is motioning his hands like to calm down,

8    stop.

9    Q.    And what do you interpret that officer to be doing based

10   on your training and knowledge of your colleagues?

11   A.    That officer was trying to actually talk to the

12   individuals to "calm down, let's talk about this peacefully."

13   Q.    Is that a deescalation technique?

14   A.    Yes, it is.

15           MS. FIFIELD:  Can we play?

16         (Government Exhibit 202 played in open court.)

17   Q.  (BY MS. FIFIELD)  What is this stuff that I've just

18   circled and drawn lines?

19   A.    That is a fence that the inaugural workers put up to

20   separate individuals from the lower west terrace from the

21   personnel seated in the grassy area for the inauguration.

22   Q.    Is that bike rack fencing?

23   A.    No.  It's like small fencing.

24   Q.    Is it attached to the ground in some way?

25   A.    Yes, it is.

125
United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1  Q.   How?

2  A.   By nuts and bolts.

3  Q.   And what's happening to it in this frame?

4  A.   It's getting torn down.

5  Q.   Okay.

6          MS. FIFIELD:  Play just for a few more seconds.

7      (Government Exhibit 202 played in open court.)

8  Q.   (BY MS. FIFIELD)  What's the crowd doing here in this

9  video?

10 A.   At this time, they are moving towards the actual

11 inauguration stage, towards the center of the lower west

12 terrace.

13 Q.   And what we just watched in the video, is that consistent

14 with what you saw and heard --

15 A.   Yes.

16 Q.   -- when you got --

17 A.   Yes.

18 Q.   -- down to the lower west terrace?

19 A.   Yes.

20         THE COURT:  Officer Williams, is that you in the

21 frame in the doorway?

22         THE WITNESS:  No, ma'am, not at that time.

23 Q.   (BY MS. FIFIELD)  In your 17 years as a Capitol police

24 officer, have you seen protests on and around Capitol grounds?

25 A.   Yes, I have.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.   Did they look like this?

2   A.   No, they did not.

3   Q.   What's the difference?

4   A.   The other protests, they complied, they had their protest

5   or demonstration.

6        This one, they were overrunning Capitol grounds at this

7   time.

8   Q.   In all of the protests that you've seen or worked

9   through, have you ever seen protesters advance past a police

10  line?

11  A.   No, I have not.

12       MS. FIFIELD:  Okay.  Could we pull up 203, please.

13  Four minutes and 15 seconds.

14       (Government Exhibit 203 played in open court.)

15  Q.   (BY MS. FIFIELD)  Okay.  What are the officers in this

16  frame doing?

17  A.   They're standing on the steps, trying to stop the

18  individuals going up any further towards the inauguration

19  stage.

20  Q.   And what's the crowd doing?

21  A.   Yelling and screaming at the officers.

22  Q.   Is that consistent with what you've seen in peaceful

23  protests?

24  A.   No.

25  Q.   Okay.  When we watched Exhibit 202, we saw the opening in

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   the stairs.

2          MS. FIFIELD:  Could we pull up 202 again at

3   2 minutes and 40 seconds, just paused.  2:40, please.  A

4   little bit further.

5   Q.  (BY MS. FIFIELD)  Is that the same opening at the base of

6   the Senate steps we were talking about when we looked at

7   Government's Exhibit 103?

8   A.  Yes, it is.

9          MS. FIFIELD:  Could we play it for about five

10  seconds.

11      (Government Exhibit 203 played in open court.)

12  Q.  (BY MS. FIFIELD)  Where does it look like the crowd's

13  heading at this point?

14  A.  Towards the center of the lower west terrace.

15  Q.  Are they bypassing this area at this point?

16  A.  Yes, they are.

17          MS. FIFIELD:  Can we pull up Exhibit 206.

18  Q.  (BY MS. FIFIELD)  And before we play, did there come a

19  point when the crowd's attention began to focus, instead, on

20  those stairs?

21  A.  Yes.

22          MS. FIFIELD:  Play 1:45.  Pause, please.

23      Could you play for about 20 more seconds.

24      (Government Exhibit 203 played in open court.)

25  Q.  (BY MS. FIFIELD)  Is this the shift in attention that we

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    were just talking about towards the stairs?

2              MS. FIFIELD:  Pull up 207, please.

3              THE WITNESS:  Yes.

4    Q.  (BY MS. FIFIELD)  Officer Williams, do you see yourself in

5    this frame?

6    A.    Yes, I do.

7    Q.    Are you able to circle yourself on your screen?

8    A.    No, I cannot.

9    Q.    What are you wearing?

10   A.    I'm wearing a blue helmet with my cruiser jacket.

11   Q.    Is this you?

12   A.    Yes, it is.

13   Q.    Okay.

14             MS. FIFIELD:  And if we could play until 14 seconds,

15   please.

16        (Government Exhibit 203 played in open court.)

17   Q.  (BY MS. FIFIELD)  What did you understand the crowd be

18   trying to do at this point?

19   A.    At this point they were just screaming, and then they

20   started inching towards the opening of the Senate steps right

21   there.

22   Q.    Did you think they were trying to get past you?

23   A.    They were trying.  There was bike racks there in front of

24   us, so we held them off with the bike racks.

25   Q.    Okay.  So you mentioned the crowd started to move forward

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   towards the stairs; right?

2   A.   Yes.

3          MS. FIFIELD:  Can we pull up Exhibit 200, please,

4   starting at 10 seconds.

5      (Government Exhibit 200 played in open court.)

6   Q.   (BY MS. FIFIELD)  Do you see yourself in this frame,

7   Officer Williams?

8   A.   Yes, I do.

9   Q.   Are you wearing that same blue helmet?

10  A.   Yes, I am.

11  Q.   Is this you?

12  A.   Yes, it is.

13  Q.   Okay.

14         MS. FIFIELD:  For the record, I've circled Officer

15  Williams in the blue helmet.

16     Can we play until 25 seconds, please.

17     (Government Exhibit 200 played in open court.)

18  Q.   (BY MS. FIFIELD)  Okay.  In those 10 seconds or so that we

19  just watched, what are you doing?

20  A.   Trying to stop the individual with the white hoodie right

21  in front of me from going up the stairs.

22  Q.   Is it fair to say your attention was solely focused on

23  that individual?

24  A.   Yes, it was.

25  Q.   Now, you mentioned the crowd pushing forward.  Is that

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   what we're starting to see in Exhibit 200 as well?

2   A.   Yes.

3   Q.   Now, in a situation like this, with the crowd advancing,

4   are you concerned about your service weapon?

5   A.   Yes, I am.

6   Q.   Are you trained to protect your service weapon?

7   A.   Yes, I am.

8   Q.   What's a possible consequence of you becoming

9   incapacitated in a situation like this?

10  A.   The results could -- somebody could take my service

11  weapon and use it against me or use it on somebody else.

12  Q.   And that's something you're trained to protect against?

13  A.   Yes, I am.

14       MS. FIFIELD:  Could we pull up Exhibit 216, please.

15       (Government Exhibit 216 played in open court.)

16       MS. FIFIELD:  Pause.

17  Q.  (BY MS. FIFIELD)  There's a box around an individual, but

18  I would like for you to just focus on yourself, okay?

19  A.   Yes.

20       MS. FIFIELD:  Okay.  Could we play.

21       (Government Exhibit 200 played in open court.)

22       MS. FIFIELD:  Pause.

23  Q.  (BY MS. FIFIELD)  What just happened to you?

24  A.   I just got hit with a flag.

25  Q.   Okay.  And you see some spray right here?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.    Yes, I do.

2   Q.    Is that heading in your direction, based on what you see

3   in this video?

4   A.    No.  It's headed towards the officers that are on the

5   stairs currently.

6   Q.    And at that time that that flag hit you, did you perceive

7   that you'd been hit with any kind of substance?

8   A.    No.

9   Q.    Okay.  At some point did you perceive that you had been

10  hit with some kind of substance?

11  A.    Yes, I do.

12  Q.    How did you know that?  Describe the physical experience.

13  What was happening?

14  A.    On the top of my helmet, I have a visor.  Between the

15  helmet and the visor, I have a thin foam for cushioning.

16        Once something went through to them, which was OC, it hit

17  the foam and then started going into my eyes.

18  Q.    Why did you think it was OC?

19  A.    From back in my training, that's what it felt like.

20  Q.    And what was that feeling?  Just remind the Court what

21  the feeling was.

22  A.    A burning sensation, like fire on my face.

23  Q.    Did you recognize that sensation?

24  A.    Yes, I do.

25  Q.    So if the spray hit your helmet, are you telling us that

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   the spray hit your helmet first?

2   A.   Yes.

3   Q.   Okay.   Is it fair to assume that there would have been a

4   slight delay between the spray hitting your face and getting

5   in your eyes?

6   A.   Yes.

7   Q.   Okay.

8          MS. FIFIELD:  Can we play –– and, Officer Williams,

9   I'd like for you to watch yourself.

10       (Government Exhibit 216 played in open court.)

11         MS. FIFIELD:  Pause.

12   Q.  (BY MS. FIFIELD)  Okay.  What did we see happening to you?

13   A.   At that time, I did feel something hit my eyes.  And then

14   the crowd still started moving up, and my vision got blurry.

15   Another officer had to pull me away from that situation.

16   Q.   You told us earlier that the purpose of OC spray is to

17   incapacitate.

18         Is it fair to say that you were incapacitated at that

19   moment?

20   A.   Yes, I was.

21   Q.   After you were sprayed, did you leave this area to

22   decontaminate?

23   A.   I did not go to decontamination.  I went around to the

24   other set of stairs where I collapsed because of the –– of the

25   sensation of my face burning.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    But then my training kicked in, said I had to get back

2    into the fight.  Then I went back around to try to stop the

3    advancement on the Senate stairs.

4    Q.   When did you have an opportunity to decontaminate?

5    A.   Not until later on that evening.  I could not tell you

6    exactly what time.

7    Q.   Between the time when you were sprayed and when you got

8    the opportunity to decontaminate -- and I'm talking just about

9    January 6th -- was your vision impaired that day?

10   A.   Yes.  Everything started getting kind of blurry.

11   Q.   And if you're in a situation where your vision is

12   impaired, are you concerned about your service weapon?

13   A.   Yes, I am.

14   Q.   For the same reasons we've talked about?

15   A.   Yes.  Make sure nobody gets it.

16   Q.   Are you still experiencing vision problems?

17   A.   Yes, I am.

18   Q.   Can you describe those?

19   A.   If I'm looking at my phone, a computer screen, my vision

20   gets kind of blurry.

21        And I went to the doctor.  They're like, you're going to

22   have residual effects because your vision is deteriorating,

23   but you do have 20/20 vision.  So I can see very far but not

24   things up close.

25   Q.   Do you wear glasses to help correct that?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

```
 1    A.    Yes, I do.
 2    Q.    Did you have those problems before January 6th?
 3    A.    No.
 4    Q.    At all times on January 6, 2021, were you performing your
 5    official duties as a United States Capitol police officer?
 6    A.    Yes, I was.
 7              MS. FIFIELD:  Okay.  Brief indulgence.
 8         (Plaintiff counsel confer off the record.)
 9              MS. FIFIELD:  Nothing further for this witness, Your
10    Honor.
11              THE COURT:  All right.  Thank you.
12         Ms. Siddiqui?
13              MS. SIDDIQUI:  Is there a way to connect my own
14    laptop to the audio?
15              THE CLERK:  Yes.
16              MS. SIDDIQUI:  This is Government Exhibit 200.  It's
17    just not labeled that way.
18                        CROSS-EXAMINATION
19    BY MS. SIDDIQUI:
20    Q.    Good afternoon.
21    A.    Good afternoon.
22    Q.    Do you remember speaking to the case agent or the
23    prosecutors in this matter?
24    A.    Yes, I do.
25    Q.    Okay.  Do you remember making statements with them?
```

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.   I do not recall.  I can't remember.

