**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————— :
                                                        :
UNITED STATES OF AMERICA             :
                                                        :
    v.                                           :        Case No. 22-CR-184 (DLF)
                                                        :
BARRY BENNET RAMEY,                  :        Honorable Judge Dabney Friedrich
                                                        :
         *Defendant.*        :
—————————————————————— :

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**
**AND ASSESSMENT OF 18 U.S.C. § 3553(a) SENTENCING FACTORS**

COMES NOW, Barry Ramey, by and through counsel, and provides the Court with his position regarding the application of the sentencing factors to the Court's obligation to impose a sentence "sufficient, but not greater than necessary to comply" with the factors found in 18 U.S.C. § 3553(a).

As correctly noted in the Presentence Report ("PSR"), the base level offense in this matter for violation of 18 U.S.C. § 111(a)(1) is 14, §2A2.2(a), United States Sentencing Commission, Guidelines Manual; six levels are added because the victim was a government officer, USSG § 3A1.2(a)(b); and two levels are added pursuant to the number of units assigned by the amount indicated in the table at USSG § 3D1.4. Without factoring in the two-level reduction under USSG §3E1.1 for acceptance of responsibility discussed *infra*, the offense level is correctly calculated at 22. Contingent upon the Court's ruling on Defendant's request for the two-level reduction and based on a criminal history category of I, the correct sentencing range is either 33-41 months (offense level 20) or 41-51 months (offense level 22).

Mr. Ramey respectfully requests a sentence in the sentencing range of 33-41 months. Mr. Ramey is brutally aware of the seriousness of his conduct on January 6, 2021, and that of the

larger collective who gathered in violent protest that day. He has taken and continues to take full and complete responsibility for his actions, including at trial where Defendant did not present arguments disputing most of the factual allegations of the case. He understands that a stern punishment is appropriate given the larger context of January 6, 2021, and appropriately is not asking for a downward variance. Nonetheless, a sentence in the 33-41 months range is appropriate to address his actions on that day in light of the principles of sentencing and the need to avoid sentencing disparity.

### Background

Mr. Ramey was indicted on seven counts. This Court heard Mr. Ramey's trial on February 21, 2023. After a one-day bench trial, both parties submitted trial briefs in lieu of closing statements. On March 3, 2023, the Court found Mr. Ramey guilty of all counts except the assault on law enforcement with a deadly or dangerous weapon charge under 18 U.S.C. § 111(b). There, the Court found that the Government had not met its burden and found Mr. Ramey guilty of a lesser included offense under code 18 U.S.C. § 111(a).

Mr. Ramey was arrested in April of 2022 and has remained in custody since. Mr. Ramey's relevant conduct includes arriving at the rally at the Peace Monument to see President Trump speak. After he arrived to the rally, he joined with a group of men that he had not known prior to January 6th. He marched with a larger crowd to the Capitol Grounds. At the Capitol Grounds Mr. Ramey largely stood around, occasionally chanted "USA," and generally observed the chaotic protests unfold. At some point, Mr. Ramey started to observe pockets of struggle breaking out between officers and the protestors. While this should have been Mr. Ramey's cue to leave, he does not. He stays at the Capitol and watches this unfold. He next observes the officers deploy self-defense mechanisms such as smoke grenades, pepper ball guns, and flash

bombs. This should have been Mr. Ramey's second cue to leave. He still remains on the grounds much like many others charged and indicted with criminal acts from January 6th, 2021. Upon seeing a nearby protestor be shot through his cheek with a rubber bullet deployed by the officers, Mr. Ramey then inches forward towards the line of officers at the base of the Senate stairs. He retrieves a small hand-held device and sprays it at Officer Riggleman, who is standing on the stairs leading up the door. The spray makes contact with officer Riggleman and he retreats back up the stairs, through the doors, and goes to decontaminate his eyes. He appears back on the line and resumes his duty after washing out his eyes. Mr. Ramey extends his arm a second time and deploys his spray a second time. The Court did not rule on whether the spray made contact with Officer Williams as it found it enough that Mr. Ramey attempted to spray officer Williams.

Most of the trial was uncontested. The major point of contention was whether the second spray made contact with Officer Williams and whether the spray, as used by Mr. Ramey, constituted a deadly or dangerous weapon. Aside from contesting these two issues, Counsel for Mr. Ramey did not make arguments or challenge the remaining charges.

