```
                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,            .
                                     .   Case Number 22-cr-184
            Plaintiff,               .
                                     .
        vs.                          .
                                     .   Washington, D.C.
BARRY BENNET RAMEY,                  .   March 3, 2023
                                     .   2:36 p.m.
            Defendant.               .
- - - - - - - - - - - - - - - - - -


                TRANSCRIPT OF BENCH TRIAL, VOLUME II
              BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                    UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the United States:        BRIAN BRADY, ESQ.
                              KATHRYN FIFIELD, ESQ.
                              U.S. Department of Justice
                              1301 New York Avenue Northwest
                              Washington D.C. 20005

For the Defendant:            FARHEENA SIDDIQUI, ESQ.
                              Law Office of Samuel C. Moore
                              526 King Street
                              Suite 506
                              Alexandria, Virginia 22314




Official Court Reporter:      SARA A. WICK, RPR, CRR
                              333 Constitution Avenue Northwest
                              Room 4704-B
                              Washington, D.C. 20001
                              202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.
```

```
 1                         P R O C E E D I N G S

 2         (Call to order of the court.)

 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4    Action 22-184, United States of America versus Barry Ramey.

 5         If I can have counsel approach the podium and state your

 6    names for the record, starting with the United States.

 7              MS. FIFIELD:  Good afternoon, Your Honor.

 8         Kathryn Fifield, on behalf of the United States.  With me

 9    is Brian Brady, also on behalf of the United States.

10              THE COURT:  Good afternoon, Ms. Fifield and Mr. Brady.

11              MS. SIDDIQUI:  Good afternoon, Your Honor.

12         Farheena Siddiqui on behalf of plaintiff Ramey.

13              THE COURT:  Good afternoon, Ms. Siddiqui, Mr. Ramey.

14         Thank you for your briefs and your replies to one another.

15    I've reviewed them.  As I said, I would give both sides an

16    opportunity to make, in effect, a closing argument here, and

17    rather than interrupt you all, I will let you all talk, and at

18    the end, if I have questions, I will ask you them.  All right?

19         So it is interesting, because on the one hand it's the

20    government's burden.  It's also the defendant's Rule 29 motion.

21    So why don't I have the government proceed first, and I will

22    probably give you each a chance to rebut if there's a need to.

23              MS. FIFIELD:  If the Court would prefer to ask

24    questions at the end, I'm happy to do it that way.  I was also

25    anticipating the Court's questions, and I welcome them.
```

1          THE COURT:  Okay.

2          MS. FIFIELD:  I was imagining this being sort of an

3     oral argument.

4          THE COURT:  That's fine.  Whatever you all's

5     preference.

6          MS. FIFIELD:  And I will take this first part, and

7     then if the Court would allow a rebuttal, Mr. Brady will handle

8     that.

9          THE COURT:  Okay.  Again, Ms. Fifield, let's focus on

10    the key issues, the -- principally, the dangerous weapon and the

11    second assault.

12         MS. FIFIELD:  You took the words right out of my

13    mouth.  I will start there, and I'm happy to rest on our

14    briefing in terms of the other elements of the other charges.

15    If the Court has questions at the end, I'm happy to address

16    those.

17         THE COURT:  Okay.

18         MS. FIFIELD:  This case comes down to the facts and

19    common sense.  This defendant intentionally attacked two police

20    officers using a weapon that was capable of seriously hurting

21    them or others.  There is certainly some nuance to the legal

22    framework that applies here, but when you take a step back and

23    see the forest through the trees, the legal framework applies to

24    these facts in a very straightforward manner.

25         Now, as the Court is aware, there are essentially three

disputes between the parties at this point, and I will address

them in turn.  The first of those disputes is the number of

assaults committed by Mr. Ramey.  The second is whether Ramey

committed those assaults using pepper spray, and the third is

whether pepper spray is a deadly or dangerous weapon.

Starting with the first, Mr. Ramey committed two assaults

on two police officers.  At this point, the defendant has

conceded that -- essentially, that he assaulted

Officer Riggleman.  He concedes that he hit Officer Riggleman.

And that's at their first post-trial brief, Docket 43 at

page 14.

And the video is clear.  Exhibit 200 shows Mr. Ramey

raising his hand twice, firmly extending his arm, pressing a

button on a canister in his hand, and releasing spray.  The

spray is visible in Exhibit 200 two times.  He was aiming for

both officers, and the spray, which again is visible in

Exhibit 200, is a clear aerosol leaving the canister in his

hand.

He did this as a part of a mob that was charging on police,

which shows his intent to hurt these officers.

As the Court is aware, an assault means any intentional

attempt or threaten to -- threat to inflict injury upon someone

else when coupled with the apparent present ability to do so.

Mr. Ramey's conduct satisfies those requirements twice,

once for Officer Riggleman and once for Officer Williams.

```
1          Now, admittedly, the video is coming from a different

2    perspective when we're looking at that second spray and whether

3    it hit Officer Williams.  And the government has asserted to the

4    Court and continues to assert that the evidence shows that

5    Ramey's second spray did hit Officer Williams.  In the video, as

6    noted or as described in the government's first post-trial

7    brief, if one plays Exhibit 200 using that frame-by-frame

8    feature and goes through the video, you can see the moment that

9    Officer Williams's body reacts to the spray having hit him.  And

10   it is at this point the spray is no longer visible in the air,

11   as it's taken some time to seep down through that foam in

12   Officer Williams's helmet and get into his eyes.

13          THE COURT:  Sorry to interrupt.  Yeah, I don't

14   dispute -- I thought Officer Williams was a credible witness.

15   Clearly, he got spray in his eyes.

16          MS. FIFIELD:  Okay.

17          THE COURT:  The issue is whether it was the spray from

18   Mr. Ramey and whether you've proven that beyond a reasonable

19   doubt.

20       What did you think about the defendant's split second by

21   split second photographs, and do you have a specific response to

22   that?

23          MS. FIFIELD:  Yes.  And I think those questions were

24   answered in our brief with the screenshots that we shared.  The

25   screenshots -- I believe no one is disputing that the first
```

1   spray -- or perhaps we are.  So there's two sprays by other

2   rioters.  So we have -- in order, these four sprays go:  Ramey's

3   first spray, which is on Officer Riggleman and hits

4   Officer Riggleman; the first spray by the other rioter, which

5   for shorthand in our brief we called OR 1; then comes Ramey's

6   spray of Officer Williams; and then fourth is the spray that we

7   called OR 2 in our brief, or the second spray by the other

8   rioter.

9       And both OR 1 and OR 2 clearly bypass Officer Williams by

10  multiple feet, and that's more clear in Exhibit 211 than it is

11  in Exhibit 200, but I do think it is clear that neither spray,

12  even in Exhibit 200, is traveling over Officer Williams's head,

13  and Exhibit 211 confirms that.

14      Officer Williams testified that he didn't begin to perceive

15  that he had been hit by spray until after he was hit by this

16  flag, and you can see that in Exhibit 200, and that matches up

17  with the frame-by-frame slowdown that the government featured in

18  its brief, and the government encourages the Court to look at it

19  itself if it hasn't already.

20      But the sequence of events, when you slow down that video,

21  is:  Ramey releases his second spray in the direction of

22  Officer Williams; Officer Williams gets hit by this -- sorry.

23  The flag happens before that second spray.  But Officer Williams

24  recoils, and his body starts shifting backwards into the

25  scaffolding, and it is at that moment or milliseconds afterwards

1   that this second other rioter's spray begins to release into the

2   air.  Officer Williams is already reacting to Ramey's spray at

3   the time that the second other rioter's spray is released into

4   the air.

5        And the government submits that chain of -- that sequence

6   of events is clear from the video.

7        THE COURT:  Do you think from the video that it's

8   clear that the spray from Mr. Ramey's, you know, pepper spray

9   actually hits Officer Williams?  Because it's not -- certainly

10  with the other officer, it's very clear.  It seems to be a dead

11  hit.  But with Officer Williams, it's hard to see that

12  connection all the way to him.

13       MS. FIFIELD:  No disputing that the -- and that's -- I

14  think the perspective of the cameraman matters in that sense;

15  right?  When the first spray happens, the cameraman, whoever he

16  is, is directly behind Ramey and in line.  It's a visual

17  straight line from the camera to Ramey to Riggleman, and so it's

18  easy to see the directionality of the spray in that video.

19       And that is no longer the case by the time Ramey releases

20  the second spray.  It's more of a triangle, Ramey over here, and

21  we have Officer Williams over here, and the camera is here.

22       And so if the camera were directly behind Ramey, as it was

23  with the Riggleman spray, I think it would be clear that the

24  spray --

25       THE COURT:  But it's not, so --

1          MS. FIFIELD:  Fair enough.

2          THE COURT:  To find beyond a reasonable doubt.  You

3     know, there's two separate sprays.  There's the Gatorade,

4     whatever the bottle is.  There's a lot going on there.  It's --

5     the struggle I'm having is the standard here.

6          MS. FIFIELD:  And -- totally understandable, Your

7     Honor, and the government submits that the evidence is

8     sufficient for the Court to find beyond a reasonable doubt that

9     the spray hit Williams.  Just distinguishing the two sprays from

10    a perspective perspective is important when comparing them,

11    Riggleman's spray versus Williams's spray.

12         THE COURT:  Can you remind me of Williams's testimony

13    about how he reacted after the spray got into his -- seeped down

14    through the helmet?  He talked about collapsing.

15         MS. FIFIELD:  Yes.

16         THE COURT:  My recollection from his testimony was he

17    thought that happened like right away, but watching another

18    video -- and that's Exhibit 208 -- it seems like he didn't

19    collapse for about a minute after.  I'm not saying he's not a

20    credible witness, but I just, you know -- in the moment with

21    everything that's going on, it's very hard to put great weight

22    on the -- your evidence -- the key evidence you're asking the

23    Court to hang on is the flag followed by the pepper spray;

24    right?  And I have to find that -- beyond a reasonable doubt

25    that he's clear on that some two years later.

1          MS. FIFIELD:  First, as the government has stated in

2     both of its briefs, and I will get to this in a second, the

3     Court doesn't have to find that Ramey's spray hit

4     Officer Williams in order to satisfy --

5          THE COURT:  Attempt, yeah.

6          MS. FIFIELD:  Setting that aside, the whole of the

7     evidence creates a complete picture.  The sequence of events:

8     Spray, reaction -- in our brief, we're talking about this.  This

9     happens in a matter of two seconds.  Ramey releases his spray,

10    and it seems like a long time, but if you watch the counter on

11    the video, it's two seconds before Officer Williams's body

12    begins recoiling backwards into the scaffolding.  And that's

13    consistent with his testimony that there was likely a delay

14    between when he perceived the spray and when it, in fact, hit

15    his head, because it had to seep down through his helmet first.

16         And that sequence of events, especially when slowed down,

17    seen frame by frame, it doesn't make sense, it's not a

18    reasonable interpretation of the video to assume that

19    Officer Williams is reacting to any other spray at that point in

20    time.

21         THE COURT:  Okay.  But the same exhibit shows people

22    in the crowd reacting all over the place to sprays, Exhibit 208.

23    I don't know if you -- you didn't play all of it, but I watched

24    all of it, and there's people in that crowd reacting to spray

25    all over the place.

1    MS. FIFIELD:  I think the complete picture that's

2 created by the video, in Officer Williams's testimony, he's very

3 clear that he's -- at the time that he gets hit with this flag,

4 for example, he is not perceiving any sort of substance having

5 hit him.  He is not perceiving other spray in the air.  And it

6 is only at the point at which Ramey -- Mr. Ramey's spray could

7 have reached him that he begins to physically react.

8    THE COURT:  But he himself testified the spray had to

9 come through the visor helmet, the visor of the helmet, and is

10 that a split second to go through, or is it a longer stream?

11 It's just -- it's tough, Ms. Fifield, to say beyond a reasonable

12 doubt based on the evidence before the Court that he actually

13 hit him.

14    MS. FIFIELD:  That's the most reasonable

15 interpretation of the evidence, in the government's view.

16    THE COURT:  Is "most reasonable" enough beyond a

17 reasonable doubt, if there's another reasonable explanation?

18    By a preponderance, yes, but beyond a reasonable doubt, is

19 the most reasonable sufficient proof for the Court to rely on?

20    MS. FIFIELD:  Playing a counterfactual out, if there's

21 reasonable doubt that Ramey's spray hit Officer Williams, the

22 Court would have to find or be operating under the assumption

23 that something else caused Officer Williams to react.  And the

24 government's position is there is not something else.  It's not

25 borne out by the videos.  It's not borne out by his testimony.

1     THE COURT:  But you just said that's the most

2   reasonable explanation, suggesting that there are other

3   reasonables.

4     Was that just a misstep?

5          MS. FIFIELD:  I think that's just lawyerspeak.

6          THE COURT:  Okay.

7          MS. FIFIELD:  With the Court's permission, I will move

8   on to the perhaps more important point, that it doesn't really

9   matter whether Mr. Ramey hit Officer Williams or not.  He

10  clearly extended his arm, clearly depressed what one can assume

11  is a button on a canister in his hand --

12         THE COURT:  Is this your attempt argument, or are you

13  making the dangerous weapon argument right now?

14         MS. FIFIELD:  No, this is still an argument about

15  whether Mr. Ramey has committed an assault.

16    He committed an assault the second he pressed that button

17  and released spray into the air.  His spray does not have to

18  have come into contact with Officer Williams for that to be a

19  completed assault.

20    So the way that the physical contact piece comes into play

21  is, when the Court is considering -- and the government laid

22  this framework out in its brief.  Counts 2 and 3 charge

23  Mr. Ramey with assault with a deadly or dangerous weapon in

24  violation of Section 111(b), and a conviction on 111(b) does not

25  require physical contact at all.  It requires a completed

assault, a simple assault, forcibly, intentionally, voluntarily, while the officer victim was engaged in the performance of his official duties and the use of a deadly or dangerous weapon, which we will get to.

The only way that physical contact is going to come into play here from a perspective of the Court making findings leading to a conviction of the defendant is if the Court finds that Mr. Ramey did not use a deadly or dangerous weapon in the course of completing this assault.

And we're getting to what is the fifth element of felonious assault under Section 111(a)(1).  And that fifth element requires the government to prove, in addition to the four elements of simple assault, that the defendant interfered -- resisted, impeded, opposed, interfered with, et cetera, assaulted the officers by making physical contact with them or the assault involved the intent to commit another felony.

And the intent to commit another felony aspect is easily satisfied here.  And the Court has in the sentencing context at least once, I remember, because I was there --

THE COURT:  Civil disorder?

MS. FIFIELD:  Correct, in the *Creek* sentencing, which you and I did in May of last year.

THE COURT:  You don't need to spend a lot of time on that.

MS. FIFIELD:  In order to satisfy that fifth element,

if the defendant committed an assault with the intent to commit

another felony, he's guilty of felonious assault under

Section 111(a)(1).  The physical contact piece comes into play

for the purposes of that fifth element of (a)(1) only if the

Court finds the defendant did not use a deadly or dangerous

weapon, therefore he's not guilty of Section 111(b), or he did

not commit an assault with the intent to commit another felony

in violation of 111(a)(1).

And the government, before turning to the next issue, would

like to emphasize, even if the Court finds it's not an assault,

which it seems pretty clearly to be, it is almost certainly --

the defendant's conduct almost certainly satisfies resisting,

opposing, impeding, intimidating, or interfering with officers

Riggleman and Williams.

So the next issue I would turn to is whether the defendant

committed these two assaults using pepper spray.  The evidence

proves that the substance that the defendant used to assault

these officers is pepper spray.

All four of the government's witnesses testified about the

immediate physical sensations caused by being sprayed with

pepper spray.  They talked about burning sensations.  They

talked about breathing issues.  They talked about nasal issues,

all of them except -- I believe Officer Riggleman did describe a

burning feeling.  In addition, he described his experience

including this like gritty sand in your eyes kind of feeling.

1          And Officers Williams and Riggleman, who were the victims

2     of these assaults on January 6, testified that they recognized

3     that sensation based on their experience being sprayed in

4     training.  They recognized the substance as pepper spray, OC

5     spray, based on the sensations.

6          And it's important to emphasize here that pepper spray is a

7     generic term, as is OC spray.  They refer to the same substance,

8     and it's -- those substances are, as I said, generic terms for

9     chemical irritants that cause the kind of symptoms that the

10    officers described.

11         And when the Court was asking the parties at the conclusion

12    of evidence on February 21st whether the government is required

13    to prove pepper spray beyond a reasonable doubt, because that is

14    the weapon that's noticed in the amendment, that generality of

15    the phrasing is important, because in the government's view the

16    indictment describes the substance at the highest level of

17    generality possible based on what we believed the evidence would

18    show.

19              THE COURT:  I guess you could have said "chemical

20    irritant."  But I get your point.  You don't think that that's a

21    variance --

22              MS. FIFIELD:  Correct.

23              THE COURT:  -- that would justify the Court --

24              MS. FIFIELD:  Correct.

25              THE COURT:  -- not convicting the defendant on that

1    basis.

2            MS. FIFIELD:  Correct.  And if it's helpful, we sort

3    of consider this analogous to the terms "gun" versus "firearm."

4    If the officers -- if this were a firearm-related case, if the

5    officers referred to it as a gun, it wouldn't be a variance.

6    Different terms for the same substance.

7            THE COURT:  And as you suggested, bear spray is

8    sometimes referred to as pepper spray?

9            MS. FIFIELD:  I think that's true.  I think that that

10   is generally understood, looking outside the record.  I don't

11   think -- I think the -- it's sort of a side issue, because the

12   government alleged pepper spray.

13           THE COURT:  And it was close enough.

14           MS. FIFIELD:  What's in the record with reference to

15   bear spray is something about a tighter stream, and that's not

16   what we alleged here, and that's not what we think the evidence

17   shows at that level of generality used in the indictment.

18       And so the last of the parties' remaining disputes is that

19   pepper spray is a deadly or dangerous weapon.  The evidence

20   admitted at trial shows that the spray that is used by the

21   defendant on January 6, which is pepper spray, the evidence

22   shows that that substance is capable of causing serious bodily

23   injury or death in the manner that the defendant used it.

24       Captain Mendoza testified that the substance can be lethal,

25   that the reason that officers are taught to use pepper spray or

1    OC spray in a certain way is to maintain the level of less

2    lethal, implying that if officers are not using pepper spray or

3    OC spray in a specific way, it can be lethal.

4        Captain Mendoza also described breathing issues, risk

5    factors --

6             THE COURT:  Back up a little bit.

7        Didn't she testify that in training -- I may get the feet

8    wrong, but typically, it's around 6 feet?  I think there was

9    some discrepancy between officers' testimony.  One said 6,

10   another said 10 or something.

11       Am I remembering that correctly?

12            MS. FIFIELD:  I agree, there was some discrepancy

13   between these -- the circumstances described by each officer

14   during their training.

