**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-184 (DLF)** |
| **BARRY BENNET RAMEY** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Barry Bennet Ramey to 108 months' imprisonment, the bottom of the advisory Guidelines range, three years' supervised release, restitution, and the mandatory special assessments for each count of conviction.

**I.    INTRODUCTION**

The defendant, Barry Ramey, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Ramey attacked police on January 6, 2021, alongside fellow Proud Boys, the organized extremist group of which Ramey is a member.   Ramey sprayed two U.S. Capitol Police officers

---

[1]    As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

in the face with pepper spray as they were struggling to hold their line against a mob surging to get past them and into the Capitol building.   This police line was one of the last separating the mob from the interior of the building.   Ramey's actions broke this critical police line and injured the two officers.   Moreover, Ramey's history of threats and violence, his ties to the Proud Boys, and his efforts to obstruct this investigation distinguish him from other participants in the attack on the Capitol.   Ramey presents a unique and serious threat to public safety and his egregious offense conduct warrants significant, just punishment.

For his conviction on seven counts,[2] the government recommends that the Court sentence Ramey to 108 months' incarceration, which is at the bottom of the advisory Guidelines' range of 108-131 months, which the government submits is the correct Guidelines calculation.   A 108-month sentence reflects the gravity of Ramey's conduct and the need for deterrence.

## II.   FACTUAL BACKGROUND[3]

### A.   The January 6, 2021, Attack on the Capitol

The government refers the Court to the Statement of Facts supporting the Complaint filed in this case (ECF No. 1) for a short summary of the January 6, 2021, attack on the United States

---

[2]   18 U.S.C. § 231(a)(3) (civil disorder); 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers) (two counts); 18 U.S.C. § 1752(a)(1) (entering or remaining in a restricted building or grounds); 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds); 18 U.S.C. § 1752(a)(4) (engaging in physical violence in a restricted building or grounds); and 40 U.S.C. § 5104(e)(2)(F) (act of physical violence in the Capitol grounds or buildings)

[3]   The facts in this Section come from both evidence presented at trial and evidence to be presented in connection with sentencing.   Trial exhibits will be referred to as "Trial Exhibit X" (abbr. "Tr. Ex.") and will be referred to by the same exhibit number as used at trial.   Exhibits not presented at trial but submitted to the Court for the purposes of sentencing will be referred to as "Sentencing Exhibit Y" (abbr. "S. Ex.") and will be identified sequentially starting with 1.

Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B. Ramey's Role in the January 6, 2021, Attack on the Capitol

Ahead of the riot that took place at the U.S. Capitol on January 6, 2021, Barry Ramey got a ride to Washington, D.C. from his home in Florida.   On the morning of January 6, Ramey joined a large group of Proud Boys,[4] an organized extremist group of which Ramey is a member.[5]   This group of Proud Boys gathered near the Washington Monument at 10:00 a.m. on January 6, where they received instructions from Proud Boy leader Ethan Nordean about "developing a front line" behind Proud Boy leaders before making a "slow and steady pace to the Capitol."   (S. Ex. 1 at 01:51-02:10).[6]   This group included Daniel Lyons Scott (a.k.a. "Milkshake") and Christopher Worrell, Proud Boy members from Florida.[7]   After receiving instructions hear the Washington Monument, the Proud Boys began to march eastward on the National Mall toward the Capitol starting at about 10:45 a.m.

---

[4]   The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group.   There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

[5]   According to information obtained by the FBI prior to Ramey's arrest, Ramey was listed on a master list of Broward County, Florida, Proud Boys.

[6]   Leaders of the Proud Boys, including Ethan Nordean, Joe Biggs, and Zachary Rehl, with whom Ramey marched ahead of the breach of Capitol grounds, were convicted on May 4, 2023, of Seditious Conspiracy and other charges for their coordinated efforts to overturn the 2020 presidential election by force.   *See United States v. Nordean et al.*, 21-cr-175 (TJK).

[7]   Scott was convicted following a guilty plea and is pending sentencing for assaulting police in the same line as Ramey.   *See United States v. Worrell et al.*, 21-cr-292 (RCL).   Worrell is Scott's co-defendant and was recently convicted following a bench trial for pepper spraying police and other conduct as part of the riot on January 6, 2021.   (*Id.*; *see* Dkt. No. 245.)

By about 11:00 a.m., Ramey was marching with the Proud Boys on the National Mall. (*See* S. Ex. 2.)   At this time, Ramey was wearing a black baseball cap with the shape of an American flag, sunglasses, a blue gator with an American flag print pulled up over his face, a black jacket, a black backpack, faded jeans, Army surplus or similar boots, armored motorcycle gloves, and what appears to be a type of tactical vest or other body armor underneath his jacket.   He later donned knee pads.   (*See infra* at 7, Screenshot of S. Ex. 1; Tr. Ex. 201A.)



*Sentencing Exhibit 2 – Ramey marching with Proud Boys on National Mall at approximately 11:00 a.m. (Ramey indicated by yellow box)*

By about 11:30 a.m., Ramey, along with the group of Proud Boys, was near the Capitol Reflecting Pool (*see* S. Ex. 3) where Ramey conversed with Nordean (dressed in black, indicated by the initials "EN") and Milkshake (wearing a green jacket, indicated by the initials "DLS"). Worrell was nearby (wearing tan/khaki, indicated by the initials "CW").



*Sentencing Exhibit 3 (Ramey indicated by yellow box)*

Neither Ramey nor any of the Proud Boys he was with attended the "Stop the Steal" rally, where President Trump was speaking near the White House.[8]   Instead, Ramey and the Proud Boys circled the Capitol, "casing" the grounds for weak points in the security perimeter.   (*See* S. Ex. 1.)   The Proud Boys' path between 10:30 a.m. and 12:45 p.m. is shown below.

---

[8]      At multiple points in his sentencing memorandum, Ramey suggests that he attended "the rally" or went to hear President Trump speak.   (ECF No. 59, Def. Sentencing Memo, at 2, 5.) These representations, at best, defy common sense and, at worst, are false.   Whether he knew Proud Boys before January 6, whether he sought them out, or just "found" them, Ramey was with the Proud Boys from approximately 11:00 a.m. until about 2:00 p.m. while they cased the Capitol, taunted police, shouted Proud Boy chants, agitated the crowd at Peace Circle, and, ultimately, collectively assaulted police at the base of the Northwest Stairs.   Regardless of whether Ramey was a card-carrying Proud Boy on the morning of January 6, he knew who he was with and he understood the mission.   *See* fn. 9, *infra*.