2   Q.   Would you remember if I was able to show you that?

3   A.   Yes.

4   Q.   Okay.  We'll come back to that in just a second, but

5   let's talk through some things just specific to January 6th.

6        I believe you mentioned that there is OC spray in the

7   air; is that right?

8   A.   Yes.

9   Q.   Okay.  And that was throughout the day?

10  A.   Yes.

11  Q.   Okay.  And this OC spray, or any sort of chemical agent,

12  had been sprayed both by the rioters as well as the officers;

13  is that right?

14  A.   I believe so.

15  Q.   And it was your recollection -- so you were with another

16  officer on the staircase; is that right?

17  A.   Yes.

18  Q.   Okay.  So I'm going to ask you to take a look at

19  Government Exhibit 200.  I'm going to play it.

20       (Government Exhibit 200 played in open court.)

21  Q.   (BY MS. SIDDIQUI)  If you could focus -- so this is -- the

22  person in the blue helmet, that's who you identified as

23  yourself; is that right?

24  A.   That is correct.

25  Q.   Okay.  And that person in the baseball hat and the white

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   mask, that's Officer Riggleman?

2   A.   Yes, it is.

3   Q.   Okay.  And that's the position y'all stayed in the entire

4   time, correct, for that incident?

5   A.   I'm sorry?

6   Q.   That's how y'all were positioned on that staircase up

7   until this incident ended; is that right?

8   A.   That is correct.

9   Q.   Okay.  So I'm going to play it again.  If you could focus

10   on yourself.

11      (Government Exhibit 200 played in open court.)

12   Q.   (BY MS. SIDDIQUI)  And at this point, the officer is still

13   talking to the rioters; correct?  The line hasn't been

14   breached?

15   A.   Yes.

16      (Government Exhibit 200 played in open court.)

17   Q.   (BY MS. SIDDIQUI)  Okay.  And the person in the white

18   hoodie right in front of you, that's who you said you were

19   trying to hold off; right?  He's pushing forward?

20   A.   Yes.

21   Q.   Okay.  And at this point, the officers are actually

22   engaging physically with the rioters; correct?

23   A.   Yes.

24   Q.   And at that point they have essentially pushed past,

25   correct, or they're pushing past on their way to go up the

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   staircase?

2   A.   Yes.

3   Q.   So the line at this point has been breached?

4   A.   Yes.

5   Q.   Okay.  And at this point you haven't been sprayed with

6   anything; is that right?

7   A.   Correct.

8   Q.   Okay.  So I'm going to keep playing, and I'm going to ask

9   you --

10          MS. SIDDIQUI:  Is there any way to mark this?

11      I can make it on this TV still; correct?

12          THE CLERK:  Yes.

13   Q.   (BY MS. SIDDIQUI)  I'm going to ask you to focus on

14   yourself again.

15      And do you see this person over here?

16   A.   Yes.

17   Q.   Okay.  And do you see that his arm is outstretched?

18   A.   Yes.

19   Q.   Okay.  And do you see -- sorry, I know this is a lot of

20   marks.  Let me clear it first.

21      And this is going here; correct?

22   A.   Correct.

23   Q.   Okay.  And that's Officer Riggleman?

24   A.   Yes.

25   Q.   Okay.  Let me clear that for just a second.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          And then he's not wearing a visor or a helmet, correct,

2    just the hat?

3    A.   Correct.

4    Q.   Nothing is covering his eyes?

5    A.   No.

6    Q.   Okay.  I'll clear that again.

7          Okay.  And at this point he's turning away; correct?

8    A.   Yes.

9    Q.   Okay.  As he's turning away, this person is also pushing

10   up against him?

11   A.   Yes.

12   Q.   And he's, like, physically touching the officer at this

13   point?

14   A.   Yes.

15   Q.   Okay.  And this person no longer has an arm outstretched;

16   is that right?

17   A.   Correct.

18   Q.   Okay.  And you're looking still into the crowd, you're

19   still trying to stop this guy in the white hoodie?

20   A.   Yes.

21   Q.   All right.  And so this bag comes in front of you; is

22   that right?

23   A.   Yes.

24   Q.   Okay.  So I'm going to clear that.

25          And then do you see this here?

139

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.   Yes, I do.

2   Q.   Okay.  And is that a spray of some kind?

3   A.   Yes.

4   Q.   Okay.  And is that going in your direction?

5   A.   No.

6   Q.   And you're saying that this is going past you; correct?

7   A.   Yes.

8   Q.   Okay.  And the spray, how close do you think it is to

9   you?

10  A.   Probably around about 2 or 3 feet.

11  Q.   Okay.  And at this point is it now hitting you?

12  A.   No.

13  Q.   Is it going over your head?

14  A.   I believe so.

15  Q.   Okay.  And so the same thing would occur, correct,

16  whatever layer you had in your helmet, visor, this is falling

17  down on you; correct?

18  A.   No, it was not.

19  Q.   Okay.  So this spray that we see right over your helmet

20  is not falling on you?

21  A.   No.

22  Q.   Okay.  Where is it going?

23  A.   It's going towards the stairs.

24  Q.   I understand that the ultimate direction is here, but you

25  were right underneath it.  Is that not right?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.   No.  The stain that's on the awning, that's where it was

2   going.

3   Q.   No, I understand.  So I understand its end target is

4   here.  We can see the end of the spray.  I got it.

5        But this part here that is right above your helmet,

6   that's going to fall on you; correct?

7   A.   No, due to the fact it was away from me.  It was in front

8   of me, not directly above my head.

9   Q.   It's in front of you, not directly above your head?

10  A.   Right.

11  Q.   So this picturization is incorrect?

12  A.   The way the video is, is in front of me, not directly

13  above my head.

14  Q.   Okay.  Let's keep watching.

15       Okay.  And now you're looking down at the ground; is that

16  right?

17  A.   Yes.

18  Q.   Okay.  And if you keep watching yourself, there was

19  something else that was thrown here, correct, that caused some

20  sort of a spray?

21       I can go back if you'd like.

22  A.   Please.

23  Q.   Okay.  So this thing, it's a bottle, right, that is

24  thrown?

25  A.   Yes.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.   That causes its own little spray?

2   A.   Yes.

3   Q.   Okay.  And at this point, now, at this time, you are

4   covering your eyes; is that right?

5   A.   Yes.

6   Q.   Okay.  I'm going to continue playing it.

7        And you're still here struggling with this guy in the

8   white hoodie; yes?

9   A.   Yes.

10  Q.   Okay.  And then at this point right in this direction

11  there was another spray that occurred that you just saw?

12       I can go back a little bit.

13  A.   Okay.

14  Q.   Actually, that's perfect.  Let me clear.

15       This is another spray; is that right?

16  A.   Yes.

17  Q.   Okay.  And you back away again, right?  You turn away

18  from it, where the spray was going?

19  A.   Yes.

20  Q.   Okay.  And that's exactly where you were standing just

21  five seconds ago, right?

22  A.   Yes.

23  Q.   Or seconds ago?

24       Okay.  You're hit again.

25       And this here, that's just the remnant of that spray?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.   Yes.

2   Q.   Okay.  Got it.  That's coming from this direction here?

3   A.   Yes.

4   Q.   Okay.  So I'm going to back it up just a little bit, and

5   I'm going to ask you a few questions more.

6        So this is the same individual that I just asked you

7   about earlier.  If you could keep your eyes on him, I'm going

8   to keep playing it and ask you some more questions.

9        At this point are his arms outstretched?

10  A.   No.

11  Q.   Okay.  And you haven't been sprayed yet; correct?

12  A.   No.

13  Q.   And then at this point are his arms outstretched?

14  A.   No.

15  Q.   Okay.  And then there's this spray again that we just

16  talked about; correct?

17  A.   Yes.

18  Q.   Okay.  And now are his arms outstretched?

19  A.   Yes.

20  Q.   Okay.  And the direction of his arms is this way;

21  correct?

22  A.   Correct.

23  Q.   Okay.  And this is the bottle of something and then more

24  spray here; yes?

25  A.   That is coming from the bottle itself.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.   Right, right.  Understood.

2        And then the direction of his arms is still this way?

3   A.   Yes.

4   Q.   Okay.  And you're here?

5   A.   Yes.

6   Q.   Okay.  At this point you're looking this way; correct?

7   A.   Correct.

8   Q.   Okay.  And you're still working with this guy or trying

9   to hold him off; yeah?

10  A.   Yes.

11  Q.   Okay.  And now at this point, when you had another

12  spray -- at this point, you backed away from the line; is that

13  right?

14  A.   I was pulled from the line, yes.

15  Q.   Okay.  And that was right after this spray that came over

16  here?

17  A.   Yes.

18  Q.   Okay.  I'm going to point your attention now to some

19  statements you might have made.

20           THE COURT:  Wait.  Ms. Siddiqui, is this his report?

21           MS. SIDDIQUI:  It's a 302, Your Honor, about this

22  officer.

23           THE COURT:  Well, you can't impeach him with someone

24  else's report.

25           MS. SIDDIQUI:  Well, I think it's his words, and he

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    can either adopt them or not.  And he can certainly testify to

2    that, whether that's actually his testimony or not.

3         So it's a prior written statement about --

4              THE COURT:  Does he adopt it?

5              MS. SIDDIQUI:  Well, I can ask him if he does.  And

6    if he doesn't, obviously, I'll move on.  But I'm just using

7    this to refresh his recollection.

8              THE COURT:  So explain to him what "adopt" means.

9              MS. SIDDIQUI:  Sure.

10   Q.   (BY MS. SIDDIQUI)  At some point during this case did you

11   speak with a case agent and some prosecutors during this case?

12   A.   Yes, I do believe so.

13   Q.   Okay.  And do you remember if that was in 2021 or 2022?

14   A.   I do not.  I don't remember.

15   Q.   Okay.  And do you remember taking a look at a report that

16   might have been generated from that?

17   A.   No.

18   Q.   Okay.  And did you make statements to them about what

19   happened on this day?

20   A.   Can you rephrase that, please?

21   Q.   Sure.

22        Did you make statements about what you saw or observed or

23   what happened to you that day?

24   A.   No, I don't believe I did, not to anybody at my job, no.

25   Q.   Right.  It wasn't to anybody at your job.  It would have

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    been to a case agent or prosecutors.

2        Did you make statements to them about what happened that

3    day?

4    A.   I believe I did, yes.

5    Q.   Okay.  And do you remember making a statement to them

6    that --

7            THE COURT:  Wait.  Ms. Siddiqui, he's not adopted

8    that.

9            MS. SIDDIQUI:  Right.  I was just going to ask him

10   about a statement.  And if it's inconsistent with what he's

11   testifying to today, then I can show him this to see if that's

12   something he can remember.  And if not, then this is a prior

13   statement that's inconsistent.

14           THE COURT:  It's not his statement.

15           MS. SIDDIQUI:  I'm happy to show it to him to see if

16   he remembers.

17           THE COURT:  It's not his written statement.

18           MS. SIDDIQUI:  But it is his statements that are

19   made to an officer.