Upon arrest, Mr. Ramey was entirely cooperative and has remained incarcerated for over a year without infractions or disciplinary issues. Mr. Ramey does not have a criminal record and this is his first instance of incarceration. The length and difficulties of incarceration, particularly with an ailing, elderly mother, have highlighted for him the consequences of his own actions. As also evidenced by the letters of support from family and friends, Mr. Ramey has understood the gravity of his actions and is ready for a change with support standing by to help him through it. This commitment should be both encouraged and fostered through a sentence that appropriately balances punishment, deterrence, rehabilitation, and avoiding unnecessary sentencing disparity.

**Argument**

3

**A.     The Court shall impose a sentence sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).**

"The court shall impose a sentence sufficient, but not greater than necessary, to comply with" 18 U.S.C. § 3553(a)'s mandates.  These include considering the "nature and circumstances of the offense and the history and characteristics of the defendant," reflecting the seriousness of the offense, affording adequate deterrence, protecting the public, and providing necessary rehabilitation to the defendant.  18 U.S.C. § 3553(a)(1-2).

In *United States v. Booker*, 125 S.Ct. 738 (2005), the United States Supreme Court restored to sentencing judges the power to use discretion in determining appropriate sentences.  "In the wake of *Booker*, therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the sentencing guidelines.  Nevertheless, a sentencing court is still required to 'consult [the] guidelines and take them into account when sentencing.'"  *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker*, 125 S.Ct. at 767).  In light of *Booker*, "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence."  *Id.* (citation omitted).

**B.     18 U.S.C. § 3553(a) Factors to Consider in Sentencing.**

**1.     Nature and Circumstances of the Offense.**

Mr. Ramey went to trial indicted on seven counts. The court found him guilty of all counts except 18 U.S.C. § 111(b) and 18 U.S.C. § 1752 (b)(1)(A). ECF 49. As discussed above, Mr. Ramey's relevant conduct includes use of a chemical spray on Officer Riggleman and attempting to use the same spray on Officer Williams. He remained on the Capitol grounds for several hours after but left the premises prior to curfew. Mr. Ramey did not enter the Capitol, did

not go into the House or Senate chambers, did not walk onto the floor of the Capitol, and he did not vandalize property that day.

It is not in dispute that Mr. Ramey went to support the then-President. He went to the rally to hear him speak. There is no evidence that he was a part of any Facebook groups, any text chains, or threads that planned a coup on a democratic government. There is also no evidence that he went prepared to stop or even knew about the electoral college certification. Upon reaching the rally, he met with people whom he later found out to be Proud Boys. At the time of this event, Mr. Ramey was not a member of the Proud Boys.

Mr. Ramey, like many other Americans, was persuaded by the barrage of news channels that depicted the 2020 election as suspicious. He consumed and internalized news coverage that propelled the idea that ANTIFA and other groups were targeting Trump supporters. He watched news coverage of the pro-Trump rally that was held in December of 2020 where four rally-goers were stabbed by supposed rival ANTIFA groups.[1] After watching the news coverage of the rally in D.C. and Washington State[2], Mr. Ramey arrived to Washington D.C. to show his support for his candidate of choice. Upon arriving to the rally alone, he found other individuals who were keeping an eye out for "ANTIFA" members and joined them. Unknown to him at the time, these were members of the Proud Boys. These members were not wearing insignia or colors that would readily identify them as the Proud Boys. Mr. Ramey marched alongside this large group to the Capitol. While at the Capitol, surveillance footage shows Mr. Ramey alone for the majority of the time up until he sprays. After the sprays, he rejoins with some people he had met

---

[1] https://www.washingtonpost.com/local/trump-dc-rally-maga/2020/12/11/8b5af818-3bdb-11eb-bc68-96af0daae728_story.html
[2] https://www.businessinsider.com/proud-boys-and-antifa-clash-at-trump-rallies-4-people-stabbed-1-shot-2020-12

earlier in the day. Soon after, he is seen on surveillance walking alone on the steps on Capitol grounds until he finally leaves before curfew.

The chaos and violence of January 6, 2021, is a rarity in recent American history. It is an event that is unlike one seen by the American government in recent times. The context that led to the events of January 6, 2021, are important to assess an individual's culpability and their ability to change from the actions of that day into productive members of society. There is a marked difference between those who came prepared that day for violence, planned for it, advocated for it, and enlisted others to carry it out versus those who came to support their candidate, and were egged on by more nefarious forces and conducted themselves in a criminal manner. While this distinction does not absolve the latter group of responsibility, it is an important consideration when deciding both punishment and rehabilitation.