15            THE COURT:  Right.  So let me just accept the most

16   generous to the defendant.  Let's say normal training is 6 feet

17   distance.  My understanding from both officers' testimony was

18   being sprayed from 6 feet away would not cause serious bodily

19   injury.  And if you disagree, tell me -- break that down for me.

20            MS. FIFIELD:  Yeah, I don't think that the record

21   reflects --

22            THE COURT:  What part of that's wrong?

23            MS. FIFIELD:  If we accept that spraying -- that the,

24   quote unquote, safe distance as used during training is 6 feet,

25   that doesn't mean that it necessarily can't cause serious bodily

1    injury.

2              THE COURT:  If there's a direct hit to the eye; right?

3         MS. FIFIELD:  Yeah, I think that's an interpretation

4    that's supported by the evidence.  And I think the best evidence

5    that pepper spray is a deadly or dangerous weapon, in addition

6    to the numerous -- actually, first, I want to go back to what

7    the witnesses described as the safeguards and the specific

8    precautions that they exercise when they use this in training.

9         Two officers in separate training cohorts, Special Agent

10   Nougaret and Officer Williams, talked about emergency medical

11   personnel being present during this training exercise and that

12   two people in their classes had to avail themselves of those

13   emergency medical services because they collapsed and in one

14   case couldn't breathe.

15             THE COURT:  So the government's position is that any

16   time pepper spray is used at the distance that law enforcement

17   used to train with pepper spray and there's no medical personnel

18   on-site, that that's -- that should be an assault with a deadly

19   weapon?  Is that what you're saying?

20             MS. FIFIELD:  Sorry.  I just want to make sure that I

21   have the question straight.

22             THE COURT:  It's a little jumbled.  But are you saying

23   that, absent two emergency personnel as law enforcement officers

24   have when they're training and, let's assume, as I think the

25   Court must, that the safe distance in training is 6 feet away,

1  are you saying without those medical personnel, it's a dangerous

2  weapon?

3          MS. FIFIELD:  No, I don't think the presence of

4  personnel changes the nature of the weapon.  The presence of the

5  personnel is an indication of the fact that police think this is

6  dangerous.

7          THE COURT:  That someone could have an allergic

8  reaction?

9          MS. FIFIELD:  Someone could have an allergic reaction.

10 Someone could have an asthma attack.  This is a different case,

11 but we cited to a case in our brief wherein it seemed to suggest

12 that the pepper spray caused the victim to have asthma and

13 continued asthma attacks over the course of months.

14     So the presence of --

15         THE COURT:  But we don't have any evidence of that

16 here, but you say the mere fact that it's possible that can

17 happen is enough?

18         MS. FIFIELD:  Yes.

19         THE COURT:  Well, what if Mr. Ramey, instead of using

20 pepper spray, was tossing peanuts and one of those officers had

21 his mouth open and he's tossing it right at him and the peanut

22 went in his mouth?  Is that an assault with a deadly weapon

23 because the officer goes into anaphylactic shock when Mr. Ramey

24 has no knowledge of that officer's susceptibility to peanuts?

25         MS. FIFIELD:  I think it's a good question, and when

1    we're talking -- because the definition of deadly or dangerous

2    weapon involves the manner of use and the capabilities of the

3    weapon as the defendant used it, we end up talking about a

4    spectrum, right.  Like, if the defendant threw a brick at a

5    person who was -- or even something not as massive as a brick,

6    say, at a victim who was susceptible to concussions, more

7    susceptible than, say, the average person, did the object cause

8    the concussion, or did the characteristics of the victim cause

9    the concussion?  It would depend on the facts of that case.

10             THE COURT:  And I thought you acknowledge in your

11   briefing that courts generally don't look -- do that sort of

12   analysis, that sort of surrounding circumstances analysis.

13        Did I read the brief incorrectly?

14             MS. FIFIELD:  No, that is --

15             THE COURT:  A Cooper -- one sentence in a detention

16   hearing or something to suggest maybe there's some authority for

17   looking at the surrounding circumstances.

18        But generally, am I right, you concede that that's

19   typically not what courts do in assessing whether something's a

20   dangerous or deadly weapon?

21             MS. FIFIELD:  Addressing that question directly, and

22   of the cases that the government was able to locate, you know,

23   extending the circumstances out as broadly as possible, I

24   wouldn't in that particular section of the brief assert that

25   courts routinely consider the surrounding circumstances so

1    broadly that -- you know, I think we're safely saying that

2    the -- I want to focus on the capabilities of the weapon that

3    the defendant used and the manner in which he used it.

4        The case law that the government cited in the section where

5    courts have found pepper spray to be a deadly or dangerous

6    weapon, they are talking about whether the victims have asthma.

7    They are talking about --

8            THE COURT:  But that's because in those cases, those

9    victims had asthma reactions and ended up in the hospital;

10   right?  I mean --

11           MS. FIFIELD:  Sure, but they're still factoring in

12   those circumstances as being important to the analysis in those

13   cases.  That's my point.

14           THE COURT:  So I guess the government's position is

15   pepper spray, kind of like a firearm, so long as it's -- you're

16   not saying it's inherently dangerous; right?  You're saying I

17   have to look at its use, and it's fact-specific.  It's not an

18   automatic, you point a firearm, it's a dangerous weapon.  By

19   definition, it's inherently dangerous.  The definition's met.

20       You're saying something different.  There's a factual

21   analysis a court has to do about how the pepper spray was used

22   in this case; right?

23           MS. FIFIELD:  As I stated previously, in our view,

24   there's a spectrum of dangerous; right?  And that peanut that

25   the Court talked about would be somewhere on the further end of

1    that spectrum of dangerous towards no.  The facts that would be

2    required to find that that's deadly or dangerous would be pretty

3    specific.

4         On the further end, it's not that, you know -- there's no

5    case -- or at least the government's review of the case law

6    tells us that whether an object is a deadly or dangerous weapon

7    depends on facts, not the law.  And a firearm is commonly

8    understood to be, as the Court said, inherently deadly or

9    dangerous because of its capabilities and because of the facts

10   that are commonly understood to accompany the firing of a gun.

11        Pepper spray is much closer to that end of the spectrum

12   where firearms live than a peanut.  Pepper spray, what the

13   record tells us in this case is that the use of pepper spray in

14   a law enforcement training context comes with considerable

15   safeguards, because the police are trying to protect their

16   people when they're exposing them to the substance.  That means

17   that it is dangerous; it's not safe.

18        But the best evidence --

19        THE COURT:  I just want to make sure I'm understanding

20   your point.  So we're going to assume for a moment that

21   Mr. Ramey used the pepper spray in the same circumstances that

22   law enforcement does, right, 6 feet away?  That's the most

23   generous reading of the testimony for him, which I think I have

24   to assume.

25        So any time someone fires pepper spray 6 feet away, it

1    meets the definition?

2         MS. FIFIELD:  I want to respectfully encourage the

3    Court to resist the urge to categorize.  If it's used in these

4    specific circumstances, it is, versus it isn't a deadly --

5         THE COURT:  I think that's what the case law -- I have

6    to do a fact-specific analysis.  So I'm looking at the evidence

7    in the light most favorable to Mr. Ramey, and I'm saying, he

8    fired it at, you know, the first officer 6 feet away.

9      And it seems like the government's position is full stop,

10   that's a dangerous weapon at that distance, because in the law

11   enforcement context there are emergency personnel around to

12   treat the potential allergic reaction, that you don't have to in

13   order to convict Mr. Ramey of this offense show any kind of

14   allergic reaction or anything in this case.

15        MS. FIFIELD:  No, but that is the -- reactions that

16   occurred with these officers are evidence of the dangerousness

17   of pepper spray as used here.

18        THE COURT:  But they're not serious bodily injury.

19   You had some reference to a retina problem with one of the

20   officers, and that's the officer that your evidence is weakest

21   on; right?  That's Williams; correct?  Am I right about that?

22        MS. FIFIELD:  Respectfully, Your Honor, I would

23   disagree.  I think, given the definition that the parties agree

24   for "seriously bodily injury," both officers suffered serious

25   bodily injury in fact.

1          THE COURT:  But the -- you think having the gritty

2      burning for a set period of time -- I think Captain Mendoza

3      talked about it typically lasts a couple hours, one or two

4      hours, and she said, when I asked her, "If you don't have a

5      chance to rinse, as one of the officers didn't, it can last up

6      to 24 hours."  That was her testimony.

7          Is that serious bodily injury?  Scrapes and abrasions also

8      last periods of time, and they burn and they hurt.  Is that

9      really serious bodily injury if there's no lasting damage?

10         MS. FIFIELD:  I would argue that loss of vision over

11     the course of hours, up to 24 hours -- and both officers had

12     loss of vision.

13         THE COURT:  No, she didn't say -- she said the

14     sensation can last up to 24 hours.

15         MS. FIFIELD:  What I'm referring to is the testimony

16     of Officers Riggleman and Williams, who both had vision loss

17     after they were sprayed by -- had vision loss and vision

18     impairment.  Officer Riggleman was not able to open his eyes

19     until he was able to decontaminate.

20         THE COURT:  And then he decontaminated and came back

21     and kept fighting.  So how can you say that's serious bodily

22     injury?

23         MS. FIFIELD:  That would be considering the action --

24         THE COURT:  It's like spraining your ankle.  Is that

25     serious bodily injury?  I mean, you come back, and you're -- I

1  can see like retina detachment and things like that as

2  definitely serious bodily injury.

3       But is the burning sensation and temporary loss of

4  victim -- loss of vision serious bodily injury?

5            MS. FIFIELD:  Yes.

6            THE COURT:  Do you have a case that says that?

7            MS. FIFIELD:  Focusing on the facts, vision loss, and

8  looking at the definition of "serious bodily injury," it is

9  extreme physical pain, which the government would submit that

10  both defendants described, in particular Officer Williams, or

11  protracted loss or impairment of the function of a bodily

12  member, organ, or mental faculty.

13           THE COURT:  But it wasn't protracted loss.  The

14  officer testified he went to the bathroom, and he came back out,

15  and he was -- he could see.  He wouldn't have reengaged if it

16  had been protracted loss.

17           MS. FIFIELD:  It was protracted until he

18  decontaminated.

19           THE COURT:  But is that -- again, do you have

20  something that's a case that says a ten-minute loss of vision --

21  I don't even know that the record's really clear on how long

22  that was, but that that constitutes serious bodily injury when

23  he's okay and back to normal ten minutes later?

24           MS. FIFIELD:  He's only okay because he was able to go

25  decontaminate, and that was a choice that he made.  That has

nothing to do with the inherent capabilities of the weapon that the defendant used or the manner in which he used it.

THE COURT:  What about Captain Mendoza's testimony when I asked her, So what if you can't decontaminate, what's the long-term effects? and she said the sensation can last up to 24 hours?

But my memory of her testimony is even without decontamination, it wouldn't be longer than that unless somebody had PTSD.  That's my recollection of what she said.

MS. FIFIELD:  I think what I recall, and I can look at the transcript if the Court would like, is that she didn't have knowledge of --

THE COURT:  I think she answered the question.

MS. FIFIELD:  Okay.  Either way, if what we're talking about is vision loss and feeling like one's face is on fire for 24 hours, that's extreme physical pain.  That's protracted impairment.  I think protracted is -- if one can't see, if one is --

THE COURT:  But she said it typically lasts a couple of hours, one or two hours, that's my recollection, typically. And I said, Well, what if you couldn't get to water?  Then it could last up to 24 hours.  But she hadn't seen a longer term impact.  Maybe, she said, if someone is not used to it or they get PTSD or something.  That was her testimony.

Based on that, I don't know how the Court concludes that

1   pepper spray's effects are normally protracted.

2          MS. FIFIELD:  Again, it goes to what the weapon is

3   capable of.  And the record seems -- the record is clear that

4   pepper spray is capable of causing serious bodily injury, that

5   being extreme physical pain.

6          THE COURT:  I think that that's -- I think pepper

7   spray is certainly capable, but have you shown that in this case

8   beyond a reasonable doubt?  That's the question.

9          MS. FIFIELD:  Yes.  If the substance is pepper spray,

10  it follows that it is -- that substance is capable of causing

11  serious bodily injury or death in the manner that the defendant

12  used it, which was releasing that aerosol into the air, from

13  what we can tell in the video, nailing Officer Riggleman

14  directly in the eyes.

15         THE COURT:  From 6 feet away.

16         MS. FIFIELD:  I don't think --

17         THE COURT:  Do you have testimony that someone

18  testified that hitting someone directly in the eye 6 feet away

19  causes serious bodily injury?  Did you elicit that from anyone?

20  You might be able to prove that, but I just don't recall that

21  testimony.

22         MS. FIFIELD:  That was purposeful, frankly, Your

23  Honor.  I don't think it's fair to ask these witnesses who --

24         THE COURT:  Well, not that question, but the facts

25  that would bring out -- that would meet the definition.  You

1   can't ask them the ultimate issue.  But can you not -- I mean,

2   what did they say?  6 feet away, he said -- this is the guy that

3   went to the bathroom and came out and kept fighting.

4           MS. FIFIELD:  What I meant was, I don't think it's

5   fair to ask these witnesses to interpret a video where, because

6   of the --

7           THE COURT:  Tell me what they experienced that was

8   protracted.  And I don't think protracted is 10 minutes.  I

9   don't know that protracted is 24 hours without the wash.

10          MS. FIFIELD:  Let's separate what the weapon is

11  capable of in the manner that the defendant used it and the

12  actual effects on the officers, which is evidence of what the

13  weapon is capable of.

14      But there's other evidence in the record --

15          THE COURT:  Then tell me --

16          MS. FIFIELD:  -- that tells us what the weapon is

17  capable of.

18          THE COURT:  -- at that distance and the way he used

19  it.

20          MS. FIFIELD:  I want to be clear with the Court that I

21  don't think -- I don't think the record is clear as to how far

22  away Mr. Ramey was from those officers.

23          THE COURT:  So I'm saying 6 feet, because I think that

24  that's the most generous interpretation of the evidence to

25  Mr. Ramey.

1          MS. FIFIELD:  So let's reimagine that the weapon is

2     something different, a heavy projectile, and the defendant

3     throws it from a distance that, you know, it's clear that the

4     defendant is aiming for a victim.  He is attempting to launch

5     that projectile, a brick, towards those victims, but he misses.

6     He's too far away.  He can't physically get it that far.

7          Does that mean that the brick is no longer a deadly or

8     dangerous weapon?  The government would say no.

9          THE COURT:  I don't think that's what we're saying.

10     We're saying he hit them with the object.  We're talking about,

11     what's his name, Rittenhouse?

12          MS. FIFIELD:  Riggleman.

13          THE COURT:  So he hit him at 6 feet.  That's the

14     evidence.  Certainly, a brick hit at 6 feet in the head, I think

15     everyone would agree that that's potentially deadly.  Pepper

16     spray, it may be, but I don't know that you've produced the

17     evidence that convinces me beyond a reasonable doubt it is at

18     6 feet.

19          MS. FIFIELD:  I don't want to belabor this point,

20     because I think the Court has been clear that the Court thinks

21     6 feet is the interpretation most favorable to the defendant.

22          I do want to say for the record that I don't think it is

23     possible to, with precision, interpret the distance that

24     Mr. Ramey was from those officers.

25          THE COURT:  But distance matters.  If he shot pepper

1    spray from 100 feet, you wouldn't be arguing that that was an

2    assault with a dangerous weapon, would you?

3        MS. FIFIELD:  I guess what the Court is asking me is,

4    if nothing changes about -- if you have an individual who is in

5    a mob charging towards officers who raises his hand and sprays

6    pepper spray twice, does it matter if he's 5 feet from them or

7    6 feet from them?

8        THE COURT:  Help me understand the mob, how that

9    changes the analysis.  Is this the officer can fall and the gun

10   falls out?  What does the mob have to do with serious bodily

11   injury?  Is it they can get trampled?  Help me understand why

12   that's a part of the analysis.

13       MS. FIFIELD:  It's a part of the analysis in the sense

14   that it bears to the defendant's intent.

15       THE COURT:  He intended to forcibly assault, but that

16   doesn't necessarily mean he used a deadly weapon to do it.

17       MS. FIFIELD:  I would also submit that 1 foot here

18   versus 1 foot there doesn't automatically transform the nature

19   of this weapon or the manner in which the defendant used it.

20     There's nothing in the record that would say the defendant

21   purposefully stepped back far enough that shows he didn't intend

22   to use this as a deadly or dangerous weapon.

23       THE COURT:  He could have a paper clip in his hand and

24   have the intent to use a deadly weapon and he wouldn't be

25   convicted of it.  His intent only goes so far.

1          MS. FIFIELD:  If there were evidence in the record

2     that a paper clip -- again, I think this is why that spectrum is

3     important.  Paper clip and peanut are over here and pepper spray

4     and firearm are over here.

5          THE COURT:  Pepper spray, you will agree, it's

6     somewhere in between, and it's -- I guess I'm struggling at what

7     the government -- it's a fact-specific inquiry.

8          MS. FIFIELD:  Yes.

9          THE COURT:  And I have to look at the facts of this

10    case.  And the government doesn't want me to pay attention to

11    distance, even though that seems to me a really critical factor

12    in whether something is capable and in this case caused serious

13    bodily injury.  But you're resisting that.  I think that's a key

14    fact that I have to look at with pepper spray.

15         Do you disagree?

16         MS. FIFIELD:  I don't think -- in the range of

17    distances that we're talking about, I don't think a foot here

18    versus a foot there transforms this weapon from dangerous or

19    deadly into not.  That's what I'm saying.

20         THE COURT:  But you haven't even given me the

21    testimony.  I think perhaps you could have proven this, but you

22    haven't given me the testimony from anyone who says a spray at

23    5 feet directly to the eyeball can cause serious bodily injury

24    or effects, like protracted eye damage.

25         You haven't presented that.  Maybe you could have, but none

1   of that's in the record.

2           MS. FIFIELD:  I disagree.  Again, this gets back to

3   how we are defining protracted injury or serious pain.  If

4   someone says it feels like my face is on fire, that's extreme

5   physical pain.  If someone is losing their vision, you know,

6   even for 10 or 15 minutes, if they are physically unable to open

7   their eyes, that's impairment.  And whether it's protracted or

8   not, in the case of pepper spray, it really depends on what the

9   victim is doing, which is not about the capability of the

10  weapon.

11      It's about the -- in particular, these witnesses benefiting

12  from law enforcement training, knowing that they were supposed

13  to go decontaminate.  That has nothing to do with the

14  capabilities of the weapon.  That has to do with a choice that

15  the victim made.

16          THE COURT:  Again, the captain testified -- I asked

17  her, What if they can't decontaminate?  Then what?  And she

18  said, Oh, it will last about 24 hours.  She didn't say they

19  would be in excruciating pain for the 24 hours.