*Screenshot from Sentencing Exhibit 1 showing path of Proud Boys' march from the Washington Monument to the Capitol Reflecting Pool, around the north side of Capitol grounds, from the west side to the east side, then back west toward Peace Circle*

As the Proud Boys and Ramey marched around the Capitol, they taunted and threatened Capitol Police (*see* S. Ex. 1 at 11:35-12:33) and made explicit their intention to "take" the Capitol.   Ramey was within feet of Worrell as Worrell shouted at police:   "Honor your oaths! … Don't make us go against you!"[9]



*Screenshot from Sentencing Exhibit 1 – showing Ramey (indicated by yellow box) at approximately 11:29 a.m. at the northwest corner of Capitol grounds marching near Worrell, who is recording video and shouting at police.*

---

[9]     In his findings of fact supporting Worrell's conviction under 18 U.S.C. § 1512(c)(2), Judge Lamberth found that these statements make clear Worrell's "purpose" for entering Capitol grounds, which was to confront police and disrupt the certification of the Electoral College certification.   That Ramey was next to Worrell while he made these statements demonstrates that Ramey understood that the mission on January 6 was to obstruct police, if not Congress.

Around 12:30 p.m., Ramey and the Proud Boys got lunch at food trucks parked near an area known as Peace Circle, located at the northwest corner of Capitol grounds (shown on the map below at the red circle marked "A").   At this time, the grounds surrounding the Capitol were closed to the public.   The restricted perimeter around the grounds was guarded at various points by U.S. Capitol Police, visually marked by "bike rack" barricades reinforced with green plastic snow fencing, adorned with large signs reading, "AREA CLOSED."   Officer Bryant Williams, a victim in this case, personally patrolled the perimeter that morning, ensuring that every barricade was interlocked, that the perimeter was intact.



*Sentencing Exhibit 4 – Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021*

At approximately 12:53 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the

handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58 p.m., the mob had breached a second manned police barrier and were flooding into the Lower West Plaza, (marked by the red oval labeled "B" on the above map), pushing against the barricade there.

The Proud Boys were key instigators in this breach.  They arrived at Peace Circle at approximately 12:50, minutes before the breach.  Nordean and Biggs used their bullhorns to agitate the crowd.   Immediately before the breach, a rioter named Ryan Samsel approached Biggs, spoke with him briefly, then turned around and approached the barriers.   Samsel was immediately followed by a torrent of rioters who knocked the officers over and used the barricades as battering rams before tossing them aside.   At this time, inside the Capitol building, the Joint Session was getting underway to certify the Electoral College vote.

As the invading mob flooded into the restricted area, they ignored or destroyed intermediate barriers and fencing inside the perimeter on their way to the Lower West Terrace. USCP formed a secondary line at the top of a set of steps which were fenced off by black metal gates bolted into the ground.   Rioters continued to chant and shout, some screaming directly into officers' faces while the officers tried to verbally deescalate and use hand signals to hold the crowd back.   The crowd did not heed.   After mere minutes, the crowd advanced again, tearing the metal fencing out of the ground as they went.   USCP fell back again to the foot of the Capitol building itself and the scaffolding and stage that were being constructed for the upcoming inauguration of the president.

Ramey entered the restricted area near Peace Circle within minutes the 12:53 p.m. breach. He hurried down Pennsylvania Walkway to meet the crowd amassing in the Upper West Plaza. There, he joined the standoff against police, chanting and cheering.   Rioters in the crowd, like

Ramey, were dressed for combat, many wearing helmets, tactical vests, goggles, and other body armor.   Intermittently, Ramey donned and removed a large gas mask as police deployed crowd control ordinance in an effort to disperse the rioters.

Officer Williams arrived to assist the vastly outnumbered USCP officers on the West Front. He positioned himself in front of an opening in the scaffolding at the base of the Northwest Stairs, alternatively called the Senate Stairs.   One rioter with a bullhorn began yelling, "Take the stairs! Take the stairs!"   (Tr. Ex. 202 at apx. 06:58.)   Around this time, Officer David Riggleman also responded to the Senate Stairs to assist officers who were "greatly outnumbered."   (Trial Tr. 170.)

At approximately 1:42 p.m., Milkshake charged the police line that included Officers Riggleman and Williams, and the crowd began to push behind him.   As this happened, Ramey lifted his right arm.   In his hand, he held a canister about the length of his palm with a black cap. Ramey briefly turned his hand towards his own face, checking to make sure the canister was ready to fire, then he extended his right arm and sprayed.   This spray hit Officer Riggleman directly in the eyes.   (Trial Tr. 171.)   Officer Riggleman reacted immediately, turning away from the surging crowd as he protected his service weapon.   (*Id.* at 172.)   Officer Riggleman described it as "incapacitating and "almost like sandpaper in your eyes."   (*Id.* at 171.)   He was no longer able to keep his eyes open, and was aware that "if I can't see and I'm incapacitated, everything on my belt can be used against me or other people around me."   (*Id.* at 171-72.)   Officer Riggleman used a railing on the stairs to guide him back to the building, where he sought assistance from another officer to get to a bathroom so that he could decontaminate.   (*Id.* at 173.)