20           THE COURT:  That he's never reviewed before and

21   adopted.

22           MS. SIDDIQUI:  So I'm happy to have him review it,

23   if he remembers this.

24           THE COURT:  No, that's not --

25        Ms. Fifield.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          MS. FIFIELD:  Yes.  We would object at this point.

2   This witness has never seen this report.  This report does not

3   include any verbatim statements from this witness.

4          THE COURT:  You can -- if you want, Ms. Siddiqui,

5   can you call the case agent later and impeach this witness

6   through that, but you can't impeach him with an FBI 302 that

7   he didn't review and adopt.  It's not his statement.

8          MS. SIDDIQUI:  Sure.

9   Q.  (BY MS. SIDDIQUI)  Let's talk about your training a little

10  bit.  I think we spoke about it earlier with the prosecutor.

11         You mentioned that, as part of training, you are sprayed

12  in the face with some sort of OC spray; is that right?

13  A.  That is correct.

14  Q.  Okay.  And this isn't, like, a large-size OC spray or --

15  like, it's not one of those large canisters; correct?

16  A.  That's correct.

17  Q.  Okay.  And you mentioned that, as part of training, they

18  spray you across the eyes; is that right?

19  A.  Above the eyes, across the face, and below the mouth.

20  Q.  Okay.  And when they spray it that way, is the OC spray

21  falling down into your eyes?

22  A.  It is a steady stream.  So when it hits your face, it

23  will automatically just roll down into your eyes.

24  Q.  Okay.  And you mentioned that as also part of training,

25  once you're sprayed, you then have to go do certain things,

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   right, as part of training?

2   A.   Yes.

3   Q.   And it's for a certain period of time that you have to do

4   that?

5   A.   Yes.

6   Q.   Do you remember how long that is?

7   A.   No, I cannot.

8   Q.   Okay.  And this is to expose you to potential effects; is

9   that right?

10   A.   Yes.

11   Q.   Okay.  And so that you can continue to do whatever you

12   need to do as your job; correct?

13   A.   Yes.

14   Q.   Okay.  And you mentioned that someone, your cohort, as

15   part of your training, had an allergic reaction to the OC

16   spray; is that right?

17   A.   Yes.

18   Q.   Did you?

19   A.   No.

20   Q.   Okay.  You talked a little bit about verbal judo and how

21   that's some sort of deescalation; is that right?

22   A.   Yes.

23   Q.   Okay.  And that's done in an effort to not escalate and

24   not have to use force; yes?

25   A.   Correct.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.   Okay.  And so there is a manual for how to use force;
2   correct?
3   A.   I'm sorry?
4   Q.   There's training provided to you in which situations to
5   use force and which situations to not?
6   A.   Yes.
7   Q.   Okay.  And there's some sort of a continuum, starting
8   from not at all, not any force, to lethal force; is that
9   right?
10  A.   Yes.
11  Q.   Okay.  And the one that's on the very low end, the very
12  bottom, that's just, like, verbal commands and officer
13  presence; is that right?
14  A.   Yes.
15  Q.   Okay.  And then we keep going up the chain up to you are
16  now putting someone in a hold or you're trying to contain
17  them; correct?
18  A.   Yes.
19  Q.   Okay.  And then up from that is chemical spray?
20  A.   To gain compliance, yes.
21  Q.   Okay.  And then above that is, like, baton and kicks and
22  things like that; yes?
23  A.   Our baton is still less lethal.  So they're pretty close
24  to hand-to-hand with OC spray.
25  Q.   Understood.  And then above that is lethal, which is a

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    discharge of a firearm or something along those lines;
2    correct?
3    A.    Yes.
4    Q.    Okay.  When you talked about your training, you talked
5    about that you were sprayed from not closer than 3 feet; is
6    that right?
7    A.    Yes.
8    Q.    They have to be at least 3 feet away from you?
9    A.    Yes.
10   Q.    Okay.  How far would you estimate these people are from
11   you in this video?
12         And I'm going to move it back a little bit so you can
13   see.
14         How far would you estimate this person is from you?
15   A.    Probably around about 3 feet or 4 feet.
16   Q.    You think this is about 3 feet or 4 feet?
17   A.    Approximately.  I really can't tell.
18   Q.    Okay.  And you mentioned some of the risks of OC spray.
19   And I think you mentioned needling in your eyes; is that
20   right?
21   A.    Yes.
22   Q.    Okay.  And that's what happens when you spray it too
23   close to the eye and it can cause damage to your retina; is
24   that right?
25   A.    That's correct.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1  Q.   Okay.  And needling is not just the spray getting in your
2  eye, but also the distance and how fast it comes into your
3  eye, correct, or the pressure with which it comes into your
4  eye?
5  A.   Yes.
6  Q.   Okay.  So safe to say that when they're spraying you in
7  training, the distance they're using, the size of what they're
8  using, is not to cause you needling; correct?
9  A.   Correct.
10  Q.   Okay.  And you mentioned that, in training, they sent you
11  to decon after you're done with the training portion, you, you
12  know, do whatever you're supposed to do, then you go to decon;
13  is that right?
14  A.   That is correct.
15  Q.   Okay.  And in decon, you're taught to flush your eyes
16  out?
17  A.   Yes.
18  Q.   And that takes away some of that stinging, that burning,
19  that irritation?
20  A.   Sometimes it does.  Sometimes it does not.
21  Q.   Makes sense.
22        MS. SIDDIQUI:  No further questions.
23        THE COURT:  Ms. Siddiqui, so you're not going to try
24  to get the 302 in through him, but you want to ask him a
25  question based on that.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          MS. SIDDIQUI:  Correct.  I'm not introducing it as

2    an exhibit or anything.

3          THE COURT:  Okay.  Go ahead.

4       Ms. Siddiqui, I'm sorry.  You can ask him that question.

5          MS. SIDDIQUI:  Oh.

6          THE COURT:  I'm sorry.

7          MS. SIDDIQUI:  You're fine.

8          THE COURT:  Do you remember what it was?

9          MS. SIDDIQUI:  No, but I do have another question,

10   so I'll ask --

11         THE COURT:  Well, I'll give you a moment to look at

12   it again and refresh your memory on that.

13         MS. SIDDIQUI:  Thank you, Your Honor.

14   Q.  (BY MS. SIDDIQUI)  Do you remember telling case agents or

15   the prosecutors in this case that you were sprayed by some

16   unknown substance?

17   A.  I might have.  I do not remember.

18   Q.  Do you remember telling case agents that Officer

19   Riggleman was sprayed first and then you?  Or, sorry, that you

20   were sprayed first and then Officer Riggleman?

21   A.  I do not remember that.

22         MS. SIDDIQUI:  No further questions now.

23         THE COURT:  Okay.  All right.

24         MS. SIDDIQUI:  Thank you.

25         THE COURT:  Ms. Siddiqui.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1      I'm sorry.  Ms. Fifield.

2                      **REDIRECT EXAMINATION**

3  BY MS. FIFIELD:

4  Q.   All right.  Officer Williams, if you could describe the

5  scene around the time when you got sprayed in one word, what

6  would it be?

7  A.   Chaotic.

8  Q.   Chaotic?

9  A.   Chaotic.

10  Q.   And I think you mentioned on direct that you had your

11  attention focused on what was immediately in front of you?

12  A.   That is correct.

13  Q.   And so all the things that Ms. Siddiqui asked you to

14  point out in these videos just now, that's not from your

15  memory?

16  A.   That's correct.

17  Q.   You're just pointing out things in the video?

18  A.   Things from the video.

19  Q.   Okay.  What do you remember?

20  A.   The thing I remember from that day was it was not going

21  to be normal after the breach.  Once they breached, it was --

22  Q.   If I could just pause you there.  I meant to be a little

23  bit more specific with my question.

24      At the time that you're standing at the base of the

25  Senate stairs, what stands out to you in your memory?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    A.   The crowd just running towards us.  We were trying to

2    hold the line, but it didn't help.  It seems like we lost

3    control.

4    Q.   Do you remember being sprayed?

5    A.   No, not till I felt the aftereffects of it.

6    Q.   So you felt being sprayed, and you remember that?

7    A.   I felt -- yes.

8    Q.   But you didn't see who sprayed you?

9    A.   No, I did not see.

10   Q.   Okay.  I'm going to go back to -- if we could have the

11   laptop here at the desk.

12        I'm going to play Government's 200, which you just

13   watched with defense counsel.

14        Okay.  Officer Williams, you've seen this video now

15   multiple times; right?

16   A.   Yes, I have.

17   Q.   Okay.  And you know that this is you right here with the

18   blue helmet?

19   A.   Yes, it is.

20   Q.   And you know that this is Officer Riggleman right here

21   with the white mask?

22   A.   Yes, it is.

23   Q.   And is that consistent with your memory from January 6th?

24   A.   Yes.

25   Q.   Okay.  So we're going to watch from about 10 seconds to

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   about 25 seconds again.

2        Okay.  We're at 27 seconds.

3        So this is the individual in white where your attention

4   is focused at this time; right?

5   A.   Yes.

6   Q.   Okay.  I'm going to go over these couple of seconds right

7   here.

8        So what just happened to you?

9   A.   I just got hit with a flag.

10  Q.   And Ms. Siddiqui was asking you about this spray right

11  here?

12  A.   Yes.

13  Q.   Can you see that?

14  A.   Yes, I do.

15  Q.   Okay.  Watch this area.

16       Actually, before we do that, do you see anything on the

17  scaffolding there?

18  A.   No, I do not.

19  Q.   Okay.  We're going to watch that same area again.

20       What happened to the scaffolding?

21  A.   The OC spray, or an irritant, hit the upper scaffolding

22  tarp right there.

23  Q.   And do you know -- just based on your review of this

24  video, do you know what this substance is that hit the

25  scaffolding?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    A.    I believe that is bear spray.

2    Q.    And how are you drawing that conclusion?

3    A.    The canister is a little bit bigger, and it's a solid

4    stream, as well as really thick.

5    Q.    And you're just making that determination based on the

6    video; you don't know from the effects of the substance?

7    A.    That's correct.

8           THE COURT:  Are the colors the same, bear spray

9    versus OC spray?

10          THE WITNESS:  No, ma'am.  They're pretty much all

11   the same color.  OC spray is clear as well.  It depends on the

12   potency of the OC spray.

13   Q.    (BY MS. FIFIELD)  I'm going to play this starting at about

14   30 seconds.

15         Okay, I'm going to go back just a hair.  So we're at 31

16   seconds.

17         So we saw that first spray that hit here.  Do you see

18   this canister and the spray emitting there?

19   A.    Yes, I do.

20   Q.    Okay.  I want you to take note of that.

21         And this is at 31 seconds in Exhibit 200.  And I'm going

22   to use my controller here to go frame by frame, okay?

23   A.    Yes.

24   Q.    Going back to 29 seconds.

25         I want you to watch this individual and his hand.  This

1   is at 29 seconds.

2        Okay.  You mentioned this object here with Ms. Siddiqui?

3   A.   Yes.

4   Q.   What does that look like?

5   A.   A Gatorade bottle.

6   Q.   Do you know that for sure?

7   A.   No, I do not.

8   Q.   You're just interpreting the video?

9   A.   Yes.

10  Q.   Do you see this?

11  A.   Yes, I do.

12  Q.   What does that look like to you?

13  A.   It looks like the OC coming from the canister.

14  Q.   Coming from which canister?

15  A.   The one from the individual with the black glove on.

16  Q.   With his arm extended?

17  A.   Yes.

18  Q.   Okay.  I'm going to go frame by frame again here.

19       Do you see the spray in the air at this point?

20  A.   It is dissipating at this point.

21  Q.   Okay.  So we took note of this canister; correct?  You

22  can see that?