      2.      **History and Characteristics of the Defendant.**

Mr. Ramey is a 39-year-old aircraft mechanic from Florida. Mr. Ramey was a caretaker for his elderly and ailing mother prior to his arrest. He is a beloved member of his community, as evidenced by the letters attached. While his community has found his actions shocking and disappointing, they are standing by Mr. Ramey, sober-eyed to hold him accountable and responsible after incarceration.

Mr. Ramey grew up in a single-parent home and was raised by his hardworking mother who did her best to provide for her family. Mr. Ramey's family struggled financially and were displaced from their homes at times. Alcoholism runs rampant in Mr. Ramey's family and Mr. Ramey admitted that he was a functioning alcoholic prior to his arrest. PSR at 15. Mr. Ramey is thankful for the sobriety that incarceration has brought and intends to pursue this path once released.

Mr. Ramey, having not come from much, worked hard to achieve financial stability and a loving home with Ms. Rowland prior to his arrest. While not having the most stable upbringing, it was important for Mr. Ramey to build his own community. To belong. To be a part of something. The letters from his family and friends more fully demonstrate all aspects of Mr. Ramey while still acknowledging his actions as shameful. These family members are not blinded by their love for Barry. They are soberly aware of the consequences of Barry's actions and are the ones truly aware of his remorse.

During the pendency of this proceeding, Mr. Ramey has relied on these friends and family members.  He needs his family, and his family needs him.  While he was incarcerated, Mr. Ramey's mother was diagnosed with a tumor and was being screened for breast cancer. She underwent major surgery, without Mr. Ramey by her side due to his criminal behavior. Having to watch his ailing mother fend for herself because his actions have placed him in jail has been extraordinarily punishing to Mr. Ramey and has intensified his guilt and remorse of his actions on January 6th.

As for his other family members and friends, they are aware of the severity of this offense.  They will support him and ensure that he refrains from any future criminal conduct. These letters speak not only of his rehabilitation, but also to the supportive and faithful network upon which Mr. Ramey can lean, which further supports future deterrence.

**3.**     **The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

The nature and circumstances of the offense and of Mr. Ramey must be balanced with imposing a sentence that reflects the seriousness of this offense, respects the rule of

law, and provides a just punishment.  Mr. Ramey understands the seriousness of this charge and, indeed, the entirety of what occurred on January 6, 2021.

Mr. Ramey takes full responsibility for his actions and his role.  He has spent every day since January 6 reliving that day, and he faces the constant reminder of his wrongdoing.  Likewise, he suffers from the seriousness of his offense every day, whether with having to face friends and family members, the indelible shame this has brought upon his family, or living in the uncertainty of losing everything he has worked for. Every future job application will require the disclosure of his crime and he will forever live with the ignominy of his actions.

As serious as Mr. Ramey's actions were, they must be viewed in context when considering sentencing.  Unlike others, Mr. Ramey did not enter the Capitol, did not steal anything from the Capitol grounds, he did not take home trophies of the day. He did not boast about being on Capitol Grounds that day nor about his actions. He did not remain defiant following January 6th—as many have done.

      **4.**      **<u>To Afford Adequate Deterrence to Criminal Conduct</u>.**

Mr. Ramey has been adequately deterred and is not likely to engage in future criminal conduct. He comes before this Court with no criminal record, so having multiple felonies on his record serves as a greater punishment and deterrence to him than it may for someone with an extensive record. He will live with its consequences daily, both professionally and personally. Because of these charges and his incarceration, he has had to put off his marriage, his elderly mother has been without help at the worst time of her life, and Mr. Ramey has lost the career he had worked so hard to build for himself. He had managed to pull himself out of poverty and the circumstances of his childhood. His own actions have left him back at square one. He is deterred.

The sentence that Mr. Ramey requests is additional deterrence. As someone with no criminal history, he is facing incarceration in federal prison for at least 33 months. 33 months is possibly the last 33 months his mother has left. He will have to wait at least 33 months to marry the person he loves. He will have at least 33 months to be in prison, away from society, and contemplate his actions and their consequences. Lastly, he is at least 33 months away from being a productive, earning member of society that can take care of his family.