20      The sentencing guidelines, although this isn't a definition

21  that binds me, but they do say medical attention for regular

22  bodily injury and hospitalization or surgery for serious bodily

23  injury.

24      So I'm not minimizing the injury to the officers.  The

25  question is, was it serious bodily injury?  And yes, they

```
1    experienced bodily injury, but is it enough to meet the

2    threshold of what's deemed "serious" in the law?

3            MS. FIFIELD:  The government says yes, and going back

4    to -- if we want to be specific about what Captain Mendoza said,

5    so she describes the decontamination process.  This is page 50

6    of the trial transcript.  "Other than that, you just wait it

7    out.  You will probably have some burning sensation that can

8    occur up to probably 24 more hours."

9        The Court asked, "If you don't use water, does the water

10   take -- are you saying the up to 24 hours happens if you don't

11   have access to water?"  The witness said, "Either way.  Whenever

12   the chemical hits your skin or your face, you know, it creates

13   the nasal situation.  Your eyes are watery," and I think this is

14   a typo, but "stinging" is I think what she said.

15       And I would ask the Court to keep in mind, when

16   interpreting this testimony, that Captain Mendoza is a law

17   enforcement officer and a training officer.  She's testifying in

18   generalities, and she's testifying -- I would say my memory of

19   her testimony was that she was speaking in a somewhat detached

20   fashion, and what the witnesses said --

21           THE COURT:  Isn't she the leader of the like combat

22   team?  No?  Like the response team?  Are you minimizing her

23   authority?

24           MS. FIFIELD:  I'm not minimizing her testimony.  What

25   I'm saying is that the way that she described these effects was
```

1   detached.

2           THE COURT:  What do you mean by that?  Not prepared to

3   address these issues?

4           MS. FIFIELD:  No.  What I mean is she's talking about

5   it in a way that lawyers might describe -- there's a way that

6   professionals speak about horrible effects, doctors, lawyers,

7   and in frequent cases police officers testifying as witnesses.

8           THE COURT:  But I appreciate that she's not emotional

9   and she's just giving me the facts.  That's what I mean.  She

10  herself experienced the impact of pepper spray.  So it isn't

11  like she doesn't have the knowledge.

12          MS. FIFIELD:  What she said is that she's been sprayed

13  in a number of different situations.  She has a lot of

14  experience with this, which she described, and Officer Williams

15  testified -- again, I want to step back and look at the forest

16  through the trees.

17      You have all of these witnesses testifying, especially in

18  Nougaret's case, you know, seven years back, a burning

19  sensation.  I don't think we should be giving that burning

20  situation or the fact that one cannot open one's eyes unless one

21  goes to decontaminate short shrift.

22      But we also have testimony in the record, Officer Williams

23  said that this substance affects everyone differently.  So that

24  gets back to the question of how much do you consider the

25  characteristics of the victim or the outside circumstances

versus how do you -- if this weapon is capable of causing

serious bodily injury.  That's the inquiry, not what actually

happened or what -- how it may affect one particular person.

THE COURT:  Okay.  You said, you know, let's back up

and let's not lose the forest for the trees.  The government can

take that position at a sentencing hearing where we're talking

about a preponderance.  At a trial, where it's the government's

burden to prove beyond a reasonable doubt each element of the

offense, the government has to dot its Is and cross its Ts.

And I'm feeling resistance, that I'm just sort of supposed

to lump all this stuff together and say, like, it really burned

and it hurt and this is a bad thing and that constitutes serious

bodily injury when, you know, definitions, like the Sentencing

Commission, talk about needing medical attention being bodily

injury, and they're talking about things like hospitalization

being serious bodily injury.

So the government's doing a lot of these cases through

pleas, a lot of these detention hearings.  But when it comes to

trial, you have to have your theory, and you can't just merge a

bunch of different key nuggets and have the Court say that

sticks.  You're really resisting -- this is a hard issue to

decide, and you may well be right that at 6 feet -- which I do

think I have to consider, and if you can convince me why I

don't, I wish you would try, because you haven't yet, but I do

think distance has to play a role with pepper spray.  It has to.

1          Spraying at 1,000 feet versus 1 feet is a very different

2     analysis.  So distance, I think, has to matter, and I do think

3     the fact that -- you concede in your briefs that courts

4     generally don't go into the surrounding circumstances and the

5     mob atmosphere.  This is all good color, and maybe it works with

6     a jury, but I've got to apply the facts that you've proven to

7     the elements here, and I'm really struggling in seeing how

8     you've met your burden.

9          MS. FIFIELD:  What I'm saying to the Court, I think,

10    is the same thing we would say to the jury, that you have to

11    look at the evidence as a whole.  And the evidence as a whole

12    proves that pepper spray is capable of causing serious bodily

13    injury in the manner that the defendant used it.  And I agree

14    when we're talking about distance, there's a significant

15    difference between 5 feet and 100 feet.

16         But the granularity -- I'm sorry.

17         THE COURT:  So on our record, not what other cases

18    say, which is not the record in this case, on our record, the

19    only testimony of serious bodily injury that's in the record

20    says within 3 feet there can be retina damage and needling, but

21    that factual circumstance the government didn't prove here,

22    within 3 feet.

23         Am I wrong?

24         I mean, that's -- the retina damage and needling to me is

25    serious bodily injury, but the testimony in the record is within

1    3 feet.  There's a reasonable doubt whether he was within 3

2    feet.

3         And you have the other officer talk about potential

4    long-term eye damage, but we have no medical testimony.  We have

5    no medical records.  We have nothing showing, even if I believed

6    that you proved that he hit him in the face -- it's just kind of

7    like, he's got retina damage and to this day.  You haven't shown

8    that that's caused by the pepper spray that he got that day.

9         It may have contributed, but one sentence by the witness,

10   no doctors, no medical records.  It's -- that's the kind of

11   testimony I think you need to prove this beyond a reasonable

12   doubt.

13        MS. FIFIELD:  Of course, the government does submit

14   that the witness's vision loss on that day, the record bears out

15   that that was as a result of the pepper spray being sprayed into

16   his face at the base of the northwest stairs.

17        THE COURT:  And how long -- what does the record show

18   how long that lasted?

19        MS. FIFIELD:  What is in the record is

20   Officer Williams testified that he was sprayed, he felt like his

21   face was on fire, he collapsed.  He wasn't able to decontaminate

22   because he stayed down near the line for several hours.  And

23   after he was sprayed, he --

24        THE COURT:  Wait.  You're on Williams.  I'm talking

25   about the other one.  Let's talk about the one that you've

1    definitely proven the hit.  All right?

2           MS. FIFIELD:  He testified that he could not see.  He

3    needed a railing to assist him with walking.  He was not able to

4    open his eyes until he had an opportunity to get to a bathroom

5    to decontaminate.

6       And the extent -- if the Court is not going to consider the

7    surrounding circumstances, I don't think the Court can consider

8    how long it was before the witness was able to decontaminate.

9       This witness had --

10          THE COURT:  No, I'm not -- I guess you're

11   misunderstanding.  It's your burden to show some serious bodily

12   injury, and I don't think you've met your burden in showing

13   serious bodily injury with respect to either one of them, but

14   particularly that one who testified he didn't need medical

15   attention, he went and rinsed out his eyes, and then he came

16   back and continued to fight.

17          MS. FIFIELD:  And he benefited from law enforcement

18   training in terms of how these weapons impacted these officers.

19   But that's sort of the broader circumstance.

20          THE COURT:  What does that -- help me understand that

21   theory.

22          MS. FIFIELD:  I want to be precise when we're talking

23   about whether this weapon is capable of causing serious bodily

24   injury and what happened to these officers, which can be

25   evidence of what this weapon is capable of but it doesn't

necessarily transform the weapon into a dangerous weapon or not.

And if what the Court is concerned about is what happened to, in particular, Officer Riggleman, number 1, the government is not obligated to show that any serious bodily injury was sustained.

THE COURT:  Understood; understood.  But the point is, you agree I still have to look at the facts of where he shot the pepper spray from, right, and where he aimed?  I have to look at all those facts, correct, in assessing whether it's capable in this case?

If I don't even look at the impact on the officers, if I just look at the facts regarding his use of the pepper spray, because I can't -- the government concedes it's not inherently dangerous; right?  You've conceded that in your brief, I think.

MS. FIFIELD:  I don't think we conceded that.

THE COURT:  Really?  Hmm.  Okay.  I'll look for that.  But I didn't think you were arguing just like a firearm pepper spray is inherently dangerous.

MS. FIFIELD:  What we've said is we're talking about a spectrum, and facts that are understood to --

THE COURT:  That's not inherently dangerous when you start talking about the facts.  Like, a gun is inherently dangerous whether it's, you know, 20 feet or 100 feet away or shot at the eye or the foot or whatever; right?

MS. FIFIELD:  The standard -- pardon me.

```
 1                THE COURT:  No, go ahead.
 2                MS. FIFIELD:  The standard is whether this weapon or
 3     any weapon, a gun, pepper spray, what have you, the standard is
 4     whether the weapon had the capability to cause serious bodily
 5     injury in the manner that the defendant used it.  The inherently
 6     dangerous versus not inherently dangerous is, as far as our
 7     research has been able to show us, is not a distinction that is
 8     relevant under this law of the circuit.
 9                THE COURT:  Okay.  So tell me what evidence the
10     government has produced with regard to how he used pepper spray
11     in such a manner.  Just list the factors that I should be
12     considering.
13                MS. FIFIELD:  The Court should consider the fact that
14     he -- every aspect of his behavior was affirmative and evinced,
15     and I do think his intent matters here.
16                THE COURT:  But why?
17                MS. FIFIELD:  I'll tell you.
18                THE COURT:  He hit him in the eye.  He aimed for the
19     eye.  That intent matters.
20           But that he wanted to hurt him?  Why does that matter?
21                MS. FIFIELD:  Because that informs the Court's
22     understanding of the manner in which he used the weapon.  If
23     he's standing 100 feet away from these officers and shooting
24     pepper spray, that's a totally different situation than he's
25     surging forward with these other people, propelling the motion
```

of his body and the spray towards these officers.  He intended
to use that weapon to attack those officers.

He didn't -- and I think there's a compelling question of
if the distance matters, you know, did the defendant know that,
you know.  Did the defendant stay back because he thought --

THE COURT:  Is it that sort of subjective analysis
here, or is it just objectively, was there -- the way in which
he used it, the manner in which he used it, it was capable of
committing serious bodily harm?

Again, what if he was 100 feet away and had every intent to
kill the officer?  How far does that get you?

MS. FIFIELD:  I don't think it would get us very far,
but that's not the facts that we're talking about here.  The
defendant, in the manner that he used this weapon, which was
purposefully, forcefully releasing the spray into the air, it
was capable of seriously hurting someone.  He was aiming for
these officers, but the manner in which the defendant used it
was the manner in which it was designed.

THE COURT:  But don't I look at the officers, not
someone?

MS. FIFIELD:  Again, separating what is the weapon
capable of in the manner that the defendant used it and then
using the officer's experience as evidence of -- first of all,
the government would submit that the officer's experience is
most important for the purpose of identifying the substance as

1   pepper spray.  The officer's experience is not necessarily

2   determinative of whether or not pepper spray is a deadly or

3   dangerous weapon.

4        THE COURT:  No, I'm relying, as you can tell, more on

5   the captain's testimony on what pepper spray is capable of than

6   I am them, the impact on them.  It's just affirming what I think

7   the record proves.

8        MS. FIFIELD:  And every single one of the government's

9   witnesses testified about not just the officers' experience

10  being sprayed on January 6.  They testified about their

11  training.  They testified about -- I do think the presence of

12  emergency medical personnel during these training exercises is a

13  significant fact about this weapon's capability.  If, in

14  training under a controlled environment, whoever the training

15  organization is, FLETC, is trying to protect officers from harm,

16  that tells me that this weapon is capable of causing serious

17  bodily injury.

18       THE COURT:  All right.  So I want to make sure I've

19  got all of your factors.  One, he wanted to hurt the agents.  He

20  was forceful and purposeful.

21     That's all kind of one thing; right?

22       MS. FIFIELD:  In terms of the elements of the assault,

23  yes.  And then also, I do --

24       THE COURT:  I just want the factors that you say show

25  serious bodily injury.

1          MS. FIFIELD:  Capable of causing.

2          THE COURT:  Capable, yes.  So he wanted to hurt, and

3     he was acting forcefully and purposefully.

4        That's all like one factor.  Do you agree?

5          MS. FIFIELD:  Sure.

6          THE COURT:  I mean, does it -- do any of those things

7     add any more than the rest?  They just seem like his intent, his

8     behavior, his --

9          MS. FIFIELD:  Those things, I think it's a basket of

10     facts that goes to the weapon's capabilities in the manner that

11     the defendant used it.

12          THE COURT:  Okay.  And then the other factor you've

13     given me is this lack of medical personnel.  And to make sure I

14     understand, you're not saying medical personnel needed to be

15     present, but you're saying because he was using the spray

16     similarly to how law enforcement officers train, 6 feet away,

17     that the Court just automatically should assume that the medical

18     officers are there because it could cause serious bodily injury?

19          MS. FIFIELD:  To use the Court's word, I think the

20     presence of medical personnel indicates some of the inherent

21     capabilities of the substance, even when the most safeguards are

22     put in place.

23        And I don't know that it's fair to say, based on our

24     record, that the defendant used this weapon in a way that's

25     consistent with law enforcement --

1          THE COURT:  By that, I mean the distance.  And I

2    think -- i mean, you don't like it.  You're resisting it.  But I

3    think the record has to be interpreted that he shot this 6 feet

4    away.

5        If you want to convince me I'm wrong on that, please, I

6    invite you to.

7          MS. FIFIELD:  I don't want to --

8          THE COURT:  No, I want to be corrected if I'm

9    construing the record incorrectly.  I just don't think I can say

10   he was any closer than that.  Actually, 10 would be most

11   generous to the defendant.

12       What was the testimony?

13         MS. FIFIELD:  And that's why I think we were walking

14   down a dangerous road when we're talking about how far this

15   defendant was away from the officers.

16         THE COURT:  But it's your burden.  You agree it's a

17   factor that affects whether it's capable of causing serious

18   bodily injury?  Don't I have to look at distance here?

19         MS. FIFIELD:  I think in the range that we're talking

20   about, which is 10 to 3 feet --

21         THE COURT:  Where do you get the 3 feet?

22         MS. FIFIELD:  Officer Williams testified that he

23   thought the defendant was 3 to 4 feet away.

24         THE COURT:  Okay.  So you think I can say beyond a

25   reasonable doubt that you've proven he was 3 feet away?

1          MS. FIFIELD:  I don't think it matters, with all due

2     respect.

3          THE COURT:  Okay.  So back up to 10 feet.  Let's look

4     at it -- if I decide to credit 10 feet.  I don't know that I

5     would, looking at the video, but I also don't think I credit 3

6     feet looking at the video either.

7          MS. FIFIELD:  Okay.

8          THE COURT:  Six seems about right to me.

9     Do you all disagree?  Does anyone disagree?

10          MS. FIFIELD:  I will stick with the statement -- my

11     position, which is trying to, based on the evidence that we

12     have, determine with precision how far away the defendant is

13     from these officers is a fraught endeavor.

14          THE COURT:  Okay.  And by definition, don't you lose?

15          MS. FIFIELD:  No.  In the range that we're talking

16     about, let's say 10 to 3 feet, was this weapon capable of

17     causing serious bodily injury in the manner that the defendant

18     used it, the government says yes.

19     It doesn't matter whether it did cause serious bodily

20     injury, as we've discussed.

21          THE COURT:  But why would I be looking at 3 if I'm

22     saying I've watched the videos a lot and it doesn't seem 3 feet

23     to me?

24          MS. FIFIELD:  It gets to my position or the

25     government's position that the precise -- the precision at the

```
1   level that we're talking about does not make a difference in

2   deciding whether this weapon was capable of causing serious

3   bodily injury.

4           THE COURT:  Okay.  Again, the only evidence in the

5   record as to any serious bodily injury, as I define the term, is

6   this retina testimony that was 3 feet.

7           MS. FIFIELD:  The record reflects that pepper spray is

8   capable of causing protracted vision loss.  It is capable of

9   causing, you know --

10          THE COURT:  How long does the record say protracted

11  vision loss would be?

12          MS. FIFIELD:  In Officer Williams's case, obviously

13  what he was referring to is ongoing, two years on.

14          THE COURT:  You cannot make that statement.  That is

15  outrageous that you all are suggesting through his statement

16  you've proven that the pepper spray has caused him ongoing

17  retina damage for a year.  That's preposterous.  You're so short

18  on the proof for that assertion.  It's really loose.

19      This is like complaint kind of stuff.  It really is.

20          MS. FIFIELD:  The record as a whole shows that pepper

21  spray has different effects on different people, depending --

22  different ability to, quote unquote, fight through it.

23      And I think the record supports a reasonable inference

24  that, in particular, law enforcement officers have increased

25  ability to fight through the effects of pepper spray than the
```

average person, which again I don't think factors into the
Court's analysis.

But the record shows that based on the testimony of all
four witnesses, pepper spray is capable of inducing asthma
attacks, causing a person to collapse and not be able to
breathe, causing a person to not be able to open their eyes,
sometimes even after decontamination, which the timing of
decontamination again does not go to the capabilities of the
weapon.

This record demonstrates that this weapon is capable of
causing serious bodily injury.  It is a dangerous weapon.

And I think it might be an appropriate time to give us all
a little time to think about this and let my co-counsel address
the Court's questions on rebuttal.

Does the Court have any questions about the elements of the
other counts?

THE COURT:  Not at this time.  Thank you.

MS. FIFIELD:  Thank you, Your Honor.

THE COURT:  Oh, wait.  I actually do have -- sorry,
Ms. Siddiqui.

MS. SIDDIQUI:  No problem.

THE COURT:  Because you might respond to this.

So the cases you cite in your brief of other January 6
cases where you say judges and juries at various stages of
litigation have concluded that pepper spray is a deadly or

dangerous weapon, you didn't include any facts to help the Court
from those cases, and a lot of them are, you know, at the
detention hearing or sentencing stage where the standard's
completely different.

The one case that appeared to maybe be helpful to the Court
in trying to figure this out was the Howell case, and you cited
three cases, but that's just one case.  And you didn't provide a
transcript.  You didn't provide a parenthetical.  But looking at
the criminal complaints in that case, it did seem to the Court
at least that the defendants were spraying fire extinguisher
sized canisters at a very close range.

For one, there's no one between the defendant and the
officers, and there was an orange stream of spray, clearly a
different substance than here.  One complaint described it as
bear spray.

Assuming my reading of the complaint is right, would you
agree that that is different factually than this case?  Have you
looked at it?

MS. FIFIELD:  Having not looked at the complaint
myself, based on the Court's description --

THE COURT:  So you all didn't even look at any of
these cases that you've cited?