*Close up of Tr. Ex. 200A – spray (circled in white) of Ofc. Riggleman by Ramey*

Seconds after Ramey sprayed Officer Riggleman, Ramey extended his arm and sprayed again.   The second spray hit Officer Williams, who was attempting to physically hold back rioters pushing at the very front of the line.   Because Officer Williams was wearing his motorcycle helmet, he did not react until the spray had seeped through the foam pad sitting on forehead and began dripping into his eyes.   He realized he had been hit with OC spray because he felt like "fire on his face."   (Trial Tr. 131.)   Officer Williams testified during trial that, after being sprayed, he was incapacitated, his vision blurred, and another officer had to pull him away from the scene. (*Id.* at 132.).   Like Officer Riggleman, he was immediately concerned about the security of his service weapon.   (*Id.* at 133.)   Officer Williams did not have an opportunity to decontaminate until several hours later.   Instead, he described, immediately after being sprayed, "went around to the other set of stairs where I collapsed because of the -- of the sensation of my face burning." (*Id.* at 132.)   Despite the searing pain, he chose to return to the "fight"—the rioters' attack on

police, which had reached a critical moment: the rioters had breached the police line on the West Plaza and were advancing through the scaffolding, up stairs that led to entrances to the Capitol Building.   (*Id.* at 133.)   Officer Williams continues to experience vision problems to this day: "If I'm looking at my phone, a computer screen, my vision gets kind of blurry."   (*Id.*)   Officer Williams' doctor has told him he will have "residual effects" and that his vision is "deteriorating," and he has trouble seeing things up close.   (*Id.*)   He did not have vision issues before he was sprayed by Ramey on January 6.   (*Id.* at 134.)



*Close up of Tr. Ex. 200C – spray (circled in blue) of Ofc. Williams by Ramey*

Ramey's assaults on Officers Riggleman and Williams contributed to the collapse of the line at the base of the Northwest Stairs.   In a matter of seconds after Ramey's assaults, rioters pushed past the remaining officers in the line and up the stairs, towards the Capitol building. Ramey and the Proud Boys moved to the side of the stairs and celebrated what they had

accomplished.   Milkshake yelled out over the group, "Proud of your fucking boy!"   The Proud

Boys, including Ramey, cheered back "Uhru!!" and threw up their hand sign (an "OK" gesture).



*Tr. Ex. 209A – Proud Boys throwing up hand signs; Ramey indicated by yellow box*[10]

Shortly after the mob made its way to the top, to the Upper West Terrace, the rioters

breached the interior of the Capitol building for the first time on January 6, at around 2:13 p.m.

The Joint Session was suspended due to the breach of the Capitol building and was not able to

resume again until after the rioters were cleared and multiple security sweeps of the building had

been performed, after 8:00 p.m.

Ramey did not leave Capitol grounds after assaulting Officers Riggleman and Williams.

He lingered on the Upper West Plaza until about 3:00 p.m., when he began to ascend the Northwest

stairs.   He reached the Upper West Terrace around 4:00 p.m., where he remained until he and

---

[10]      Tr. Ex. 209 captures the Proud Boyd chants and slogans quoted above.

other rioters on the Upper West Terrace were cleared by police around 4:30 p.m.   Even then, Ramey did not leave.   After ending up on the East Front of the Capitol following the police push, Ramey again returned to the Upper West Plaza, where he remained until at least until 5:20 p.m. as the sun went down and Capitol grounds grew dark.   In total, Ramey was on Capitol grounds for at least four and a half hours.

*Pepper Spray as a Dangerous Weapon*

Both Officers Riggleman and Williams testified that they recognized the substance that they were sprayed with on January 6 as OC or pepper spray, because they felt the same burning sensation that they felt when they were sprayed with OC as part of their law enforcement training. Officer Williams understood that the purpose of the training was, in part, to teach officers to "fight through it."   (Trial Tr. 117.)   When he was sprayed in training, he said, "it felt like my face was burning, it was on fire."   *(Id.)*   His eyes involuntarily shut.   *(Id.)*   He recalled that, when a classmate was sprayed during the training exercise, she complained that she could not breathe. *(Id.* at 118.)   When she still felt like she could not breathe, even after decontamination, the training instructors called for emergency medical assistance to help her.   *(Id.)*

Officer Williams also described what he had learned about the proper use of OC spray during his training.   He explained that he learned to use the spray in a z-shaped pattern, avoiding direct contact with the eyes.   *(Id.* at 115.)   He was taught to stand at least three feet away.   *(Id.)* He was also taught to shake the can so that the irritant would be spread throughout the liquid, so that it wouldn't concentrate in a "lethal dose" at the bottom of the can.   *(Id.)*   He testified that retina damage, or "needling," could result if the spray was used in a way inconsistent with the method taught in training.   *(Id.* at 116-17.)

U.S. Capitol Police Sergeant Kevin Jiannotti, a training sergeant who is certified to teach recruits in the use of pepper spray, testified in *United States v. Worrell et al.*, 21-cr-292 (RCL), about the "severe pain" reactions he has observed among recruits.   21-cr-292, 4/27/23 Trial Tr. at 127.   Those include "screaming" and "yelling."   *Id.*   He described, "We've had recruits to the extent of throwing themselves on the ground and balling up in a fetal position."   *Id.*   In the last six months, one recruit was sprayed and the recruit's windpipe became restricted.   Even though an EMT was on the scene, Capitol Police had to call an ambulance for help.   *Id.* at 128. It is "not uncommon" for recruits to go to the emergency room because of continued difficulty breathing and issues with their vision; which are usually treated with pain medication and steroid eye drops.   *Id.* at 129.   Sergeant Jiannotti also described his own experience being sprayed in training: "it's kind of like hot melted metal in your eyes, right into your eye sockets."   *Id.* at 125. The pain in the eye area was "10 out of ten."   *Id.* at 126.   It was "significantly more painful than CS gas," to which the Sergeant had also been exposed.   *Id.*   He also testified that he would choose being tased over being pepper-sprayed.   *Id.* at 132.   When asked, "If someone gets sprayed with OC spray from a longer distance away, do they feel those same effects if the spray hits them?"   Sergeant Jiannotti responded, "If they have the product on them, absolutely, they will."   *Id*. at 129.

Other officers exposed to pepper spray during training and on January 6 have described experiencing extreme physical pain.   Testifying in *United States v. Schwartz,* 21-cr-178 (APM), Metropolitan Police Department (MPD) Officer Christopher Boyle described being sprayed with OC spray during training and on January 6 as a "9 or 10 out of 10" on the pain scale.   *Schwartz*, 21-cr-178, 11/30/22 Tr. at 460.   In the same trial, MPD Officer Pitt testified to being "horribly" physically affected in training and feeling a "severe burn."   In the *Worrell* trial, former U.S.

Capitol Police officer Stephen Lowe described an individual – whom he believed to have a high pain tolerance – "screaming out in pain" during the training and describing the pain as "excruciating."   21-cr-292, 4/27/23 Trial Tr. at 78.   Officer Lowe also described why, despite being sprayed repeatedly, he nonetheless returned to the police line: "I thought if I did not return back to the police line they were going to be able to breach the line and make their way into the Capitol."   *Id.* at 74.