23  A.   Yes.

24  Q.   And we can see that spray coming out there.

25       I want you to watch yourself.  I'm going to go back and

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    just do a few frames over again.

2        What do we see happening to your body in those couple of

3    frames right there?

4    A.    I'm getting twisted.

5    Q.    Is it fair to say you're tensing up?

6    A.    Yes.

7    Q.    Now what are you doing?

8    A.    It looks like I'm about to get pulled from -- to the side

9    from the other coworkers.

10   Q.    Did you see your head change directions?

11   A.    Yes.

12   Q.    And when we play this -- and before we move on, this

13   stream/cloud here, does that look like it's hitting you?

14   A.    No.

15   Q.    So starting at 31 seconds, we're going to play this at

16   regular speed.

17       Fair to say -- you know, we talked about your body

18   tensing, your head turning.  What happened to you just then

19   that we saw?

20   A.    The OC that hit the foam between my visor and my helmet

21   started running towards my eyes and hit my eyes.

22       And then the officer grabbed me to get out of the way of

23   the individuals coming up the stairs.

24   Q.    So your body tensed, your head turned, and then you got

25   pulled down?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.   Yes.

2           MS. FIFIELD:  Okay.  Now I'd like to pull up

3   Government's 211.

4           THE COURT:  Officer Williams, can you tell me, based

5   on your experience and your training, what the outer distance

6   for a canister of pepper spray is?

7           THE WITNESS:  I'm sorry, ma'am?

8           THE COURT:  How far can a canister of pepper spray

9   go, shoot?

10          THE WITNESS:  Approximately –– the distance for a

11  full canister could probably be around 6 feet, 7 feet.

12  Q.   (BY MS. FIFIELD)  Okay.  So this is Government Exhibit

13  211.  Do you see yourself in this frame?

14  A.   Yes, I do.

15  Q.   Blue helmet?

16  A.   Blue helmet.

17  Q.   Is that you?

18  A.   Yes, it is.

19  Q.   And Officer Riggleman?

20  A.   Yes, it is.

21  Q.   I just want to watch a couple seconds of this quick.

22       What do we see happening to you right here?

23  A.   Getting hit with the flag.

24  Q.   Does this look like the same thing that we just watched

25  it in 200 but from a different angle?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.   Yes, it is.

2   Q.   Okay.  Now I'm going to go frame by frame again.

3        Before I do that, do you see that?

4   A.   Yes, I do.

5   Q.   What does that look like?

6   A.   It looks like the substance coming from the canister.

7   Q.   Okay.  Let's watch that substance as we go frame by

8   frame.

9        Is that the same stain on scaffolding we saw in 200?

10  A.   Yes, it is.

11  Q.   Does it look like that spray is going over your head?

12  A.   No, it does not.

13  Q.   Okay.  Keep going.

14       All right.  Watch yourself, please.

15       What's happening to your body right now?

16  A.   Tensed up and a fellow officer pulling me out of the way.

17  Q.   Which direction is your body and your face facing?

18  A.   Going towards the left.

19  Q.   Okay.  So you're in the process of turning?

20  A.   Yes.

21  Q.   Do you see this stuff in the air here?

22  A.   Yes.

23  Q.   Let's go back just a hair so we can watch that stuff.

24       All right.  Do you see that stuff in the air?

25  A.   Yes.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.   Did you see your body turning?

2   A.   Yes.

3   Q.   Is it fair to say that you're already turning away from

4   this scene by the time that stuff leaves someone's hand?

5   A.   Yes.

6   Q.   Okay.  Did you see what happened to that stuff in the

7   air?

8   A.   It continued up the Senate steps.

9   Q.   Was it going in your direction?

10  A.   No.

11  Q.   Did it go over your head?

12  A.   No.

13          MS. FIFIELD:  No further questions.

14          THE COURT:  All right.  May this witness be excused?

15          MS. FIFIELD:  Nothing further from the government.

16          MS. SIDDIQUI:  Nothing further from us, Your Honor.

17          THE COURT:  All right.  Thank you, Officer Williams.

18  Appreciate your service.

19          THE WITNESS:  Thank you, ma'am.

20      (Witness excused.)

21          THE COURT:  Is this the last witness?

22          MR. BRADY:  Yes, Your Honor.

23      May I proceed?

24          THE COURT:  Oh, yes.  Sorry.  I thought you were

25  calling.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          MR. BRADY:  Yes.  The United States calls Officer
2  David Riggleman.
3          THE COURT:  Okay.
4          MR. BRADY:  Thank you, Your Honor.
5          THE COURT:  Mr. Brady, we're not going to have to go
6  through the barricades again, are we?
7          MR. BRADY:  No, Your Honor.  I'll be quick.
8          THE COURT:  Thank you.
9       Good afternoon, sir.
10          THE WITNESS:  Good afternoon, ma'am.  How are you?
11          THE COURT:  Fine, thanks.
12       (Witness duly sworn.)
13          MR. BRADY:  May it please the Court.
14          THE COURT:  You may proceed.
15                          **DAVID RIGGLEMAN,**
16  after having been first duly sworn, testifies in reply to the
17  questions propounded as follows:
18                          **DIRECT EXAMINATION**
19  BY MR. BRADY:
20  Q.   Afternoon, officer.
21  A.   Good afternoon.
22  Q.   Can you please introduce yourself to the Court and spell
23  your name for the record, please.
24  A.   Officer David Riggleman.  R-I-G-G-L-E-M-A-N.
25  Q.   And your first name?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    A.    David.   D-A-V-I-D.

2    Q.    It sounds obvious, but you never know.

3          Where do you work?

4    A.    The United States Capitol.

5    Q.    Are you part of the United States Capitol Police Force?

6    A.    Yes.

7    Q.    How long have you worked there?

8    A.    Approximately six years.

9    Q.    What do you do for them?

10   A.    Police officer.

11   Q.    Have you been a police officer your entire time?

12   A.    Yes.

13   Q.    What duties are involved in being a United States Capitol

14   police officer?

15   A.    Protecting the members of Congress, the grounds, and the

16   stakeholders.

17   Q.    Are you assigned to the United States Capitol itself?

18   A.    Yes.

19   Q.    Do you work inside or outside primarily?

20   A.    Primarily outside.

21   Q.    When you do work on a day you're normally scheduled for

22   duty, what do you wear?

23   A.    Very much what I'm wearing today.

24         So we call them ODUs, kind of cargo-pocketed pants and a

25   shirt and probably a jacket.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    Q.    Do you have a utility belt?

2    A.    Yes.

3    Q.    What's on your utility belt?

4    A.    A variety of things.  Our service weapon, the baton,

5    pepper spray, handcuffs, radio.

6    Q.    To become a United States Capitol police officer, do you

7    go through some training?

8    A.    Yes.

9    Q.    Where is that located at?

10   A.    Glen County, Georgia, FLETC.

11   Q.    At the Federal Law Enforcement Training Center?

12   A.    Yes.

13   Q.    As part of your training, are you trained on some of the

14   items you carry with you on your utility belt?

15   A.    Yes.

16   Q.    Are you trained in OC, or pepper spray, during the course

17   of your training?

18   A.    Yes.

19   Q.    Can you just tell the Court what that training entails?

20   A.    There's a -- there's training in Georgia where you're

21   given a brief exposure to it, and then again up here, when we

22   get to Cheltenham, which is where our facilities are for the

23   D.C. area.

24        You're given an exposure kind of across the eyes and the

25   face to kind of get the idea of what is entailed with it and

164

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   what it feels like.

2   Q.   And were you actually sprayed during your training?

3   A.   Yes.

4   Q.   What did it feel like for you?

5   A.   It's a burning sensation, very gritty, almost like sand

6   kind of in your eyes.  It's very difficult to see,

7   incapacitating.  So it's tough until you can kind of relieve

8   that.

9   Q.   I want to focus your attention on January 6, 2021.  Were

10  you working that day?

11  A.   Yes.

12  Q.   What was going on at the Capitol that day?

13  A.   There was quite a few things going on that day.  I know

14  that they were doing the count for the vote and some other

15  various things that Congress is doing.

16  Q.   As a result of that, was the perimeter of the Capitol

17  restricted?

18  A.   Yes.

19  Q.   Now, your day that day, what time did you get on to work

20  or start your shift?

21  A.   I started at 7:00 a.m.

22  Q.   And how long were you scheduled to be at the Capitol

23  working that day?

24  A.   It's an eight-hour tour, so from 7:00 to 3:00.

25  Q.   So what did you start your day doing?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    What was the first thing you did that day?

2    A.   We started off typically with, like, a roll call, you

3    know, what our detail is, we're kind of given our assignments

4    for the day.

5        My assignment was a van, and I was transporting officers

6    back and forth to our property, exchanging helmets and various

7    pieces of equipment.

8    Q.   I want to move forward to around 12:50 p.m. during your

9    day.  Did something happen around that time?

10   A.   I believe they called out a breach on the west front of

11   the Capitol.  I responded back, responded down to the west

12   front, on the steps on the north side, so on the Senate side

13   of the stairs.

14   Q.   I'm showing you Government Exhibit 104 on the easel

15   that's just right next to you.

16       Could you --

17           MR. BRADY:  Your Honor, may the witness step down to

18   show us where he was?

19           THE COURT:  Yes.

20   Q.   (BY MR. BRADY)  You mentioned on the north side of the

21   Capitol.  Can you point to where you were when you got to the

22   Capitol?

23   A.   So I returned back out here to the north side, and

24   then -- here, this is the north side of the building.  The way

25   the stage gets constructed, there's a set of stairs you come

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   down, and this is where I responded to.

2   Q.   Okay.  Thank you.  You can retake your seat.

3        You mentioned that a stage was constructed.  Is that the

4   inaugural stage?

5   A.   Yes.

6   Q.   Was that for the presidential inauguration that would

7   take place?

8   A.   Yes.

9   Q.   So you get back, you return your van.  You said you

10  turned around the corner on the northern side of the building.

11  What do you see when you turn the corner?

12  A.   A very large group of people on the west side, so kind of

13  the mall, coming towards the Capitol.

14  Q.   Small amount of people?

15  A.   A very large group of people.

16  Q.   What'd you do?

17  A.   I immediately responded down to the stairs.

18  Q.   What stairs?

19  A.   The steps on the north side of the building.  We would

20  call them Senate steps on the -- on the west front.

21           MR. BRADY:  Your Honor, may I publish some

22  Government Exhibits to the computer screens?

23           THE COURT:  Of course.

24           MR. BRADY:  May I have Government Exhibit 102,

25  please?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.   (BY MR. BRADY)   Officer Riggleman, is your screen

2   displaying Government Exhibit 102?

3   A.   Yes.

4   Q.   What do we see here?

5   A.   It looks like an aerial photo of the west front of the

6   Capitol.

7   Q.   Can you actually draw a circle on where you were on the

8   north side of the building to kind of trace your pathway as

9   you went to the northwest stairs for the Court, please.

10  A.   Of course.

11          MR. BRADY:   Your Honor, may I approach the witness?

12          THE COURT:   Sure.

13  Q.   (BY MR. BRADY)   Officer Riggleman, is this general

14  vicinity on the left-hand side of the Capitol I have traced in

15  red, is that where you turned the corner at the top part of

16  the upper west terrace?