These collateral consequences are more than enough to deter anyone from criminal conduct, especially conduct similar to that of January 6th. Those who are not deterred by almost three years in jail are likely not deterrable. Although Mr. Ramey has already spent over twelve months in jail and accepts further incarceration as a fair punishment, a lengthy jail sentence only goes so far to address sentencing principles. The National Institute of Justice by Department of Justice issued a summary on research on deterrence. It states that increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. Of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Justice in America 199 (2013)).[3] While punishment has a deterrent effect, research shows that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006)." *Id.*

**C.**    **The Sentencing Guidelines and Enhancements.**

The Government requests a 4-point enhancement under USSG § 2A2.2(b)(2)(B) for use of a dangerous weapon for all counts. The Government also requests a 3-point enhancement for bodily injury under USSG § 2A2.2(b)(3)(A). Lastly, the Government requests a 2-point

---

[3] https://nij.ojp.gov/library/publications/five-things-about-deterrence

enhancement under USSG § 3C1.1 for obstruction of justice. This Court should reject all three requests.

As to the first request for a 4-point enhancement, the Court should reject that request based upon its ruling at trial. At the end of evidence, the Court found that the Government had not met its burden in proving that the spray, as used by Mr. Ramey, constituted a deadly or dangerous weapon. ECF at 49. While the burden of proof is lower at sentencing, it does not change the facts that were elicited at trial. The testimony at trial stated that Mr. Ramey sprayed the officers from at least six feet away. TT3[4] at 27. This was at least the same distance, if not greater, than what the officers use at pepper spray training. *Id*. While it a lower standard at sentencing, the Court must still have facts sufficient to make a finding that this enhancement applies. The code requires the same finding as at trial—that the defendant have used a dangerous weapon that is capable of causing death or serious bodily injury. The evidence elicited at trial is not sufficient even for a lower standard that the way in which Mr. Ramey used the spray is capable of causing serious bodily injury, much less death.

In *United States v. Perez*, the court denied a 3-level enhancement for a dangerous weapon when defendant was arrested with a pepper spray can and this court should follow the same reasoning. *United States v. Perez*, 519 F. App'x 525, 527 (11th Cir. 2013). While *Perez's* ruling comes from a sister court, it is directly on point. *Perez* was convicted of two counts of conspiracy to commit robbery amongst other charges. Upon arrest officers found him in possession of a can of pepper spray. *Id*. Testimony at trial showed that Perez intended to use the pepper spray to incapacitate the victim of the robbery. *Id* at 528. The Government argued that the pepper spray can, whose brand was identified in trial, warns of the "dangerous" nature of its

---

[4] Trial Transcript from March 03, 2023 is cited as "TT3 .____."

contents and that the court can take notice of the dangerous nature of pepper spray generally to find that it is a dangerous weapon and the enhancement should apply. *Id*. The court found that while the label of the pepper spray might warn that it is dangerous, it is not enough to prove that it is a dangerous weapon under the guidelines. *Id*.

The Court in *Perez*, much like this Court at closing argument, found that a person who has been sprayed by pepper spray and has to wash the affected area for 15 minutes or seek medical attention does not establish that it can cause "extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental facility; or require medical intervention such as surgery, hospitalization or physical rehabilitation." *Id*. The court in Perez grappled with the same question as is present in our case. The fact that pepper spray was present does not by itself make it a deadly or dangerous weapon. There has to be factual findings that support that it was capable of causing such a serious bodily injury and that it was used in that manner. Neither was present in our trial.

There was no evidence in this trial that a small handheld spray could cause injuries that would be protracted or could cause extreme physical pain. In fact the opposite was testified to at trial. Further, what distinguishes this case from *Perez*, is that the court in *Perez* could identify exactly which spray was used, its concentration, its size and its capacity. It could read the warnings on the exact label of the pepper spray in contention. Here, that is not present. This Court does not have the pertinent facts to make the finding at a lower standard. To apply a sentencing enhancement without sufficient factual support would be legal error. *Id*.

Next, the Government requests a 3-point enhancement for bodily injury. The Court should similarly reject that enhancement based upon its findings at trial. USSG § 1B1.1, cmt. N. 1(B) states that bodily injury means any "significant injury; e.g. an injury that is painful and

11

obvious, or is of a type for which medical attention would ordinarily be sought." The injury described by Officer Riggleman does not meet the criteria. Officer Riggleman, as the Court noted in its ruling, suffered the most direct attack by being sprayed in the eye by Mr. Ramey. Officer Riggleman was still able to walk up the stairs, walk into a bathroom, decontaminate and come back out to the line of duty. TT3 at 24. Officer Riggleman did not have protracted vision loss, he did not seek medical attention, and he did not suffer the impacts of this injury after the 10-minute period it took him to reach the bathroom. *Id*.