MS. FIFIELD:  The government prepared this section of
the brief because the Court requested findings in Capitol breach
cases where pepper spray was determined to be a deadly or

1    dangerous weapon.

2         And I agree that at the detention stage or plea stage, the

3    burden and level of analysis required to make those findings is

4    much different than we're dealing with here.

5             THE COURT:  But that was -- according to your brief,

6    that was a Rule 29 or trial stage, and it could be very

7    persuasive, but I don't have information about the facts there

8    other than what I am telling you from the complaint.  So I don't

9    know what the government proved or not.  And it's frustrating,

10   because it would be helpful.  I couldn't get it, because it's

11   not on the docket.

12        But another example -- the Howell case was a detention

13   hearing case.  I think that other -- if I misspoke, I think that

14   was a Mehta case.

15            MS. FIFIELD:  Your Honor, could I just check?  You

16   were referring to *United States v. Brown*?

17            THE COURT:  I think this is the single -- you said

18   there were three trial cases and they're all the same -- let me

19   find it in your brief.  Yeah, this is *Brown*.  It's Mehta.  So

20   I'm looking at page 10 of your brief.

21            MS. FIFIELD:  Okay.

22            THE COURT:  Guilty pleas might -- it's obviously

23   beyond a reasonable doubt.  And I don't know.  Maybe some of

24   those pleas didn't have Statement of Facts, didn't have any more

25   in it than here.  But in those instances, I'm guessing the

defendant is admitting that he used a dangerous or deadly
weapon.  I don't have any specifics on those either.

But the *Worrell* case, which was a Howell case, I could find
the transcript in that case, and it suggests that the government
was able to recover the type of pepper spray that was used in
that case, and that was a gel form that was, according to the
record, more likely to be targeted and was double the average
strength of other pepper sprays.

The defense in that detention hearing didn't contest in a
big way whether the pepper spray is dangerous but primarily
argued that the defendant sprayed another rioter rather than an
officer.

In that hearing, the government specifically noted the
lower standard of review and suggested that things could be
different at trial when it's beyond a reasonable doubt.

And there, Howell specifically mentioned that it does view
pepper spray gel, particularly if the marketing can be believed,
a particularly powerful pepper spray, gel is a dangerous weapon.

This was an enhanced -- maybe that was the case here, too,
but we don't have any evidence as to the nature of the spray, do
we, whether it was a more intense form of double the average
strength, because you didn't recover -- you didn't admit the
pepper spray.  You couldn't tie it to January 6, I guess.  Is
that why you didn't admit the spray at trial?

MS. FIFIELD:  Truthfully, I mean, we didn't admit

1     that -- it was not alleged to -- we were not intending to offer

2     that as the canister that the defendant used.  In conversations

3     with defense counsel, we ended up deciding not to admit that.

4               THE COURT:  Okay.  That's all.

5          Ms. Siddiqui?

6               MS. SIDDIQUI:  Thank you, Your Honor.

7          Just to start with the same argument since we're still on

8     it, I think the government's use of *Arrington* is misplaced.

9     It's not just whether it's capable of causing serious bodily

10    injury, but also that the defendant had to use it in that manner

11    to do it.  And that matters for this case-specific analysis,

12    that it has to be used in a manner to produce that.

13         The only testimony that we have, as the Court pointed out,

14    is that it could cause hydraulic needling, that it could cause

15    that retina detachment.  And I believe Captain Mendoza testified

16    to it, and she gave very specifics as to how that can occur.

17    And I asked her on cross of whether that's even more of a

18    concern with larger cans, not the smaller handheld ones, which

19    is what is alleged to have been used here.

20         I also want to point out that I think the government puts a

21    lot of stock in training in that EMS was available for officers.

22    This is a training that's carried out --

23               THE COURT:  This is a what?

24               MS. SIDDIQUI:  This is a training that's carried out

25    for officers.  I think we can all assume there's liability

1    issues here.

2         Officers don't have EMS present when they're deploying it

3    in the field, when they're deploying it even on January 6.

4    Again, that's because that is not a requirement of the use of

5    pepper spray.

6         There's --

7         THE COURT:  What about, Ms. Siddiqui, I do remember

8    some testimony about -- with the first officer who was hit dead

9    in the eye, testimony about how in training they do the Z motion

10   rather than the direct hit.

11        I mean, this may be another instance of not proving up the

12   evidence, but my recollection is, there's nothing in the record

13   really explaining the need for the Z versus the direct hit,

14   other than the 3 feet you can detach the retina.

15        MS. SIDDIQUI:  Yes, Your Honor.  And I think the only

16   testimony that had anything to do with the Z formation as

17   opposed to just straightforward is they wanted to ensure that it

18   gets all across your eyes and goes down your face so you

19   actually feel the burning sensation on your face, and that was

20   one of the officers, I believe, who testified and said that.

21        THE COURT:  So you think it's to make it aggravated

22   rather than to mitigate it?

23        MS. SIDDIQUI:  Exactly.  To show the actual features

24   of what alleged pepper spray can do, that is why it is sprayed

25   that way, so that it not only drips down into your eye but it

1    continues down for the entirety down your face so you are able

2    to feel all of those impacts.

3            THE COURT:  But I assumed -- and maybe this was just

4    an assumption I was making without the evidence.  I assumed that

5    when they're talking about making the Z motion, they're making

6    it across the forehead and not a direct hit to the eye.

7        You don't think I can even infer that from the evidence?

8            MS. SIDDIQUI:  I don't, Your Honor, because there's no

9    testimony to support that.  Nobody got on the stand, not even

10   Captain Mendoza, who, as the Court pointed out, is the head of

11   CDU.  She trains officers.  She has had training.  She's prior

12   military.  And she would be the one to be able to speak to this

13   issue.  No one testified that that's why that's done.  And the

14   only testimony that we had about the Z formation was so that

15   officers can feel the pain or whatever the impacts are once it's

16   going down your face and impacts your skin.

17       And I do want to point out that I think there's a lot that

18   has been made here of EMS, of the potential and it's because its

19   potentially dangerous.  Officers are deploying this in the

20   field, and especially the size that is alleged here in this

21   specific case.  It's not one of those larger canisters, as was

22   the case in *Brown*.  It's not one of the, you know, handheld, the

23   fire extinguisher size.  It's not the ones that have the higher

24   velocity of spray.

25       And I asked Captain Mendoza this as well, if that is a

1    factor in hydraulic needling or the retina detachment, and she

2    said yes, there was.  And there's a reason for that.  The spray

3    comes out at higher velocity and faster and with much more spray

4    than a normal handheld one.

5         And if we are extrapolating to factors that were not

6    present in this case, then I do want to point out that the

7    alleged size of the spray in this case is the same as one would

8    get in a supermarket, as somebody would have on a key chain.

9    And that is not sold with some special license.  It's not sold

10   with some special training.  Women carry that as a part of their

11   normal key chain.

12        And to prove that that, that specific thing that's

13   deployed, that not only is it pepper spray but that it causes

14   serious bodily injury, the government has not met that burden

15   here.  I think as the Court has rightly pointed out, it's not

16   just bodily injury.  It's a step further than that.

17             THE COURT:  Serious bodily injury.

18             MS. SIDDIQUI:  Yes.

19             THE COURT:  What definition does the defense think the

20   Court should apply?

21             MS. SIDDIQUI:  Your Honor, I think the definition that

22   the Court has pointed out, it's protracted injury, it's

23   significant injury.  It's something that requires

24   hospitalization or surgery.

25             THE COURT:  By the way, you don't have any issues with

1      any of the jury instructions in this case, do you?

2            MS. SIDDIQUI:  No, Your Honor, I do not.  But that is

3      what we would submit that the Court should use, and that is what

4      has been used.  Even Judge Mehta in *Brown* used that definition,

5      and that's what we cited to in our brief as well, because that

6      is the standard definition -- even though assault does not

7      specifically define it, that is the definition that has been

8      applied in previous trials.

9            And we do --

10           THE COURT:  So what would you say to the argument that

11     this was extreme physical pain?  Do I have enough of that -- do

12     I have enough evidence of that in the record to find beyond a

13     reasonable doubt that they've proven serious bodily injury?

14           MS. SIDDIQUI:  I do not, your Honor.  I think the

15     serious physical pain is not just the burning sensation you

16     might get right away or the inability to open your eyes for the

17     next five minutes.  And even that is not in testimony.

18           No officer testified as to how long it took them to go

19     decontaminate.  I know Officer Riggleman went immediately.  We

20     can see him on the video.  He decontaminated, flushes his eyes,

21     and comes back.

22           THE COURT:  They say I shouldn't look at the

23     decontamination, because I should just look at it objectively

24     without that help, you know, to the officer, that assistance.

25           MS. SIDDIQUI:  Understood.  But even then, there is no

testimony to that of what this protracted pain was or how much of a pain level or pain scale that it was.

And I think again, Captain Mendoza was the one to have testified to that if she could have.

THE COURT:  She talked about a burning sensation.

MS. SIDDIQUI:  And I don't think, Your Honor, that that qualifies as extreme physical pain.  Even something -- and again, I think because we've now created the spectrum, I do want to point out, if shampoo gets in your eyes, that's pain.  That's a burning sensation, and that stops you from opening your eyes for the next five minutes.

But again --

THE COURT:  A skinned knee, too.

MS. SIDDIQUI:  Yes, and all of those things.  Even lemon on a cut skin, all of those cause burning sensations.  That does not inherently mean that it is dangerous.

THE COURT:  How would you define protracted impairment of a bodily function?  What do you think is the threshold for "protracted"?

MS. SIDDIQUI:  Your Honor, just from the basic reading of the definitions in the statute and the fact that it requires hospitalization and the fact that it requires surgery, to me, that's more than just the temporary day.  That's more than just -- and just to be clear, they were out there, they were using that organ.  They are being able to see.  They're

1    fighting.  They're continuing to do their duties.  I do not

2    think that it's just simply the next 15 minutes.

3        If it requires surgery, even if it's a one-day surgery and

4    you're out of the hospital, that requires a full day.  That

5    requires further therapy or treatment or ongoing treatment that

6    surgery would require, even post-op treatment.

7        And I think that is what the Court has intended, and that's

8    why it's separated bodily injury from serious bodily injury.

9    They are not the same, and they have different proofs and have

10   different burdens.

11       And again, I do think that the government -- this is the

12   government's burden.  This was the witnesses that they chose to

13   put on; this was the case they chose to put on.  And I do not

14   think they have met their burden on that piece of it.

15       I do want to point out that Officer Williams, and I think

16   this is just purely a matter of fact, if the Court looks at

17   Exhibit 211, he does not collapse.  He walks away.

18            THE COURT:  And I meant to clarify that.  I said he

19   collapsed a minute later.  What I meant to say is as of a minute

20   later, he still was standing.

21            MS. SIDDIQUI:  Yes, Your Honor.  And he doesn't walk

22   away with the aid of somebody else.  He just walks away off the

23   camera.  And you can see that he's able to look at the officer

24   in front of him --

25            THE COURT:  But I do need to look at the capability,

1       right, not just what happened to these officers?

2              MS. SIDDIQUI:  Absolutely.  I just wanted to clarify

3       that for the record.

4              But yes, the capability -- but it goes hand in hand with

5       the manner in which it's used.  If it is used in the exact same

6       way that officers are using it in training, out in the field --

7       and one can argue that when you're struggling with a suspect out

8       in the field, you are not going to measure 6 feet away.  You are

9       not going to walk away and say all right, I'm at a safe

10      distance, let me deploy in a Z pattern, and let make sure that

11      EMS is standing by.  That simply does not happen and that's

12      because it does not need to happen.

13             All those reasons, Your Honor, I do not think that this

14      meets the burden of deadly or dangerous and certainly is not

15      inherently dangerous.  It's more on the spectrum of something

16      like a bat that one can use, and you can cause serious

17      significant bodily injury, but it depends on how you used it.

18      If you strike it once, most likely not.  If you continue to

19      strike it and over and over and over again, then yeah, possibly.

20      And that's the same as a fist, that's the same as any object

21      that one uses to cause any sort of injury.

22             Moving on to Officer Williams -- and I'm happy to answer

23      any more questions.

24             THE COURT:  I want to ask you specifically about

25      Officer Williams --

1           MS. SIDDIQUI:  Yes, Your Honor.

2           THE COURT:  -- and Ms. Fifield's point that she thinks

3     that the photographs that I reviewed on page 28 through -- I

4     think it's 32 of their brief rebut sufficiently your

5     screenshots.

6           MS. SIDDIQUI:  So I just want to be very careful and

7     make sure that I clarify, because I don't think I did.  I'm not

8     saying that any of those two sprays hit him directly in the eye.

9     I understand that it goes over him, it goes next to him.  Both

10    of those canisters are larger canisters, and I think everybody

11    now, it's common knowledge that those are not intended for one

12    person as opposed to the small handheld ones.  Those are

13    intended for a larger crowd.  They're intended for crowd

14    control.  They go everywhere.

15          THE COURT:  So your point is one of those could fall

16    down like it did on all the crowd in that exhibit, that video?

17          MS. SIDDIQUI:  Yes, Your Honor.  That is why everybody

18    is reacting the way they react.

19          THE COURT:  And it's possible that it happened at the

20    same moment?

21          MS. SIDDIQUI:  In fact, it should have happened

22    before, and that's why we included the screenshots we included.

23    Officer Williams's reaction, the bending down, the looking down,

24    looking like he is trying to get something out of his eyes, that

25    actually happens well before Mr. Ramey ever reaches out his hand

1    a second time.

2        And that is why we have argued that.  That is why we have

3    included that in our brief.  It's not that those other two

4    sprays directly hit in the eye and, thus, it's not Mr. Ramey.

5        One, Mr. Ramey, as you can see in the video, does not

6    actually make it all the way to Officer Williams.  The second

7    piece of it is, he already has something in his eyes by the time

8    Mr. Ramey even extends his hand.  So whatever effect he's

9    feeling, whatever burning sensation he's feeling is not from the

10   spray.  It's from the two that have already occurred.

11       On top of that, he's also hit on the head with a flag pole

12   before Mr. Ramey sprays.  So again, his head is down.  He's not

13   looking up.  He's not looking at the crowd, And he does not in

14   fact until well after the spray.  And at that point, he looks

15   up.  He looks to the officer to his right, and he walks off

16   camera.

17       It's not just simply that he didn't make contact.  He

18   didn't even anticipate anything from Mr. Ramey.  I think he

19   testified very credibly he doesn't recognize anyone from that

20   crowd.  He doesn't know them.  He has not had interactions with

21   them since.  He was not threatened by Mr. Ramey's spray.  He was

22   not in fear of imminent bodily injury.  He didn't even know that

23   this was occurring.

24       And so it's not just that it didn't make contact.  It's

25   that he had no idea that this was even happening.  The effects

1    that he felt, his body language, his reaction happened well

2    before Mr. Ramey.

3            THE COURT:  You agree it's an attempt?

4            MS. SIDDIQUI:  If so, Your Honor, I still do think

5    that he would have had to have seen some threat coming towards

6    him.

7            THE COURT:  Why can't you attempt to assault someone

8    from behind, you know, with a board?  They actually have to see

9    it for it to be an assault because it has to generate fear?

10           MS. SIDDIQUI:  Yes, Your Honor.

11           THE COURT:  You're right.  It's not a battery.

12           MS. SIDDIQUI:  Exactly, and that is the problem here.

13   He even said he does not recognize anyone in the crowd.

14           THE COURT:  I know.  But why would you expect these

15   officers who are in the trenches getting battered by everybody

16   to recognize Mr. Ramey?  That would be bizarre.

17           MS. SIDDIQUI:  We would not.

18           THE COURT:  But it doesn't mean that he didn't see and

19   wasn't scared by him.  But you're saying he had to see him

20   pointing that at him?

21           MS. SIDDIQUI:  He had to have seen -- it's not that he

22   had to have said I saw that spray and I know it's Mr. Ramey.

23   It's that he had to have said I saw that spray and that scared

24   me and I knew that I'm about to get hit and I'm about to have

25   bodily injury.  There's none of that in this record.

1      It's not just that he didn't recognize him.  The ID was

2   obviously not the issue.  We stipulated to that.  It's that he

3   did not even know that there was any imminent danger of anything

4   coming towards him.  One, his head is bowed.  Two, he's already

5   feeling the impact of something else that's not Mr. Ramey.

6          THE COURT:  But Mr. Ramey is clearly a part of a large

7   mob.  You're saying that I have to find beyond a reasonable

8   doubt that Officer Williams had Mr. Ramey -- his eyesight on

9   Mr. Ramey, not the mob as a whole, and felt fear because of his

10   arm coming up?

11          MS. SIDDIQUI:  Yes, Your Honor, because it's not

12   charged -- it's charged as one individual person committing one

13   individual act.  It's not charged as a part of a mob they

14   incited violence against this one officer, which --

15          THE COURT:  What about attempting to intimidate him?

16   He's still got to know?

17          MS. SIDDIQUI:  He would have still had to have

18   known -- again, it's not attempting to intimidate him as being a

19   part of a mob.  The mob is not the alleged intimidation.

20          THE COURT:  I don't know.  They want the mob to move

21   away.

22          MS. SIDDIQUI:  They do.  And that's a separate charge,

23   if the government had chosen to charge it that way.  I don't

24   think --

25          THE COURT:  But isn't that a part of the charge, it's

```
 1   to assault or intimidate?
 2              MS. SIDDIQUI:  Your Honor, it's to intimidate with the
 3   assault.  It's not to intimidate just because he's a part of a
 4   larger crowd.
 5              THE COURT:  I know, but --
 6              MS. SIDDIQUI:  It's to intimidate the officer with
 7   this assault.  It's to impede him.  All of that is to have done
 8   with the charged conduct, which is the assault.
 9              THE COURT:  All right.  So you're saying -- let's take
10   it away from these facts.
11       Officers are surrounded by an angry mob of 100 people, and
12   they're getting battered from every direction, and the officer
13   is almost, you know, hands covering the face.  In that
14   situation, the government can't charge even attempted assault
15   because the officer's literally not making eye contact with the
16   individual ten back who is throwing the projectile?
17       The officer is hunkered down and is trying to stay alive,
18   and it surely can't be the case that that officer has to make
19   eye contact with one out of 100 and say this person is trying to
20   intimidate and assault me.  That cannot be the case.
21              MS. SIDDIQUI:  Your Honor, it's also not charged that
22   he's a part of a mob or he's a part of a gang of people that is
23   ganging up together --
24              THE COURT:  It would have to be charged as being a
25   part of the mob?  Is that true?
```

1          MS. SIDDIQUI:  I do, Your Honor.  When it's charged as

2     a conspiracy with other people, you take a look at the conduct

3     of everyone.  It's not just that all four have to have

4     threatened him in the same way.  It's that the mob constituted

5     the threat.