Officer Lowe also described an incident where he and two other officers nearby were sprayed and almost got pulled into the violent mob.[11]   The two officers could not open their eyes and grasped a nearby bicycle rack, looking for something to hold on to because they could not see. It seemed to be "an involuntary reaction. They were just holding on as tight as they could," he observed.   *Id.* at 77.   But rioters were also pulling on the bicycle rack—and Officer Lowe had to deploy his pepper spray against them to keep the officers from getting pulled into the crowd.[12]

Pepper or OC spray are generic terms for irritant spray derived from purified chemicals extracted from plants in the capsicum family, that is, peppers.   (*See* S. Ex. 5 at 105.)[13]   *See also*

---

[11]    Officer Lowe later testified that the spray he experienced on January 6 was consistent with the OC spray he had experienced in several trainings.   *Worrell*, 21-cr-292, 4/27/28 Tr. at 78.

[12]    The government further refers the Court to the cases cited in its post-trial briefing, which describe additional instances of extreme physical pain, protracted impairment, and medical intervention required as a result of the use of pepper spray or mace.   (*See* Gov. Post-Trial Brief, ECF No. 45 at 12-15.)   *See United States v. Neill,* 11 166 F.3d 943, 949-50 (9th Cir. 1999) (holding that pepper spray is a dangerous weapon where victim testified that after being sprayed she felt "like somebody took a match and stuck it up both sides of [her] nostrils ... it was like I was on fire," and experienced protracted medical complications resulting from exposure to pepper spray); *United States v. Bartolotta*, 153 F.3d 875, 879 (8th Cir. 1998) (victim "developed chemical pneumonia as a result of the [mace attack], and … missed almost two weeks of work. [The victim] had to take daily steroid shots for over four months and steroid pills for one year to cleanse the mace from her system").

[13]    Government's Sentencing Exhibit 5 is a transcript of testimony given by a toxicology expert in the Worrell trial.   The transcript provided as an exhibit is an excerpt.   Page numbers

*Pepper Spray,* Merriam-Webster.com, https://www.merriam-webster.com/dictionary/pepper%20spray (last visited May 25, 2023) (Pepper spray is "a temporarily disabling aerosol that is composed partly of capsicum oleoresin and causes irritation and blinding of the eyes and inflammation of the nose, throat, and skin."). Pepper spray contains chemical compounds referred to as "major capsaicinoids," (MC) the concentration of which indicates the potency or strength of the spray. (S. Ex. 5 at 106-08.) Commercially available pepper spray for use on humans contains concentrations of MC from 0.18 to 1.33 percent. (*Id.* at 106.). A pepper spray with MC concentration of 1.33 percent corresponds to a Scoville Heat Unit rating (SHU) of 2 million, which is many times more potent than even the hottest peppers that humans come into contact with and eat. (*Id.* at 108-09.)

When the human body comes into contact with OC, certain physiological responses are triggered regardless of concentration or delivery mechanism and regardless of a person's perceived sensitivity to the substance. In other words, what matters is simply "whether the body comes into contact with capsaicinoids." (*Id.* at 109.) At that point, the neurons that can detect capsaicin will release other substances and neurotransmitters, including substance P, which is one of the main neurotransmitters for pain. (*Id.*) For example, when OC comes into contact with the eyes, neurotransmitters trigger a "very strong reflex" causing the eyes to shut "very tightly … in some respects, violently," to protect the body from additional exposure. (*Id.* at 110.) The eyes and the skin on a person's face are particularly sensitive due to the large number of pain receptors present there in contrast to, for example, the skin on a person's arm. (*Id.* at 111.) Once OC enters the nasal passageway, a person's respiratory tract also clinches shut to prevent the chemical from

used for identification in this memorandum correspond to the page numbers marked on the transcript itself, not the page number in the exhibit.

entering the lungs, causing a person to have difficulty breathing, sometimes leading to bronchospasm, extreme tightening of the respiratory tract.  (*Id.* at 112.)   A person experiencing bronchospasm will wheeze heavily and may lose the ability to breathe altogether.  (*Id.*)   In addition to the impairment of the lungs, OC also triggers dial aged blood vessels which, in turn, may cause bradycardia or tachycardia (unsafe high or low heart rate) the risks of which increase if a person is already engaged in strenuous physical activity.  (*Id.* at 113-14, 118.)   Rapid changes in blood pressure can cause a person to lose consciousness.  (*Id.* at 123.)   OC exposure to the eyes may cause corneal abrasions due to extreme dryness, which may take days or weeks to heal. (*Id.* at 116.)   The risk of corneal abrasion and permanent eye damage increases if a person is not able to decontaminate right after being exposed.  (*Id.* at 117.)   The cornea is also vulnerable to infection; a secondary infection due to capsaicin-induced corneal damage may cause long-term eye problems.  (*Id.* at 121.)   In addition, following exposure to pepper spray, some individuals will develop reactive airway dysfunction syndrome, or RADS (which makes their lungs vulnerable to future chemical exposures), and long-term asthma, each of which may require individuals to go on long-term medication to ensure that their lungs are functioning properly.  (*Id.* at 114-15.)

Approximately 15 percent of people exposed to OC will experience severe medical problems requiring emergency medical treatment.  (*Id.* at 117-18.)   In rare cases, persons exposed to pepper spray have died of heart attack or heart failure, or severe heart or respiratory failure.  (*Id.* at 124, 133.)   Individuals with asthma are particularly vulnerable; a capsaicin exposure is more likely to cause an individual with asthma to not be able to breathe, which could trigger other serious medical complications.  (*Id.* at 123.)

*Ramey's Pre-Arrest Obstruction*

On February 11, 2022, prior to Ramey's arrest in connection with these offenses, Special Agent Ryan Nougaret, the FBI case agent, attempted to speak with Ramey's fiancée in order to obtain a third-party identification of Ramey.   After Ramey's fiancée refused to speak with Agent Nougaret, he left her his FBI business card.   The next day, Agent Nougaret received a phone call from a Mr. Richard Barner, an attorney purporting to represent Ramey.