17  A.   Yes, that's correct.

18  Q.   You mentioned you went down the northwest stairs.

19      Circling the stairs that are on the left side of the

20  building, is that the northwest stairs?

21  A.   Yes, that's correct.

22  Q.   Do you also call them the Senate stairs?

23  A.   We do.

24  Q.   If we could bring up Government Exhibit 103, please,

25  Ms. Macechko, please.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1       What are we seeing here, sir?

2   A.   This is another image of the west side of the Capitol.

3   You can see the inaugural stage has been constructed.  The

4   north-side stairs would be on the left side of the screen as

5   I'm facing it.

6   Q.   So you are charging down the stairs that are on the

7   left-hand side of the screen.

8        What do you see when you get to the bottom of the stairs?

9   A.   The lower west terrace is covered in people who were

10  obviously not supposed to be there.  It's completely covered.

11  It's very difficult to see kind of out past that.  There's a

12  number of people still coming towards us.

13  Q.   Where do you station yourself?

14  A.   There's kind of a narrow stairway on the side of the

15  steps there on the north side.  And I kind of stopped at that

16  middle landing, kind of assessed what was going on, and then

17  we started to come down.

18       Yeah, that's the area.

19  Q.   I just circled the left side of that stairway.  Is that

20  an accurate area of where you stopped on that stairwell?

21  A.   Yes.

22  Q.   What'd you do after stopping there?

23  A.   I encountered some of the protesters there, and I was

24  able to see -- if you look, the stage is constructed of a

25  fabric material.  You can kind of see through it when you're

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    close.

2        I could see people kind of cutting away at this front

3    corner of it and going underneath of the steps.  At that time

4    I kind of backed up to that middle landing and then came down

5    underneath the stage.

6    Q.   Did you come out through that open cutout that I've boxed

7    on Government Exhibit 103?

8    A.   Yes.

9    Q.   What was the scene like when you got to that bottom area?

10   A.   The entire lower west terrace on that, the area was

11   covered with protesters or rioters.

12   Q.   Were they chanting things?

13   A.   Yes.

14   Q.   Do you remember anything specific?

15   A.   No, nothing specific.

16   Q.   What was the general demeanor of the crowd?

17   A.   Very hostile.

18   Q.   Did you notice anything about what the crowd was dressed

19   in?

20   A.   I did notice what appeared to be some sort of, like, body

21   armor carrier or plate carrier, and ballistic helmets, and

22   maybe some gas masks --

23   Q.   Is that unusual for you?

24   A.   -- or respirators.

25   Q.   Why is that?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    A.    As many protests as I've dealt with, I typically don't

2    see those things in the crowd.  In fact, I don't think I've

3    ever seen those before.

4    Q.    So you get to the bottom of the stairs.  Are there other

5    officers at the bottom of the stairs too?

6    A.    Yeah.

7    Q.    How many other officers?

8    A.    A handful.  I'm not sure exactly how many were there with

9    me.  We had kind of formed a line kind of across the opening

10   of that portal going up.

11   Q.    How would you describe the number of officers that you

12   had guarding the northwest stairs in comparison to the crowd

13   or mob that was before you?

14   A.    We were greatly outnumbered.

15   Q.    So what happened next when you reached the bottom of the

16   stairs and joined your fellow officers?

17   A.    There was a police line, trying to kind of reinforce that

18   police line.  I know there was some passive aggressive kind of

19   shoving or trying to walk through the line there.

20         As I was kind of reaching over, that's, you know, when I

21   was sprayed on the west front.

22   Q.    Okay.

23         MR. BRADY:  Your Honor, may I publish Government

24   Exhibit 200?

25         THE COURT:  Yes, you may.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    MR. BRADY:  And if we could just pause it once it

2  starts playing, please.

3  Q.  (BY MR. BRADY)  Officer Riggleman, I'm showing you

4  Government Exhibit 200.  It's about one second in.  Do you see

5  yourself in the frame here?

6  A.  Yes.

7  Q.  What are you wearing?

8  A.  A baseball cap, a jacket, and a kind of blue face mask.

9  Q.  And are you on the right-hand side or the left-hand side

10  of the screen?

11  A.  It appears to be the right-hand side.

12  Q.  Is this person I've circled in red you?

13  A.  Yes.

14    MR. BRADY:  If we can hit play, please.

15    Thank you.

16  Q.  (BY MR. BRADY)  Officer Riggleman, what just happened to

17  you in the video?

18  A.  I was sprayed with a chemical irritant, or pepper spray.

19  Q.  And, I guess, where were you sprayed?

20  A.  Across the face, the eyes.

21  Q.  What did it feel like when you got sprayed?

22  A.  Burning sensation, almost like sandpaper in your eyes.

23  It's really difficult to see.  You know, it can be

24  incapacitating.

25  Q.  Was it incapacitating for you at that moment?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.   Yes.

2   Q.   Did your eyes water?

3   A.   Yes.

4   Q.   Did it have any effect on your nose?

5   A.   Yes.

6   Q.   What was that?

7   A.   It was more difficult to breathe.  You also get kind of a

8   runny nose or a nasal drip from it.

9   Q.   What was the first thing that went through your mind when

10  you were sprayed?

11  A.   To cover your weapon.

12  Q.   Why is that?

13  A.   Because if I can't see and I'm incapacitated, everything

14  on my belt can be used against me or other people around me.

15  Q.   Is this a dangerous situation?

16  A.   Yes.

17  Q.   Why is that?

18  A.   I have no idea what the intention of the crowd is here.

19  Obviously, I've just been sprayed, and trying to cover my

20  weapon to protect my fellow officers.

21  Q.   What can happen if someone were to take your weapon from

22  you?

23  A.   They could use it on me, use it --

24       MS. SIDDIQUI:  Objection.  Speculation and

25  relevance.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          THE COURT:  Overruled, but ...

2          MR. BRADY:  But it's obvious, Your Honor?

3          THE COURT:  It's pretty obvious.

4          MR. BRADY:  Yes, Your Honor.

5   Q.   (BY MR. BRADY)  Are you afraid in that moment, Officer

6   Riggleman?

7   A.   Yes.

8   Q.   Why is that?

9   A.   I'm unable to see.

10  Q.   What happened next?

11  A.   I kind of used the railing as a guide to get up the

12  stairs to try to find some relief, to decontaminate the spray

13  that's in my eyes, or whatever irritant it is.

14          MR. BRADY:  If we could hit play on the video,

15  please.

16  Q.   (BY MR. BRADY)  Officer Riggleman, when you're ascending

17  the stairs, are you aware that you're being followed by

18  members of the mob behind you?

19  A.   No.

20  Q.   Why is that?

21  A.   I can't see.

22  Q.   Now, when you go up the stairs, what are you going up the

23  stairs to do?

24  A.   To either try to get into the building or to try to find

25  water to decontaminate or flush out whatever chemical irritant

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   that's in my eyes.

2   Q.   Were you able to get into the building and find water?

3   A.   Yes.

4   Q.   Can you explain for the Court how that happened?

5   A.   I kind of worked my way up the steps, and then the stage

6   kind of goes to the right.  As I worked my way up, there was a

7   lieutenant coming down, and I was able to obtain his water to

8   start to decontaminate the spray that was in my eyes.  And

9   then I was ultimately able to get in the lower west terrace

10  door and decon in the bathroom.

11  Q.   Were you able to make it down the hallway by yourself?

12  A.   It was difficult.  The longer the irritant is in your

13  eyes, the worse or more difficult it is to see.

14  Q.   Did you have difficulty keeping your eyes open?

15  A.   Yes.

16  Q.   Who escorted down the hallway?

17       Or, I guess, were you escorted down the hallway?

18  A.   Lieutenant Pollack was coming down the hallway and

19  assisted me with getting to the restroom.

20  Q.   Did you make it to the restroom?

21  A.   Yes.

22  Q.   Can you explain to the Court your entry process into the

23  restroom and the decontamination process?

24  A.   So it's difficult.  Your natural reaction is going to be

25  to close your eyes, but you kind of have to hold your eyes

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

```
 1    open and just keep flushing to get the irritant out of it.
 2         It's very gritty.  I guess the best analogy that I can
 3    come up with, kind of like sand.  Imagine sand in your eyes,
 4    that's what it feels like.
 5    Q.   You mentioned you had to hold your eyes open.  Why was
 6    that?
 7    A.   It's, again, your body's natural reaction is to close
 8    your eye.  So you have to kind of force them open and then use
 9    fresh water to clear it out.
10    Q.   And did you need the lieutenant's assistance to get into
11    the bathroom and do this decontamination process?
12    A.   Yes.
13    Q.   Why?
14    A.   It was difficult to see and kind of navigate the hallway.
15    Q.   How long would you estimate you were in the bathroom
16    decontaminating?
17    A.   Approximately five to 10 minutes.
18    Q.   Did you pull out a stopwatch during that time?
19    A.   No.
20    Q.   Were you able to decontaminate your eyes in the bathroom?
21    A.   Yes.
22    Q.   What'd you do then?
23    A.   Came back out to assist with other officers.
24         MR. BRADY:  If we can bring up Government Exhibit
25    200-A, please.
```

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.  (BY MR. BRADY)  Officer Riggleman, I'm showing you Exhibit

2   200-A.

3           MR. BRADY:  If we could zoom in on Officer Riggleman

4   and the spray.  Thank you.

5   Q.  (BY MR. BRADY)  Officer Riggleman, what are we seeing

6   here?

7   A.   That's myself with the blueish-white mask on, and I'm

8   going sprayed with some sort of chemical irritant or pepper

9   spray.

10  Q.  And is this the spray from January 6th on the Senate

11  stairs that we've been talking about?

12  A.   Yes.

13  Q.  When you were sprayed, was that feeling that you felt

14  consistent with the spray that you felt in training from OC

15  spray or pepper spray?

16  A.   Yes.

17  Q.  Ultimately, did you stop and ask the rioter who sprayed

18  you what he sprayed you with?

19  A.   No.

20          MR. BRADY:  Judge, may I have a moment?

21          THE COURT:  Of course.

22  Q.  (BY MR. BRADY)  Officer Riggleman, how late were you at

23  the U.S. Capitol that day performing your official duties?

24  A.   I don't recall the exact time, but I would say somewhere

25  between midnight and 1:00 a.m., somewheres in there.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    Q.   During the course of that entire day, were you acting in

2    your official capacity as a U.S. Capitol Police Officer?

3    A.   Yes.

4    Q.   As part of your duties, was that securing the U.S.

5    Capitol?

6    A.   Yes.

7    Q.   And protecting the men and women in Congress who were

8    inside?

9    A.   Yes.

10            MR. BRADY:   Your Honor, that's all I have.

11            THE COURT:   Okay.  Cross-examination.

12                        **CROSS-EXAMINATION**

13   BY MS. SIDDIQUI:

14   Q.   Good afternoon, sir.

15   A.   Hello.

16            MS. SIDDIQUI:   If we could pull up Government

17   Exhibit 200, please.

18        If you could pause it right there.  Thank you.

19   Q.   (BY MS. SIDDIQUI)   I'm going to circle -- and I think

20   you've ID'd yourself.  This is you; correct?

21   A.   Yes, ma'am.

22   Q.   Okay.  And you're wearing that blue-white mask and a

23   baseball hat; correct?

24   A.   Correct.

25   Q.   You're not wearing a visor, you're not wearing anything

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1   else?