And as the Court noted, Officer Riggleman was the Government's strongest case as to any injury by Mr. Ramey. *Id* at 22. The Court rejected the argument that Officer Williams' testimony regarding decrease in vision was specifically due to Mr. Ramey's spray without a medical expert or documents to show causation. *Id* at 116. The Court ruled that there remained doubts whether Mr. Ramey's spray is what Officer Williams felt and while he appears to recoil in the video, it was unclear to the Court as to why he did. *Id* at 118. It could have been due to the other sprays in the vicinity, the physical struggle he was engaged in with another rioter, or because he was pulled to the side by another officer. *Id*. Officer Williams could not identify who sprayed him. *Id* at 118. Officer Williams also does not collapse and can be seen standing for a minute after the alleged spray while other rioters are seen coughing and covering their face. *Id* at 119. Officer Williams, much like Officer Riggleman, continued his shift after decontamination and fought on the front lines for hours. Because there are not enough factual findings to say that it was Mr. Ramey's spray that caused any harm to Officer Williams and because Officer Williams' injuries are not proven to be due to any spray, the court should reject the bodily injury enhancement.

Finally, the Government seeks a 2-point enhancement for obstruction of justice. Even the Government's own evidence in support of this claim does not provide enough facts to apply this enhancement. USSG § 3C1.1 clearly states that the enhancement applies if "the defendant willfully obstructed or impeded or intended to obstruct or impede the administration of justice with respect to the investigation…" and that the "obstructive conduct be related to the defendant's offenses of conviction. In support, the Government claims that on February 11, 2022, more than a year after January 6th, Special Agent Nougaret attempted to speak to Mr. Ramey's fiancé in order to obtain a third-party verification of Mr. Ramey. Ms. Rowland refused to speak to the agents and Special Agent Nougaret left his business card with her. The next day Special Agent Nougaret received a phone call from Mr. Barner who was Mr. Ramey's attorney. By February 12th, Special Agent Nougaret knew that Mr. Ramey was represented by counsel and to not communicate with Mr. Ramey directly. The letter provided by Mr. Ramey's then-counsel, Mr. Barner clarifies that Ms. Rowland provided the business card on February 11th to Mr. Barner before Mr. Ramey even came home or had possession of the card. *See* Ex. 1. By Mr. Barner's account, Mr. Ramey did not see the card, nor did he have any reason to know the agent's name. Further, Mr. Ramey was assured that Mr. Barner had made contact with the Agent and was cooperating thereby removing any need for the agent to reach out to Mr. Ramey on his own.

Neither Mr. Barner nor Mr. Ramey heard anything from the Special Agent from February to April. In April, Special Agent Nougaret apparently called Mr. Ramey's place of work to "verify employment" instead of reaching out to Mr. Ramey's counsel. The Government concedes that the Agent did not identify himself as law enforcement or an agent. He asks the person who answered if Mr. Ramey still worked there. The individual who answered the call puts the Agent on hold and after a few minutes, Special Agent Nougaret hangs up.

Several days after this call to Mr. Ramey, Special Agent Nougaret receives messages on his work cell phone number. This is the same cell number he utilized to call Mr. Ramey's workplace. He also receives a call from an unknown individual and Agent Nougaret recognizes the voice to be Mr. Ramey's. At no point during this call does the Special Agent identify himself as such nor does the caller make any reference to him being a law enforcement officer.

In fact, the only thing that is clear from the Government's own evidence is that Special Agent Nougaret never identified himself as someone investigating Mr. Ramey's case. The obstruction enhancement only applies if it is behavior directed at someone you know to be connected with the investigation of your criminal behavior. The Government concedes that the Agent did not identify himself when he called Mr. Ramey's place of employment. Further, the letter from Mr. Ramey's prior counsel clarifies that it is Mr. Barner who informed Mr. Ramey that it was the agent who received a threatening call. Lastly, the letter from Mr. Riedel, Mr. Ramey's coworker who answered the phone, also corroborates that the individual on the phone did not identify who they were and Mr. Ramey did not recognize the name. *See* Ex. 2.

In short, any messages that Mr. Ramey may have sent were not sent as a threat to law enforcement or as an act of obstruction in this case. He believed someone was harassing him. He would not have sent these messages if he knew it was to a member of law enforcement. He simply did not know.