6          That's not how it's charged here.  It's charged here as one

7     person assaulting him or impeding with him or intimidating him.

8          THE COURT:  Are we talking about like common law

9     assault here versus this assault?  Because doesn't assault mean

10    any intentional attempt to threat to inflict injury upon someone

11    else?  So can't the government satisfy it by proving that Ramey

12    intentionally attempted to inflict injury?  Aren't those the

13    elements to this offense?

14         MS. SIDDIQUI:  But I think if we're talking about just

15    simple assault, if we're talking just about that, if we're not

16    talking about the felonious assault and we're not talking about

17    contact, we're just saying --

18         THE COURT:  Why does it matter whether it's felonious

19    or simple assault?

20         MS. SIDDIQUI:  Because I think if we're looking at

21    what the government has proved, if we're saying they have not

22    proven this, they have not proven contact, they have not proven

23    that it's a deadly or dangerous weapon, then we fall back into

24    the lower included offense, and that's why I'm including that in

25    my analysis.

1        And for that, I do not think --

2            THE COURT:  But the felonious assault is while making

3    physical contact with the person or acting with intent to commit

4    another felony, which you're not going to concede this, I know,

5    but do you have any real argument on the civil disorder?

6            MS. SIDDIQUI:  We don't, only in the sense that -- we

7    don't.

8            THE COURT:  All right.

9            MS. SIDDIQUI:  But I do think it then raises a

10   separate issue, which we've included in our response, but I can

11   handle it after.

12       But I do think that it's not just enough to say he was just

13   there as a part of a mob when you're not charging him that way.

14   When you're not charging five people as a part of one conspiracy

15   to act a certain way -- that is when you can impute everyone's

16   actions to every single person included in that conspiracy.

17   That's not the way that this is charged here.

18       And if that was the case, then yes, I would not have a leg

19   to stand on when I made that argument.  But that is not how it's

20   charged here, because there are people that were there that did

21   not participate in the mob, that did not participate in

22   assaulting law enforcement, and they simply just by existing and

23   adding to the number cannot be charged with the same conduct as

24   Mr. Ramey.  And I do think that that matters.

25           THE COURT:  All right.  Looking at the fifth element

1    to assault, the physical contact or other felony, the government

2    has to show that the acts involved physical contact with the

3    victim of the assault or the intent to commit another felony.

4         So why don't they get the felonious assault, regardless of

5    whether the officers saw Mr. Ramey's attempt at all?  I just

6    don't see where that's an element.

7              MS. SIDDIQUI:  Understood, Judge, but then we fall

8    back to it's not a deadly or dangerous weapon at that point.

9              THE COURT:  But it can still meet this other

10   definition; right?

11             MS. SIDDIQUI:  If it does, then, Your Honor, we would

12   argue that it does then create a *Blockburger* issue for the

13   civil --

14             THE COURT:  The *Blockburger* issue is a loser.  Come

15   on.  They each have an element that the other doesn't.

16             MS. SIDDIQUI:  Understood, Judge, and that's fine.

17   But I would still for the record submit that.

18        But that's -- we would then say that it's not deadly or

19   dangerous, and if that is the theory that they're proceeding

20   under, I don't think they've made physical contact for

21   Officer Williams.

22        If the Court is inclined to allow it under the theory that

23   it is in commission of another felony, then we would submit,

24   Your Honor, that elements of that have already been included in

25   this assault charge, and thus, the civil disorder, if that is

1    the underlying other felony, does not stand.

2              THE COURT:  Because of *Blockburger*?

3              MS. SIDDIQUI:  Yes.

4              THE COURT:  Okay.  But you don't have any other

5    argument?

6              MS. SIDDIQUI:  No, Your Honor.

7              THE COURT:  Okay.  And in terms of any of the other

8    charges, the misdemeanors, any points you want to highlight?

9         I do appreciate that you all targeted your briefs.

10             MS. SIDDIQUI:  We do believe, obviously, that those

11   were the most important issues, and those are the issues that we

12   would dispute in this trial.

13             THE COURT:  All right.  Thank you very much.

14        Mr. Brady?  Mr. Brady, if you can start with on the

15   assault.  She had me going a little bit on the officer needing

16   to see him, but that's not an element in this assault,

17   regardless of whether I find you've proven beyond a reasonable

18   doubt he used a deadly or dangerous weapon.

19             MR. BRADY:  Just so I'm clear, Your Honor, on that

20   that last portion you were arguing about with defense counsel,

21   you don't need me to go into that to rebut?

22             THE COURT:  No, no, I just want -- you agree that I'm

23   reading these elements right?  The officer does not need to see

24   Mr. Ramey try to hit him with pepper spray for me to find an

25   attempted assault?

1          MR. BRADY:  That's true, Your Honor.  Under the common

2     law, assault is either intentionally placing someone in fear or

3     an attempted battery.  So there's a Second Circuit case we cite

4     to that talks about that as well, the jury instructions as well

5     when you look at them.  Plus, there's five other verbs in 111

6     that we can rely on.  He's intimidating, impeding, opposing.

7     You can impede an officer by closing a door.

8          Can I have a moment, Your Honor?

9               THE COURT:  Sure.

10               MR. BRADY:  Your Honor, may I display my laptop?  I

11     have a --

12               THE COURT:  Of course.

13               MR. BRADY:  Your Honor, I won't say this is a simple

14     case.  And I appreciate Your Honor's detail-oriented analysis of

15     everything.  There is a lot to look at with this case.

16          At the end of the day, this defendant sprayed two officers

17     in the face with an aerosol canister that had the effects of

18     peppering their eyes, burning.  It caused their eyes to shut.

19     They lost their vision.  It was blurry.  They were

20     incapacitated.  You heard testimony about difficulty breathing.

21          And we've had some conversations with Your Honor about

22     serious bodily injury.  We focused on the defense's -- the

23     defense in their brief cited to four different ways which

24     serious bodily injury could be considered.  Protracted injury is

25     just one of them.  Protracted impairment of one of the bodily

1    functions is what we spent a lot of time on, impairing the

2    officer's vision.

3            THE COURT:  But protracted, help me understand why

4    this is protracted.

5            MR. BRADY:  Again, Your Honor, protracted just means

6    long or longer than one would expect.  Losing one's vision, one

7    of the five senses, certainly in the context of a riot, but just

8    losing one's vision --

9            THE COURT:  Where is the testimony in the record that

10   vision is lost more than a short period of time?  Even the

11   captain talked about the burning sensation lasting for up to 24

12   hours when an officer can't get to a water station, but she did

13   not -- even she did not say the sight's lost for that period of

14   time.  She said that the burning sensation can last for up to 24

15   hours.

16       So how long is the lack of vision lost in the record?

17           MR. BRADY:  We know from the record what the effects

18   of this defendant's spray was on Officer Riggleman.  His eyes

19   were forced shut, and he had to stay in the bathroom after he

20   ascended the Capitol steps.

21           THE COURT:  For a short period of time, and he was

22   back out there.

23       I think Ms. Fifield is right.  I don't have to focus on the

24   officers themselves, but where in the record is there any

25   testimony about in general how long vision is lost with pepper

1    spray?

2         MR. BRADY:  Sure.  When we looked at the officers, we

3    use that as a way to look at what the capabilities of the weapon

4    are, but also the training as well is something that Your Honor

5    can --

6         THE COURT:  But what did they say about how long

7    vision is lost?

8         MR. BRADY:  It depends on the person is what the

9    testimony was.  It impacts each person --

10        THE COURT:  But what's the maximum?  What did I hear

11   in the record about how long vision is lost?

12        MR. BRADY:  Officer Williams testified that he was on

13   the line for hours after this, several hours.

14        THE COURT:  And couldn't see the whole time?  No way

15   he stayed on the line the whole time.

16        MR. BRADY:  He said his vision was blurry for the

17   remainder of the day, Your Honor.

18        THE COURT:  But that's not a loss of vision.  My

19   vision right now is blurry.  I can still see you.  I need

20   glasses.  But there's blurry, and there's I can't see, I can't

21   cope, I can't function.  I don't think he testified he couldn't

22   function for the rest of the day.

23        MR. BRADY:  Certainly, he was impaired, and that was

24   for a protracted period of time.  I want to focus, Your Honor,

25   on the other parts of serious bodily injury.  It's not just one.

1    There's a four-pronged test that the defense proposed and that

2    we essentially agree with in our brief, one of which is extreme

3    pain.  It doesn't say extreme pain for protracted, permanent

4    extreme pain, or anything like that.  Certainly, the officer's

5    testimony about their face feeling like it was on fire, the

6    extreme pain of the sandpaper, like Officer Riggleman testified

7    to, that it felt like he had sandpaper on his eye.  The idea of

8    having someone take a piece of sandpaper and rub that on your

9    eye, I would classify that as extreme pain.

10         The expansion -- or the writing of serious bodily injury --

11         THE COURT:  I recall he talked about it being gritty

12    like sand in your eye.

13         MR. BRADY:  I can pull the exact quote for Your Honor.

14    Officer Riggleman said, and this is between 163 and 176, "It's a

15    burning sensation, very gritty, almost like sand kind of in your

16    eyes.  It's very difficult to see, incapacitating."

17         THE COURT:  Again, "gritty."

18         MR. BRADY:  "Officer Riggleman, what did it feel

19    like?"  "Burning sensation, almost like sandpaper in your eyes.

20    It's really difficult to see, you know.  It can be

21    incapacitating."

22         THE COURT:  "Almost like sandpaper."

23         MR. BRADY:  Your Honor, if someone took something

24    almost like sandpaper to someone's eye, that would be extreme

25    physical pain.

1          THE COURT:  I don't know what "almost" means.

2          MR. BRADY:  Or take Officer Williams's testimony about

3    what pepper spray felt like to him.  Officer Williams said, "It

4    felt like my face was burning, my face was on fire."

5          Just a common understanding of someone having their face on

6    fire is extreme pain.  I don't consider that oops, I cut myself

7    with my notes up here while discussing this, Your Honor.  That

8    would be extreme pain.  Your face is on fire.

9          THE COURT:  Do you have any case I can rely on to say

10   a burning sensation is extreme physical pain?

11         MR. BRADY:  It's going to be hard to find one that

12   says specifically just that one factor is extreme pain.  But

13   that *Neel* case out of the Ninth Circuit involved a lot of the

14   same circumstances.  In *Neel* specifically, the victim talked

15   about pepper spray, and they said, "It was like I was on fire,"

16   and quote from the victim, "I was not able to breathe."  The

17   victim in that case suffered other effects.

18        Again, you don't look at what this victim suffered.  You

19   look at the capabilities.  But when you look at the *Neel* case,

20   some of the things that that victim experienced were very

21   similar to what these officers experienced.

22         THE COURT:  Do I know anything about the pepper spray,

23   how equal it was to that or the distance or the circumstances?

24         MR. BRADY:  You do, because you have the testimony of

25   two officers who said, I've been sprayed in training with pepper

1    spray and it felt like this:  Burning, my face is on fire,

2    sandpaper in my eyes, incapacitation.

3        And then you have them testifying on January 6 that this

4    defendant sprayed me with a substance and it made me feel like

5    my face was on fire, I had grittiness in my eyes.

6        They're incapacitating to officers.  So they are forced to

7    turn and fall off the line.

8            THE COURT:  Yeah, I know.  I hear you, and I don't

9    mean to suggest at all that the government couldn't prove this

10   case.  I just don't know that you've done so here.

11           MR. BRADY:  I would disagree, Your Honor, based on the

12   testimony of the officers when comparing it to what they

13   experienced in trial.  When looking at serious bodily injury,

14   there are four different ways to prove it.  If you don't think

15   we've met the protracted prong of that, extreme pain is

16   something that both officers did testify to by using the

17   analysis of what it felt like on their face on that day.

18       If Your Honor looks at the evidence, both not only the

19   testimony but also the videos, their reaction,

20   Officer Riggleman --

21           THE COURT:  Let me go back to the Ninth Circuit case.

22   All right?

23           MR. BRADY:  Yes, ma'am.

24           THE COURT:  That's *Neel*.  In that case, the victim

25   suffered from severe asthma attacks for a week after the

1    incident and continued to present and is required to take five

2    asthma relief pills a day for the rest of her life.

3         So I don't think it's fair to say that *Neel* rested on this

4    extreme pain prong in the way that you've characterized it here.

5              MR. BRADY:  Well, in that case, it's pepper spray, and

6    it's causing the effects that are very similar to what our

7    officers had minus the asthma.

8         We did have Officer Riggleman testify that he had

9    difficulty breathing.  Taking away the ability and making it

10   difficult for someone to breathe is certainly going to be --

11             THE COURT:  For how long?  That's an impairment of a

12   breathing function for how long did he testify?

13             MR. BRADY:  He didn't testify for any particular

14   moment, for any particular --

15             THE COURT:  This is what the government has to do.  It

16   has to prove its case beyond a reasonable doubt.

17             MR. BRADY:  And we have, Judge, based on the extreme

18   pain that this chemical that was put in their eyes caused

19   these --

20             THE COURT:  You're resting solely on extreme pain --

21             MR. BRADY:  I --

22             THE COURT:  Well, I don't think the protracted you've

23   proven, but the extreme pain is this burning sensation almost

24   like sandpaper.  I don't have any cases where -- before me other

25   than the Ninth Circuit one you've mentioned where you're talking

about extreme physical pain and that being the basis for
categorizing the injury as serious bodily injury.  But I think I
need them.

    MR. BRADY:  It's the capabilities of the weapon, Your
Honor.  When Your Honor sprays this, he doesn't know what the
officers' reaction's going to be, if they're going to have an
asthma attack, if they're going to fall over onto the steps of
the Capitol and hit their head and be incapacitated.

    You heard testimony from Captain Mendoza that although it's
less than lethal, it can be lethal.  It's about where you spray
someone.  She testified about spraying someone and when they're
incapacitated as a subject, what they're going to be falling on
and being incapacitated and fall to the ground on.

    You heard from Special Agent Nougaret, who said that one of
his members of his class fell to their knees.

    If one of these officers were to have fallen down on those
steps, what could have happened?  Certainly, we're not asking
you to look at every single circumstance surrounding --

    THE COURT:  This is the first time you've argued this
today in the hearing, and you're suggesting that if the officer
had fallen down, someone could grab the firearm, and that makes
the case more aggravated; right?

    MR. BRADY:  I think there are dangers associated with
the circumstances that immediately surround the spraying that I
think are things Your Honor can consider.

1          THE COURT:  Well, again, you all kind of concede in

2     the briefs that the case law doesn't seem to go down that path

3     very far, and you do cite a case in which an inmate is, you

4     know, feet pulled out from under him, and he falls, and using

5     the hands to pull the feet out from under him didn't constitute

6     serious bodily injury; right?

7          And let's just say that -- let's just say that, you know,

8     right next to that inmate was an officer with a firearm, and you

9     pull his feet out from under him, could have toppled the

10    officer, could have grabbed the gun.

11         Do you think that would change the outcome of that case at

12    all?  I don't think so.

13         MR. BRADY:  Your Honor, I'll point to the *Arrington*

14    case that defense counsel cited to and we cited to, specifically

15    a line in defense counsel's brief.  She specifically talks about

16    the court found it persuasive that the, quote, "car was used in

17    a manner in which it dragged the officer for at least 50 feet

18    and through an intersection."

19         If a court in *Arrington* can look at the number of feet an

20    officer was dragged, the roadways in which the officer is

21    dragged, in this case an intersection in that case, why can't

22    this Court look at -- that the officers are on -- near a

23    stairway, by an angry mob.

24         THE COURT:  But that's the injury.  They're being

25    drug.  That's like -- I could look at, if Mr. Ramey shot the

1   pepper spray for an hour -- like, that's the ongoing injury,

2   isn't it, dragging them on the street?  Didn't that result in

3   the injury?

4        I was zoning out at the beginning.  Sorry.

5             MR. BRADY:  That's okay, Your Honor.

6        I think that the circumstances surrounding it are a part of

7   the capabilities the weapon was capable of doing at the time.

8        Your Honor mentioned injuries, but the court in *Arrington*

9   isn't focusing on injuries.  It doesn't say the road rash that

10  was caused by the 50 feet.  It looks at the number of feet the

11  officer was dragged, the fact that it was an intersection the

12  officer was dragged through as indicative of is this something

13  that is capable of being used in the manner in which the

14  defendant used it.

15       And we're looking at this defendant using pepper spray,

16  which we know the capabilities from training and from what the

17  officer suffered from, and we're looking at the manner in which

18  he used it, in which the context of which the officers are being

19  rushed by a mob and they have lethal and nonlethal items that

20  are on their belt that could potentially be taken.

21       I think it's a factor to be considered by Your Honor.

22             THE COURT:  Okay.

23             MR. BRADY:  You have testimony from Officer Williams

24  that the spray, that if you don't shake up the pepper spray --

25  it has pepper contents inside.  If you don't shake it up, almost

1    like a -- like any normal kitchen item that you would need to

2    shake to distribute the contents through, that the end of the

3    spray can be more intense because it wasn't shaken.

4         This defendant in this case doesn't shake the can.

5              THE COURT:  But I'm to presume misuse of the spray?

6    Is that a part of the calculus, too?

7              MR. BRADY:  I'm saying he used the pepper spray as

8    intended.  I'm saying because he doesn't shake the spray, the

9    spray that he sprays towards Officer Williams is probably going

10   to be a stronger dose with more things at the end, which would

11   explain why his vision is potentially impacted more a longer

12   term.

13             THE COURT:  What if he doesn't shake it and all the

14   stuff is in the bottom and it's the top of the dose with no

15   pepper spray in it?

16             MR. BRADY:  I think you would look at Officer

17   Riggleman's testimony about his injuries, how he was

18   incapacitated, how his eyes were forced shut, forcing one of

19   your five senses to remain closed where you have to physically

20   hold open your eye.

21             THE COURT:  That's serious bodily injury?

22             MR. BRADY:  I would.  I hate to go back to

23   "protracted" because I know how Your Honor feels about it.  But

24   the fact that the officer was able to decontaminate, let's just

25   say, in a five-minute period, you can say look at the evidence

1    we've presented, which is how big the Capitol is, that he had to

2    go in through this middle terrace door, down a hallway, being

3    assisted by another officer because he couldn't go down there by

4    himself, and actually physically put water in his eye for

5    several minutes.

6             THE COURT:  But that's not even medical care.  That's

7    just water.

8             MR. BRADY:  That's not, Your Honor, but that doesn't

9    mean that he's not in extreme pain from this.  Having his eye

10   and --

11            THE COURT:  I understand your point, that there's

12   testimony that there was serious burning or burning sensation.

13   And whether that's enough, I don't know, you know.

14            MR. BRADY:  If somebody burned an officer, we wouldn't

15   be --

16            THE COURT:  If you're talking about burning like a

17   fire, but you can have other burning, too, sensations.