In early April of 2022, Agent Nougaret called Ramey's workplace to verify Ramey's employment.   Agent Nougaret, without identifying himself, inquired of the person who answered the phone whether Ramey still worked there.   That person put Agent Nougaret on hold and, after being on hold for a minute or two, Agent Nougaret hung up the phone.   Agent Nougaret did not speak further with anyone at Ramey's place of employment.

A few days later, on April 8, 2022, Agent Nougaret received a phone call on his work cell phone from a "voice-over internet protocol" ("VOIP") phone number.[14]   The caller asked, "Is this Ryan 'noo-garrett'?" mispronouncing Agent Nougaret's last name.   The caller then recited Agent Nougaret's current home address.   Agent Nougaret had recently reviewed a video in which Ramey speaks at length, and immediately recognized the caller's voice as that of Barry Ramey. Shortly after the call, Agent Nougaret received a text message on his work cell phone from the same VOIP number containing a string of digits.   Agent Nougaret replied, "????" and the VOIP number texted back, "check that VIN number. ;)"

---

[14]    A VOIP number can be used similar to a burner phone because it makes the caller more difficult to identify and/or trace.



*Sentencing Exhibit 6 – Screenshot of texts between Ramey's VOIP number and Agent Nougaret*

The VIN number was associated with a vehicle that Agent Nougaret used to own.   When FBI

agents executed the warrant for Ramey's arrest on April 20, 2022, Ramey spontaneously said,

"This is about the call, isn't it?" followed by, "Are you Ryan 'noo-garrett'?" using the same

mispronunciation that the VOIP caller used.

## III.    THE CHARGES AND CONVICTIONS

On May 25, 2022, a federal grand jury returned an indictment charging Ramey with seven

counts:    18  U.S.C. §  231(a)(3)  (civil  disorder);  18  U.S.C. §  111(a)(1)  and  (b)  (assaulting,

resisting, or impeding certain officers using a dangerous weapon); 18 U.S.C. § 1752(a)(1) and

(b)(1)(A) (entering or remaining in a restricted building or grounds with a deadly or dangerous

weapon); 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (disorderly and disruptive conduct in a restricted

building or grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon); and 40 U.S.C. § 5104(e)(2)(F) (act of physical violence in the Capitol grounds or buildings).   On, March 3, 2023, the Court sitting as fact-finder, returned verdicts of guilty on all seven counts.   The Court did not find beyond a reasonable doubt that the defendant used or carried a deadly or dangerous weapon, and therefore did not convict the defendant of enhanced felonies under 18 U.S.C. § 111(b) (Counts 2 and 3) and 18 U.S.C. § 1752(b)(1)(A) (Counts 4, 5, and 6).

## IV.   STATUTORY PENALTIES

Ramey now faces sentencing on seven counts:   18 U.S.C. § 231(a)(3) (civil disorder); 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers); 18 U.S.C. § 1752(a)(1) (entering or remaining in a restricted building or grounds); 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds); 18 U.S.C. § 1752(a)(4) (engaging in physical violence in a restricted building or grounds); and 40 U.S.C. § 5104(e)(2)(F) (act of physical violence in the Capitol grounds or buildings).

As noted by the Presentence Report issued by the U.S. Probation Office, Ramey faces the following statutory penalties:

| Count 1 | Class D felony | <ul><li>Five-year maximum term of imprisonment</li><li>Term of supervised release not to exceed three years</li><li>Not less than one nor more than five years' probation</li><li>$250,000 maximum fine</li><li>Mandatory $100 special assessment</li></ul> |
|---|---|---|
| Counts 2 and 3 | Class C felonies | <ul><li>Eight-year maximum term of imprisonment</li><li>Term of supervised release not to exceed three years</li><li>Not less than one nor more than five years' probation</li></ul> |

| | | |
|---|---|---|
| | | • $250,000 maximum fine<br>• Mandatory $100 special assessment per count |
| Counts 4, 5, and 6 | Class A misdemeanors | • One-year maximum term of imprisonment<br>• Term of supervised release not to exceed one year<br>• Up to five years' probation<br>• $100,000 maximum fine<br>• Mandatory $25 special assessment per count |
| Count 7 | Class B misdemeanor | • Six-month maximum term of imprisonment<br>• Supervised release not applicable (petty offense)<br>• Up to five years' probation<br>• $5,000 maximum fine<br>• Mandatory $10 special assessment |

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).

The final PSR incorporates facts regarding Ramey's connection to the Proud Boys and his pre-arrest intimidation attempts added at the request of the government.   (ECF No. 57, ¶¶ 20a-e.) The government requests that these facts be adopted by the Court in its findings of fact at sentencing.

As to the Guidelines, the government objects to the PSR's grouping analysis and requests the application of an enhancement under U.S.S.G. §2A2.2(b)(2)(B) not applied by the PSR. U.S.S.G. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. §1B1.1(a)(4), the applicable Guidelines analysis as set out

in U.S.S.G. §1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count."   Only after the Guidelines analysis as set out in U.S.S.G. §1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.   The PSR does not follow these steps.   It performs a grouping analysis first (*see* PSR ¶ 36-39) and does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. §1B1.1(a)(4).

The government submits the correct Guidelines analysis is as follows:

**Count One: 18 U.S.C. § 231(a)(3)—obstructing police during a civil disorder (against USCP Officers defending Northwest Stairs)**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."   U.S.S.G. §2X5.1.   Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 14 | Pursuant to U.S.S.G. §2A2.4, the Base Offense Level is 10. But Section 2A2.4(c) directs that Section 2A2.2 applies "if the conduct constituted aggravated assault." |
| --- | --- | --- |
| | | "Aggravated assault," under n.1 to §2A2.2 "means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury with that weapon . . . or (D) an intent to commit another felony." |
| | | Ramey used pepper spray to assault police officers at the base of the Northwest Stairs. The spray used by Ramey constitutes a dangerous weapon and he used it in a manner intended to cause bodily injury. In addition, Ramey's felonious assault was not committed as an end in itself, but rather with the intent to commit a felony beyond the assault itself, in this case, Civil Disorder in violation of § 231. |
| | | For both of these reasons, Ramey committed an "aggravated assault" and U.S.S.G. §2A2.2(a) applies. |
| Specific Offense Characteristic | +4 | U.S.S.G. §2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used" |
| | | Though the Court did not find beyond a reasonable doubt that the defendant used or carried a deadly or dangerous weapon, and therefore did not convict the defendant of enhanced felonies under 18 U.S.C. § |