2   A.   (Nods head).

3   Q.   Okay.

4           MS. SIDDIQUI:   And if we could play it for just a

5   few seconds.  Pause it there.

6   Q.   (BY MS. SIDDIQUI)  Do you know who this person is in the

7   blue helmet?

8   A.   It appears to be Officer Williams.

9   Q.   Okay.  And that's how y'all stayed throughout the

10  duration of this incident; right?  He was in front of you?

11  A.   Yes.

12  Q.   Okay.  And that day when you were on duty, did you have

13  your own police kit on you, your baton, your spray, and all

14  that stuff?

15  A.   Yes.

16  Q.   Okay.  And you mentioned, I think, that this crowd was

17  trying to overrun, they were chaotic; is that right?

18  A.   Yes.

19  Q.   Okay.  And do you remember, to your recollection, what

20  you saw crowd control methods being used to stop them?

21  A.   Yes.

22  Q.   That included pepper ball guns and things like that?

23  A.   Not in this instance here.

24  Q.   But in general, yes?

25  A.   At some point during the day.  I don't -- it's not a

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   weapons system that I'm trained on, so I'm not familiar with

2   what their schedules are.

3   Q.   And you mentioned that you had training prior to becoming

4   an officer, and part of that training was the OC spray

5   training; is that right?

6   A.   That's correct.

7   Q.   That training is spraying you across the eyes --

8   A.   Yes.

9   Q.   -- with the spray?

10      Okay.  And how far are they when they're spraying you?

11  A.   Approximately 10 feet.

12  Q.   Okay.

13  A.   Ish.  I don't remember exactly.  It's been a number of

14  years.

15  Q.   Okay.  And is there a safety -- when you're trained to

16  use or deploy OC spray, there's a certain amount of feet that

17  you're supposed to be away from the subject; is that right?

18  A.   I believe so.

19  Q.   Okay.  Do you remember what that is?

20  A.   Maybe 6 feet comes to mind, approximately.

21  Q.   Is that for the small handheld ones or the larger ones?

22  A.   I believe the small ones.  I'm not trained on the larger.

23  Q.   Okay.  And after you're sprayed, you're asked to do

24  certain tasks, in training?

25  A.   Yes.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.   Okay.  And then after that, you can go decontaminate?

2   A.   Correct.

3   Q.   And decontamination is essentially flushing your eyes out

4   like you mentioned earlier?

5   A.   Yes.

6   Q.   Okay.  I'm going to ask -- I'm going to clear this.

7        If you could keep watching this for a little bit, if we

8   can play it.

9        Pause it right there.

10       Is the crowd pushing up now towards the staircase?

11   A.   I believe so.

12   Q.   Okay.  And they're physically now making contact with the

13   officers; is that right?

14   A.   Yes.

15   Q.   You haven't been sprayed yet?

16   A.   No.

17          MS. SIDDIQUI:  Okay.  If we could keep playing it,

18   please.  Stop right there.

19   Q.   (BY MS. SIDDIQUI)  This over here, they're essentially

20   moving the line past, correct, the officer line?

21   A.   The line is being pushed back.

22   Q.   And it's, at this point, now being breached; correct?

23   A.   I believe so.  It's hard to tell from this image.

24   Q.   Okay.  And all of this is prior to you being sprayed?

25   A.   Correct.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.    Okay.  And if we -- I will clear it.

2            MS. SIDDIQUI:  If we could pause.

3   Q.  (BY MS. SIDDIQUI)  At some point here you're sprayed;

4   correct?

5   A.    Yes.

6   Q.    Okay.  And I think Mr. Brady asked you, you didn't ask

7   the person in front of you what you were sprayed with; right?

8   A.    No.

9   Q.    Okay.  And do you remember making a statement that you

10  don't actually know what you were sprayed with?

11  A.    It appears to be pepper spray, but, again, without

12  knowing exactly what was in the canister, I couldn't tell you.

13  There are different brands, different variants.

14  Q.    And there's different irritants, right, that would have

15  the same sensation?

16  A.    Yes.

17  Q.    Okay.  And the person that sprayed you, you don't know

18  who that is?

19  A.    No idea.

20  Q.    You don't know them personally?  They never came up and

21  talked to you, they never threatened you; correct?

22  A.    No.

23  Q.    And as far as you know, you never interacted with them

24  after; is that right?

25  A.    To the best of my knowledge.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1  Q.   Okay.  I'm going to ask you to take notice of this person
2  on this video, if we can play it.  I'll clear it so you can
3  see it more clearly.  Stop right there.
4       How far would you estimate this person is from you?
5  A.   Six to 10 feet.  It's hard to tell from this image.
6  Q.   Understood.
7       Once you're sprayed, you make your way back up here;
8  correct?
9  A.   Yes.
10 Q.   Okay.  And you mentioned that you went to the bathroom to
11 try to flush out your eyes?
12 A.   Yes.
13 Q.   Did anyone take your firearm at this point?
14 A.   No.
15 Q.   Did anyone attack you further at this point?
16 A.   No.
17 Q.   And so you were able to make it to the bathroom and flush
18 out your eyes; is that right?
19 A.   Yes.
20 Q.   Okay.  And then I think you mentioned at some point you
21 came back down to join the other officers in the line again;
22 is that right?
23 A.   Yes.
24 Q.   Okay.
25           MS. SIDDIQUI:  No further questions.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1     THE COURT:  Any redirect?

2     MR. BRADY:  May I have a moment, Judge?

3     THE COURT:  Sure.

4     MR. BRADY:  Briefly.

5                    **REDIRECT EXAMINATION**

6  BY MR. BRADY:

7  Q.   Officer Riggleman, the spray from that individual that

8  hit you, did that impact your ability to secure that line at

9  the northwest stairs?

10 A.   Yes.

11 Q.   Did it impede your ability to secure the Capitol?

12 A.   Yes.

13 Q.   On cross-examination, Counsel asked you if the individual

14 ever threatened you.

15     Did his pepper spray that sprayed you in the face or a

16 chemical irritant that sprayed you in the face, did that

17 threaten you?

18 A.   Yes.

19 Q.   Did it threaten your safety?

20 A.   Yes.

21     MR. BRADY:  No further questions, Judge.

22     THE COURT:  All right.  May this witness be excused?

23     MR. BRADY:  Yes, Your Honor.

24     THE COURT:  All right.  Thank you, sir.

25     THE WITNESS:  Thank you, ma'am.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1           THE COURT:  Appreciate your service.

2           THE WITNESS:  Thank you.

3      (Witness excused.)

4           THE COURT:  Is the government resting?

5           MS. FIFIELD:  The government rests.

6           THE COURT:  Okay.  Ms. Siddiqui.

7           MS. SIDDIQUI:  Your Honor, we'd like to call the

8  Special Agent in the case just very briefly.  Before that, I'm

9  happy to make my Rule 29 motion.

10          THE COURT:  Okay.  I'll probably reserve on that

11 under Rule 29.

12      On the Special Agent's testimony, is it more than just

13 the impeachment?

14          MS. SIDDIQUI:  No, Your Honor.  Just two questions.

15          THE COURT:  Is there really anything to impeach

16 there?

17          MS. SIDDIQUI:  I think so.  I think it's important

18 to the case.  It'll be two questions.  It really is not that

19 long.

20          THE COURT: All right.  Go ahead.

21                   **RYAN NOUGARET,**

22 recalled on behalf of the defendant, after having been

23 previously duly sworn, testifies in reply to the questions

24 propounded as follows:

25                 **DIRECT EXAMINATION**

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   BY MS. SIDDIQUI:

2   Q.   Good afternoon again.

3   A.   Hello.

4   Q.   You are the agent that investigated this matter; is that

5   right?

6   A.   Yes.

7   Q.   And you spoke to the officers that were -- that just

8   testified that were named victims in this case?

9   A.   I did.

10  Q.   Okay.  And you created a report of that?

11  A.   I did.

12  Q.   Okay.  And that report put forth your conversations with

13  these officers?

14  A.   Correct.  I spoke with each of them over the phone.

15  Q.   Okay.  And do you remember the entire interview that you

16  did with them?

17  A.   Honestly, no.

18  Q.   Would it refresh your recollection if you were able to

19  see it?

20  A.   It would.

21  Q.   Okay.  Let me ask you a different question first, and

22  then we can see if you need refreshment.

23       Did you speak to Officer Riggleman at some point?

24  A.   Yes.

25  Q.   Okay.  And I apologize, let me go back.

United States v. Barry Bennet Ramey
Bench Trial — Afternoon Session — February 21, 2023

1       Did you speak to Officer Williams at some point?

2    A.   Yes.

3    Q.   Okay.  And did Officer Williams tell you that he did not

4    know what he was sprayed with?

5    A.   I don't recall.  Whatever I put in that 302 is what our

6    discussion consisted of.

7    Q.   Would it refresh your recollection if I showed it to you?

8    A.   Yes.

9            MS. SIDDIQUI:  Your Honor, may I approach?

10           THE COURT:  Yes, you may.

11           MS. SIDDIQUI:  Is it possible to put it on the ELMO

12   just for the witness and me?

13           THE COURT:  Well, let's just get his testimony.  See

14   if it refreshes his memory.

15           MS. SIDDIQUI:  Yes, Your Honor.

16       I only have one copy.  So I'm just going to write it down

17   with a marker.

18       Your Honor, may I approach?

19           THE COURT:  Yes, you may.

20   Q.   (BY MS. SIDDIQUI)  Would you take a look at the middle

21   part of that report and just let me know when you're done.

22           THE COURT:  You're just refreshing his recollection

23   and then you're going to take it away; right?

24           MS. SIDDIQUI:  Yes.

25           THE WITNESS:  Okay.

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1  Q.   (BY MS. SIDDIQUI)  Do you remember Officer Williams

2  telling you that he was sprayed with an unknown substance?

3  A.   Yes.

4            THE COURT:  Did the document refresh your

5  recollection?

6            THE WITNESS:  Based on what I just read, that

7  refresher, that's what I wrote, so...

8  Q.   (BY MS. SIDDIQUI)  And did he also tell you that he was

9  sprayed and then Officer Riggleman was sprayed?

10 A.   That's what I see I documented there, yes.

11           THE COURT:  But does that refresh your memory?

12           THE WITNESS:  I mean, I don't remember exactly what

13 he said, but I wouldn't have written it if he wouldn't have

14 said it to me, if that makes sense.

15           THE COURT:  That's all you can --

16           THE WITNESS:  That was back in -- when was that?

17 That was last year.  It was over 10 months ago.

18           THE COURT:  Okay.  So just to be clear, did the

19 document refresh your memory as to either question, or are you

20 just repeating what's on the document?

21           THE WITNESS:  I do not remember the specifics of our

22 conversation in regards to that specific question.  However --

23           THE COURT:  Either specific question?

24           THE WITNESS:  Correct.

25           THE COURT:  All right.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          THE WITNESS:  I do not remember him specifically

2   saying it was an unknown substance or that, you know --

3          THE COURT:  Okay.

4          THE WITNESS:  -- where in relation the other officer

5   was to him, et cetera.

6   Q.  (BY MS. SIDDIQUI)  Understood.  I'll move on.

7      At some point, did you also have a chance to speak with

8   Officer Riggleman?

9   A.   Yes.

10  Q.   Okay.  And do you remember that he also told you that he

11  was sprayed with an unknown substance?

12  A.   I don't remember that specifically.  I'm assuming that's

13  what I wrote.