Lastly, Mr. Ramey requests a 2-level reduction under USSG § 3E1.1. As correctly pointed out in the PSR, the adjustment is not intended for a defendant who denies factual elements of guilt. USSG § 3E1.1, cmt. N. 2. However, a conviction at trial does not automatically preclude the defendant from this adjustment. *Id*. In rare circumstances, it is

possible for a defendant to both demonstrate an acceptance of responsibility while exercising constitutional rights to a trial. *Id.*

Undersigned counsel made contact with AUSA Fifield on June 10th, 2022. Soon after that, Counsel made Mr. Ramey's desire to plead known and requested a plea offer. On or around August 15, 2022, counsel received a plea offer and acknowledged receipt to AUSA Fifield. By September 5, 2022, counsel had sent a counter-offer to AUSA Fifield and Brady proposing a plea to either 18 USC § 111(a) or 18 USC § 231. Counsel provided similar cases where the Government had made plea offers to either §111(a) or § 231(a)(3) when the charged conduct was §111(b) at the request of AUSA Fifield.[5]

The plea offer that Mr. Ramey had requested was imminently reasonable, is the exact charge that he was eventually convicted of, and was an offer made to other January 6th defendants. Once the Government made it clear that it could not provide such an offer to Mr. Ramey, despite having provided it to other defendants, and trial commenced on February 21, 2023.  Mr. Ramey, in an effort to conserve judicial resources, waived a jury trial and stipulated to most of the evidence presented at trial, thereby reducing a multiple-day jury trial into a one-day bench trial.

Very few matters were in contest at the trial. The first issue was whether Officer Williams was struck by Mr. Ramey's spray. This argument went to whether Mr. Ramey was responsible for any injuries that Officer Williams suffered and was an essential part of the second issue at trial. The second issue in contest was whether the manner in which Mr. Ramey used the spray constituted a deadly or dangerous weapon as required by 111(B). Disqualifying

---

[5] *United States v. Mault*, No. 1:21-cr-657 (D.D.C. July 19, 2022); *United States v. Blair*, No. 1:21-cr-186 (D.D.C. July 13, 2022); *United States v. Mattice*, No. 1:21-cr-657 (D.D.C. July 15, 2022); *United States v. Richardson*, No. 1:21-cr-721 (D.D.C. August 26, 2022).

Mr. Ramey for the 2-level decrease for acceptance of responsibility would essentially penalize Mr. Ramey for being forced to exercise his constitutional rights. While the constitutionality of section 3E1.1 has been upheld by various circuits, they have also ruled that denying a defendant this adjustment simply due to his decision to go to a trial would create constitutional challenges under the Fifth and Fourteenth Amendments. *See United States v. Saunders*, 973 F.2d 1354, 1362 (7th Cir. 1992) (implying that if the acceptance of responsibility provision was completely unavailable to defendants electing to go to trial, it would create constitutional problems); *United States v. Rodriguez*, 959 F.2d 193, 198 (11th Cir. 1992) (vacating a sentence where sentencing judge relied on defendant's decision expressly when deciding on whether to grant a reduction); *United States v. Cortes*, 299 F.3d 1030 (9th Cir. 2002) (court found that a per se bar to reduction based on acceptance of responsibility in impermissible and penalizes a defendant for exercising his constitutional rights).

**D.      Avoiding Sentencing Disparity.**

If this Court were to impose a sentence greater than 33-41, it would create an unwarranted sentencing disparity amongst cases that this Court has already sentenced or are awaiting sentencing. 18 U.S.C. § 3553(a)(6) directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Due to the large number of January 6 cases, there are many cases available for comparison, all subject to unique facts and criminal histories.  Nonetheless, comparison and consideration of these cases is helpful.

The following is a chart of convictions under §111(b) or §111(a), their fact patterns, and their sentences. Many of the defendants outlined below have conduct similar to Mr. Ramey. Still, Mr. Ramey requests a sentence that is within his guidelines range and is not requesting a

variance. Mr. Ramey's conduct does not put him towards the end of the chart with sentences that

are upward of 40+ months.