18            MR. BRADY:  Chemical burns would be some of the most

19   writhing and like hurtful pain that you could experience.

20            THE COURT:  You all could have elicited that.  I just

21   have "burning sensation."

22            MR. BRADY:  But I think it would be well within Your

23   Honor's way to rule within common sense to say burning is

24   something that's not just mere -- it's not a flick of the arm.

25   It's not regular bodily injury.  It would be extreme pain that

1    somebody would be in from having their face feel like it was on

2    fire.

3              THE COURT:  You all want me to apply like a common

4    sense measure to this case, and I'm just not like -- has the

5    government proven each element beyond a reasonable doubt?  And

6    when you come in to court for a trial, you need to be prepared

7    to do that and put your best case on.  I think perhaps you could

8    have done it here, but I don't think you have.

9              MR. BRADY:  Well, I think you can do both, Your Honor.

10   I don't think you get to check or need to check your common

11   sense at the door when analyzing the facts.

12         You have two roles, and it's --

13             THE COURT:  And I'm not checking it at the door.  I'm

14   just looking at the common sense.  Both of these officers, one

15   came back -- both came back that day.  It's hard for me on those

16   facts to say that constitutes serious bodily injury, when legal

17   definitions and case law point to things like getting medical

18   care being bodily injury and serious bodily injury being

19   hospitalization and the like.

20         I just don't think you've met it.

21             MR. BRADY:  But when looking at what the officers went

22   through and how long that they suffered, that's just indicative

23   of what this thing was capable of on the very low end of the

24   spectrum.  The officers --

25             THE COURT:  I wish you had presented testimony about

the outer limits so I could consider it.  All I've got are these officers.  I don't know anything about pepper spray personally.  I don't know.  This is the small canister.  His whole hand covers it up.  I know nothing about how it really works other than it can roughly spray 6 to 10 feet and at 3 feet it can cause a detached retina.

I mean, I don't -- you don't have the kind of granular evidence that would make your case that you're trying to make here.

MR. BRADY:  I think we do, Your Honor.  We have the testimony from their training about the capabilities.  So it's not just about what it did to these officers; it's about what it's capable of doing.

Captain Mendoza testified that it is meant to be less lethal but that it can be lethal, given the way it is -- in which it's used.

Officer -- or Agent Nougaret --

THE COURT:  Fair enough, but again, the way in which it was used here, I don't think you've proven beyond a reasonable doubt that he used it in a way that it was capable of being lethal.

MR. BRADY:  I think if you look at the surrounding circumstances, that a mob is rushing towards these officers --

THE COURT:  What does the mob have to do with the pepper spray?

1          MR. BRADY:  It's the manner in which this defendant

2    used this --

3          THE COURT:  Very aggressively, very aggressive use of

4    pepper spray, I will give you that.

5        But what does that have to do with serious bodily injury?

6          MR. BRADY:  It deals with the capabilities of the

7    weapon, what that weapon was capable with in the moment.

8          THE COURT:  Because he really wanted to hurt, the

9    weapon becomes more --

10         MR. BRADY:  It's the surrounding circumstances, Your

11   Honor.  If an officer is sprayed and they're incapacitated --

12   all four testified that this pepper spray can be incapacitating,

13   cause you to close your eyes, your eyes could water, run,

14   difficulty breathing.

15       Having those symptoms as a mob is charging up the steps

16   towards you, if agents or officers are knocked down like the

17   agent in Agent Nougaret's training class was knocked down, this

18   is something that makes it capable of causing much more damage

19   than just that burning sensation.

20       But the burning sensation by itself would be extreme

21   physical pain and make it a serious -- capable of causing

22   serious bodily injury.

23         THE COURT:  Again, I want to quote the sentencing

24   guidelines again, not because they bind me, but they contrast

25   bodily injury, which includes an injury that is painful and

1    obvious or is of a type for which medical attention ordinarily

2    would be sought, with serious bodily injury, which involves

3    extreme physical pain or the protracted impairment of a function

4    of, in this case, an organ or requiring medical intervention

5    such as surgery, hospitalization, or physical rehabilitation.

6            MR. BRADY:  And, Your Honor, I don't dare question you

7    on the guidelines.  I know you know them better than me.

8            THE COURT:  It's not binding, but it's persuasive in

9    how to look at what these terms mean.

10           MR. BRADY:  And of course, and we cited to the

11   sentencing guidelines.  We cited to 1B1.1, which is the

12   applicable instructions, and it has a definition for serious

13   bodily injury in the sentencing guidelines.  We pointed to that

14   based on Your Honor's history, and we know that Your Honor would

15   find it persuasive.

16       On that, Subsection M defines serious bodily injury.  It

17   means injury involving extreme pain or the protracted impairment

18   of a bodily function, member, organ, mental faculty, or

19   requiring medical intervention such as surgery, hospitalization

20   or physical rehabilitation.

21       That seems to be a three-prong test, but extreme pain is

22   one of those three, and because "or" is used, the government

23   would say you could rely on just that first prong.

24       The legislature and the Sentencing Commission, I would

25   anticipate -- you would know better than I would -- wouldn't

1    want to draw it so narrowly that you could cause an officer

2    extreme physical pain but he didn't go to the hospital, so --

3           THE COURT:  There's no evidence in the record that

4    they were yelling, that they were incapacitated for a long time.

5       I have to read "extreme physical pain" in the context of

6    these other parts of the definition.  And pain -- I don't know.

7    I can think of you shut your finger in a drawer.  Like that's

8    extreme physical pain momentarily.  But is that what they're

9    talking about, serious bodily injury that I shut my fingernail

10   in the drawer at home and it hurts like crazy for an hour and is

11   throbbing, but is that serious bodily injury?

12      That's my common sense.  You want me to use my common

13   sense.  That's where I'm going with this.  I think extreme

14   physical pain is the pain of the kind that people who have to go

15   to the hospital experience, not people who have momentary sharp,

16   excruciating pain.  Sometimes intestinal cramps can be

17   excruciatingly painful.  That's not serious bodily injury.

18          MR. BRADY:  I would say it is under the statute and

19   also under the case law and under the sentencing guidelines.

20   And it's drawn broadly because it's not just -- we're not just

21   proving Mr. Ramey caused this.  It's that he --

22          THE COURT:  But how can you take that position when

23   bodily injury is painful and obvious and is -- or is a type for

24   which medical attention ordinarily would be sought?  I mean,

25   that's the kind of -- that's just bodily injury.

1      Serious -- you're saying intestinal cramps is serious

2   bodily injury?  That sort of pain would really qualify under

3   this definition?  I don't think so.

4          MR. BRADY:  I think so, Your Honor.  And I think if

5   you look at, as Your Honor probably has, the statute itself,

6   there's a second prong which the government didn't allege in

7   this case, but we could prove that this defendant is guilty of

8   111(b) by causing bodily injury.

9      And if that second prong was serious bodily injury, I would

10  say that second prong would inform that dangerous weapon and say

11  well, if it's serious bodily injury here, it's clearly mirroring

12  both of those.

13     But we could have proven this case by alleging bodily

14  injury, no dangerous weapon at all.

15         THE COURT:  I can't fix that.

16         MR. BRADY:  I'm not asking you to fix that.  What I'm

17  asking you to do is when you look at that second prong, that

18  should maybe inform the first prong, meaning extreme pain

19  doesn't need to be something that requires hospitalization.  It

20  just needs to meet the definition of extreme pain, something

21  that is extremely painful.

22     And if Your Honor thinks that Mr. Ramey's chemical spray

23  caused these officers extreme pain, even if it was for a

24  moment's notice, the legislature has outlawed defendants

25  obstructing, resisting, opposing, intimidating officers in the

1    course of their duty forcefully by using an object that can

2    cause extreme physical pain.

3              THE COURT:  Okay.  Other than the Ninth Circuit case,

4    which clearly had other elements that don't exist here, and

5    that's the -- what is it, *Neel*?

6              MR. BRADY:  Yes, Your Honor.

7              THE COURT:  Do you have any other case law in your

8    brief that I should be focusing on?

9         While you're looking, my very able law clerk here has given

10   me some case law from the D.C. Circuit.

11        "The cases in which we found sufficient evidence of serious

12   bodily injury to support convictions for aggravated assault have

13   involved grievous stab wounds, severe burnings, broken bones,

14   lacerations, and actual or threatened loss of consciousness.

15   The injuries in these cases usually were life-threatening or

16   disabling.  The victims typically required urgent and continuing

17   medical treatment and often surgery, carry visible and

18   long-lasting, if not permanent, scars, and suffered other

19   consequential damage such as significant impairment of their

20   faculties.

21        "In short, these cases have been horrific.  Until now, we

22   have not had a case of serious bodily injury predicated on an

23   unarmed assault in which the victim's only physical injuries

24   were bruises."

25        Well, this is bruises.  I'm not trying to minimize pepper

1    spray.

2        And the Circuit goes on to say, "Without minimizing either

3    the officer's or the victim's ordeal or the defendant's

4    culpability, we are compelled to recognize that the harm the

5    victim suffered does not appear to be of the same order of

6    magnitude as that suffered by the victims in all or other

7    aggravated assault cases."

8        Sorry.  That's a D.C. Court of Appeals case.

9            MR. BRADY:  Is that an A cite, Your Honor?  I

10   apologize.  We would just argue that would be persuasive

11   authority.

12           THE COURT:  Persuasive, but again, it's just -- here's

13   another D.C. law case saying so.  It's Court of Appeals across

14   the street.

15       But, "Serious bodily injury has a restrictive meaning.  We

16   have construed it to denote only bodily injury that involves a

17   substantial risk of death, unconsciousness, extreme physical

18   pain, protracted and obvious disfigurement, or protracted loss

19   or impairment of the function of a bodily member, organ, or

20   mental faculty."

21           MR. BRADY:  Your Honor, I'm happy to provide

22   supplemental briefing.  I ignored a vast amount of case law from

23   the D.C. Circuit just because it's not an Article III court.

24           THE COURT:  And I don't mean to suggest that this in

25   any way binds me.  It's just I'm really resisting the

1    government's urging that I consider things like severe

2    intestinal cramps and fingers getting smashed in drawers that

3    cause extreme pain as serious bodily injury.

4        I just think it's -- those don't meet any definition, even

5    though they can involve momentarily serious pain.

6        Again, I will say it once more, it's not that I don't think

7    the government might have been able to prove this.  I just don't

8    think it has here by, you know, the burden, the standard it

9    must, beyond a reasonable doubt.

10       And I will address this at sentencing, and maybe I reach a

11   different conclusion.  But --

12            MR. BRADY:  Sure.  And Your Honor, I would also point

13   Your Honor to the -- I mispronounce names, Patrick Edward

14   McCaughe III.  This is a Judge McFadden case and involved a riot

15   shield.  There's a number of different defendants that are

16   charged.  That's just the first defendant.  Some of them, he

17   found that the riot shield was a dangerous weapon.  Some of

18   them, he found it wasn't a dangerous weapon.

19            THE COURT:  But that makes my point.  He's looking at

20   the facts of the way it's being used, which is what I'm doing

21   here.

22            MR. BRADY:  Exactly, and that's what we are asking

23   Your Honor to do.

24            THE COURT:  But I don't think you've met the threshold

25   here.  I think maybe, again, you could have, but you haven't.

1   It doesn't mean that in another case involving pepper spray I'm

2   not going to hold that you have met it.  But on the proof that

3   you introduced at trial, I don't think you've met it.

4           MR. BRADY:  And I would point Your Honor to that case,

5   because Judge McFadden considered the bruises that the officer

6   suffered all over their body when he was determining whether the

7   riot shield, when used offensively or defensively, was used as a

8   dangerous weapon which would be capable of causing serious

9   bodily harm.

10      I would just point to the statute that it's -- it doesn't

11  require it to actually cause that.  It's just capable of causing

12  that injury.  And that's why the statute is written that

13  broadly.

14          THE COURT:  And I think it could be capable, but you

15  haven't given me the evidence.

16          MR. BRADY:  Your Honor, the testimony from

17  Officer Williams and Officer Nougaret about their classmates

18  having to receive medical attention after being sprayed in the

19  face with pepper spray under the most sterile and safe

20  conditions possible would be enough just by itself to show that

21  pepper spray is capable of causing serious bodily injury and

22  caused one of his officers --

23          THE COURT:  But back to the peanut example, he could

24  have thrown a peanut and caused anaphylactic shock, and you

25  wouldn't be arguing that.

1          MR. BRADY:  If Mr. Ramey had met an eggshell victim in

2     that case that was --

3          THE COURT:  That he knew, and that would be different,

4     but just --

5          MR. BRADY:  I think you could still convict him of a

6     homicide.  Despite if he had an intention to cause that injury,

7     he would just have to have knowledge that could inflict some.

8         But that is so far afield of what this defendant did.  He

9     took a dangerous weapon, an item that you can't even bring onto

10    a plane with you, an item that you must keep in your check

11    baggage, an item that you can't bring into the courthouse, an

12    item that you can't bring into the Capitol, and he brought that

13    item, pointed it at two officers, and sprayed them in the face

14    and incapacitated them, took away their vision.

15         THE COURT:  You've proven one.

16         MR. BRADY:  And you want to see testimony -- can I

17    move on to the Officer Williams and whether he was sprayed?

18         THE COURT:  Uh-huh.

19         MR. BRADY:  First, it doesn't matter if he was sprayed

20    or not because an assault could be an attempted battery.

21         THE COURT:  I'm with you on the attempt.  So I don't

22    know how much you need to --

23         MR. BRADY:  I can go through this briefly, Your Honor.

24         THE COURT:  Okay.

25         MR. BRADY:  Exhibit 200, we introduced into evidence.

It shows this defendant spraying in that direction.  While there's a lot of sprays being sprayed, the government has shown that there was only one spray that was being sprayed in Officer Williams's direction.

Mr. Ramey talks about these two other sprayers.  We'll just abbreviate them other sprayer 1 for the first in time and other sprayer 2.  They're actually the same canister.

Other sprayer 1, when you look at Exhibit 200, this is at 29 seconds, on the left-hand side of that screen, it looks like it could be near or at Officer Williams.

But when you look at Exhibit 200, that same exact spray, you look at the distance that it is away from Officer Williams, and it's being sprayed almost in a line like a gel form that's not going to be dissipating and going into Officer Williams's eyes.

And then you see here is another still from 4 seconds with the first spray, again not hitting Mr. Williams, going up and to the left, versus Mr. Ramey's spray, when he sprays, it was moving from left to right towards Officer Williams, not away from Officer Williams.

This is the second spray, the second in time.  I believe it's the same rioter that sprayed it.  It's the same bear spray, comes up and sprays on the right-hand side of your screen.

But when you look at Exhibit 211, this different angle, Exhibit 211 at 6 seconds shows the remnants or shows particles

1     of that going, and it's --

2              THE COURT:  Particles of what going?

3              MR. BRADY:  This is the bear spray that was sprayed in

4     Government Exhibit 200.  This is just that same spray from a

5     different angle.

6         At the 6-second mark, you see that other spray, too, it's

7     spraying, and it's not going anywhere near Mr. Williams.

8              THE COURT:  Okay.  Are you --

9              MR. BRADY:  Again, this is all on the officers don't

10    need to be hit.

11             THE COURT:  Wait.  Did I miss the one involving

12    Mr. Ramey?  Did you show that?

13             MR. BRADY:  That was the first one.  That was this one

14    right here, Judge.

15        In Exhibit 211, when Mr. Ramey puts his hand up, there's

16    someone with a phone that obscures it briefly.  Again, the

17    government will concede that the angles on these are not the

18    best angles, but you can see that those two other sprays are far

19    from Officer Williams and not in his direction.

20             THE COURT:  How -- can I, based on the evidence you've

21    presented, be sure that there's no other pepper spray exchange

22    in this crowd around that time?  Have you proven that this is

23    it?

24        I just look at that spray.  It's -- I get Ms. Fifield's

25    point about the angle, but is there -- is it possible that there

1     could be some other spray that hit him?

2               MR. BRADY:  No, no, Your Honor.

3               THE COURT:  And how can I be sure of that?

4               MR. BRADY:  It's on video from multiple different

5     angles.  We've identified the two sprays the defense is alleging

6     could possibly have interfered with and impacted the officer.

7     But those didn't come near this officer.

8               THE COURT:  Okay.  All right.  Keep that up.  That's

9     helpful.

10         Do you have more to present?

11              MR. BRADY:  If Your Honor has other questions.  I will

12    be up here for six hours straight arguing that this is a deadly

13    weapon.

14              THE COURT:  I will have to check with court staff,

15    because I have a long ruling, and I'm thinking that we may have

16    to continue this in order -- we're already past their normal

17    4:30.

18              MR. BRADY:  I'm happy to continue on dangerous weapon.

19    I will go until you stop me, Your Honor.

20              THE COURT:  No, I think I've had enough on dangerous

21    weapon, but thank you.

22              MR. BRADY:  And just on the dangerous weapon, when you

23    watch the videos as you have, Your Honor, the officers'

24    reactions, the crowd's reactions, people recoiling like they've

25    been hit with a bullet would be evidence that Your Honor could

1    look to to see, does this cause extreme pain, is this weapon

2    capable of causing extreme pain.

3         So the reaction themselves coupled with the testimony,

4    coupled with the training testimony, I believe, would be enough

5    for Your Honor to find that this is capable of causing extreme

6    pain.

7              THE COURT:  All right.  Ms. Siddiqui, very briefly.

8              MS. SIDDIQUI:  Very briefly, Your Honor.

9         Just very briefly addressing the second spray, this is what

10   we're talking about.  This is the whole crux of the case as it

11   relates to Officer Williams.  This, if taken just in a vacuum,

12   that this is the only second that matters, then perhaps the

13   government could say that he's looking away or he's doing this

14   because of the spray, but that is not actually the case.  And

15   that is why we included a breakdown.  In fact, it's actually

16   millisecond-by-millisecond breakdown of what was going on in the

17   crowd, how he was reacting.  And he was reacting this way, with

18   his head bent down looking away well before Mr. Ramey ever

19   extended his hand.

20             THE COURT:  Ms. Siddiqui, you're going to push back on

21   attempted assault here; right?

22        But I think they've clearly got that, and whether he

23   actually hit him or not makes no difference in terms of

24   Mr. Ramey being convicted; right?

25             MS. SIDDIQUI:  Understood, Judge, and your point is

 1    taken.

 2         But I do, Your Honor, want to go back to the deadly and

 3    dangerous very briefly.  I do think that the analysis is just

 4    not correct by the government.

 5         It's not just that it has the capabilities, because most

 6    things have the capabilities and they can be used that way.  A

 7    sharpened pencil can be the same thing.  But it's also the

 8    manner it's used.

 9         If he's using it in a manner that police use it in training

10    and probably in a better manner than they would use it in the

11    field when they're struggling with a suspect, it cannot be

12    deadly or dangerous.