| | | |
|---|---|---|
| | | 111(b) (Counts 2 and 3) and 18 U.S.C. § 1752(b)(1)(A) (Counts 4, 5, and 6), that finding was based on the standard of beyond a reasonable doubt.   At sentencing, the standard is preponderance of the evidence, and the Court may consider acquitted conduct.  *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008).  Here, the pepper spray, as it was used by Ramey to assault Officers Riggleman and Williams, constituted a dangerous weapon by a preponderance of the evidence, for the reasons explained below. |
| Adjustment | +6 | U.S.S.G. §3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." <br><br> Alternatively, this adjustment applies via U.S.S.G. §3A1.2(c)(1): "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense." <br><br> The officers identified above were all officers of the United States Capitol Police, wearing full USCP uniforms. The evidence at trial showed this, and that they were guarding a critical access point to the Capitol. It was clear that they were government officers. |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded or intended to obstruct or impede the administration of justice with respect to the investigation…" and the obstructive conduct related to the defendant's offenses of conviction. <br><br> As discussed above, Ramey attempted to intimidate the FBI case agent investigating him for his conduct on January 6. |
| Total | 26 | |

*Enhancement Under U.S.S.G. §2A2.2(b)(2)(B) For Use of a Dangerous Weapon*

Ramey used pepper spray, which is a dangerous weapon, to assault Officers Riggleman and Williams.   "Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily

injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).  U.S.S.G. §1B1.1 cmt. n. (E).  As is demonstrated by the discussion above (*see supra* pp. 13-17) pepper spray as used by Ramey is a deadly or dangerous weapon because it is capable of causing serious bodily injury including corneal abrasions, an inability to breathe, rapid changes in blood pressure which may lead to loss of consciousness or heart failure, or death.  Exposure also causes immediate and extreme physical pain.

To be sure, a variety of circumstances may contribute to the relative dangerousness of pepper spray, including the type of spray, the delivery mechanism, the concentration, the complex health makeup of the person sprayed.   That said, exposure to capsicum, regardless of the particular circumstances of the exposure, is capable of causing multiple forms of serious bodily injury.   It can cause protracted impairment to organs: abrasions to the eyes which may become permanent, asthma, RADS, and, in rare cases, severe heart or respiratory failure.

It is also capable of causing extreme physical pain.   As described above, pain reactions to pepper spray described by officers include "10 out of 10" on the pain scale, hot metal being poked into one's eye socket, police officers in a fetal position, screaming.  *See United States v. Villalobos-Macias*, No. 22-2163, 2023 WL 2889481, at *3 (10th Cir. Apr. 11, 2023) ("The district court found that J.K.'s description of his pain as an 8 or 8.5 on a scale of 1 to 10 qualifies as extreme physical pain. . . . [That] is enough").   Many of these reactions occurred in the controlled environment of a training exercise, where the exposure is followed by immediate decontamination, in contrast to circumstances faced by officers battling rioters on January 6.

Finally, as also described above, pepper spray is capable of causing injuries requiring various forms of medical intervention.   This includes emergency room visits, breathing medication, steroid eye drops, and pain medication.

Unlike the testimony provided at trial regarding hydraulic needling, these reactions resulting from exposure to pepper spray—the pain, the protracted impairment, and the injuries requiring medical intervention—do not occur only when a person is sprayed from less than three feet away.   These are reactions that can occur upon exposure to capsaicin, as the training officer and toxicology expert testified in *United States v. Worrell*.   In that case, Judge Lamberth concluded, beyond a reasonable doubt, that the defendant's pepper gel was a deadly and dangerous weapon because "the evidence at trial show[ed] that being sprayed with the pepper gel in the manner that Mr. Worrell used the weapon is capable of causing extreme physical pain and protracted impairment of the eyes including corneal damage, and sometimes requires medical intervention."   Notes for Oral Ruling, *United States v. Worrell,* 21-cr-292 (RCL), ECF No. 245 at 8 (D.D.C. May 12, 2023).

The *Worrell* trial included no testimony from victims.   Rather, a U.S. Capitol Police training officer and a toxicologist testified, as did several officers, who recounted what they had observed during their experience with OC spray in training and with unknown chemical irritants on January 6.   Worrell appears to have more than 10 feet away from the police at whom he was spraying when he deployed his weapon, as seen in the image below (from Worrell Trial Ex. 166):



Worrell's case involved pepper gel, rather than pepper spray.   The toxicologist in *Worrell* noted that "the amount of pepper spray a person might come into contact with from an aerosol is potentially less because it's not a concentrated form," compared with a gel, and that "gel is much more difficult to get off" the body.   4/28/23 Trial Tr. at 122.   But none of the physiological effects she described were specific to gel.   *See, e.g.,* 4/28/23 Trial Tr. at 111 (describing effects "when they are struck with something like pepper spray or pepper gel"), 122.   Moreover, the testimony provided by officers in the *Worrell* trial, including the training officer's testimony, was based on their experience with pepper spray, rather than gel.   The potential for extreme physical pain, protracted impairment, and medical interventions established in *Worrell* trial apply equally to Ramey's use of pepper spray here.

Further, in the manner that Ramey used pepper spray—that is, by spraying and hitting Officers Riggleman and Williams directly in the face—Ramey *actually did* cause several serious effects.   Officer Williams experienced corneal abrasions resulting in permanent eye damage, which is protracted impairment of a bodily organ or function.   *See United States v. Frazier*, 769

F. App'x 268, 271 (6th Cir. 2019) (affirming on sufficiency review that "the weeklong loss of vision in his swollen right eye amounted to a protracted 'impairment' ").   He also experienced extreme physical pain: so extreme that he, despite being an officer with prior exposure to spray, an officer dedicated to staying in the fight for the Capitol, "collapsed" because his face was burning.