14         THE COURT:  Don't assume.

15  Q.  (BY MS. SIDDIQUI)  If I were to show you a copy of your

16  report, would that refresh your recollection?

17  A.   I can't guarantee it would refresh my recollection, but

18  it would verify that that's what I wrote.

19  Q.  (BY MS. SIDDIQUI)  I can try it.

20     I'm going to show you what's -- it's your report.  So if

21  you can take a look at it and see the middle part, about this

22  much -- read that and let me know.

23         MS. FIFIELD:  Your Honor, we'd be willing to

24  stipulate both witnesses claimed that they were sprayed with

25  an unknown substance.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          THE COURT:  Oh, great.  Okay.

2          MS. SIDDIQUI:  No further questions, Your Honor.

3          THE COURT:  All right.

4          MS. SIDDIQUI:  Your Honor, if I could have a brief

5   moment?

6          THE COURT:  Sure.  Can this agent have a seat?

7          MS. FIFIELD:  Your Honor, if I could ask a few

8   questions as well.

9          THE COURT:  Sure.

10         MS. SIDDIQUI:  I think we've reached an additional

11  stipulation, Your Honor.  Just that, in his report, it states

12  that both agents stated that they were sprayed by an unknown

13  substance.

14       And then the second piece of it is for Officer Williams,

15  who would have stated, according to his report, that he was

16  sprayed and then Officer Riggleman was sprayed.

17         THE COURT:  Okay.  So the stipulation is two-part?

18         MS. SIDDIQUI:  If we can split it up by the

19  officers, that might just be easier.

20       So Officer Riggleman states, "Was sprayed by an unknown

21  substance."

22       Officer Williams states, "Sprayed by an unknown

23  substance," and he -- I just want to confirm, because I don't

24  want to say this wrong, so let me just make sure.

25       That Officer Williams said he was sprayed once, and then

1    Officer Riggleman was sprayed.  So he was sprayed first, then

2    Riggleman was sprayed.

3            MS. FIFIELD:  To be clear, we're not stipulating to

4    those as facts.

5            MS. SIDDIQUI:  Correct.

6            MS. FIFIELD:  We're not stipulating to those as

7    statements.  We're stipulating that that's what's in the

8    report.

9            THE COURT:  But is the report -- I mean, you're

10   basically saying the report can come in; right?

11       Those portions of the report, that's evidence.  You're

12   stipulating that the report says these three things?

13           MS. FIFIELD:  Yes.

14           THE COURT:  Okay.

15           MS. FIFIELD:  That limited piece of information from

16   the report.

17           THE COURT:  All right.

18           MS. SIDDIQUI:  And I can draft it for the Court, the

19   stipulation.

20           THE COURT:  Okay.  I understood.  It's just the 302

21   says X, Y, and Z.

22           MS. SIDDIQUI:  Yes, Your Honor.

23           THE COURT:  Any cross-examination, Ms. Fifield?

24           MS. FIFIELD:  Yes, briefly, Your Honor.

25                        **CROSS-EXAMINATION**

United States v. Barry Bennet Ramey
Bench Trial — Afternoon Session — February 21, 2023

1   BY MS. FIFIELD:

2   Q.   In the course of this investigation -- this investigation

3   has lasted more than a year going back from today; right?

4   A.   Yes.

5   Q.   And throughout the course of the investigation, including

6   in preparation for trial, you had multiple conversations with

7   these witnesses?

8   A.   Yes.

9   Q.   Officers Riggleman and Williams?

10  A.   Yes.

11  Q.   And you were present for conversations in preparation for

12  trial that Mr. Brady and I conducted?

13  A.   Yes.

14  Q.   Telephonically?

15  A.   Telephonically.

16  Q.   Did you ever hear -- let me say this.

17       Did you hear them describe what happened to them when

18  they were sprayed on January 6th at the base of the stairs?

19  A.   Yes.

20            THE COURT:  Wait.  You're talking about both

21  officers?

22            MS. FIFIELD:  Both officers, yes.

23  Q.   (BY MS. FIFIELD)  Did you hear what Officer Williams

24  described and what Officer Riggleman described as their

25  physical experience on January 6th at the base of the stairs?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   A.   Yes.

2   Q.   Did you hear them say that it caused a burning sensation?

3   A.   Yes.

4            MS. SIDDIQUI:  Objection, Your Honor.  It's going

5   far beyond the scope of direct at this point.

6            THE COURT:  It's also hearsay, isn't it?  I mean,

7   the fact that he heard them say that, you're not offering it

8   for the truth?

9            MS. FIFIELD:  We're offering it for -- I believe

10  Ms. Siddiqui's attempt here is to impugn the credibility of a

11  witness declarant.  And these statements are being elicited

12  for the purpose of --

13           THE COURT:  Rehabilitating.

14           MS. FIFIELD:  -- rehabilitating the credibility of

15  those witnesses.

16           THE COURT:  What was the question again?

17           MS. FIFIELD:  Sorry?

18           THE COURT:  Repeat the question.

19  Q.   (BY MS. FIFIELD)  You heard them say that it caused a

20  burning sensation?

21  A.   Yes.

22  Q.   You heard them say that it was consistent with the

23  experience they had when they were sprayed with OC during

24  training?

25  A.   Yes.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1   Q.   And, as you testified today, that was consistent with

2   your experience being sprayed with OC during training?

3   A.   Yes.

4   Q.   Did you ever hear them claim that they knew exactly what

5   they had been sprayed with?

6   A.   No, not that I can recall.  No.

7         MS. FIFIELD:  Thank you.

8         THE COURT:  Ms. Siddiqui, any further witnesses?

9         MS. SIDDIQUI:  If I can have just a brief moment.

10       (Defense counsel and defendant confer off the record.)

11       MS. SIDDIQUI:  Your Honor, defense rests.

12       THE COURT:  Okay.  So I just want to make sure that

13  Mr. Ramey knows -- oh, sorry.  You may have a seat, sir.

14       (Witness excused.)

15       THE COURT:  Mr. Ramey, I've sure that you've spoken

16  to your attorney about this, but I just want to affirm for the

17  record.

18       You understand that you do have the right to testify in

19  your defense?

20       THE DEFENDANT:  (Nods head.)

21       THE COURT:  I need you to answer "yes" or "no."

22       THE DEFENDANT:  Yes.

23       THE COURT:  Okay.  And you can take that down, sir.

24       You understand that you also have the Constitutional

25  right not to testify at all?

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1           THE DEFENDANT:  Yes, Your Honor.

2           THE COURT:  And the decision is entirely yours?

3           THE DEFENDANT:  Yes, Your Honor.

4           THE COURT:  All right.  You've consulted with

5   Ms. Siddiqui, and you've determined you don't want to testify;

6   correct?

7           THE DEFENDANT:  I have, Your Honor.

8           THE COURT:  All right, okay.  Thank you, sir.

9       No further evidence for the defense?

10          MS. SIDDIQUI:  Yes, Your Honor.  We rest.

11          THE COURT:  The defense rests.

12      Any rebuttal from the government?

13          MS. FIFIELD:  (Shakes head.)

14          THE COURT:  Okay, all right.  Thank you.  So we're

15  done.  I do want to talk to you-all about briefing.

16      Ms. Siddiqui, I think that you had suggested that you'd

17  need about a week to file your briefs.  Is that what you were

18  going to ask for?  I can't recall exactly.  I might be

19  confusing this with another case.

20          MS. SIDDIQUI:  That would be ideal.  I'm not sure if

21  I requested it, but that would be ideal.

22          THE COURT:  Okay.  Is the government also going to

23  want to file something?

24          MR. BRADY:  (Nods head.)

25          MS. FIFIELD:  Yes, Your Honor.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1       THE COURT:  All right.  So rather than have a

2   regular briefing schedule, I'd like y'all just to

3   simultaneously file your briefs, and I'll give you –– those

4   should be filed on or before February 28th.

5       I'll give you both until March 2nd, if you want to

6   respond to anything that the other side says, very briefly

7   though.  This is really –– don't save everything for your

8   opposition brief to the other side, all right?

9       Put it all in the initial brief.  Then if there's

10  specific points, no more than –– with that opposition brief,

11  no more than five pages, all right.  I'm really looking for

12  you to state what you want to state in your opening briefs.

13      MS. SIDDIQUI:  Yes, Your Honor.

14      THE COURT:  What would be especially helpful for me

15  is case law relating to the deadly or dangerous weapon and, in

16  particular, whether pepper spray can be that.

17      And I'm interested in cases –– really any federal cases.

18  Of course, I'm especially interested in any January 6th cases

19  to date where courts have –– judges in this court have ruled

20  either way on this.  Case numbers and a brief summary would be

21  helpful.

22      Also, the government has charged the dangerous or deadly

23  weapon as, to wit, pepper spray.  I think that means –– answer

24  this question for me –– that the government has to prove

25  pepper spray, not bear spray or anything else.

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1        Do you disagree, Ms. Fifield?

2            MS. FIFIELD:  Yes.  The government asserts that the

3    substance is pepper spray, but, on the law, the government

4    doesn't believe that we need to prove exactly what the

5    substance was.

6            THE COURT:  So the "to wit," you don't think you

7    have to prove as alleged?

8        You didn't say "a chemical irritant."  You said, "to wit,

9    pepper spray."

10       So don't you have to prove what you alleged?  That's a

11   question for you-all to brief.

12           MS. FIFIELD:  Okay.

13           THE COURT:  It says, "Using a deadly and dangerous

14   weapon, that is pepper spray."

15       Given how the Indictment is alleged, does the government

16   have to prove beyond a reasonable doubt that Mr. Ramey used

17   pepper spray?

18       Those are two questions in particular.

19       Just off the top of your heads, do either of you-all know

20   whether judges on this Court have decided, in the Capitol

21   context, this issue.

22           MS. SIDDIQUI:  On the Indictment piece, that it has

23   to be proven that --

24           THE COURT:  No.  On the pepper spray.

25           MS. SIDDIQUI:  More recently, yes, Your Honor, there

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1  have, I believe in the sentencing context, not in the trial

2  stage.

3      I believe Judge Berman Jackson had asked for briefings.

4  I'm happy to take a look into that.  I don't want to misspeak.

5          THE COURT:  Okay.  Do you know the name of that

6  case?

7          MS. SIDDIQUI:  I don't.  I'm happy to pull it up.

8          THE COURT:  Okay.

9          MR. BRADY:  Your Honor, I did some cursory research

10  on this.

11      Judge Sullivan has an opinion.  This is United States v.

12  -- I'm going to mispronounce it, so I'll spell it --

13  G-I-E-S-W-I-E-N.  It's a slip opinion.  It's 20- -- the

14  Westlaw cite, I can give Your Honor.  I could also email it to

15  chambers.  It might be easier than putting it on the record.

16      Some of the quotes though from this -- a quote from the

17  opinion would be, "It's enough that Mr. Gieswien forcefully

18  used the chemical spray in a manner that was threatening to a

19  federal officer."

20      This was in regards to being a dangerous weapon, the

21  threatening aspect of it.  We can send some of the quotes and

22  stuff to Your Honor ahead of time.

23          THE COURT:  So the threatening part comes from the

24  force element; right?