| **Name** | **Charge** | **Facts** | **Sentence** |
|---|---|---|---|
| USA v. Mathew Council, 1:21-cr-207-TNM | 231(a)(3), 111(a)(1), 1752(a)(1) and (2) | Defendant entered the senate wing doors with the initial breach. He was with a larger group of rioters. He continued to push into the building, shouting at officers who were trying to contain him. Once inside, he continued undeterred and pushed an officer he encountered. He had to be pepper sprayed by several officers before he was detained. | 6 months home detention |
| USA v. Philip Young, 1:21-cr-617-DLF | 111(a)(1), 231(a)(3) | Defendant assaulted a line of law enforcement with a metal barricade | 8 months |
| USA v. Troy Sargent, 1:21-cr-258-TFH | 111(a), 231(a)(3), 1752(a)(1) and (2) | Defendant swung open hand at an officer and made contact. He then swung again at the same officer but made contact with someone else. He later boasted about it on social media that he "got two hits on a rookie cop." | 14 months |
| USA v. Michael Dickinson, 1:21-cr-649-JDB | 111(a)(1) | Defendant walked up to a line of officers guarding the north side. He threw coffee tumbler at an officer. It struck the officer in | 20 months |

| | | | |
|---|---|---|---|
| | | the face and chest and bounced off to hit another officer. He then picked up a bucket of unknown liquid and dumped it on other officers. | |
| USA v. Michael Eckerman, 1:21-cr-513-RBW | 111(a)(1) | Eckerman recruited friends and family members for weeks leading up to the rally. He encouraged and filmed another rioter assaulting a police officer, calling him a "traitor." He walked into the Capitol through the broken senate wing window. He was crucial in breaching a line inside when he pushed an officer causing him to fall down. After the officer fell, another rioter sprayed him in the face with a fire extinguisher. His actions allowed the mob to penetrate the second floor of the Capitol. He took celebratory photos, bragged about his behavior, and assaulting law enforcement. He continued to message with friends and family members about a "civil war" and boasting about his behavior. | 20 months |

| | | | |
|---|---|---|---|
| USA v. Joshua Hernandez, 1:22-cr-042-CRC | 111(a)(1), 231(a)(3) | He incited the crowd before entering the Senate Wing Doors through a broken window. He joined rioters and shouted at them to push officers so they can open the door to other rioters. He used a flagpole and hit an officer in the head with the metal portion. He entered the Capitol. | 24 months |
| USA v. Kevin Creek, 1:21-cr-645-DLF | 111(a)(1) | Mr. Creek played a pivotal role n breaking the police's defensive lines on the West Terrace. Mr. Creek assaulted a Sergeant who was overseeing a thin line of police. His attack according to AUSA Fifield was a pivotal moment in the defense of the Capitol. When asked if he was remorseful prior to his arrest, he replied "50/50." | 27 months |
| USA v. David Judd, 1:21-cr-0040-TNM | 111(a)(1) | Judd was in the lower west tunnel. He waived other rioters into the tunnel, participated in the heave-ho against the police line, passed around police shields to other rioters, and finally after being in the tunnel for close to 25 minutes, lit an object that appeared to be a fireacracker and threw it at the | 32 months when government requested 90 months |

| | | | |
|---|---|---|---|
| | | police line. He stayed in the tunnel even after the police had cleared the tunnel and tried to push against the second line officers created. | |
| USA v. Logan Barnhart, 1:21-035-EGS | 111(a)(1) and (b) | He was in the archway that led to the Lower West Terrace entrance. When a law enforcement officer was being attacked by another rioter, Barnhart jumped in to help. He grabbed the officer's ballistic vest and dragged the officer down the steps into a prone position. This allowed other rioters to beat the officer with flagpoles and batons. He then went back to the archway and helped other rioters push against the police line and finally struck at the officers with the base of a flagpole | 36 months when the Government requested 63 months |
| USA v. Dennis, 1:21-cr-679-JEB | 111(a)(1) | Defendant rushed the line of officers at the Upper West Terrace. He grabbed an officer's baton and took that officer to the ground and continued to throw punches. He also snatched the officer's baton out of his hands. | 36 months when government requested 64 |

| | | | |
|---|---|---|---|
| USA v. Jersey, 1:21-cr-0350EGS | 111(b) | Jersey grabbed an officer's baton, and grabbed another officer's face with his other hand. He fought with the officer over the baton for several seconds. He knocked the officer to the ground. Once he was on the ground, Jersey's codefendant dragged him into a mob of rioters. Jersey grabbed another baton and used it to beat other officers in the archway leading to the tunnel. He stole a police helmet and badge and later displayed it at his home. His messages leading up to January 6th contemplated him participating in violence. | 51 months |
| USA v. Robert Sanford, 1:21-cr-086-PLF | 111(a)(1) and (b) | Defendant was on the lower west terrace when he threw a fire extinguisher, striking three in the head. He also threw a traffic cone at officers calling them "traitors." | 52 months |
| USA v. Denney, 1:22-cr-070-RDM | 111(b) | A former military police officer and President of the Patriot Boys, a militia group, expressed his expectations for a civil war prior to J6. He repeatedly confronted police officers and fought | 52 months |