13         And I do think that words matter.  It's not just pain.

14    It's extreme pain.  And when compared to the words it's

15    surrounded by in the definition, it's simply not, just as the

16    Court pointed out, smashing your hand in a car door, which yes,

17    is pain, is very painful and it will give you a bruise, but it's

18    temporary, just like it was based on the evidence that was

19    provided here by the Court -- by the officers.

20         I do want to cite to one Eleventh Circuit case, if the

21    Court is open to it.  It's *United States v. Perez*, and in it,

22    the Court had a very similar analysis, and they actually found

23    that -- this was where there was an actual canister produced.

24    There was a brand name produced, and it had marketing labels,

25    and the Court did not find that to be enough to prove dangerous

1    weapon under the guidelines.

2         In fact, it said that it was not enough to prove extreme

3    physical pain or the projected impairment of a function of

4    bodily member or organ.

5         It also goes on to say that it's -- the testimony is devoid

6    of what this particular -- whatever the alleged spray is, what

7    the can is, what the functionalities of that are.  The record is

8    silent as to the form or nature of the pepper spray, its

9    chemical composition -- and again, it's not talking generally

10   about a pepper spray; it's talking about the specific one

11   used -- the strength or concentration of the active agent, the

12   size of the can, whether the spray mechanism was functional --

13             COURT REPORTER:  Counsel, please slow down.

14             MS. SIDDIQUI:  Sorry.  I apologize.  Just trying to be

15   quick.

16        According to *Perez*, the evidentiary record is silent as to

17   the form or nature of the pepper spray, the chemical

18   composition, the strength or concentration of the active agent,

19   the size of the can, whether the spray mechanism was functional,

20   or the distance or velocity that mechanism was designed to

21   achieve.

22        That would be our argument that the government has not

23   proved.

24             THE COURT:  Ms. Fifield, like 20 seconds.

25             MS. FIFIELD:  I just want to make one correction.

1        I do think it would be helpful for the Court to rewatch

2   Exhibits 200, 208, and 211.  It does show both officers

3   recoiling as if they've been hit, and --

4        THE COURT:  Recoiling can happen with a tennis ball,

5   too.  That doesn't get you there.

6        MS. FIFIELD:  If I'm being sprayed with an aerosol and

7   my body is shooting backwards as if I've been hit with a

8   physical object, I think that's significant.

9        But I did want to make clear, and the reason I stood up,

10  this screenshot does not show the moment that we have argued

11  Officer Williams is reacting.  That reaction takes place 2

12  seconds later, and it is --

13       THE COURT:  Do you agree that if I find the defendant

14  guilty of attempted assault and don't find use of a dangerous

15  weapon, that this makes no difference here, this dispute?

16       MS. FIFIELD:  That is the government's position, yes.

17  The government alleges that he is guilty of felonious assault if

18  the Court doesn't find deadly or dangerous weapon.

19       THE COURT:  Okay.  Just bear with me one moment.

20       (Discussion off the record.)

21       THE COURT:  We're just going to take a quick bathroom

22  break for the court staff.

23       (Recess taken from 4:56 p.m. to 5:01 p.m.)

24       THE COURT:  All right.  So I'm prepared to rule after

25  reviewing the briefs, the record in its entirety, and the

arguments of counsel for both sides.  I will make the following findings of fact and conclusions of law in support of my verdict.  This also constitutes my ruling on Mr. Ramey's motion for judgment of acquittal under Rule 29(a).

This verdict is taken in full recognition of the standard jury instructions, including but not limited to the government's burden to prove its case beyond a reasonable doubt.

Unless otherwise stated, I am utilizing the elements of each offense laid out in the Court's proposed substantive jury instructions at Docket 28 and the government's edits at Docket 37, which were previously discussed and to which the defense stated that it does not object.

As a general matter, I found the four witnesses, Captain Carneysha Mendoza, Special Agent Ryan Nougaret, Officer Bryant Williams, and Officer David Riggleman, credible.  Much of their testimony was supported by the video evidence.

I will begin with Counts 2 and 3, as my findings there are relevant to the other counts.

Count 2 charges Mr. Ramey with forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with an officer of the United States, Officer Riggleman, who was engaged in the performance of official duties, while using a dangerous -- a deadly or dangerous weapon or while making physical contact with the person or acting with the intent to commit another felony.

1          Count 3 charges Mr. Ramey with the same as to

2     Officer Williams.

3          The first element is that the defendant assaulted,

4     resisted, opposed, impeded, intimidated, or interfered with an

5     officer of the United States.  Here, the two officers are U.S.

6     Capitol Police.

7          The term "assault" means any intentional attempt or threat

8     to inflict injury upon someone else when coupled with an

9     apparent present ability to do so.

10          As to Count 2, I find that the government has proven beyond

11     a reasonable doubt that Mr. Ramey intentionally attempted to and

12     in fact did inflict injury on Officer Riggleman with a chemical

13     irritant spray.  There was ample video evidence of Mr. Ramey's

14     actions, and Mr. Ramey's identity in those videos is not

15     disputed.

16          Mr. Ramey stipulated to his identity in several of the

17     videos, and his clothing, accessories, and general appearance

18     clearly match the main video depicting the assault.

19          The video captures Mr. Ramey standing in a large crowd,

20     raising and stretching out his arm, and pointing a small

21     canister in the direction of Officer Riggleman.  He then presses

22     the canister with his thumb, and it emits a spray stream

23     directed right at Officer Riggleman's eyes.  The trajectory of

24     the spray is captured in Exhibit 200A, a still screenshot from

25     the video.

1        Immediately thereafter, the video shows the officer

2   reacting by bending over, putting his hands over his face, and

3   retreating.  Officer Riggleman testified that he was sprayed

4   with a chemical irritant or pepper spray across the face, the

5   eyes, and it felt like a burning sensation almost like sandpaper

6   in his eyes, which made it really difficult to see and difficult

7   to breathe.

8        I, therefore, find Mr. Ramey assaulted Officer Riggleman.

9        As to Count 3, I find the government has proven beyond a

10  reasonable doubt that Mr. Ramey intentionally attempted to

11  inflict injury on Officer Williams with a chemical irritant

12  spray.  The same video just described shows Mr. Ramey raising

13  his arm a second time, still holding the canister, and pointing

14  it directly towards the officer, which Officer Williams

15  identified as himself.  Again, this is Exhibit 200.

16       At the same time, Mr. Ramey raises his arm.  Another person

17  is seen throwing a bottle of orange liquid in the same area as

18  Mr. Ramey's arm.  It is, therefore, somewhat difficult to see

19  the spray emitting from Mr. Ramey's canister.  The perspective

20  is also different than the video that documented the assault

21  against Officer Riggleman.

22       But in any event, for this element, it's not necessary to

23  find that Mr. Ramey actually made contact with Officer Williams,

24  and assault includes an intentional attempt or threat to inflict

25  injury, coupled with an apparent present ability to do so.

1    There's no reasonable doubt that Mr. Ramey intentionally

2    attempted to spray Officer Williams.  Mr. Ramey intentionally

3    raised his arm with the spray canister and pointed it in

4    Officer Williams's direction, and there is no doubt he was

5    trying to spray Officer Williams, and he had the apparent

6    ability to do so, as he was armed with pepper spray.

7    Second, the defendant must have done such acts forcibly.

8    I'm not going to repeat the definition of "forcibly," but

9    clearly, Mr. Ramey's use of the chemical irritant spray on the

10   officer satisfies this element.  He employed something knowingly

11   as a device to cause physical harm, even without direct contact.

12   That's *U.S. v. Castleman*, 572 U.S. at 171.

13   Element 3, the defendant did such acts voluntarily and

14   intentionally.  Ample video evidence and photographic

15   screenshots show Mr. Ramey at the scene of the January 6 Capitol

16   riots equipped with various pieces of gear, including knee pads,

17   a gas mask, and a canister of chemical irritant.  He's shown

18   among a large group of rioters who began pushing the police line

19   at the base of the northwest stairs of the Capitol and

20   eventually broke through the line.

21   When he sprayed the chemical irritant, the video shows

22   Mr. Ramey joining in that mob, looking towards the officers,

23   raising his arms twice, and pointing it towards each of them and

24   then spraying.  So there's sufficient evidence that he acted

25   with intent.

1        Fourth, the officer must have been engaged in the

2    performance of official duties.  There's no question that both

3    officers were working at the Capitol on January 6, 2021, to

4    protect the Capitol grounds.

5        The fifth element, the defendant intentionally used a

6    deadly or dangerous weapon, is the main dispute in this case.

7    There are two primary issues.

8        First, whether the government must prove that it was pepper

9    spray, the indictment does charge Mr. Ramey with using a deadly

10   and dangerous weapon, that is, pepper spray.  I had asked the

11   parties whether that required the government to prove beyond a

12   reasonable doubt that the tool used by Mr. Ramey was in fact

13   pepper spray as opposed to a different chemical irritant.

14       I find now that the government need not do so.  I'm not

15   going to go into the law here in the interest of time, but it's

16   clear that this was not a variance from the indictment, a

17   substantive change that would be problematic for the government

18   here.

19       So in any event, though, this holding is of little

20   consequence, because I find the government did not prove beyond

21   a reasonable doubt that the pepper spray was used here as a

22   deadly or dangerous weapon.  It bears emphasizing that this

23   question is highly fact-intensive and dependent on the evidence

24   that the government has presented in this particular case.

25       To be clear, I'm not holding that pepper spray can never be

1    a deadly or dangerous weapon, but the government has not

2    presented, in my view, evidence sufficient to prove it beyond a

3    reasonable doubt based on the facts of this case.

4         An object is a deadly or dangerous weapon if, one, it is

5    inherently deadly like a gun or, alternatively, if the object is

6    capable of causing serious bodily injury or death to another

7    person and the defendant uses it in that manner.  *U.S. v.*

8    *Arrington*, 309 F.3d 40 at 45.

9         The government does not argue that pepper spray is

10   inherently deadly, although today in the argument they backed

11   off that, but I certainly didn't get that sense from the brief.

12   But in any event, I don't find pepper spray is inherently deadly

13   like a firearm.

14        In my view, this case turns on the second definition, and

15   that definition considers both the physical capabilities of the

16   object used and the manner in which the object was used.

17        While the government may have shown that pepper spray is

18   capable of causing serious bodily injury or death, it has not

19   proven beyond a reasonable doubt that Mr. Ramey used it in such

20   a manner.

21        Each of the government's law enforcement witnesses gave

22   similar testimony as to the normal effect of pepper spray, that

23   it causes a burning sensation, eyes watering, making your skin

24   feel like it is on fire.  That's the transcript at 56, Special

25   Agent Nougaret.  "It affects your nose and causes eyes to be

watery and stinging."  Transcript at 51, Captain Mendoza.  "It

makes your eyes shut."  Transcript at 117, Officer Williams.

"And feels very gritty, almost like sand in your eyes, making it

very difficult to see and incapacitating."  Transcript at 164,

Officer Riggleman.

These effects may constitute bodily harm, but the testimony

did not include any serious bodily harm.  The parties both agree

on the definition for substantial bodily harm, which comes from

another statute.  That statute defines bodily injury to include

a cut, abrasion, bruise, burn, or disfigurement, physical pain,

illness, impairment of a function of a bodily member, organ, or

mental faculty, or any other injury to the body, no matter how

temporarily.  18 U.S.C. Section 1365(h)(4).

In contrast, serious bodily injury means bodily injury

which involves a substantial risk of death, extreme physical

pain, protracted and obvious disfigurement or protracted loss or

impairment of a function of a bodily member, organ, or mental

faculty.  That's Section 1365(h)(3).

Similarly, the sentencing guidelines contrast between

bodily injury, which include an injury that is painful and

obvious, or is the type for which medical attention ordinarily

would be sought with serious bodily injury, which involves

extreme physical pain or protracted impairment of a function of

a bodily member, organ, or mental faculty or requiring medical

intervention such as surgery, hospitalization, or physical

1    rehabilitation.  That's Section 1B1.1, Comment 1(b) and (m) of

2    the U.S. Sentencing Guidelines.

3         Neither of these two definitions are binding on the Court

4    here because it arises in a different context, but they are

5    rational and persuasive, because as a matter of common sense

6    serious bodily injury must be more extreme or more protracted

7    than mere bodily injury.

8         The burning, eyes watering, nasal effects of pepper spray

9    are usually temporary.  Captain Mendoza testified that although

10   a person can still have a burning sensation later, regardless of

11   whether they decontaminate their eyes by flushing with water, it

12   typically lasts a couple hours, one or two hours.  Trial

13   transcript at 51.

14        She testified that the sensation can last up to 24 hours,

15   but she hadn't seen a longer-term impact besides maybe if

16   someone is not used to it and they get PTSD or something.  Same

17   cite.

18        Thus, the testimony elicited here does not support the

19   conclusion that pepper spray's injurious effects are normally

20   protracted, nor does the testimony support the conclusion that

21   the effects are generally extreme of the sort that ordinarily

22   require surgery or hospitalization.

23        The government witnesses testified that some people exposed

24   to pepper spray sometimes require emergency care, for instance

25   one officer who had a more severe reaction where the spray

1   knocked him down, brought him to his knees and made him

2   discombobulated.  But the government hasn't proven that even

3   this more severe reaction rises to the level of serious bodily

4   injury, for instance by being prolonged or permanent or

5   requiring hospitalization or surgery as opposed to normal

6   medical attention.

7       Even painful cuts and abrasions can sometimes require

8   medical attention, but that alone does not transform them from

9   bodily injuries into serious bodily injuries.

10      To be sure, pepper spray can cause serious bodily injury,

11  and there may well be a case where or evidence the government

12  could have put forth here in this case to show that pepper spray

13  is a dangerous or deadly weapon.  For instance, pepper spray may

14  cause a more severe reaction if the person being sprayed has

15  asthma, trial transcript at 52, or an allergic reaction that may

16  render the person unable to breathe and require emergency aid,

17  transcript at 118.  And if you spray someone directly in the

18  eyes at close range, transcript at 49, it can have very serious

19  effects, including needling or damage to the retinas and the

20  eyes, transcript at 116.

21      Another officer alluded to the possibility of a lethal

22  dose, for instance if the user doesn't shake the can to

23  distribute the chemicals.  Transcript at 115.  But despite the

24  capability of pepper spray to cause serious bodily harm, the

25  government has not proven beyond a reasonable doubt, let me

emphasize beyond a reasonable doubt, Mr. Ramey used the pepper spray in such a manner to cause such serious bodily harm.

The Pepper spray can theoretically cause an allergic or more severe reaction in a person with a preexisting condition. That fact does not transform it into an inherently dangerous weapon.  Otherwise, anything can be considered a dangerous weapon, given an eggshell victim or the right preexisting condition, even if unknown.

And the government has not provided any evidence that Mr. Ramey used the pepper spray in such a way as to increase the risk of severe reaction here due to allergy, asthma, or other preexisting conditions, for instance that he knew anyone in the crowd was asthmatic or allergic or that they were in fact allergic or asthmatic.  See trial transcript at 147, Officer Williams testifying that he's not allergic.

More importantly, the government did not prove beyond a reasonable doubt that the way Mr. Ramey sprayed could cause serious bodily harm.  Each of the government's witnesses testified to being purposefully exposed to pepper spray during their training so that they could become familiar with the effect and learn how to fight through it.  Trial transcript at 49, 56, 105, 117, 146, 164 to 165.  Indeed, Captain Mendoza testified that she's exposed a lot.  Transcript at 49.

During the training exercise, the officers testified they are quickly sprayed across the face and across the eyes and then

1   have to fight for 90 seconds, including verbalizing commands to

2   a role player, essentially conducting an arrest.  Transcript at

3   49, 56, 105.

4       One officer testified that the training spray is from a

5   distance of about 5 feet, transcript at 105, while another

6   officer testified that the training spray was from a distance of

7   10 feet, transcript at 179.  Other testimony stated that a full

8   canister of pepper spray is capable of being sprayed only around

9   6 feet, 7 feet.  Transcript at 158.  The distance used in the

10  training exercise is meant to avoid needling or retina damage.

11  Transcript at 150.

12      Furthermore, the witnesses testified that they're trained

13  to use pepper spray from about 6 feet away from the subject,

14  transcript at 179, and are not allowed to deploy it closer than

15  three feet to the individual, transcript at 115.

16      The government did not present evidence that the manner in

17  which Mr. Ramey used the pepper spray is inconsistent with those

18  guidelines and the training exercise, although they do point out

19  that medical personnel was not available here.

20      The video shows Mr. Ramey deploying a quick burst of pepper

21  spray towards Officer Riggleman's eyes no more than 1 second.

22  Exhibit 200 at 27.  The spray toward Officer Williams's eyes

23  appears to be a similar duration.  Transcript -- sorry,

24  Exhibit 200 at 31.

25      Given the vantage point of the video, it's difficult to

tell how far Mr. Ramey is from Officer Riggleman and

Officer Williams, who stood in approximately the same location

when Mr. Ramey sprayed each of them.

Officer Riggleman testified that it was hard to remember or

tell from the video, but he estimated Mr. Ramey was 6 to 10 feet

away, transcript at 182, while Officer Williams put the distance

at about 3 or 4 feet, transcript at 149.

In the government's main video exhibit, Exhibit 200, there

appear to be at least three people in between Mr. Ramey and the

officers.

Based on those facts, I do not find that the government has

proven beyond a doubt that Mr. Ramey was closer than 6 feet from

either officer, the distance at which the officers are trained

to spray and the approximate distance at which they were sprayed

during training.

And the government provided absolutely no evidence or

testimony that Mr. Ramey was closer than 3 feet to the officers,

the distance within which serious bodily injury, needling, and

retina damage can occur.

Officer Williams testified that he's still experiencing

vision problems, including blurry vision, that he wears glasses

to help correct, problems he did not have before January 6.

Transcript at 133 to 134.  But that statement was the extent of

his testimony on this point.

While I find Officer Williams's testimony generally

credible, the government did not introduce any further evidence
of his vision problem, its extent or seriousness, and, more
importantly, its cause.

I, therefore, find that the government did not prove beyond
a reasonable doubt that Officer Williams actually suffered
serious and lasting impairment of his eyes caused by the pepper
spray as opposed to any other cause, such as natural age-related
vision deterioration.

In summary, although the government has presented testimony
that pepper spray can cause temporary impairment of bodily
organs or functions, it did not provide any testimony or
evidence to prove that, when used in the manner Mr. Ramey used
it, pepper spray causes protracted impairment of bodily organs
or functions.

Indeed, the government's evidence primarily showed that
Mr. Ramey used a quick burst from about 6 feet away.  The
government witnesses are exposed, some of them regularly during
training, in that very manner, and the effects, though painful,
are generally temporary.