The spray was also dangerous in the manner it was used because Ramey used it on officers in the midst of a struggle against a violent mob that vastly outnumbered them.   A weapon used to blind an officer while he is under attack from all sides is capable of causing a serious bodily injury: creating an obvious risk that the officer will be disarmed, hit by a flying object, pulled into the crowd, or otherwise left defenseless against attackers.   In other words: used in the way, spray was capable of causing a substantial risk of death, protracted impairment, or extreme physical pain. Like an attacker who holds a pillow over a victim's head while the victim is assaulted, Ramey's spray was capable of making officers just as vulnerable to attack.   Officer Williams described just these fears.   The Court should impose the dangerous weapon enhancement here.

**Counts Two and Three: 18 U.S.C. § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (Count Two: Officer Riggleman) (Count Three: Officer Williams).**

| Base Offense Level: | 14 | Pursuant to U.S.S.G. § 2A2.4, the Base Offense Level is 10. But § 2A2.4(c) directs that a cross-reference to § 2A2.2 applies "if the conduct constituted aggravated assault."   *See* Discussion from Count One, above. |
|---|---|---|
| | | Therefore, U.S.S.G. § 2A2.2(a) applies, and the Base Offense Level is 14. |
| Specific Offense Characteristic | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used" |
| | | *See* Discussion from Count One, above. |
| | | Here, the pepper spray, as it was used by Ramey to assault Officers Riggleman and Williams, constituted a dangerous weapon by a preponderance of the evidence. |

| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.2(b)(3)(A): "the victim sustained bodily injury"<br><br>"Bodily injury" means "any significant injury; *e.g.* an injury that is painful and obvious, or is of a type for which medical attention would ordinarily be sought." U.S.S.G. §1B1.1, cmt. n. 1(B)<br><br>Both officers experienced immediate and severe pain and vision impairment as a result of being sprayed in the face by Ramey.   Officer Riggleman was immediately unable to see and required assistance to reach a bathroom.   He initiated first aid (decontamination) by splashing water in his face, consistent with his training.   Officer Williams experienced a feeling like his face was "on fire," and was not able to decontaminate until several hours later due to the ongoing civil disorder.   Officer Williams experienced impaired, blurry vision for the rest of the day and reported ongoing vision impairment that he did not have prior to January 6, 2021. |
| --- | --- | --- |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>*See* scission from Count One, above. |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded or intended to obstruct or impede the administration of justice with respect to the investigation…" and the obstructive conduct related to the defendant's offenses of conviction.<br><br>*See* Discussion from Count One, above. |
| Total | 29 | |

**Count Four: 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted building or grounds**

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): "the trespass occurred at any restricted building or grounds." <br><br> On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). The Lower West Terrace tunnel was part of the restricted grounds of the Capitol. |
| Cross-reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Offense Level (from Count One) | 26 | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> Ramey entered and remained in the restricted area of the U.S. Capitol grounds for the purpose of obstructing or interfering with law enforcement officers in the Lower West Terrace tunnel who were engaged in the lawful performance of official duties during a civil disorder, in violation of 18 U.S.C. § 231, as charged in Count One. |
| Total | 26 | |

**Count Five: 18 U.S.C. § 1752(a)(2)—disorderly and disruptive conduct in a restricted area**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Special Offense Characteristic | +3 | §2A2.4(b)(1), "the offense involved physical contact, or a dangerous weapon (including a firearm) was possessed and its use was threatened." <br><br> Here, the offense involved both a dangerous weapon (the pepper spray) and physical contact (hitting the officers with pepper spray). |
| Cross Reference | applied | U.S.S.G. §2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." |

| Offense Level (adjusted) | OL 29 (from Count Two) | See discussion above from Count Two. |
|---|---|---|
| Total | 29 | |

**Count Six: 18 U.S.C. § 1752(a)(4)—engaging in physical violence in a restricted building or grounds**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Special Offense Characteristic | +3 | §2A2.4(b)(1), "the offense involved physical contact, or a dangerous weapon (including a firearm) was possessed and its use was threatened." <br><br> Here, the offense involved both a dangerous weapon (the pepper spray) and physical contact (hitting the officers with pepper spray). |
| Cross Reference | applied | U.S.S.G. §2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." |
| Offense Level (adjusted) | OL 29 (from Count Two) | See discussion above from Count Two. |
| Total | 29 | |

**Count Seven: 40 U.S.C. § 5104(e)(2)(F)—Act of Physical Violence in a Capitol Building or Grounds.**

| Base Offense Level: | n/a | Because this offense is a Class B misdemeanor, the Guidelines do not apply to it.  *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |
|---|---|---|

**Grouping Analysis**

The government submits the five relevant counts of conviction should be placed into Two groups. Group One consists of Counts One, Two, and Four through Six.  Though these counts involve different victims—that is, USCP officers generally guarding the base of the Northwest Stairs (Counts One and Six), USCP Officer David Riggleman specifically (Count Two) and Congress (Counts Four and Five)—these counts group because they embody conduct  (using a dangerous weapon to assault an officer) that is treated as a specific offense characteristic to Count

Two (i.e., the +4 enhancement for use of a dangerous weapon).  The highest offense level for Group One is 29.

Group Two consists of Count Three.  Note that while the other counts also embody conduct that is treated as a specific offense characteristic to Count Three, the commentary to § 3D1.2 notes that where several counts could be treated as an aggravating factor to another count, only one is grouped and the other is treated separately. See U.S.S.G. § 3D1.2, cmt. n. 5. The highest offense level for Group Two is 29.

One Unit is counted for Group One, and an additional unit is counted for Group Two and because it is equally serious.  Two total units results in an additional two levels, resulting in a Combined Offense Level of 31.

The U.S. Probation Office calculated Ramey's criminal history as category I, which is not disputed.  (PSR ¶ 71.)  Accordingly, based on the government's calculation of the Combined offense level of 31, Ramey's Guidelines imprisonment range is 108 to 135 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As described in Section II(B) of this memorandum, Ramey's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Ramey played a pivotal role in advancing the riot.   At the base of the Northwest stairs, he and fellow Proud Boys attacked police and broke their line, making it possible for rioters to get under the scaffolding, and from there, to directly access the interior of

the Capitol building.   The nature and circumstances of Ramey's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 108 months.