25      But he didn't expand any on the pepper spray being an

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1   item capable of causing serious bodily injury?  There's no
2   analysis?
3           MR. BRADY:  There's the analysis in the beginning
4   that talks about there's no requirement under 18 U.S.C. 111(b)
5   that the defendant use the dangerous weapon to actually injure
6   a person.
7           THE COURT:  I understand that.
8       But did he discuss how pepper spray is capable of causing
9   serious bodily injury?
10          MR. BRADY:  There have been a number of cases that
11  I've seen that quote it.  I don't think there's a long and
12  lengthy discussion on a lot of the January 6 cases that I've
13  seen.  A lot of them are in bail context too, Your Honor.
14          THE COURT:  Okay.
15          MR. BRADY:  Another case was U.S. v. Brown.  This is
16  a case -- I can send Your Honor the cite, but that one, I
17  don't think the "dangerous weapon" was in dispute.
18      In this case, they talked about Brown's mere wielding of
19  pepper spray towards officers satisfies the elements of the
20  charged offense.
21      The charged offense in that case was 111(a)(1) and (B),
22  which is the use of a dangerous weapon.  In that case, the
23  defense wasn't contesting that issue, but the judge did make
24  that finding.
25          MS. SIDDIQUI:  Your Honor, that was our case, and we

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

1    were contesting the "deadly dangerous weapon."

2        It's Judge Meta's case.  We were contesting it, and he

3    did make a --

4            THE COURT:  And what?  It sounds like you know this

5    case well.

6            MS. SIDDIQUI:  We also had a similar case, and there

7    are different reasonings that are laid out by the Court on

8    that one of why they'd gone "deadly-dangerous."

9        It was within a tunnel, it was an enclosed space, and

10   there was further testimony elicited from victims about that,

11   that the Court used to rule on "deadly-dangerous."

12       So, again, I think *ad hoc* doing it like this is not

13   helpful.  I'm happy to provide the briefing, as the

14   government, I'm sure --

15           THE COURT:  Right.  I want comprehensive.  I was

16   just curious, off the top of your head, if this was an issue

17   that a lot of judges had dealt with and with some analysis.

18       The other question I had is the government's theory seems

19   like it doesn't simply hinge on the nature of the weapon, in

20   this case the pepper spray, but rather the way in which it can

21   be used, and someone can fall down, and the gun can be

22   grabbed.

23       I just wonder, how far does that go?  I don't think the

24   government would allege that a fist, barehanded fist -- or

25   would you? -- is a deadly weapon.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1      And, if not, what if an officer got punched in the face

2 and the firearm, you know -- he's still vulnerable to have it

3 taken away.  Could a fist be a deadly weapon in the case law?

4           MR. BRADY:  Yes, Your Honor.  I've seen a number of

5 cases in the case law.  Happy to brief.

6           THE COURT:  Okay.

7           MR. BRADY:  But walking sticks have been found to be

8 a dangerous weapon.  Shoes have been found to be a dangerous

9 weapon.

10      It all boils down to whether it's inherently dangerous --

11 a gun -- or used in a particular context.

12           THE COURT:  Okay.

13           MR. BRADY:  So in the jury instructions, you say,

14 "It's capable of causing death or serious bodily harm."  So

15 it's the context surrounding all that.

16           THE COURT:  But wouldn't a fist always be capable of

17 causing dangerous or deadly harm?

18           MR. BRADY:  I would say if I'm giving Ms. Fifield a

19 fist bump, that might not be a dangerous weapon, but if I hit

20 her in the head --

21           THE COURT:  A big punch can always be?  Your view is

22 a punch in the face or a punch that's strong enough to knock

23 an officer down with the weapon?

24           MS. FIFIELD:  Your Honor, I think when we're talking

25 about a fist, we're not talking about whether it's deadly or

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    dangerous.  We're talking about whether it's an object and

2    whether it is a weapon.

3         I think -- without having looked at the case law, I can't

4    say for sure, but the distinction between a fist and, say, a

5    brick is that a fist is considered part of the actor

6    themselves.

7              THE COURT:  So you wouldn't say a fist can be a

8    dangerous weapon?

9              MS. FIFIELD:  Off the top of my head right now, no.

10             THE COURT:  All right.  So your theories -- I mean,

11   it just seems like you were rolling out several different

12   ones.

13        One is, the officer could have the gun taken away.

14   Another is the retinal damage, right, that caused this serious

15   injury?

16             MR. BRADY:  Your Honor, our theory is that there are

17   a number of different dangerous situations that this defendant

18   put those officers in.  He incapacitated them, took away one

19   of their five senses in the middle of a violent riot.

20        They had long-lasting effects, like Officer Williams.

21   They, thankfully, did not have the effects of their

22   classmates, who had EMS called with breathing issues.

23        This defendant, when he launched this spray into the air,

24   didn't know if they would have an allergic reaction to which

25   they might die on the steps of the Capitol that day.  It's the

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    capability of the weapon, not necessarily the end result.

2         You don't look at a search warrant and see if they found

3    good evidence to see if it's good or bad.  It's the

4    capabilities of pepper spray.

5         If this defendant was using the pepper spray as a maraca

6    to shake it, that might not be a dangerous or deadly weapon,

7    but when he points it at an officer in the context of a riot

8    and sprays them in the face, that would be using it, according

9    to the government.

10        THE COURT:  Okay.

11        MS. SIDDIQUI:  Your Honor, it's not just the

12   intended effect.  It's also the manner in which it's used.

13   That's actually what's in the statute.

14        So it's not, you know, intended consequence because, like

15   Mr. Brady said, no one knows.  We're getting into the eggshell

16   plaintiff territory where you don't know the impact.

17        Like the officer testified, everybody has different

18   impacts, so somebody doesn't know that.  So it's really how

19   it's used which can make it deadly or dangerous.  I'm happy to

20   provide briefing on --

21        THE COURT:  No.  And I know you-all -- I'm not

22   holding you to any of this.  I'm just curious.  I want you to

23   know these are the issues that I'm focused on.

24        Another one factually is the government's made a point of

25   emphasizing the way they believe that Officer Williams

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    flinched when hit, in their view, with pepper spray, but

2    there's also some testimony the government elicited about

3    Officer Williams being pulled by another officer.

4        There was also testimony about, you know, the spray

5    coming through the helmet.

6        So how does all this fit together?  The flinching, you

7    know -- you showed a lot of different things and elicited

8    pieces from different witnesses, but I'm really interested in

9    what your view is.

10           MS. FIFIELD:  The government had intended to tie all

11    that together in closing argument.

12           THE COURT:  Yeah.  I'm just trying to get you-all to

13    focus.  These are -- things that aren't worth you-all spending

14    a lot of time on are the barricades, right.  I understand you

15    wanted your record, but the barricades, you can do that in a

16    pretty short number of pages, I hope.

17        This is the critical piece, you know.  This more than the

18    one or two.  I think at the detention hearing, I wasn't sure

19    about the two, but it seems to me -- maybe you'll convince me

20    otherwise, but it seems like they're two streams going in two

21    general different directions.  So that issue is not as

22    difficult to decide as the other.

23        So, you know, "to wit, the pepper spray," do you have to

24    prove pepper spray?  The definition that I should -- I know

25    the definition, but the way in which it's been applied.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1        Maybe not just in this context but an analogous context
2   where you're having to look at not just the nature of the
3   weapon but the impact that it could have in that situation and
4   those particular facts.  That would be helpful, and, of
5   course, January 6th cases very helpful.
6            MS. SIDDIQUI:  Yes, Your Honor.
7       Just to clarify, this is in lieu of presenting any
8   closing arguments?
9            THE COURT:  Well, it's up to you-all.  If you-all
10  want to do, I'm happy to hear closing argument now or tomorrow
11  if you want to do that.  It's really up to you, both sides.
12  I'm happy to hear it.
13           MS. FIFIELD:  May we speak for a moment?
14           THE COURT:  Sure.
15           MS. FIFIELD:  Your Honor, what we'd like to do, if
16  the Court's amenable, is write our briefing and then have an
17  oral argument, closing argument --
18           THE COURT:  Okay.
19           MS. FIFIELD:  -- after the briefing's been filed.
20           THE COURT:  After the briefing, that would probably
21  be most helpful.  That would give me a chance to follow-up.
22  Okay, great.
23      So I've given you the deadlines for the briefs.  Because
24  I have another trial next week in a civil matter next week --
25           Is the civil hearing on the 3rd or the 27th, or am I

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023



United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023



United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

United States v. Barry Bennet Ramey
Bench Trial - Afternoon Session - February 21, 2023

 6          THE COURT:  All right.  Mr. Hopkins, you got all

 7  those down in your head?

 8          THE CLERK:  Absolutely.

 9          MS. SIDDIQUI:  Just to clarify, Your Honor, our

10  briefings are due by the 20th of February, reply briefings

11  March 2nd, the hearing to be heard on March 3rd at 2:30?

12          THE COURT:  Yeah, it's pretty tight.  So I'll ask

13  that you do your opposition brief by -- can we shorten this to

14  the 27th and then the 1st so that I have more time to look at

15  this?

16          MS. FIFIELD:  Yes.

17          THE COURT:  Okay.  So changing those dates.  Initial

18  briefs are due the 27th; any opposition, no more than five

19  pages, due March 1st; with any luck, we'll have the hearing at

20  2:30 on March 3rd.

21      If that doesn't work, we're going to be looking at

22  sometime the week of March 20th; right?

23          MS. SIDDIQUI:  Yes, Your Honor.

24      Is there a page limit on the initial briefing?

25          THE COURT:  No, but be reasonable, please, if you

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1    want me to stay awake.

2            MS. FIFIELD:  Your Honor, I'd anticipate that much

3    of the pages will be taken up by pictures and screenshots as

4    well.  So that will take up space.

5            THE COURT:  Yeah.  I don't really want to limit

6    you-all.  I want you to be able to lay it out, but, you know,

7    you can do CEG.  I think that would be helpful.

8        Is Mr. Ramey going to be -- he's in Alexandria now.  So,

9    presumably, he'll be kept here.

10           MS. SIDDIQUI:  That's what we would ask, just for

11   the hearings, so he can be here for them.

12           THE COURT:  Yeah.  Well, this is still a

13   continuation.  Sorry?

14           MS. SIDDIQUI:  If I could just consult with him for

15   just one second.

16           THE COURT:  Yeah.

17       (Defense counsel and defendant confer off the record.)

18           MS. SIDDIQUI:  Yes, Your Honor.  We'd ask,

19   obviously, that he remain here until that hearing.

20           THE COURT:  Okay.  Mr. Hopkins, do we need to do

21   anything for that?  Can you just let the Marshals know that

22   there's post-trial briefing, and he's going to need to be

23   brought back, I hope, on the 3rd, assuming everything goes

24   well, okay?

25           THE CLERK:  Yes.

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1          THE COURT:  Is there anything else that we need to

2    address?

3          Thank you-all for being efficient.  I thought this was

4    going to be two days.  So I appreciate it.  I'll see you-all

5    back on March 3rd, I hope.

6          (Adjourned at 3:04 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States v. Barry Bennet Ramey
Bench Trial – Afternoon Session – February 21, 2023

1                    REPORTER'S CERTIFICATE

2

3          I, SHERRI GRUBBS, Federal Official Court Reporter in

4    and for the United States District Court for the Western

5    District of Oklahoma, do hereby certify that pursuant to

6    Section 753, Title 28, United States Code that the foregoing

7    is a true and correct transcript of the stenographically

8    reported proceedings held in the above-entitled matter and

9    that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12          Dated this 25th day of February, 2023.

13

14          /S/ SHERRI GRUBBS_____

15          SHERRI GRUBBS, RPR, RMR, RDR, CRR
            State of Oklahoma CSR Number 1232
16          Federal Official Court Reporter

17

18

19

20

21

22

23

24

25