| | | | |
|---|---|---|---|
| | | with them. He sprayed a chemical irritant at officers on two occasions, grabbed and shoved an officer, and joined another rioter in launching a large tube towards a line of officers. He attempted to disarm an officer by grabbing the officer's crowd-control spray and swung a pole at him. He entered the lower west tunnel and pushed a riot shield into a line of officers. He participated in the heave ho efforts. Lastly, he swung his arm and fist at an officer who had been dragged out of the tunnel by other rioters. | |
| USA v. Brown | | Brown participated in the heave-ho line at the lower west tunnel. He also sprayed officers stuck in the tunnel with a large hand-held spray | 54 months |
| USA v. Gardner | | Gardner sprayed a large extinguisher into the lower west terrace. He also used the fire extinguisher to break a window of the Capitol Building. | 55 months |
| United States v. Mazza, No. 1:21-CR-00736 | | Defendant entered the Capitol, came with two loaded guns, assaulted law enforcement with a | 60 months |

| | | stolen baton, and later made a false police report to avoid detection | |
|---|---|---|---|
| USA v. Tristan Stevens, 1:21-cr-040-TNM | 111(a)(1) | Stevens was part of the mob in the lower west tunnel for about 90 minutes. He helped organize rioter efforts to break down the police line at the mouth of the tunnel. He also used a police shield to attack the police line. Officers testified being pinned by Stevens and physically assaulted in between the door that led to the Capitol. | 60 months |
| USA v. Sandlin, 1:21-cr-088-DLF | 111(a)(1) and (2) | Sandlin along with codefendants planned to travel to the Capitol to interfere with the transition of the government. He discussed shipping guns to their meet up spot before they travelled to D.C. He posted a photo of his codefendant with a firearm indicating he was traveling with it to D.C. He made references to a civil war. He live streamed a video on J6 calling other rioters to "take the Capitol." After arriving to the Capitol Grounds, he dismantled bike racks, pushed past officers to get closer. | 63 months |

| | | | |
|---|---|---|---|
| | | He entered the Capitol through the Upper West Terrace door and pushed against an officer guarding that door. He forced the door open and allowed a mob inside. He grabbed an officer's helmet. He then incited the mob to keep officers from locking the door to the senate gallery. He shoved officers and made contact with an officer's head. He took a book from a desk as a souvenir. After the riot, he deleted photos and messages regarding the events in an attempt to conceal his actions. | |
| USA v. Webster, 1:21-cr-208-APM | 111(a)(b) | Webster tackled an MPD officer and pulled his gas mask off of him and choked him. He also shoved a metal gate into an officer's body, raised a flagpole and swung it at the officer, breaking the pole in half. Webster physically restrained the officer on the ground, making him unable to breathe. Others in the mob began to strike the officer. | 120 months when government asked for 210 |

**Conclusion**

For these reasons, Defendant respectfully request a period of incarceration within a range of 33-41 months along with other conditions the Court sees appropriate.

Respectfully submitted,

Barry Ramey
*By Counsel*


___/s/_____
Farheena Siddiqui
D.C. Bar No. 888325080
Law Office of Samuel C.  Moore, PLLC
526 King St., Suite 506
Alexandria, VA 22314
Email: fsiddiqui@scmoorelaw.com
Phone: 703-535-7809
Fax: 571-223-5234
*Counsel for the Defendant*


**CERTIFICATE OF SERVICE**

I hereby certify that on the 25 day of May, 2023, I electronically filed the foregoing with the Clerk of Court Using the CM/ECF system, which will then send a notification of such filing (NEF) to:

Brian Daniel Brady
DOJ-CRM
1301 New York Avenue NW
Washington DC, DC 20005
202-834-1916
Email: brian.brady@usdoj.gov

Kathryn E. Fifield
DOJ-CRM

25

1301 New York Avenue NW
Suite 1000
Washington, DC 20530
202-320-0048
Email: kathryn.fifield@usdoj.gov

     /s/
Farheena Siddiqui
D.C. Bar No. 888325080
Law Office of Samuel C.  Moore, PLLC
526 King St., Suite 506
Alexandria, VA 22314
Email: fsiddiqui@scmoorelaw.com
Phone: 703-535-7809
Fax: 571-223-5234