The government has emphasized in this argument that the
pepper spray caused extreme physical pain.  In the interest of
time, I'm not going to provide my rebuttal on all of those
points, but I will note that I think that that language needs to
be read in the context of the definition as a whole.  And here,
I don't think that the government has met its burden beyond a

reasonable doubt to show that what the officers experienced

here, what pepper spray could cause at 6 feet is extreme

physical pain that meets the definition.

All right.  I can't remember whether I stated this

sentence, but the government did not also provide any evidence

that the protracted or extreme bodily injury results from a

quick spray at 6-foot range, nor that any substantial injury was

actually sustained.

This separates the case from some other cases finding

sufficient evidence to conclude that pepper spray was used as a

deadly or dangerous weapon.

As an initial matter, the government mostly cites January 6

cases and at a different stage in the proceeding where the Court

evaluates a factual basis -- well, in a different proceeding

such as a guilty plea where the Court evaluates the factual

basis for the charge based on a proffer, and the government need

not provide evidence to support their claims beyond a reasonable

doubt where a defendant admits using a serious -- causing

serious bodily injury, as it must here.

The other January 6 cases are from detention hearings and

sentencings where the standard is crucially much lower.  The

standard I'm applying here today is beyond a reasonable doubt,

and I'm reserving judgment on whether the government proved this

at a lower standard whether Mr. Ramey used a dangerous weapon,

and I will address this at sentencing, where both the applicable

1      definition and standard differ.

2          Furthermore, in the other cases the government cites,

3      unlike here, substantial evidence was presented of substantial

4      bodily injury that results from pepper spray.

5          The government, I will note, indirectly cited *U.S. v.*

6      *Duran*, 96 F.3d 1495 at 1511, a D.C. Circuit case, stating the

7      act of causing -- or the brief stated the act of causing deadly

8      weapon with the purpose of causing Secret Service agents to fear

9      imminent serious bodily injury constituted a crime under 111(b).

10         *Duran*, however, involved an inherently deadly weapon, a

11     gun, and the analysis centered not on the weapon itself, but

12     whether the defendant must cause or try to cause bodily injury.

13     The Court held it was enough that the defendant used the

14     inherently deadly weapon, thereby randomly shooting into a field

15     even if not intended to actually hit an officer.

16         This analysis is irrelevant here when the question is

17     whether the weapon is deadly or dangerous.

18         In the other cases, *U.S. v. Neel*, 156 F.3d at 943 and 949,

19     a Ninth Circuit case, affirmed dangerous weapon sentencing

20     guideline enhancement where the victim testified that "she

21     suffered from severe asthma attacks for a week after the

22     incident and continued to present and is required to take five

23     asthma relief pills a day for the rest of her life."

24         *U.S. v. Douglas*, 957 F.3d 602 at 607, Fifth Circuit, that

25     court found the district court did not clearly err in applying

1    dangerous weapon sentencing guideline enhancement where the

2    evidence showed pepper spray was deployed at a close proximity,

3    requiring hospital treatment and resulting in protracted

4    impairment of the right eye.

5        U.S. v. *Bartolotta*, 153 F.3d. 875 at 879, Eighth Circuit

6    case, affirmed dangerous weapon sentencing guideline enhancement

7    where the victim testified that she developed chemical pneumonia

8    as a result of the incident, missed almost two weeks of work,

9    and had to take daily steroid shots for over four months and

10   steroid pills for one year.

11       *Bartolotta* explicitly distinguished another case, U.S. v.

12   *Harris*, where the Third Circuit determined that the government

13   had not established that mace was a dangerous weapon because the

14   victims of the mace spraying in *Harris* did not testify about

15   having any significant effects from the mace.  That's at 879,

16   Note 3.

17       In *Harris*, the government's evidence showed that the mace's

18   temporary blindness, respiratory problems, and other effects

19   were temporary and left no residual incapacity.  And so the

20   government did not carry its burden in that case to prove the

21   mace was a dangerous weapon.

22       *Harris* reaches the conclusion even under a mere

23   preponderance of the evidence standard.

24       The evidence is similar here, and the standard is

25   substantially higher.  It's not enough that the government has

1    cited a plethora of other cases where there was sufficient

2    evidence that pepper spray was used in a particular -- used in a

3    particular manner as capable of causing protracted bodily harm.

4    The government did not provide such evidence here.

5         While evidence of actually resulting in protracted harm is

6    not necessary for a Section 111(b) conviction, it is surely very

7    persuasive and relevant evidence to show that substantial bodily

8    harm could result from the manner in which the defendant used

9    the pepper spray, and the government's evidence of possible

10   protracted and extreme harm does not meet its burden for the

11   reasons already explained.

12        Therefore, I cannot find that the government has met its

13   burden to prove this element beyond a reasonable doubt.

14        Finally, the government witnesses testified that pepper

15   spray can be deadly or dangerous in certain surrounding

16   circumstances or due to subsequent events.

17        For instance, a person incapacitated by pepper spray can

18   fall and hit their head, transcript at 49, or the attacker can

19   grab and incapacitate an officer's gun and use it lethally,

20   transcript at 53, 130, 172.

21        This argument is intuitively compelling in the midst of

22   January 6 riots.  One can imagine that an incapacitated officer

23   could suffer imminent harm by the mob of people or even that a

24   rioter could take his or her weapon.

25        I appreciate the danger and risk that could be present for

an officer who cannot see during the January 6 riots.  But the government has also cited no case that permits me to consider such vulnerabilities to possible subsequent events or third parties.

The government cites only one Ninth Circuit case from 1986. The case is neither binding nor particularly persuasive here. It evaluated whether a stun gun was a deadly or dangerous weapon in the context of a different statute, which prohibited bringing concealed deadly or dangerous weapons onto a plane.  It is, thus, unsurprising that the Court stated that a stun gun could be used to incapacitate key personnel aboard an aircraft. That's *U.S. v. Wallace*, 800 F.2d 1509 at 1513.

Indeed, the government states that courts generally have not considered the nature of the environment or surrounding circumstances to determine whether the object is capable of causing serious bodily injury in the manner that it is used. That is the government's post-trial brief at 18.

And the cases the government cites find various seemingly innocuous objects to be deadly or dangerous based on the injuries imposed or possibly imposed by the object itself in the way it was wielded, not possible secondary effects resulting after the object was wielded.

To be clear, again, I do not now hold as a matter of law that the surrounding circumstances or possible subsequent events are never relevant to the factual question of whether something

1    is a deadly or dangerous weapon.

2         But here, the government did not prove it beyond a

3    reasonable doubt.  Beyond briefly stating a theoretical

4    possibility, the government provided little evidence on this

5    point.

6         Officer Riggleman briefly testified that after he was

7    sprayed, his first thought was to cover his weapon because while

8    incapacitated "everything on his belt can be used against him or

9    other people around me."  Transcript at 172.

10        Officer Riggleman also testified that he immediately

11   retreated up the steps, entered the building, and decontaminated

12   his eyes.  Transcript at 173 to 174.  And Officer Williams

13   similarly testified that he left the area after being sprayed as

14   well.  Transcript at 133.

15        There was no evidence that Mr. Ramey used the pepper spray

16   in an attempt to grab either officers' weapon himself or that he

17   was even physically capable of doing so, given the distance of

18   approximately 6 feet he was from the officers, nor is there any

19   evidence that any person in the crowd ever attempted to grab any

20   officer's weapon, much less these two officers.

21        There are many things the government could have done in

22   this case.  The government, just as an example, could have

23   elicited testimony about the effects of a direct hit on the eye

24   at this distance.  The government could have included testimony

25   from a medical expert about the effects of pepper spray

generally.  Officer Williams could have provided more testimony, and the government certainly could have offered medical testimony about his eye problems.

But the government can't simply cite to other cases and expect the Court to rely on those to decide a factual issue at trial.

So in sum, the government has not carried its evidentiary burden on this point.

And again, to emphasize, I do not find that pepper spray can never be a deadly or dangerous weapon or even that it can never be a deadly or dangerous weapon in the circumstances of this case here.  But I do find that the government failed to prove beyond a reasonable doubt.

Therefore, the deadly or dangerous weapon element required for conviction of Section 111(b) has not been met.

Turning next to whether the government has proved a violation of 111(a), the government has proved at least simple assault made up of the first four elements.  It also shows that if the act involved physical contact of the victim of the assaults or the attempt to commit another felony, an eight-year statutory maximum will apply.

The government has proven the former as to Count 2 and the latter as to both counts.  The assault by pepper spray involved physical contact of the officers.  That Mr. Ramey made physical contact with Officer Riggleman is beyond any doubt for the

reasons already described.  I won't state those here.

Whether Mr. Ramey successfully made physical contact with Officer Williams is a much closer question.  The video evidence shows Mr. Ramey raise his arm and point it towards Officer Williams.  About a second or two later, Officer Williams appears to stop struggling with a different rioter and reach for his face and helmet, and then he disappears from view.

Officer Williams testified that he felt the sensation of something seeping through the thin foam for cushioning on his helmet and then start going into his eyes.  Transcript at 131. He testified that it was OC or pepper spray and that he knew because he recognized the sensation.

He testified he felt a burning sensation and his vision got blurry, and he eventually went around the other set of stairs where he collapsed because of that sensation.  Transcript at 131 to 132.

Also apparent in the video were at least two other streams of some kind of spray coming from elsewhere in the crowd.  The defense suggested that Officer Williams may have been hit with this other spray rather than Mr. Ramey's or that the spray could have trickled down on his helmet and into his eyes.

From the vantage point of Exhibit 200, the main video of assault, it's hard for the Court to tell.  Other vantage points entered into evidence make clear that the two other discernible sprays were headed in different directions.

1          Exhibit 211 clearly show the two other streams of spray

2     were at least several feet from Office Williams and headed in a

3     different direction, not over his head.  That's Exhibit 212,

4     3 through 4 and 6.

5          Were this a lower standard of review, all of this evidence

6     may well suffice to show that Mr. Ramey's spray hit Officer

7     Williams and caused his reaction.

8          But a standard beyond a reasonable doubt, this is a very

9     close question, for two main reasons.  First, another rioter

10    appears to throw a bottle of liquid at the same time Mr. Ramey

11    sprays.  So it's difficult to see the exact spray and its

12    trajectory.  Though the spray stream is faintly visible in 200B,

13    it's not obvious that its trajectory definitely hit

14    Officer Williams's helmet or certainly would have hit it.

15         Second, on the video, Officer Williams's reaction at the

16    precise moment, one would expect him to feel the spray as less

17    pronounced than Officer Riggleman's.  While I credit Officer

18    Williams's testimony that he felt pepper spray in his face, it's

19    not clear the exact moment that he felt the spray, and there

20    remains a doubt that it was caused -- in the Court's view, there

21    remains a doubt that it was caused by Mr. Ramey's spray in

22    particular.

23         Officer Williams testified he did not remember being

24    sprayed until he felt the after effects of it, that he did not

25    see who sprayed him.  Transcript at 153.  Although his body

appears to recoil at some point, it's not absolutely clear
whether it's due to the spray, his physical struggle at that
moment with another rioter in a white hoodie, Exhibit 200 at 32,
or because he got pulled to the side from his other coworkers,
transcript at 157.

And in Exhibit 208, Officer Williams can be seen off to the
side up to a minute after Mr. Ramey sprayed, still standing and
not yet collapsed, and other rioters in various areas are seen
covering their faces and coughing.  It's Exhibit 208 at 131
through 137.  See also Exhibit 210 at 204.  Other rioters were
coughing and covering their faces.

Because the benefit of the doubt goes to a criminal
defendant, I cannot say beyond a reasonable doubt that
Mr. Ramey's spray made physical contact with Officer Williams
and caused his reaction.

And again, in any event, the government has proven the
second alternative way to apply the sentencing enhancement.
Mr. Ramey's assault was committed with intent to commit another
felony, civil disorder, which I will discuss shortly.

I find the evidence shows beyond a reasonable doubt
Mr. Ramey sprayed the officers with the intent to obstruct the
officers during a civil disorder.

To summarize, I find Mr. Ramey guilty of Count 2, forcibly
assaulting Officer Riggleman with physical contact and intent to
commit another felony, and Count 3, forcibly assaulting

1    Officer Williams with intent to commit another felony under

2    111(a).

3        But I find Mr. Ramey not guilty of using a deadly or

4    dangerous weapon in either of these offenses in violation of

5    111(b).

6        Turning to Count 1, civil disorder, I find Mr. Ramey guilty

7    on this count for many of the same reasons I've already

8    described.

9        He's required to have knowingly committed or attempted to

10   commit an act.  The videos show that Mr. Ramey intentionally

11   raised his arm twice, aiming at each officer, pressed the

12   canister in his hand to activate the spray.

13       Given that and all of the other video footage, I find

14   Mr. Ramey's use of pepper spray was certainly knowingly.

15       Secondly, he must have intended the act to obstruct,

16   impede, or interfere with the law enforcement officers.  For the

17   same reason, this element is satisfied.

18       The third element, at the time of Mr. Ramey's act, the

19   officers were engaged in the lawful performance of their

20   official duties incident to and during a civil disorder.

21       I've already found that the officers were engaged in their

22   official duties, and I don't think there's any real dispute of

23   that.

24       And a civil disorder is any public disturbance involving

25   acts of violence by groups of three or more persons which causes

an immediate danger, results in injury to another individual or damage to another individual's property.

The January 6 riot clearly meets this definition.

The fourth and final element is civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the moving of an article or commodity in commerce or the conduct or performance of any federally protected function.

The government's required to prove only one of these, but I find they've proven both.

The federally protected function here was Officer Riggleman and Williams being on duty to protect the Capitol grounds and members of Congress who were engaged in the certification of the vote.

Clearly, the civil disorder obstructed or delayed their performance.  Both officers were incapacitated and retreated, and the rioters eventually entered the building.  The civil disorder also obstructed commerce.  This includes interstate commerce and commerce wholly within the District of Columbia.

The parties stipulated the D.C. mayor imposed a city-wide curfew at 6:00 p.m. as a result of the civil disorder, and the government introduced evidence that Safeway stores had to close early.  Exhibits 401 and 402 are informative and relevant on this point.

Thus, the government has proven beyond a reasonable doubt that commerce within the District of Columbia was obstructed.

1    Therefore, I find Mr. Ramey guilty of Count 1, civil

2    disorder.

3    Okay.  Because this offense is punishable by not more than

4    five years under Section 231(a)(3), it is a felony offense, it

5    can serve as a predicate for the eight-year maximum penalty

6    enhancement in Counts 2 and 3 for an assault committed with the

7    intent to commit another felony.

8    The defendant argues that Count 1, civil disorder, as a

9    predicate offense for the enhancement element of Counts 2 and 3,

10    assault, violates *Blockburger*.

11    The *Blockburger* test is clearly satisfied here.  The

12    assault Counts 2 and 3 require proof of assault on an officer

13    committed forcibly, voluntarily, and intentionally while the

14    officer was performing official duties and with the intent to

15    commit another felony, here civil disorder.

16    Civil disorder requires proof of knowingly committing an

17    act that intended to obstruct officers.  The officers were

18    performing official duties incident to civil disorder, and the

19    civil disorder obstructed commerce or any federally protected

20    function.

21    Although proving aggravated assault also requires proving

22    each element of civil disorder in order to apply the eight-year

23    sentencing enhancement, each charge requires proving at least

24    one element that the other does not.

25    Namely, the aggravated assault charge requires showing

forcible assault, while the civil disorder does not.  The civil
disorder charge requires showing that the officers were engaged
in duties incident during a civil disorder and the civil
disorder disrupted commerce or a federal function, both of which
the assault charge does not.

All right.  The final four counts all arise in the same
statute and involve similar elements.  I will address them
together.

For the reasons that I've explained, I find the
government's not proven beyond a reasonable doubt that
Mr. Ramey's offense involved a deadly or dangerous weapon of a
firearm.

Therefore, I find him not guilty of the statutory maximum
penalty enhancement of Section 1752(B)(1)(a), but I find him
guilty of the base offenses in Count 4, Count 5, and Count 6.

The common element for each count is that Mr. Ramey knew
the building or grounds were restricted and he lacked the lawful
authority to enter or remain there.

I'm not going to give the definitions here, but the parties
have agreed to them.  And there's no question on January 6, the
Capitol grounds were restricted due to the Joint Session of
Congress.  It was obvious and apparent, there's ample evidence
in the record that depicts the myriad bike racks, snow fencing,
and signs blocking off the Capitol grounds perimeter.

There's also ample evidence that shows Mr. Ramey near this

1    fencing, looking at this fencing, blocking stairs.  There's no

2    doubt he was aware of the police line and the fencing and that

3    the grounds were, thus, restricted, and he did not have a lawful

4    authority to be present there at the time.

5          So I find him guilty of Count 4.

6          As to Count 5, there are three additional elements.  I'm

7    not going to state them all here.  But for the reasons already

8    explained in Count 1, I do find that Mr. Ramey's actions clearly

9    satisfy these elements beyond a reasonable doubt.

10         As to Count 6, the government must also prove that

11   Mr. Ramey engaged in physical violence against a person or

12   property on the restricted grounds.

13         Again, this element is obviously met for the reasons

14   explained in Counts 2 and 3.  So I find him guilty of Count 6,

15   too.

16         Count 7, the final count, requires the government to prove

17   beyond a reasonable doubt that Mr. Ramey willfully and knowingly

18   engaged in an act of physical violence on the United States

19   Capitol grounds.

20         I, likewise, find him guilty of this offense based on all

21   the evidence and the reasons discussed.

22         So I will put out just a brief order summarizing this.

23         Is there any question or concerns about the Court's reasons

24   being adequate for the record?  Ms. Siddiqui?

25         On the misdemeanors, I cut to the chase, because I think

```
1    it's pretty obvious that he's guilty of those.

2              MS. SIDDIQUI:  Yes, Your Honor, and no questions from

3    us.

4              THE COURT:  All right.  Does the government have any

5    concerns?

6              MS. FIFIELD:  No, Your Honor.

7              THE COURT:  All right, everyone.  Thank you.

8         And sorry to keep marshals, court staff here.  I appreciate

9    it.

10        Just so everybody can get out of here, Mr. Hopkins, why

11   don't we do the whole calendar thing, dance on e-mail so that

12   you all can leave.  I feel bad about keeping everyone here so

13   long.

14        I did this, so the marshals know, counsel has conflicts for

15   a few weeks.  So if we didn't do it now, it was going to be a

16   while.

17             MS. SIDDIQUI:  Just one more thing, Your Honor.

18        We'd just ask that Mr. Ramey be held here in Alexandria

19   pending sentencing.

20             THE COURT:  I'm not going to order that.  It's up to

21   the marshals.  But I will say that would be preferred.  But it's

22   really up to them.

23             MS. SIDDIQUI:  Understood, Judge.  Thank you.

24        (Proceedings adjourned at 5:39 p.m.)

25
```

1           CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Sara A. Wick_____          May 4, 2023_____

9    SIGNATURE OF COURT REPORTER              DATE