### B.   The History and Characteristics of the Defendant

Ramey is a member of an organized, violent extremist group that committed violence on January 6, 2021, and poses an ongoing threat to public safety.   Further, while Ramey does not have any scorable criminal history, Ramey has a significant history of harassment, intimidation, threats, and violence which weighs in favor of a lengthy period of incarceration.   The government described this history in detail in its filings opposing Ramey's motion to revoke the detention order (*see* ECF Nos. 17, 19, and 20) and incorporates that discussion here by reference.   This Court denied Ramey's motion, finding by clear and convincing evidence that Ramey posed a "threat to public safety," in large part due to his history of harassing and threatening conduct.   (*See* Det. Tr., August 16, 2022, at 8-12.)   Ramey's pattern of intimidation and retaliation against those who cross him culminated in his efforts to obstruct this investigation by intimidating the FBI case agent. As was the case when this Court denied Ramey's motion to revoke detention, Ramey remains a threat to public safety.   His history, including his offense conduct, demonstrates a lack of respect for law enforcement and a propensity towards violence that is deeply concerning.   The defendant's history and characteristics weigh heavily in favor of a lengthy term of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Ramey's criminal conduct on January 6—attacking law enforcement officers guarding the United States Capitol building—was the epitome of disrespect for the law.

**D.       The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[15]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   First, although Ramey has a criminal history category of I, his history shows a clear pattern of threatening and violent behavior, as well as disrespect for the law.   *See* Section VI(B) *supra.*   Second, Ramey has expressed no remorse or contrition whatsoever for the harm he caused the officers, or acknowledged his role in advancing the riot.   While the government's anticipates Ramey's expressions of remorse at sentencing, his conduct on January 6, 2021, was that of a person who had no sense of right and wrong.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   This defendant's sentence must be sufficient to

---

[15]      *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

provide specific deterrence from committing future crimes of violence, particularly in light of his history of threats and violence and his utter lack of remorse.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord*

United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id.* at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

---

[16]     If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.   *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).   *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[17]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Julian Khater*, 21-cr-222 (RJL), the defendant pled guilty to two counts of violating 18 U.S.C. § 111(a)(1) and (b).   On January 6, 2021, Khater bypassed multiple fences, area closed signs law enforcement, and ignored crowd control devices as he made his way to the Lower West Terrace.   Gov. Sentencing Memo., *United States v. Julian Khater*, 21-cr-222 (RJL)*,* ECF 97 at 9-17.   Once there, he sprayed three officers with chemical spray.   *Id.*   These three officers had strong, visible reactions to Khater's attack and were forced to fall back from the police line.   *Id.*   Khater's attack, in addition to the surging mob, caused the police line to break.   *Id.* Khater's Guidelines range, including a downward adjustment for acceptance of responsibility, was 78 to 97 months.   *Id., ECF 107.*   The court agreed with the parties that the pepper spray used by

---

[17]    A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Khater was a dangerous weapon, and sentenced Khater to 80 months' incarceration.   *Id.*, ECF at 102.

In *United States v. James McGrew*, 21-cr-398 (BAH), the defendant pled guilty to one charge of violating 18 U.S.C. § 111(a)(1).   On January 6, 2021, McGrew bypassed multiple fences, area closed signs law enforcement, and ignored crowd control devices as he made his way to the Lower West Terrace.   Gov. Sentencing Memo., *United States v. James McGrew*, 21-cr-398 (BAH)*, ECF 84 at 2-3.   McGrew made his way through the mob and into the Capitol through the Upper West Terrace door.   *Id.*   While inside he struck a number of officers, grabbed their batons, and defied orders from law enforcement.

Like Khater and McGrew, Ramey passed by police barricades, area closed signs, persisted through tear gas, and made his way to the Lower West Terrace.   Ramey also attacked not one, but multiple officers using pepper spray that had strong, visible reactions, forcing the officers to fall from their police line.   Ramey and Khater's actions contributed in large part to the collapse of two police lines.   However, Khater accepted responsibility and pleaded guilty.   And, after January 6, 2021, Ramey continued his intimidation of law enforcement when he attempted to intimidate the case agent in this investigation.   Consequently, Ramey does not benefit from a downward adjustment for acceptance of responsibility and is subject to an upward adjustment for obstruction of justice, resulting in a meaningfully higher Guidelines range than in *Khater*. Further, Ramey faces conviction on five more charges than Khater, including one additional felony.   Ramey's aggravating circumstances set him apart from other January 6 defendants facing sentencing on similar charges.   A sentence of 108 months' incarceration is warranted.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes apply here. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to only certain offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), such as a "crime of violence,"   § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily

injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under

both the statutes, the government bears the burden by a preponderance of the evidence to establish

the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C.

Cir. 2019).

 In deciding whether to impose restitution under the VWPA, the sentencing court must

take account of the victim's losses, the defendant's financial resources, and "such other factors

as the court deems appropriate."   *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C.

2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of

full restitution without respect to a defendant's ability to pay.[18]

Because this case involves the related criminal conduct of hundreds of defendants, the

Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of

restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution

imposed under § 3663, "the court shall order restitution to each victim in the full amount of each

victim's losses as determined by the court and without consideration of the economic circumstances

of the defendant"); or (2) apportion restitution and hold the defendant and other defendants

responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C.

§ 3664(h).   That latter approach is appropriate here.

More specifically, the Court should require Ramey to pay $2,000 in restitution for his

convictions.   This amount fairly reflects Ramey' role in the offense and the damages resulting

from his conduct.   Moreover, in cases where the parties have entered into a guilty plea agreement,

two thousand dollars has consistently been the agreed upon amount of restitution and the amount

---

[18]      Both statutes permit the sentencing court to decline to impose restitution where doing so
will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii),
3663A(c)(3)(B).

of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Ramey's convictions under Sections 111 and 231 subject him to a statutory maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public."   *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case.   As the PSR notes, Ramey has raised over $20,000 in an online campaign.   PSR ¶ 98.   The website indicates the funds are to be used for attorney fees and prison commissary.   *Id.*   Ramey should not be able to "capitalize" on his participation in the Capitol breach in this way.

## IX.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 108 months' imprisonment, three years' supervised release, $2,000 in restitution, and the mandatory assessment for each count of conviction totaling $385.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:   _____
Kathryn E. Fifield
Brian D. Brady
Trial Attorneys
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
601 D St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048